UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, DEERBROOK INSURANCE COMPANY, ALLSTATE NEW JERSEY INSURANCE COMPANY AND ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,

                              Plaintiffs,

                    -against-

MARK MIRVIS, MARK LUPOLOVER, MICHAEL BEZENYAN, RUVEN KATZ, IGOR ZHURAVSKY, GEORGY STATNROSH a/k/a GARY STATNIGROSH a/k/a GEORGY STATNIGROSH, OCEAN L. MANAGEMENT GROUP INC., FLATLANDS BEST MANAGEMENT GROUP, INC., HILLMED MANAGEMENT, INC. f/k/a 97-12 ASSOCIATES, INC., B-WAY MANAGEMENT, INC., FLAT-80 MANAGEMENT, INC., NORTMED MANAGEMENT, INC., L&B MEDICAL, P.C., LAMED MEDICAL, P.C., 825 BROADWAY MEDICAL CARE, P.C., DOVER MEDICAL, P.C., FLATLANDS 78 MEDICAL, P.C., GENERAL MEDICAL CARE, P.C., S&L MEDICAL, P.C., ZDR MEDICAL, P.C., DEL PRADO ONE, LLC, DEL PRADO TWO, LLC, DEL PRADO THREE, LLC, DEL PRADO FOUR, LLC, EL DORADO ONE, LLC, M&M OCEANFRONT, LLC, NE 10, LLC, NE 24, LLC, TROPICANA ONE, LLC, YAKOV RAUFOV, M.D., DALE ALEXANDER a/k/a ALEXANDER DALE, M.D., SOFIA BENTSIANOV, M.D., EMMA BENJAMIN, M.D., AUDREY IVANUSHKIN a/k/a ANDREW IVANSON, M.D., LEV BENTSIANOV, M.D., LEONID SLUTSKY, GARY TSIRELMAN, IRENA SHPERLING, M.D., LYUBOV MOYSIK, M.D., YEFIM SOSONKIN, GRIGORY SHTENDER, M.D., ALEXANDER ISRAELI, M.D., MIKHAIL MIRER, M.D., ZHANNA ROIT, M.D., RENAT SUKHOV, M.D., HUIKANG DANIEL LAI, M.D., JEAN FRANCOIS, M.D., JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20, AND XYZ CORPORATIONS 1 THROUGH 20,

                              Defendants.

---------------------------------------------------------------

08 4405

2008 CV
_____

COMPLAINT

(TRIAL BY JURY DEMANDED)

TOWNES, J.

POHORELSKY, M.J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   OCT 30 2008   ★

BROOKLYN OFFICE

Allstate Insurance Company, Allstate Indemnity Company, Deerbrook Insurance Company, Allstate New Jersey Insurance Company and Allstate Property & Casualty Insurance Company ("Allstate"), by their attorneys Stern & Montana, LLP, for their Complaint against Mark Mirvis, Mark Lupolover, Michael Bezenyan, Ruven Katz, Igor Zhuravsky, Georgy Statnrosh a/k/a Gary Statnigrosh A/K/A Georgy Statnigrosh,   Ocean L. Management Group Inc., Flatlands Best Management Group, Inc., Hillmed Management, Inc. f/k/a 97-12 Associates, Inc., B-Way Management, Inc., Flat-80 Management, Inc., Nortmed Management, Inc., L&B Medical, P.C., Lamed Medical, P.C., 825 Broadway Medical Care, P.C., Dover Medical, P.C., Flatlands 78 Medical, P.C., General Medical Care, P.C., S&L Medical, P.C., ZDR Medical, P.C., Del Prado One, LLC, Del Prado Two, LLC, Del Prado Three, LLC, Del Prado Four, LLC, El Dorado One, LLC, M&M Oceanfront, LLC, NE 10, LLC, NE 24, LLC, Tropicana One, LLC, Yakov Raufov, M.D., Dale Alexander a/k/a Alexander Dale, M.D., Sofia Bentsianov, M.D., Emma Benjamin, M.D., Audrey Ivanushkin a/k/a Andrew Ivanson, M.D., Lev Bentsianov, M.D., Leonid Slutsky, Gary Tsirelman, Irena Shperling, M.D., Lyubov Moysik, M.D., Yefim Sosonkin, Grigory Shtender, M.D., Alexander Israeli, M.D., Mikhail Mirer, M.D., Zhanna Roit, M.D., Renat Sukhov, M.D., Huikang Daniel Lai, M.D., Jean Francois, M.D., John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 (collectively referred to as the "Defendants"), allege, on information and belief, as follows:

## PRELIMINARY STATEMENT

1.     On information and belief, from 1995 through the date of the filing of this Complaint, Defendants Mark Mirvis ("Mirvis"), Mark Lupolover ("Lupolover"), Michael Bezenyan ("Bezenyan"), Ruven Katz ("Katz"), Igor Zhuravsky ("Zhuravsky") and Georgy Statnrosh a/k/a Gary Statnigrosh a/k/a Georgy Stanigrosh ("Statnrosh), (individually referred to

by name and collectively referred to as the "Principals") presided over an organization that systematically stole tens of millions of dollars from automobile insurance companies, including Allstate -- activity that continues unabated to this day -- through New York State's No-fault system.

2.     The Principals, each laypeople who are not licensed to practice any healthcare profession in the State of New York committed theft through various criminal means, including the creation of illegally owned, fraudulently incorporated and improperly licensed professional corporations ("PCs") that were used to fraudulently bill insurance companies in general, and Allstate, in particular.

3.     Through its criminal organization and structure of sham professional corporations, dummy management companies and the enlistment of an expansive support staff utilizing sophisticated computer systems, the Principals, along with the other Defendants, used the No-fault system to steal, and launder, tens of millions of dollars through various entities they controlled, managed and operated.

4.     The Principals implemented their massive scheme to defraud through the use of complicit doctors and other licensed professionals, who in exchange for ostensibly being paid to provide medical services, allowed their names, signatures and licenses to be used to fraudulently bill insurance companies for services that were either never rendered, of no diagnostic value or resulted in an egregious and intentional pattern of billing for services that were medically unnecessary.

5.     The Defendant licensed professionals who sold their names and/or licenses for use by the Principals include, but are not limited to Yakov Raufov, M.D. ("Raufov"), Dale Alexander a/k/a Alexander Dale ("Alexander"), M.D., Sofia Bentsianov, M.D. ("Sofia

Bentsianov"), Emma Benjamin, M.D. ("Benjamin"), Audrey Ivanushkin a/k/a Andrew Ivanson, M.D. ("Ivanushkin"), Lev Bentsianov, M.D. ("Lev Bentisianov"), Gary Tsirelman ("Tsirelman"), Leonid Slutsky, Irena Shperling, M.D. ("Shperling"), Lyubov Moysik, M.D. ("Moysik"), Zhanna Roit, M.D. ("Roit"), Yefim Sosonkin, M.D. ("Sosonkin"), Grigory Shtender, M.D. ("Shtender"), Alexander Israeli, M.D. ("Israeli"), Mikhail Mirer, M.D. ("Mirer"), Renat Sukhov, M.D. ("Sukhov"), Daniel Huikang Lai, M.D. ("Lai") and Jean Francois, M.D. ("Francois") (Rafov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Shperling, Tsirelman, Moysik and Roit are collectively referred to as the "Paper Owners") (Sosonkin, Shtender, Israeli, Mirer, Sukhov, Lai and Francois are collectively referred to as the "Non-Paper Owners"). The Paper Owners and Non-Paper Owners are collectively referred to as the "Defendant Doctors."

6.     In furtherance of the scheme to defraud alleged herein, the Defendant Paper Owners sold the use of their names and licenses to the Principals and in doing so permitted the Principals, who are lay people, to own, control and operate that in which they are prohibited by law from maintaining a financial interest, *to wit*: professional corporations that must be owned exclusively by a licensed professional or like professionals acting within the scope of the professional corporation's authorized practice.  In so doing, the Principals and Paper Owners severely compromised the safety and integrity of the healthcare delivery system in New York State.

7.     In furtherance of the scheme to defraud alleged herein, each of the Defendant Doctors illegally sold their professional names and licenses for a fee and/or other compensation arrangement, including being paid for services that were never rendered and/or were of no diagnostic or treatment value.

8.     On information and belief, unlike the other Defendant Doctors whose only interest in the Defendant PCs existed on paper, Defendant Slutsky maintained a financial and/or investment interest in a number of the Defendant PCs, including but not limited to S&L Medical, P.C., Lamed Medical, P.C., L&B Medical, P.C., General Medical Care, P.C. and Flatlands 78 Medical, P.C.  On information and belief, Defendant Slutsky, along with the Principals, was one of the true beneficial owners of those professional corporations in violation of New York State Law.

9.     On information and belief, in violation of the New York Business Corporation Law ("BCL") and Education Law, at the time of their respective incorporation or transfer of ownership, the Defendant Paper Owners were immediately divested of any interest and responsibility in the operation of the Defendant professional corporations and maintained no control over how they were managed.

10.     On information and belief, in furtherance of the scheme to defraud, each of the Defendant Doctors knowingly allowed fictitious bills to be submitted under their names in association with one or more of the Defendant Professional Corporations named herein, including L&B Medical, P.C. ("L&B Medical"), Lamed Medical, P.C. ("Lamed Medical"), 825 Broadway Medical Care, P.C. ("825 Broadway Medical"), Dover Medical, P.C. ("Dover Medical"), Flatlands 78 Medical, P.C. ("Flatlands 78 Medical"), General Medical Care, P.C. ("General Medical"), ZDR Medical, P.C., ("ZDR Medical") and S&L Medical, P.C. ("S&L Medical"). Said providers are collectively referred to herein as the "Defendant PCs."

11.     In State Farm v. Mallela, 4 N.Y.3d 313; 827 N.E.2d 758; 794 N.Y.S.2d 700 (2005), the Court of Appeals held, in part, that a fraudulently incorporated professional corporation is not entitled to recover benefits under the New York State No-fault Law and

implementing regulations and that an insurer is entitled to recover payments made to such an entity after April 4, 2002, the effective date of the amended No-fault regulations.

12.     At all relevant times mentioned herein, the Defendant PCs were fraudulently incorporated and, in furtherance of the scheme to defraud alleged herein, submitted fraudulent bills, medical records and reports to insurers, in general, and Allstate, in particular, for reimbursement of medical services that were never rendered or of no diagnostic or treatment value.

13.     The Defendant PCs are purported medical practices created in violation of Article 15 of the BCL, which governs the corporate practice of medicine in New York State and requires any corporation that provides physician medical services to do so as a professional corporation ("PC") owned and controlled exclusively by physicians.  The practice of medicine by one who is not a physician, as well as the sale of a medical license by a physician, are felonies pursuant to New York Education Law § 6512.

14.     On information and belief, in violation of Article 15 of the BCL, at the time the Defendant PCs were incorporated in the State of New York, the Paper Owners were divested of any and all attributes of ownership and control, which was then diverted by the Principals to management companies including but not limited to Defendants Ocean L. Management Group, Inc. ("Ocean L. Management"), Flatlands Best Management Group, Inc. ("Flatlands Best Management"), Hillmed Management, Inc. f/k/a 97-12 Associates, Inc. ("Hillmed Management"), B-Way Management, Inc. ("B-Way Management"), Flat-80 Management, Inc. ("Flat-80 Management"), Nortmed Management, Inc. ("Nortmed Management") and ABC Corporations 1 through 20 (collectively referred to as the "Defendant Management Companies"), in which the Principals, their co-conspirators and others unknown to

Allstate maintained a similar ownership and financial interest. The ABC Corporations are additional management companies that the Principals, their co-conspirators and others unknown to Allstate owned, controlled and operated, but are unknown to Allstate at the time of the filing of this Complaint.

15. In carrying out their fraudulent scheme, the Principals used the names of the Paper Owners to fraudulently incorporate professional service corporations in which they engaged in the unlicensed practice of medicine and held out the Defendant PCs to be legitimate professional service corporations that were properly licensed in accordance with applicable New York State and Local Law when, in fact, they were not.

16. At all relevant times mentioned herein, the Principals were the true beneficial owners of the Defendant PCs, which they owned, controlled and operated.

17. In carrying out their scheme to defraud, Defendants stole millions of dollars from the Plaintiffs by submitting fraudulent medical claims for persons who allegedly sustained injuries covered by the New York Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law"). Under that law, policyholders and others who sustain injuries in automobile accidents (the "No-fault claimants" or "claimants") can obtain payments from the policyholders' automobile insurance companies for necessary medical care, including treatments, tests and medical equipment ordered by the patients' physicians. Patients can also assign those benefits to doctors and other properly licensed healthcare providers, enabling them to bill insurance companies directly for their services. Defendants created their organization to exploit the No-fault system by obtaining such assignments, and billing insurers for fictitious or unnecessary services supplied by sham entities.

18.     To facilitate the wholesale and pervasive fraud alleged herein, the Principals created sham corporate entities intended to conceal and insulate them from their criminal activities. Such insulation started with a number of purported management companies, including but not limited to Defendants Ocean L. Management, Flatlands Best Management, Hillmed Management, B-Way Management, Flat-80 Management, Nortmed Management and others unknown to Plaintiffs, which served to further the fraudulent activities of the Defendant PCs involved and from which the illicit proceeds were siphoned to other controlled entities that served as integral parts of the scheme to defraud.

19.     On information and belief, at all relevant times mentioned herein, the Defendant Management Companies entered into management, premises and equipment lease agreements with one or more of the Defendant PCs, ostensibly in connection with providing management services to the Defendant PCs. In fact, the management agreements and lease agreements were used to funnel millions of dollars in fraudulently obtained insurance payments to the Principals, and others unknown to Allstate, through the Defendant Management Companies.

20.     At all times mentioned herein, the Defendant Management Companies, through the Defendant PCs, the Defendant PCs' office manager(s), support staff, and other co-conspirators created, generated and fabricated the billing for the Defendant PCs.

21.     At all relevant times mentioned herein, each of the Principals established and/or owned, controlled and operated jointly and/or individually, a series of foreign companies that were used to launder No-fault insurance payments made by insurance carriers, in general, and Allstate, in particular, which were obtained through the criminal enterprise alleged herein.

22.     The foreign companies, located within and without the State of New York, include Del Prado One, LLC ("Del Prado One"), Del Prado Two, LLC ("Del Prado Two"), Del Prado Three, LLC ("Del Prado Three"), Del Prado Four, LLC ("Del Prado Four"), El Dorado One, LLC ("El Dorado One"), M&M Oceanfront, LLC (M & M Oceanfront"), NE 10, LLC ("NE 10"), NE 24, LLC ("NE 24"), Tropicana One, LLC ("Tropicana One") and XYZ Corporations 1 through 20 (collectively referred to as the "Money Laundering Companies"). The XYZ Corporations are additional companies that the Principals, their co-conspirators and others unknown to Allstate owned, controlled and operated, but are unknown to Allstate at the time of the filing of this Complaint.

23.     On information and belief, the Defendant Management Companies and Money Laundering Companies are the alter egos of the Principals, which conspired with and assisted in the fraudulent and unlawful conduct alleged herein.  For all practical and legal purposes, said corporations are one and the same.

24.     On information and belief, at the end of each month, the Defendant PCs were left profitless or otherwise left with only sufficient funds to cover basic operating expenses, with virtually all the insurance proceeds diverted to the Defendant Management Companies and/or the other Defendant PCs owned and operated by the Principals for eventual disbursement to the Principals and their co-conspirators and others unknown to Allstate.

25.     The Defendant PCs were created for the singular purpose of fraudulently billing insurance companies under the No-fault Law and sweeping the illicit profits gained therefrom to the Principals, through substantial, regular payments made by Defendants PCs to the Defendant Management Companies, and other entities, which were owned and operated by the Principals and/or others unknown to Allstate.

26.    The Defendant PCs, which held themselves out as being owned, controlled and operated exclusively by properly licensed professionals, were engaged in the unlicensed practice of medicine and were in violation of the proscription against the illegal corporate practice of medicine.  In doing so, the Principals perpetrated a fraud upon the public, Allstate, and upon any other professional who relied upon their fictitious medical reports.

27.    Separate and apart from their illegal corporate structure, the Defendants presided over a massive billing fraud operation, routinely submitting bills to insurers, in general, and Allstate, in particular, for services that were never rendered, of any diagnostic or treatment value and reflected a pattern of billing for services that were medically unnecessary.

28.    In furtherance of their scheme to defraud, Defendants concocted a sophisticated fraudulent billing and medical documentation scheme that created the illusion that claimants had serious injuries and medical conditions that required, among other bogus services, extensive diagnostic testing, range of motion testing and synaptic treatment, when in fact no such injuries and/or conditions existed.

29.    In furtherance of Defendants' scheme to defraud alleged herein, a "patient's" initial consultation and follow-up visits created and maintained the illusion of serious injuries, a misrepresented fact that was used to justify further consultations, testing, treatment and referrals to ancillary providers. By the conclusion of their treatment, each "patient" would receive virtually identical examinations and referrals for expensive diagnostic tests, including but not limited to nerve conduction velocity tests ("NCV") and electromyograms ("EMG") (The foregoing diagnostic tests are generically and collectively referred to as "Electrodiagnostic Testing.")

30.   As more fully alleged in the "Electrodiagnostic Scheme to Defraud" section below, as a matter of procedure, practice and protocol, the Defendant PCs fraudulently submitted numerous bills for Electrodiagnostic Testing that was never rendered or was rendered in a manner that was of no diagnostic value.  In that regard, in numerous instances, the reported results associated with the foregoing diagnostic tests were fictitious, fraudulently altered and/or otherwise invalid for the purpose of making a legitimate diagnosis, meaning that Defendants routinely and intentionally misrepresented the findings, diagnosis and results relating thereto and submitted fabricated medical reports, findings and data to insurance companies, in general, and Allstate, in particular, to substantiate their fraudulent claims and induce payment. By way of example and not limitation, Exhibit "1," in the accompanying Compendium of Exhibits, is a spreadsheet listing a random sample of claims Allstate paid to each Defendant PC for reimbursement of Electrodiagnostic Testing that was never rendered or that contained false and material misrepresentations of diagnoses and findings that were of no diagnostic value.  In each instance, the Defendants knew or should have known that the Electrodiagnostic Testing contained material and misleading statements, was not rendered and/or was of no diagnostic value.

31.   As more fully alleged in the "Range of Motion Scheme to Defraud" section below, as a matter of practice, procedure and protocol, the Defendant PCs fraudulently submitted bills and reports for range of motion testing ("ROM Testing") that was materially misrepresented, fabricated and/or never performed or performed in a way that could not possibly produce valid data or results.  By way of example, to substantiate their fraudulent claims and induce payment, Defendants routinely and intentionally submitted reports and test results indicating that virtually all patients who underwent ROM Testing displayed an abnormality, with

approximately three quarters of patients displaying abnormalities for all ROM components, demonstrating that ROM data was contrived to deceive insurers, in general, and Allstate, in particular, concerning the alleged seriousness of the injuries of patients being treated at the Defendant PCs. By way of example and not limitation, Exhibit "2," in the accompanying Compendium of Exhibits, is a spreadsheet listing a random sample of claims Allstate paid to each Defendant PC for reimbursement of ROM Testing that was never rendered or contained false and material misrepresentations relative to the services rendered. In each instance, Defendants knew or should have known that the ROM Testing contained material and misleading statements and/or was not rendered and/or was of no diagnostic value.

32. As more fully alleged in the "Synaptic Scheme to Defraud" section below, as a matter of practice, procedure and protocol, the Defendant PCs fraudulently submitted bills for synaptic treatment that was never rendered. By way of example, to substantiate their fraudulent claims and induce payment, Defendants routinely and intentionally misrepresented the services rendered by: (1) billing synaptic treatment after May 1, 2002, on multiple days per patient under CPT Code 64550 when the definition of CPT 64550 was changed to permit this code to be used only once per patient to report the services rendered on the day that a provider demonstrated to the patient how to apply and set a TENS Unit for home use; (2) billing Allstate for synaptic treatment using CPT Codes 64550, plus 64613 and 64622, which materially misrepresented the TENS Unit as "chemodenervation of the neck muscle" and "destruction by neurolytic agent;" and (3) billing synaptic treatment under CPT Code 64999 as an unlisted procedure when in fact a specific CPT Code exists for the application of a TENS Unit. By way of example and not limitation, Exhibit "3," in the accompanying Compendium of Exhibits, is a spreadsheet listing a random sample of claims Allstate paid to each Defendant PC for

reimbursement of synaptic treatment that was never rendered or contained false and material misrepresentations relative to the services rendered. In each instance, Defendants knew or should have known that the synaptic treatment contained material and misleading statements and/or was not rendered.

33. Every aspect of Defendants' fraudulent scheme was motivated by money and greed, without regard to the grave harm inflicted on the public at large by the Defendant PCs, holding themselves out as being legitimate health care providers when, in fact, they were not.

34. The fraudulent criminal enterprise described herein drains this Country's limited health care resources, which are already under strain to meet legitimate healthcare needs. The New York State Insurance Department and insurance committees in both the New York State Senate and Assembly each estimate that No-fault insurance fraud is costing New York State consumers in excess of one billion dollars a year. These fraudulent schemes also subject legitimate patients to treatment by non-physicians, masquerading as medical doctors who are seeking to circumvent the laws enacted by the legislature of New York to protect consumers.

35. In direct contravention of the strong public policy concerns of the New York State Legislature in regulating the licensing of, and limiting the practice of medicine to, qualified professionals, Defendants have circumvented the laws of the State and imperiled the welfare of the public by engaging in the purchase and misuse of medical licenses. In so doing, Defendants have facilitated the transfer of the exclusive right to control the practice of medicine to lay people, *to wit:* the Principals.

36. These repeated violations of the laws established by the State of New York to protect the public are serious in their nature and include repeated felonies that have created

and will continue to create grave danger to the public if the Defendants' wholesale practice of buying and misusing medical licenses is not stopped. These practices were conducted willfully, with the sole object of converting money, in utter disregard of their impact on the premium-paying public.

37.     The duration, scope and nature of the Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies.  Defendants did not engage in sporadic acts of fraud -- although that would be troubling enough -- they adopted a fraudulent blueprint as their business plan, and used it to participate in a systematic pattern of racketeering activity.  Every facet of Defendants' operation, from generating fraudulent supporting medical documents to record keeping to billing, was carried out for the purpose of committing fraud.

## NATURE OF THE ACTION

38.     This action is brought pursuant to:

    i)     The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c)&(d) and 1964(c); and

    ii)     New York State common law.

## NATURE OF RELIEF SOUGHT

39.     Allstate seeks treble damages that it sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Allstate for medical services they allegedly rendered to individuals covered by Allstate under New York State's No-fault Law.

40.     Allstate further seeks a permanent injunction enjoining and restraining Defendants from:

  i)  Submitting to Allstate any bills seeking payment for any examination, testing, treatment and referral arising from services purportedly rendered by or through the Defendant PCs to covered persons as described herein; and

  ii)  Initiating against Allstate any legal proceedings, including but not limited to arbitration proceedings or lawsuits, in any forum or jurisdiction seeking payment for, or equitable relief regarding, any examinations, testing, treatments and referrals arising from services purportedly rendered by or through the Defendant PCs to covered persons as described herein.

41.     Allstate further seeks a judgment declaring that:

  i)  Allstate is under no obligation to pay any of the Defendant PCs' No-fault claims due to the Defendant PCs' illegal corporate structure and lack of standing to recover No-fault benefits;

  ii)  The assignments of benefits received by the Defendant PCs are void as a matter of law and that the Defendant PCs never had, and do not now have, standing to prosecute any claim for first-party No-fault benefits as an assignee of covered persons in any arbitration proceeding or lawsuit commenced in state or federal court;

  iii)  Allstate is under no obligation to pay any of the Defendants' No-fault claims arising from any examination, testing, treatment and referral provided to patients because of Defendants' fraudulent and deceptive scheme to induce such payments; and

  iv)  Any and all third-party claims wherein any covered person was treated at one or more of the Defendant PCs is founded on false and fraudulent medical records and any such claim is not causally related to any injuries arising out of the use and operation of a vehicle insured by Allstate, and that such injuries did not arise out of the use and operation of a vehicle insured by Allstate.

42.     As a result of Defendants' actions alleged herein, Allstate was defrauded of an amount in excess of $40,000,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Allstate for services which were never rendered or of no diagnostic value.

15

## THE PARTIES

A.    <u>Allstate</u>

43.    Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois; having its principal place of business in Northbrook, Illinois.

44.    Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois; having its principal place of business in Northbrook, Illinois.

45.    Deerbrook Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois; having its principal place of business in Northbrook, Illinois.

46.    Allstate New Jersey Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois; having its principal place of business in Northbrook, Illinois.

47.    Allstate Property & Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois; having its principal place of business in Northbrook, Illinois.

48.    Allstate Insurance Company, Allstate Indemnity Company, Deerbrook Insurance Company, Allstate New Jersey Insurance Company and Allstate Property & Casualty Insurance Company are collectively referred to as "Allstate."

49.    Allstate is duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York; and provide automobile insurance coverage to its policyholders under and in accordance with New York State Law.

**B.**     **The Defendant PCs**

       50.     S&L Medical, P.C. ("S&L Medical") was incorporated on or about January 25, 1996, and is purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located at 1724 Ocean Avenue in Brooklyn, NY. Defendants Sofia Bentsianov, M.D. and Lev Bentsianov, M.D. are the nominal Paper Owners of S&L Medical, and, on information and belief, received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them.

       51.     Lamed Medical, P.C. ("Lamed Medical") was incorporated on or about May 1, 1997, and was purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located at 7802 Flatlands Avenue, Brooklyn, New York. On information and belief, from its incorporation through August 2000, Defendant Slutsky was the listed as the owner of Lamed Medical, and, on information and belief, received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them. On information and belief, the Principals replaced Defendant Slutsky with Defendant Tsirelman as the nominal Paper Owner of Lamed Medical; thereafter, Defendant Tsirelman's interest on paper in Lamed Medical was transferred to Defendant Shperling, who replaced Tsirelman as Lamed Medical's nominal Paper Owner. On information and belief, Defendant Shperling's interest on paper in Lamed Medical was thereafter transferred to Defendant Benjamin, who replaced Shperling as the Paper Owner.

       52.     On information and belief, each of the purported transfers in ownership were subject to the approval of the Principals, with no financial consideration being given to the

doctors whose alleged interest in Lamed Medical were being transferred from one Paper Owner to the next.

      53.    On information and belief, Defendants Tsirelman, Shperling and Benjamin received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them. Based on substantial charges of medical misconduct brought by the Office of Professional Medical Conduct, by Consent Order and Agreement dated March 3, 2003, Defendant Slutsky agreed to divest himself of any and all interests he had in any entity engaged in the practice of medicine, including but not limited to Lamed Medical. Similarly, based on substantial charges of medical misconduct, by Decision and Order dated December 12, 2007, Defendant Tsirelman's licensed was revoked for using his license to engage in the fraudulent practice of medicine, false reporting, the performance of tests and treatments not warranted by the patient's condition, and engaging in conduct which evidences moral unfitness. Moreover, following her conviction for Falsifying Business Records in the First Degree, Defendant Benjamin's license was suspended from April 9, 2007 through February 10, 2008, after which she was placed on probation for a period of three years.

      54.    L&B Medical, P.C. ("L&B Medical") was incorporated on or about January 23, 1998, and is purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located at 153-25 Hillside Avenue, Jamaica, NY. Defendant Lev Bentsianov, M.D. was the nominal Paper Owner of L&B Medical, and, on information and belief, received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them.

18

55.     General Medical Care, P.C. ("General Medical") was incorporated on or about April 20, 1999, and is purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located at 825 Broadway, New York. On information and belief, at different periods in time since its incorporation, Defendants Andrey Ivanushkin, M.D. and Lyubov Moysik, M.D. were nominal Paper Owners of General Medical Care and received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them.

56.     On information and belief, Defendant Ivanushkin's interest on paper in General Medical was transferred to Defendant Moysik, who replaced Ivanushkin as General Medical's nominal Paper Owner.

57.     On information and belief, each of the purported transfers in ownership were subject to the approval of the Principals, with no financial consideration being given to the doctors whose alleged interest in General Medical were being transferred from one Paper Owner to the next.

58.     ZDR Medical, P.C. ("ZDR Medical") was incorporated on or about November 17, 2000, and was purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located at 79-08 B Northern Boulevard, Jackson Heights, New York.  Defendant Zhanna Roit, M.D. was the nominal Paper Owner of ZDR Medical and, on information and belief, received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them.  On information and belief, on or about

January 30, 2005, ownership of ZDR Medical was transferred to Defendant Lev Bentsianov, M.D.

59.     On information and belief, the purported transfer of Defendant Roit's interest in ZDR Medical to Defendant Lev Bentsianov was subject to the approval of the Principals, with no financial consideration being given to Defendant Roit, whose alleged interest in ZDR Medical was being transferred.

60.     Dover Medical, P.C. ("Dover Medical") was incorporated on or about April 26, 2000, and is purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located at 8008 Flatlands Avenue, Brooklyn, New York.   Defendant Sofia Bentsianov, M.D., was the nominal Paper Owner of Dover Medical and, on information and belief, received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them.

61.     825 Broadway Medical Care, P.C. ("825 Broadway Medical") was incorporated on or about January 17, 2003, and is purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located at 825 Broadway, Brooklyn, New York.   At different times, Defendants Yakov Raufov, M.D. and Dale Alexander, M.D. were the nominal Paper Owners of 825 Broadway Medical and, on information and belief, received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them.   On information and belief, from the date of its incorporation through on or about January 1, 2006 when he left 825 Broadway Medical, Defendant Yakov Raufov, M.D. was the nominal Paper Owner of 825 Broadway Medical.   Nearly two years later,

on or about April 10, 2008, Defendant Raufov's interest on paper in 825 Broadway Medical was transferred to Defendant Dale Alexander, M.D., who replaced Raufov as 825 Broadway Medical's nominal Paper Owner. In the interceding two-year period between the date Defendant Raufov left 825 Broadway Medical and Defendant Alexander's installment as 825 Broadway Medical's new Paper Owner, 825 Broadway Medical did not even have a medical doctor owner on paper and its existence was completely void and illegal.

     62.    On information and belief, the purported transfer of Defendant Rafov's interest in 825 Broadway Medical to Defendant Alexander was subject to the approval of the Principals, with no financial consideration being given to Defendant Rafov, whose alleged interest in 825 Broadway Medical was being transferred.

     63.    Flatlands 78 Medical, P.C. ("Flatlands 78 Medical") was incorporated on or about March 14, 2005, and is purportedly a professional corporation authorized to do business in the State of New York, with its principal place of business located 7802 Flatlands Avenue, Brooklyn, New York. Defendant Emma Benjamin, M.D., was the nominal Paper Owner of Flatlands 78 Medical, and, on information and belief, received a fee and/or other compensation for doing so from the Principals, one or more of the Defendant Management Companies, and/or other entities owned, controlled and operated by them.

     64.    On information and belief, at all times mentioned herein, the Defendant Paper Owner Doctors, in furtherance of the scheme to defraud, ceded control and ownership to the Principals and Defendant Slutsky, who were the true beneficial owners of a number of the Defendant PCs.

## C.    The Management Company Defendants

     65.    Ocean L. Management Group, Inc. ("Ocean L. Management") was incorporated on or about October 24, 1995, and is a corporation authorized to do business in the

State of New York, with its principal place of business located at 1725 Ocean Avenue, Brooklyn, New York. On information and belief, Ocean L. Management entered into a series of management agreements, lease and equipment agreements and other contracts with one or more of the Defendant PCs and/or was otherwise used to funnel money from one or more of the Defendant PCs to Ocean L. Management which, in turn, paid huge sums of cash to Defendants, including but not limited to the Principals.

66.    Flatlands Best Management Group, Inc. ("Flatlands Best Management") was incorporated on or about February 5, 1997, and is a corporation authorized to do business in the State of New York, with its principal place of business located 7804 Flatlands Avenue, Brooklyn, New York. On information and belief, Flatlands Best Management entered into a series of management agreements, lease and equipment agreements and other contracts with one or more of the Defendant PCs and/or was otherwise used to funnel money from one or more of the Defendant PCs, which, in turn, paid huge sums of cash to Defendants, including but not limited to the Principals.

67.    Hillmed Management, Inc., f/k/a 97-12 Associates, Inc., ("Hillmed Management") was incorporated on or about July 30, 1997 as 97-12 Associates, Inc. and was a corporation authorized to do business in the State of New York, and maintained its principal place of business at 153-25 Hillside Avenue, Jamaica, New York. On or about March 3, 1998, 97-12 Associates, Inc. filed a Certificate of Amendment with the New York State Department of State, changing its name from 97-12 Associates, Inc. to Hillmed Management, Inc. On or about June 22, 2006, Hillmed Management filed a certificate of dissolution with the New York Department of State. On information and belief, Hillmed Management entered into a series of management agreements, lease and equipment agreements and other contracts with one or more

of the Defendant PCs and/or was otherwise used to funnel money from one or more of the Defendant PCs, which, in turn, paid huge sums of cash to Defendants, including but not limited to the Principals.

68.     B-Way Management, Inc. ("B-Way Management") was incorporated on or about February 11, 1999, was a corporation authorized to do business in the State of New York, and maintained its principal place of business at 825 Broadway, New York, New York.   On information and belief, B-Way Management entered into a series of management agreements, lease and equipment agreements and other contracts with one or more of the Defendant PCs and/or was otherwise used to funnel money from one or more of the Defendant PCs, which, in turn, paid huge sums of cash to Defendants, including but not limited to the Principals.   On or about March 14, 2004, B-Way Management filed a Certificate of Dissolution with the New York Department of State.

69.     Flat-80 Management, Inc. ("Flat-80 Management") was incorporated on or about March 21, 2000, was a corporation authorized to do business in the State of New York, and maintained its principal place of business at 8008 Flatlands, Avenue, Brooklyn, New York.   On information and belief, Flat-80 Management entered into a series of management agreements, lease and equipment agreements and other contracts with one or more of the Defendant PCs and/or was otherwise used to funnel money from one or more of the Defendant PCs, which, in turn, paid huge sums of cash to Defendants, including but not limited to the Principals.   On or about May 19, 2004, B-Way Management filed a Certificate of Dissolution with the New York Department of State.

70.     Nortmed Management, Inc. ("Nortmed Management") was incorporated on or about August 10, 2000, and is a corporation authorized to do business in the State of New

York, with its principal place of business located at 79-09 B Northern Boulevard, Jackson Heights, New York.  On information and belief, Nortmed Management entered into a series of management agreements, lease and equipment agreements and other contracts with one or more of the Defendant PCs and/or was otherwise used to funnel money from one or more of the Defendant PCs, which, in turn, paid huge sums of cash to Defendants, including but not limited to the Principals.

71.     On information and belief, at all times mentioned herein, the Defendant Management Companies were owned, controlled and/or operated by the Principals, their co-conspirators and/or others unknown to Allstate.

**D.     The Money Laundering Company  Defendants**

72.     On information and belief, M&M Oceanfront, LLC ("M&M Oceanfront") is a foreign limited liability company organized under the laws of the State of Florida, which was incorporated on or about December 1, 2003, with offices located at 528 Burgundy, Delray Beach, Florida.  On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, M&M Oceanfront was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals. On information and belief, Defendants Mirvis, Lupolover and Zhuravsky are listed in public records as officers of M&M Oceanfront.

73.     On information and belief, Del Prado One, LLC ("Del Prado One") is a foreign limited liability company organized under the laws of the State of Florida, which was incorporated on or about November 5, 2004, with offices located at 528 Burgundy K, Delray Beach, Florida.  On information and belief, at all times relevant herein, and in furtherance of the

scheme to defraud alleged herein, Del Prado One was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals. On information and belief, Defendants Mirvis, Zhuravsky, Lupolover, Bezenyan and Katz are listed in public records as officers of Del Prado One.

74.     On information and belief, Del Prado Two, LLC ("Del Prado Two") is a foreign limited liability company organized under the laws of the State of Florida, which was incorporated on or about November 16, 2004, with offices located at 528 Burgundy K, Delray Beach, Florida. On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, Del Prado Two was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals. On information and belief, Defendant Lupolover is listed in public records as the Registered Agent of Del Prado Two and Defendants Mirvis, Zhuravsky, Lupolover, Bezenyan and Katz are listed in public records as officers of Del Prado Two.

75.     On information and belief, Del Prado Three, LLC ("Del Prado Three") is a foreign limited liability company organized under the laws of the State of Florida, which was incorporated on or about February 10, 2005, with offices located at 528 Burgundy K, Delray Beach, Florida. On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, Del Prado Three was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals. On information and belief, Defendant Mirvis is listed in public records as the Registered Agent

of Del Prado Three and Defendants Mirvis, Zhuravsky, Lupolover, Bezenyan and Katz are listed in public records as officers of Del Prado Three.

76. On information and belief, Del Prado Four, LLC ("Del Prado Four") is a foreign limited liability company organized under the laws of the State of Florida, which was incorporated on or about July 19, 2005, with offices located at 528 Burgundy K, Delray Beach, Florida. On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, Del Prado Four was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals. On information and belief, Defendant Mirvis is listed in public records as the Registered Agent of Del Prado Four and Defendants Mirvis, Zhuravsky, Lupolover and Bezenyan are listed in public records as officers of Del Prado Four.

77. On information and belief, El Dorado One, LLC ("El Dorado One") is a foreign limited liability company organized under the laws of the State of Florida, which was incorporated on or about December 10, 2004, with offices located at 528 Burgundy K, Delray Beach, Florida. On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, El Dorado One was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals. On information and belief, Defendants Mirvis, Lupolover and Katz are listed in public records as officers of El Dorado One.

78. On information and belief, Tropicana One, LLC ("Tropicana One") is a foreign limited liability company organized under the laws of the State of Florida, which was

incorporated on or about January 26, 2005, with offices located at 528 Burgundy K, Delray Beach, Florida.  On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, Tropicana One was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals. On information and belief, Defendants Mirvis, Katz and Lupolover are listed in public records as officers of Tropicana One.

79.     On information and belief, NE 10, LLC ("NE 10") is a foreign limited liability company organized under the laws of the State of Florida, which was incorporated on or about March 4, 2005, with offices located at 528 Burgundy K, Delray Beach, Florida.  On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, NE 10 was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals.  On information and belief, Defendant Mirvis is listed in public records as the Registered Agent of NE 10 and Defendants Mirvis, Zhuravsky and Lupolover are listed in public records as officers of NE 10.

80.     On information and belief, NE 24, LLC ("NE 24") is a foreign limited liability company organized under the laws of the State of Florida, which was incorporated on or about September 6, 2005, with offices located at 528 Burgundy K, Delray Beach, Florida.  On information and belief, at all times relevant herein and in furtherance of the scheme to defraud alleged herein, NE 24 was a foreign limited liability company used by Defendants to funnel money from the unlawful activities of the Defendant PCs and/or the Defendant Management Companies to Defendants, including but not limited to the Principals.  On information and belief,

Defendant Mirvis is listed in public records as the Registered Agent of NE 24 and Defendants

Mirvis, Lupolover, Zhuravsky and Bezenyan are listed in public records as officers of NE 24.

81.     On information and belief, at all times mentioned herein, the Money

Laundering Company Defendants were closely held companies owned by one or more of the

Principals that were funded through the illegal activities that form the basis of this Complaint.

On information and belief, one or more of the Money Laundering Companies maintained a New

York mailing address, *to wit*: 2753 Coney Island Avenue, Brooklyn, New York.

E.     **The Principal Defendants**

82.     Defendant Mark Mirvis ("Mirvis") is a natural person residing in the State

of New York and is one of the true beneficial owners of the Defendant PCs. He is also one of the

owners of, or otherwise maintains a financial interest in, the Defendant Management Companies,

and Defendant Money Laundering Companies.  At all times mentioned herein, Defendant Mirvis,

was one of the masterminds of Defendants' elaborate scheme to defraud and, with the other

Principals, established the Defendant PCs that fraudulently submitted bills to insurers, in general,

and Allstate, in particular; established the Defendant Management Companies to ensure that the

profits from their criminal enterprise were funneled to him and his co-conspirators; entered into

agreements on Defendants' behalf to ensure that the profits from their criminal enterprise were

funneled to him and his co-conspirators; retained counsel; and solicited healthcare professionals

to form the Defendant PCs in violation of the New York Business Corporation Law.

83.     Defendant Mark Lupolover ("Lupolover") is a natural person residing in

the State of New Jersey and is one of the true beneficial owners of the Defendant PCs.  He is also

one of the owners of, or otherwise maintains a financial interest in, the Defendant Management

Companies and the Money Laundering Companies.  At all times mentioned herein, Defendant

Lupolover was one of the masterminds of Defendants' elaborate scheme to defraud and, with the other Principals, established the Defendant PCs that fraudulently submitted bills to insurers, in general, and Allstate, in particular; established the Defendant Management Companies to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; entered into agreements on Defendants' behalf to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; retained counsel; and solicited healthcare professionals to form the Defendant PCs in violation of the New York Business Corporation Law.  In furtherance of the scheme to defraud alleged herein, Defendant Lupolover transacted business within New York State and/or contracted to provide services within New York State.

84.     Defendant Michael Bezenyan ("Bezenyan") is a natural person residing in the State of New Jersey and is one of the true beneficial owners of the Defendant PCs.  He is also one of the owners of, or otherwise maintains a financial interest in, the Defendant Management Companies and the Money Laundering Companies.  At all times mentioned herein, Defendant Bezenyan was one of the masterminds of Defendants' elaborate scheme to defraud and, with the other Principals, established the Defendant PCs that fraudulently submitted bills to insurers, in general, and Allstate, in particular; established the Defendant Management Companies to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; entered into agreements on Defendants' behalf to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; retained counsel; and solicited healthcare professionals to form the Defendant PCs in violation of the New York Business Corporation Law.  In furtherance of the scheme to defraud alleged herein, Defendant Bezenyan

transacted business within New York State and/or contracted to provide services within New York State.

85.    Defendant Ruven Katz ("Katz") is a natural person residing in the State of New York and is one of the true beneficial owners of the Defendant PCs. He is also one of the owners of, or otherwise maintains a financial interest in, the Defendant Management Companies and the Money Laundering Companies. At all times mentioned herein, Defendant Katz was one of the masterminds of Defendants' elaborate scheme to defraud and, with the other Principals, established the Defendant PCs that fraudulently submitted bills to insurers, in general, and Allstate, in particular; established the Defendant Management Companies to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; entered into agreements on Defendants' behalf to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; retained counsel; and solicited healthcare professionals to form the Defendant PCs in violation of the New York Business Corporation Law.

86.    Defendant Igor Zhuravsky ("Zhuravsky") is a natural person residing in the State of New Jersey and is one of the true beneficial owners of the Defendant PCs. He is also one of the owners of, or otherwise maintains a financial interest in, the Defendant Management Companies and the Money Laundering Companies. At all times mentioned herein, Defendant Zhuravsky was one of the masterminds of Defendants' elaborate scheme to defraud and, with the other Principals, established the Defendant PCs that fraudulently submitted bills to insurers, in general, and Allstate, in particular; established the Defendant Management Companies to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; entered into agreements on Defendants' behalf to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; retained counsel; and solicited

healthcare professionals to form the Defendant PCs in violation of the New York Business Corporation Law.  In furtherance of the scheme to defraud alleged herein, Defendant Zhuravsky transacted business within New York State and/or contracted to provide services within New York State.

87.    Defendant Georgy Statnrosh a/k/a Gary Statnigrosh ("Statnrosh") is a natural person residing in the State of New York and is one of the true beneficial owners of the Defendant PCs.  He is also one of the owners of, or otherwise maintains a financial interest in, the Defendant Management Companies and Defendant Money Laundering Companies.  At all times mentioned herein, Defendant Statnrosh was one of the masterminds of Defendants' elaborate scheme to defraud and, with the other Principals, established the Defendant PCs that fraudulently submitted bills to insurers, in general, and Allstate, in particular; established the Defendant Management Companies to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; entered into agreements on Defendants' behalf to ensure that the profits from their criminal enterprise were funneled to him and his co-conspirators; retained counsel; and solicited healthcare professionals to form the Defendant PCs in violation of the New York Business Corporation Law.

**F.     The Licensed Healthcare Professional Defendants**

88.    Defendant Sofia Bentsianov, M.D. ("Sofia Bentsianov") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 163251 issued by the New York State Education Department on or about July 22, 1985. Defendant Sofia Bentsianov is listed with the Departments of State and Education as the sole owner of Dover Medical and co-owner (with her husband Defendant Lev Bentsianov) of S&L Medical, and, on information and belief, is the owner on paper of these professional corporations.

89.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Sofia Bentsianov performed or caused to be performed Range of Motion Testing and Synaptic Treatment for one or more of the Defendant PCs, including but not limited to S&L Medical and Dover Medical that she knew or should have known was of no diagnostic value and/or was medically unnecessary.   By way of example, in Allstate claim number 4144129790-01, Defendant Sofia Bentsianov knowingly performed Range of Motion Testing and Synaptic Treatment for Dover Medical that were medically unnecessary and of no diagnostic value.   Additional examples of claims in which Defendant Sofia Bentsianov knowingly performed ROM Testing and Synaptic Treatment for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits as Exhibits "4" and "5" respectively.

90.    Defendant Lev Bentsianov, M.D. ("Lev Bentisianov") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 147176 issued by the New York State Education Department on or about July 24, 1981. Defendant Lev Bentsianov is listed as the owner of L&B Medical with the New York Departments of State and Education, and (with his wife, Defendant Sofia Bentsianov), is listed as the co-owner of S&L Medical with the New York Department of State.   On information and belief, Lev Bentsianov is the owner on paper of these professional corporations.

91.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Lev Bentsianov performed or caused to be performed ROM Testing and Synaptic Treatment for one or more of the Defendant PCs, including but not limited to Dover Medical, S&L Medical and L&B Medical that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically

unnecessary.  By way of example, in Allstate claim number 4144172394-01, Defendant Lev Bentsianov knowingly performed ROM Testing and Synaptic Treatment for L & B Medical that were medically unnecessary and of no diagnostic or treatment value.  Additional examples of claims in which Defendant Lev Bentsianov knowingly performed ROM Testing and Synaptic Treatment for a number of the Defendant PCs that were medically unnecessary and of no diagnostic or treatment value are in the accompanying Compendium of Exhibits as Exhibits "6" and "7" respectively.

92.     Defendant Yakov Raufov ("Raufov") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 221186 issued by the New York State Education Department on or about May 22, 2001.  Defendant Raufov was listed as the owner of 825 Broadway Medical on its Certificate of Incorporation, filed with the State of New York on or about January 17, 2003, and, on information and belief, was the owner on paper of this professional corporation until it was transferred on paper to Defendant Dale Alexander on or about April 10, 2008.

93.     On or about May 22, 2007, Defendant Raufov was arrested and charged by the Queens County District Attorney's Office with multiple felonies, including Grand Larceny in the Fourth Degree, a violation of N.Y. P.L. § 155.30(1), Insurance Fraud in the Third Degree, a violation of N.Y. P.L § 176.20, and Falsifying Business Records in the First Degree, a violation of N.Y. P.L. § 175.10, for allegedly submitting, to insurers, including Allstate, bogus claims for Electrodiagnostic Testing and nerve destruction procedures purportedly rendered at Defendant L&B Medical, but which were never performed.

94.     In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Raufov performed or caused to be performed

33

Electrodiagnostic Testing, ROM Testing and Synaptic Treatment for one or more of the Defendant PCs, including but not limited to S&L Medical, Lamed Medical, L&B Medical, General Medical and 825 Broadway Medical that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary. By way of example, in Allstate claim number 4815978442-01, Defendant Raufov knowingly performed Electrodiagnostic Testing for 825 Broadway Medical that was medically unnecessary and of no diagnostic value; in claim number 8140100796-05 Defendant Raufov knowingly performed ROM Testing for 825 Broadway Medical that was medically unnecessary and of no diagnostic value;  in claim number 4143918730-02 Defendant Raufov knowingly performed Synaptic Treatment for 825 Broadway Medical that was medically unnecessary and of no treatment value   Additional examples of claims in which Defendant Raufov knowingly performed Electrodiagnostic Testing, ROM Testing, and Synaptic Treatment for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits as Exhibits "8," "9" and "10" respectively.

95.     Defendant Dale Alexander, M.D. ("Alexander") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 229782 issued by the New York State Education Department on or about September 2, 2003. In or about, April 10, 2008, Defendant Raufov's interest on paper was transferred without any consideration to Defendant Alexander who is listed on the New York State Department of State website as the owner of 825 Broadway Medical.  On information and belief, he is the current owner on paper of this professional corporation.

96.     In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Alexander performed or caused to be performed

Electrodiagnostic Testing for one or more of the Defendant PCs, including but not limited to S&L Medical and L&B Medical that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary. By way of example, in Allstate claim number 1125992162-03, Defendant Alexander knowingly performed Electrodiagnostic Testing for S&L Medical that was medically unnecessary and of no diagnostic value. Additional examples of claims in which Defendant Alexander knowingly performed Electrodiagnostic Testing for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits, as Exhibit "11."

97.    Defendant Andrey Ivanushkin, M.D. a/k/a Andrew Ivanson ("Ivanushkin") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 209134 issued by the New York State Education Department on or about December 11, 1997. Defendant Ivanushkin is listed as an owner of General Medical on its Certificate of Incorporation, filed with the State of New York on or about April 20, 1999, and, on information and belief, is the owner on paper of this professional corporation.

98.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Ivanushkin, through General Medical, performed or caused to be performed Electrodiagnostic Testing that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary. By way of example, in Allstate claim number 4815609831-02, Defendant Ivanushkin knowingly performed or caused to be performed Electrodiagnostic Testing for General Medical that was medically unnecessary and of no diagnostic value. Additional examples of claims in which Defendant Ivanushkin knowingly performed or caused to be performed Electrodiagnostic Testing

for General Medical that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits, as Exhibit "12."

99.    Defendant Lyubov Moysik, M.D. ("Moysik") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 211979 issued by the New York State Education Department on or about September 1, 1998. Defendant Moysik is listed on documents filed with the New York Department of State as the owner of General Medical, and, on information and belief, is listed as the owner on paper of this professional corporation.

100.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Moysik performed or caused to be performed ROM Testing and Synaptic Treatment for one or more of the Defendant PCs, including but not limited to General Medical, that she knew or should have known would produce medically invalid test results of no diagnostic or treatment value and/or that were medically unnecessary. By way of example, in Allstate claim number 4815759289-03, Defendant Moysik knowingly performed ROM Testing and Synaptic Treatment for General Medical that was medically unnecessary and of no diagnostic or treatment value. Additional examples of claims in which Defendant Moysik knowingly performed Range of Motion Testing and Synaptic Treatment for a number of the Defendant PCs that were medically unnecessary and of no diagnostic or treatment value are in the accompanying Compendium of Exhibits as Exhibits "13" and "14" respectively.

101.    Defendant Leonid Slutsky, M.D. ("Slutsky") is a natural person residing in the State of New York and until on or about April 3, 2003, was licensed to practice medicine in the State of New York under license number 196275 issued by the New York State Education Department on or about July 1, 1994. On information and belief, Defendant Slutsky, along with

the Principals, had a financial interest in one or more of the Defendant PCs, including but not limited to S&L Medical, Lamed Medical, Flatlands 78 Medical, L&B Medical and General Medical.

102.    On information and belief, from the date of its incorporation on May 1, 1997 through August 2000, Defendant Slutsky was listed as the owner of Lamed Medical on its Certificate of Incorporation, filed with the State of New York and, on information and belief, is associated with selling his name and license to lay people and recruiting healthcare providers to form fraudulently incorporated and licensed professional corporations in violation of the New York Business Corporation Law.  On information and belief, during the relevant time period, Defendant Slutsky was the owner on paper for this professional corporation until it was transferred on paper to Defendant Tsirelman on or about August 2000.

103.    On or about September 6, 2006, Defendant Slutsky was convicted by the Westchester District County's Office of insurance-related crimes, specifically Enterprise Corruption, a violation of N.Y. P.L. § 460.20, Grand Larceny in the Second Degree, a violation of N.Y. P.L. § 155.40, and Insurance Fraud in the First and Second Degrees, a violation of N.Y. P.L. §§ 176.30 and 176.25, respectively, committed in the State of New York.  Thereafter, he pleaded guilty to additional insurance fraud related crimes based on indictments handed down by the District Attorneys of Queens and Kings County, respectively.  Prior to Defendant Slutsky's conviction, based on substantial charges of medical misconduct brought by the Office of Professional Medical Conduct, by Consent Order and Agreement dated March 3, 2003, Slutsky agreed, inter alia, not to seek renewal of his license to practice medicine in the State of New York; not to practice medicine in the State of New York; not to practice medicine in any jurisdiction where that practice is predicated upon his having a valid license in the State of New

York; and to divest himself of any and all interests he purportedly had in any entity engaged in the practice of medicine, including but not limited to Lamed Medical.

104.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Slutsky, through Lamed Medical, performed or caused to be performed Electrodiagnostic Testing and Synaptic Treatment that he knew or should have known would produce medically invalid test results of no diagnostic or treatment value and/or that were medically unnecessary.    By way of example, in Allstate claim number 1124630615-01, Defendant Slutsky knowingly performed or caused to be performed Electrodiagnostic Testing and/or Synaptic Treatment for Lamed Medical that was medically unnecessary and of no diagnostic or treatment value.    Additional examples of claims in which Defendant Slutsky knowingly performed or caused to be performed Electrodiagnostic Testing and/or Synaptic Treatment for Lamed Medical that were medically unnecessary and of no diagnostic or treatment value are in the accompanying Compendium of Exhibits, as Exhibit "15."

105.    Defendant Gary Tsirelman ("Tsirelman") is a natural person residing in the State of New York who is licensed to practice law in the State of New York and until on or February 22, 2008, was licensed to practice medicine in the State of New York under license number 205235 issued by the New York State Education Department on or about December 11, 1996.  In or about August 2000, Defendant Slutsky's interest on paper in Lamed Medical was transferred without any consideration to Defendant Tsirelman.  From in or about August 2000 through July 2001, Defendant Tsirelman was the owner on paper of Lamed Medical.

106.    Following a hearing based on substantial charges of medical misconduct brought by the Office of Professional Medical Conduct "(OPMC"), by Decision and Order dated December 12, 2007, the OPMC held that Defendant Tsirelman, through Defendant Lamed

Medical, used his license to engage in the fraudulent practice of medicine, false reporting, the performance of tests and treatments not warranted by the patient's condition, and engaging in conduct which evidences moral unfitness. As part of its decision, the OPMC revoked Defendant Tsirelman's license to practice medicine in the State of New York.

107.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Tsirelman, through Lamed Medical, performed or caused to be performed Synaptic Treatment that he knew or should have known would be of no treatment value and/or that was medically unnecessary. By way of example, in Allstate claim number 1124648831-01, Defendant Tsirelman knowingly performed or caused to be performed Synaptic Treatment for Lamed Medical that was medically unnecessary and of no treatment value. Additional examples of claims in which Defendant Tsirelman knowingly performed or caused to be performed Synaptic Treatment for Lamed Medical that were medically unnecessary and of no treatment value are in the accompanying Compendium of Exhibits, as Exhibit "16."

108.    Defendant Irena Shperling ("Shperling") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 141337 issued by the New York State Education Department on or about February 29, 1980. In or about August 2001, Defendant Tsirelman's interest on paper in Lamed Medical was transferred without any consideration to Defendant Shperling. From in or about August 2001 through January 22, 2004, Defendant Shperling was the owner on paper for Lamed Medical.

109.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Shperling, through Lamed Medical, performed or caused to be performed Electrodiagnosting Testing that she knew or should have known would be of no diagnostic value and/or that was medically unnecessary. By way of example, in Allstate claim

number 1125157212-01, Defendant Shperling knowingly performed or caused to be performed Electrodiagnostic Testing for Lamed Medical that was medically unnecessary and of no diagnostic value. Additional examples of claims in which Defendant Shperling knowingly performed or caused to be performed Electrodiagnostic Testing for Lamed Medical that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits, as Exhibit "17."

110. Defendant Emma Benjamin, M.D. ("Benjamin") is a natural person residing in the State of New York, and until on or about March 2007, was licensed to practice medicine in the State of New York under license number 209190 issued by the New York State Education Department on or about December 17, 1997. On or about, January 24, 2004, Defendant Shperling's interest on paper in Lamed Medical was transferred without any consideration to Defendant Benjamin. From on or about January 24, 2004 through the suspension of her license on or about April 9, 2007, Defendant Benjamin was listed as the owner of Lamed Medical with the New York Departments of State and Education, and, on information and belief, was the owner on paper of this professional corporation during the relevant time period. .

111. On or about September 13, 2006, Defendant Benjamin pled guilty to insurance-related crimes, including Falsifying Business Records in the First Degree, a violation of N.Y. P.L. §175.10, for allegedly submitting, to insurers, bogus claims for services purportedly rendered at Defendant L&B Medical, but which were never performed.

112. In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Benjamin performed or caused to be performed Electrodiagnostic Testing, ROM Testing and Synaptic Treatment for one or more of the

Defendant PCs, including but not limited to L&B Medical, Lamed Medical, Dover Medical and Flatlands 78 Medical that she knew or should have known would produce medically invalid test results of no diagnostic or treatment value and/or that were medically unnecessary. By way of example, in Allstate claim number 1125464279-02, Defendant Benjamin knowingly performed Electrodiagnostic Testing for L & B Medical that was medically unnecessary and of no diagnostic or treatment value; in claim number 4816401675-02 Defendant Benjamin knowingly performed ROM Testing and Synaptic Treatment for the Flatlands 78 Medical that was medically unnecessary and of no diagnostic or treatment value. Additional examples of claims in which Defendant Benjamin knowingly performed Electrodiagnostic Testing, ROM Testing and Synaptic Treatment for a number of the Defendant PCs that were medically unnecessary and of no diagnostic or treatment value are in the accompanying Compendium of Exhibits, as Exhibits "18," "19," and "20" respectively.

113.   Defendant Zhanna Roit ("Roit") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 145102 issued by the New York State Education Department on or about February 13, 1981. Defendant Roit is listed on documents filed with the New York Department of State as the owner of ZDR Medical, and, on information and belief, was the owner on paper of this professional corporation until her interest on paper in ZDR Medical was transferred without any consideration to Defendant Lev Bentsianov. From in or about November 17, 2000 through January 3, 2005, Defendant Roit was the owner on paper for ZDR Medical.

114.   In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Roit performed or caused to be performed ROM Testing and Synaptic Treatment for one or more of the Defendant PCs, including but not limited to ZDR

Medical, that she knew or should have known would produce medically invalid test results of no diagnostic or treatment value and/or that were medically unnecessary.  By way of example, in Allstate claim number 1125071330-01, Defendant Roit knowingly performed ROM Testing and Synaptic Treatment for ZDR Medical that was medically unnecessary and of no diagnostic or treatment value.  Additional examples of claims in which Defendant Roit knowingly performed Range of Motion Testing and Synaptic Treatment for ZDR Medical that were medically unnecessary and of no diagnostic or treatment value are in the accompanying Compendium of Exhibits, as Exhibits "21" and "22" respectively.

115.    Defendant Yefim Sosonkin, M.D. ("Sosonkin") is a natural person residing in the State of New York and practiced medicine in the State of New York under license number 209924, issued by the New York State Education Department on or about March 27, 1998 and "worked" for and purportedly performed services on behalf of a number of the Defendant PCs, including General Medical and Dover Medical.  On information and belief, on or about April 24, 2005, in connection with a separate criminal enterprise engaged in a similar scheme to defraud as alleged herein, Defendant Sosonkin was convicted of insurance-related crimes, specifically felony Grand Larceny in the Second Degree, committed in the State of New York, a violation of N.Y. P.L. §155.40.  As a result of his criminal conviction, Defendant Sosonkin's license to practice medicine in the State of New York was revoked.

116.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Sosonkin performed or caused to be performed Electrodiagnostic Testing for one or more of the Defendant PCs, including but not limited to General Medical, that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary.  By way of example, in

Allstate claim number 4815866761-01, Defendant Sosonkin knowingly performed Electrodiagnostic Testing for General Medical that was medically unnecessary and of no diagnostic value. Additional examples of claims in which Defendant Sosonkin knowingly performed Electrodiagnostic Testing for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits, as Exhibit "23."

117.    Defendant Grigory Shtender, M.D. ("Shtender") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 218261, issued by the New York State Education Department on or about July 3, 2000 and "worked" for and purportedly performed services on behalf of a number of the Defendant PCs, including S&L Medical, Lamed Medical and General Medical.

118.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Shtender performed or caused to be performed Electrodiagnostic Testing for one or more of the Defendant PCs, including but not limited to Lamed Medical, S&L Medical and General Medical, that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary. By way of example, in Allstate claim number 4815787900-03, Defendant Shtender knowingly performed Electrodiagnostic Testing for S & L Medical that was medically unnecessary and of no diagnostic value. Additional examples of claims in which Defendant Shtender knowingly performed Electrodiagnostic Testing for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits, as Exhibit "24."

119.     Defendant Alexander Israeli ("Israeli") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 225588, issued by the New York State Education Department on or about July 12, 2002 and "worked" for and purportedly performed services on behalf of a number of the Defendant PCs, including ZDR Medical and L&B Medical.   On or about June 12, 2007, Defendant Israeli was arrested and charged by the Queens County District Attorney's Office with multiple felonies, including Grand Larceny in the Fourth Degree, a violation of N.Y. P.L. § 155.30(1), Insurance Fraud in the Third Degree, a violation of N.Y. P.L § 176.20, and Falsifying Business Records in the First Degree, a violation of N.Y. P.L. § 175.10 for allegedly submitting, to insurers, including Allstate, bogus claims, through L&B Medical, for Electrodiagnostic Testing and Synaptic Treatment, including nerve destruction procedures, which were never performed.

120.     In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Israeli performed or caused to be performed Electrodiagnostic Testing for one or more of the Defendant PCs, including but not limited to L&B Medical and ZDR Medical that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary.  By way of example, in Allstate claim number 8140138515-03, Defendant Israeli knowingly performed Electrodiagnostic Testing for ZDR Medical that was medically unnecessary and of no diagnostic value.   Additional examples of claims in which Defendant Israeli knowingly performed Electrodiagnostic Testing for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits as Exhibit "25."

121.     Defendant Mikhail Mirer, M.D. ("Mirer") is a natural person residing in the State of New York and practices medicine in the State of New York under license number

44

206190 issued by the New York State Education Department on or about March 24, 1997 and "worked" for and purportedly performed services on behalf of a number of the Defendant PCs, including ZDR Medical.

122.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Mirer performed or caused to be performed Electrodiagnostic Testing for one or more of the Defendant PCs, including but not limited to ZDR Medical, that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary.   By way of example, in Allstate claim number 1125145126-01, Defendant Mirer knowingly performed Electrodiagnostic Testing for ZDR Medical that was medically unnecessary and of no diagnostic value.  Additional examples of claims in which Defendant Mirer knowingly performed Electrodiagnostic Testing for ZDR Medical that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits as Exhibit "26."

123.    Defendant Renat Sukhov, M.D. ("Sukhov") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 212874 issued by the New York State Education Department on or about January 5, 1999 and "worked" for and purportedly performed services on behalf of a number of the Defendant PCs, including L&B Medical and ZDR Medical.

124.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Sukhov performed or caused to be performed Electrodiagnostic Testing for one or more of the Defendant PCs, including but not limited to L&B Medical and ZDR Medical, that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary.  By way of

example, in Allstate claim number 6622990155-01, Defendant Sukhov knowingly performed Electrodiagnostic Testing for L&B Medical that was medically unnecessary and of no diagnostic value.   Additional examples of claims in which Defendant Sukhov knowingly performed Electrodiagnostic Testing for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value in the accompanying Compendium of Exhibits as Exhibit "27."

125.   Defendant Huikang Daniel Lai, M.D. ("Lai") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 226453 issued by the New York State Education Department on or about September 23, 2002 and "worked" for and purportedly performed services on behalf of a number of the Defendant PCs, including S&L Medical.

126.   In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Lai performed or caused to be performed Electrodiagnostic Testing for one or more of the Defendant PCs, including but not limited to S&L Medical, that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary.   By way of example, in Allstate claim number 4815956679-01, Defendant Lai knowingly performed Electrodiagnostic Testing for S&L Medical that was medically unnecessary and of no diagnostic value.   Additional examples of claims in which Defendant Lai knowingly performed Electrodiagnostic Testing for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits, as Exhibit "28."

127.   Defendant Jean Francois, M.D. ("Francois") is a natural person residing in the State of New York and practices medicine in the State of New York under license number 197329 issued by the New York State Education Department on or about October 4, 1994 and

"worked" for and purportedly performed services on behalf of a number of the Defendant PCs, including Dover Medical.

128.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendant Francois performed or caused to be performed Electrodiagnostic Testing for one or more of the Defendant PCs, including but not limited to Dover Medical, that he knew or should have known would produce medically invalid test results of no diagnostic value and/or that were medically unnecessary.  By way of example, in Allstate claim number 1125140382-02, Defendant Francois knowingly performed Electrodiagnostic Testing for Dover Medical that was medically unnecessary and of no diagnostic value. Additional examples of claims in which Defendant Francois knowingly performed Electrodiagnostic Testing for a number of the Defendant PCs that were medically unnecessary and of no diagnostic value are in the accompanying Compendium of Exhibits, as Exhibit "29."

**G.    The John Doe Defendants**

129.    Defendants John Does 1 through 20 (collectively referred to as "John Does") are individuals who conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein.  These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**H.    The ABC Corporations**

130.    Defendant ABC Corporations 1 through 20 are additional management companies that are unknown to Plaintiffs, and are owned, controlled and operated by the Principals and/or others unknown to Plaintiffs, and which entered into ostensible management agreements and other contracts with the Defendant PCs and were used to funnel money to the Principals.  Similar to the Defendant Corporations named herein, the ABC Corporations also are

the alter egos of the Principals and their associates and conspired and assisted in the fraudulent and unlawful conduct alleged herein.  These corporations will be added as defendants when their names and the extent of their participation become known through discovery.

**I.      The XYZ Corporations**

131.    Defendant XYZ Corporations 1 through 20 are additional corporations that are unknown to Allstate and are owned, controlled and operated by the Principals and/or others unknown to Allstate for the purpose of concealing and laundering money in violation of state and federal law.   Similar to the Defendant Corporations named herein, the XYZ Corporations also are the alter egos of the Principals and their associates and conspired and assisted in the fraudulent and unlawful conduct alleged herein.  These corporations will be added as defendants when their names and the extent of their participation become known through discovery.

<strong>JURISDICTION AND VENUE</strong>

132.    The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

133.    The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

134.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

135.    Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

136.    Allstate underwrites automobile insurance in the Greater New York Metropolitan area, including but not limited to New York City, Counties of Kings and Queens.

137.    Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law §§ 5101, *et seq.*, Allstate is required to pay, *inter alia*, for health service expenses that are incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians ("Covered Persons") that arise from the use or operation of such motor vehicles in the State of New York.

138.    On information and belief, the Defendant PCs are ostensibly healthcare providers that bill for treatments to, among others, individuals covered under the No-fault Law. In exchange for their services, the Defendant PCs accept assignments of benefits from their patients covered under the No-fault Law (the "No-fault claimants" or "claimants") and submit claims for payment to No-fault insurance carriers, in general, and to Allstate, in particular.

139.    In purported compliance with the No-fault Law and 11 NYCRR 65 *et seq.*, the Defendant PCs submitted proof of their claims to Allstate, using the claim form prescribed by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3").

140.    Pursuant to Section 403 of the New York State Insurance Law, the claim forms (NF-3s) submitted to Allstate by the Defendant PCs contained the following warning at the foot of the page:

> "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

141.    To process and verify claims submitted by the Defendant PCs, Allstate required, and the Defendant PCs submitted, to the extent applicable, licenses, narrative reports and other medical records relative to the alleged medical care and treatment rendered to Covered Persons, for which the Defendant PCs were seeking payment from Allstate.

142.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Allstate is required to promptly process claims within 30 days of receipt of proof of claim.

143.    To fulfill its obligation to promptly process claims, Allstate justifiably relied upon the bills and documentation submitted by Defendants in support of their claims, and has paid Defendants based on the representations and information that Defendants mailed to Allstate.

144.    On information and belief, the Principals created the Defendant PCs as multidisciplinary practices, ostensibly owned by medical doctors, as the centerpiece of an elaborate scheme to fraudulently bill No-fault insurance carriers for services that were never rendered or that were of no diagnostic or treatment value.

145.    The Defendant PCs that the Principals created and controlled were part of a well-organized illegal enterprise (the "Medical Network Enterprise" or "Enterprise") that engaged in systematic and pervasive fraudulent practices that distinguished them from legitimate healthcare providers.   On information and belief, the components of that enterprise followed practices that were part of a racketeering scheme dictated by the Principals and others:

- Unlike legitimate medical practices, Defendants misrepresented the existence or severity of any injuries that the patient may have had and the course of any treatments.

- Unlike legitimate medical practices, Defendants routinely submitted medical reports which contained identical diagnoses for different patients, almost always indicative of radiculopathy, irrespective of a patient's age,

gender, medical history, individual mechanism of injury, subjective and objective findings, progress and current medical condition.

- Unlike legitimate medical practices, Defendants routinely submitted claims for diagnostic testing that did not occur and/or was performed in a sub-standard manner from which no useful medical information could be derived, and submitted false medical reports in support of those services.

- Unlike legitimate medical practices, Defendants routinely submitted claims for synaptic treatment, including nerve destruction procedures, that did not occur and/or submitted false reports and billing documents in support of those services.

- Unlike legitimate medical practices, Defendants routinely submitted claims for ROM testing that was performed in a sub-standard manner from which no useful medical information could be derived, and submitted false medical reports in support of those services.

- Unlike legitimate medical practices, Defendants established a fraudulent protocol for the Electrodiagnostic Testing of "patients."

- Unlike legitimate medical practices, Defendants established a fraudulent protocol for the "treatment" of "patients."

- Unlike legitimate medical practices, Defendants routinely misrepresented test results for Electrodiagnostic Testing.

- Unlike legitimate medical practices, Defendants routinely fabricated and submitted fraudulent documentation to insurers for payment, including but not limited to duplicate tests results for NCVs purportedly provided to multiple patients when in fact documentation for such services were fraudulently fabricated and/or contained material misrepresentations and/or reflected billing for services that were never rendered.

- Unlike legitimate medical practices, on information and belief, Defendants routinely billed for services that were never rendered, including but not limited to Electrodiagnostic Testing.

- Unlike legitimate medical practices, rather than perform a valid test according to prevailing standards of medical care as they must, or refer to a legitimate practitioner, Defendants performed invalid and bogus diagnostic tests that willfully misrepresented medical facts and potentially endangered the patients.

- Unlike legitimate medical practices, Defendants submitted bills, using the prescribed "NF-3" forms promulgated by the Superintendent of Insurance, entitled "Verification of Treatment by Attending Physician or Other Provider of Health Services" wherein Defendants knowing, with intent to deceive Allstate and induce payment as a result thereof, falsely misrepresented the services reflected therein, when in fact the services were not performed or of no diagnostic or treatment value.

- Unlike legitimate medical practices, the Defendant Doctors and other professionals falsely represented that they reviewed the NF-3 claim forms and narrative reports before they were submitted to Allstate for payment when in fact they did not.

146.   In these and numerous other ways, Defendants sought to deceive Allstate into paying fraudulent medical claims that typically exceeded thousands of dollars per patient.

147.   The Principals controlled their criminal enterprise through a number of key subordinate co-conspirators, including but not limited to Defendant Ben Zion Kliot, who was an office manager whose role in the criminal enterprise included direct oversight and supervision of the support staff and day-to-day operations of one or more of the Defendant PCs, including but not limited to L&B Medical and at least 18 essential and complicit healthcare professionals: Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Sosonkin, Shtender, Israeli, Mirer, Shperling, Moysik, Roit, Sukhov, Lai and Francois, each of whom was a medical doctor licensed in the State of New York.

148.   Each member of the Medical Network Enterprise played a well-defined and essential role in the Defendants' scheme to defraud and in directing the affairs of the Enterprise. By way of example and not limitation, in furtherance of their scheme to defraud, the Principals:

- Submitted or caused to be submitted medical reports and bills in the names of the Defendant Doctors that in fact had not been reviewed and signed by such licensed professionals;
- Routinely referred or caused to be referred patients for NCVs, EMGs, ROM Testing, and Synaptic Treatment that were medically unnecessary, materially misrepresented and/or of no diagnostic or treatment value;
- Submitted or caused to be submitted, on behalf of the Defendant PCs, numerous fraudulent claim forms seeking payment for services that were purportedly (but not actually) provided to many claimants;
- Prepared or caused to be prepared fraudulent bills and sent them to Allstate;

- Created or caused to be created fictional narrative reports of claimants' conditions and added or caused to be added stamped signatures on those reports;

- Submitted or caused to be submitted numerous insurance claims to Allstate during the twelve year period relevant to this Complaint;

- Participated, or caused those acting under their direction, in the preparation and mailing of bogus claims, knowing that they contained materially false and misleading information;

- Opened, maintained and controlled the bank accounts for the Defendant PCs and Management Companies; and

- Used the Defendant Management Companies interchangeably to ensure that the profits from their criminal enterprise were funneled to them and their co-conspirators. By way of example, although purportedly distinct entities, Defendant Zhuravsky signed checks for or on behalf of one or more of the Defendant Management Companies, including but not limited to Flat-80 Management, Ocean L. Management, B-Way Management and Hillmed Management. By way of further example, although purportedly distinct entities, Defendant Mirvis signed checks on behalf of one or more of the Defendant Management Companies, including but not limited to Flatlands Best Management, B-Way Management and Hillmed Management. By way of further example, Defendant Katz signed checks for or on behalf of Nortmed Management.

149. By way of further example, in furtherance of the scheme to defraud alleged herein, the Defendant Paper-Owners:

- Sold their names and license for use by the Principals;

- Provided the essential means through which the Principals (laypersons) were able to own the Defendant PCs in contravention of New York State Law;

- Ceded ownership and control in the Defendant PCs;

- Abdicated any and all attributes of ownership and control to the Principals;

- Maintained no control over how the Defendant PCs were operated and managed;

- Allowed their names and licenses to be used to pursue fraudulent claims on behalf of the Defendant PCs -- fraudulently incorporated professional corporations that were unlawfully formed and operated by the Principals;

- Allowed and facilitated the generation of fictitious medical records and bills that were submitted to Allstate under their names in association with one or more of the Defendant PCs;

- Allowed their name(s) to be signed or stamped on HCFA forms and narrative reports, which falsely represented that they actually rendered the health services for which the Defendant PCs submitted bills, when in fact the services were materially misrepresented, never rendered, or of no diagnostic or treatment value; and

- Knew that they were performing or causing to be performed Electrodiagnostic Testing, ROM Testing and Synaptic Treatment that was materially misrepresented in the bills submitted to insurers and of no diagnostic and/or treatment value.

150.    By way of further example, in furtherance of the scheme to defraud alleged herein, the Defendant Doctors, including the Paper Owners and Non-paper Owners:

- Allowed and facilitated the generation of fictitious medical records and bills that were submitted to Allstate under their names in association with one or more of the Defendant PCs;

- Allowed their name(s) to be signed or stamped on HCFA forms and narrative reports, which falsely represented that they actually rendered the health services for which the Defendant PCs submitted bills, when in fact the services were materially misrepresented, never rendered, or of no diagnostic or treatment value;

- Knew that they were performing or causing to be performed Electrodiagnostic Testing, ROM Testing and Synaptic Treatment that was materially misrepresented in the bills submitted to the insurers and of no diagnostic and/or treatment value;

- Ordered and/or performed Electrodiagnostic Testing for Covered Persons, signed and/or authorized their signature stamp to be applied to boilerplate medical records, reports and bills for services that were materially misrepresented, never rendered, or of no diagnostic value;

- Ordered and/or performed ROM Testing for Covered Persons, signed and/or authorized their signature stamp to be applied to medical records, reports and bills for services that were materially misrepresented, never rendered, or of no diagnostic value and that contained medically improbable data and diagnoses; and

- Ordered and/or performed Synaptic Treatment for Covered Persons, signed and/or authorized their signature stamp to be applied to boilerplate medical records, reports and bills for services that were materially misrepresented, never rendered, or of no treatment value.

151.   By way of further example, in furtherance of the scheme to defraud alleged herein, Defendant Slutsky:

- Allowed and facilitated the generation of fictitious medical records and bills that were submitted to Allstate under his name in association with one or more of the Defendant PCs;

- Ordered and/or performed Synaptic Treatment for Covered Persons, signed and/or authorized his signature stamp to be applied to boilerplate medical records, reports and bills for services that were materially misrepresented, never rendered, or of no treatment value;

- Recruited doctors to serve as Paper Owners of illegally structured professional corporations;

- Forged relationships with others unknown to Plaintiffs who aided and abetted the scheme to defraud alleged herein;

- Signed or caused his name to be signed on various fraudulent bills and medical records that were submitted to insurers, in general, and Allstate, in general; and

- Designed and created fraudulent narratives, medical records and test results for the Defendant PCs that would appear legitimate on their face to insurance companies, in general, and Allstate, in particular.

152.   To carry out their scheme, the Principals and Defendant Doctors used the Defendant PCs to generate bogus reports and bills for physical examinations, medical tests, medical treatments, and diagnostic testing that were purportedly rendered to persons involved in automobile accidents when, in fact, such services were never rendered or were of no diagnostic or treatment value.

153.   On information and belief, Defendants created a bogus report generation and billing apparatus that was designed to exploit the No-fault laws and regulations, and in the process, drain the maximum amount of dollars from insurance companies for each and every patient, regardless of whether treatment was required at all.

154.   On information and belief, although this organization operated at several locations and under various names at various times, their activities -- particularly their corporate

structures, billing and collection activities -- were firmly controlled by the Principals and others working under their direction and control, who, although taking orders from the Principals, exercised their own independent discretion in carrying out their specific roles in furtherance of the scheme to defraud. Through the Principals and others working under their direction and control, Defendants prepared and mailed insurance claim forms in the name of the Defendant PCs. The claim forms prepared by and through the Principals directed insurers to mail checks to office addresses that they rented or controlled.

155. On information and belief, although their beneficial and financial interest was not otherwise disclosed and they were not listed in the certificates of incorporation as shareholders, officers or directors of the Defendant PCs, the Principals controlled and/or maintained access to the Defendant PCs' bank accounts.

156. The fact that the proceeds of Medical Network Enterprise went to the Principals and their co-conspirators establishes their true beneficial ownership and control of the Enterprise. That control was also demonstrated by their day-to-day operation of the Enterprise. For example, on information and belief, the Principals:

- Purchased the names and licenses of the Defendant Doctors to fraudulently incorporate the Defendant PCs in violation of Article 15 of the New York State Business Corporation Law;

- Retained the accountant, counsel and/or other professionals who created the illegal corporate structures under which the Enterprise was permitted to operate;

- Retained the same attorney Alexander Almonte to dissolve one or more of the Defendant Management Companies, including but not limited to Hillmed Management, Flat-80 Management and B-Way Management;

- Retained the same company ALCO Corporate Services to incorporate one or more of the Defendant PCs and Defendant Management Companies, including but not limited to: Lamed Medical, Flatlands 78 Medical, Flatlands Best Management, B-Way Management and Hillmed Management;

- Hired physicians and office support staff for the Defendant PCs and instructed them in the procedures and protocol they were to follow;

- Participated or otherwise directed the preparation of standardized reports that fabricated and/or exaggerated injuries to support prescriptions for unnecessary tests, follow-up visits and treatments;

- Established or otherwise participated and directed the treatment and diagnostic protocol for each Defendant PC.

- Established the Defendant Management Companies to collect the proceeds for all or part of the Enterprise's illegal activities and to funnel the illicit proceeds obtained through the Defendant PCs to the Principals;

- Entered into contracts and agreements on behalf of the Defendant PCs; and

- Maintained and controlled the corporate books and records for the Defendant PCs.

157.    In addition to their participation in the management and operation in the overall affairs of the Medical Network Enterprise, on information and belief, the Principals managed and supervised the day-to-day operations of the Defendant PCs.

158.    On information and belief, Defendants' activity promoted and facilitated other acts that incurred costs to Allstate well beyond the insurance proceeds that Defendants collected, including but not limited to, Allstate' expenditures for verifying each fraudulent claim through examinations under oath ("EUO") and associated attorneys' and court reporting fees, independent medical examinations ("IME") and peer reviews.   Other losses associated with Defendants' fraudulent scheme included payments on bodily injury claims that were predicated on fraud.

159.    Under the complex scheme, over the course of approximately 12 years, the Principals purchased and used the names and licenses of Defendant Doctors Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Shperling, Moysik

and Roit, to establish the Defendant PCs throughout at least six locations within Queens and Kings County, New York.

160.   On information and belief, the Principals and Defendant Doctors maintained the Defendant PCs offices at six different locations, with some office locations serving as host to multiple professional corporations purportedly doing business at the same address.   The dates of incorporation, name of the Paper Owner(s) and office location are as follows:

| Name of Defendant P.C. | Date of Incorporation | Dates of Purported Ownership | Owner(s) | Office Location |
|---|---|---|---|---|
| S&L Medical | 1/25/1996 | January 1996 to present | Sofia Bentisianov Lev Bentsianov | 1724 Ocean Avenue, Brooklyn, New York |
| Lamed Medical | 3/3/1997 | May 1997 to Aug. 2000 Aug. 2000 to Aug. 2001 Aug. 2001 to Dec. 2003 Jan. 2004 to Present | Leonid Slutsky Gary Tsirelman Irena Shperling Emma Benjamin | 7802 Flatlands Avenue, Brooklyn, New York |
| L&B Medical | 1/1231998 | January 1998 to Present | Lev Bentsianov | 153-25 Hillside Avenue, Jamaica, New York |
| General Medical | 4/20/1999 | April 1999 to Present | Andrey Ivanushkin Lyubov Moysik | 825 Broadway, Brooklyn, New York |
| Dover Medical | 4/26/2000 | April 2000 to Present | Sofia Bentisianov | 8008 Flatlands Avenue, Brooklyn, New York |
| ZDR Medical | 11/17/2000 | Nov. 2000 to Jan. 2005 Jan. 2005 to Present | Zhanna Roit Lev Bentsianov | 79-08 Northern Blvd. Jackson Heights, New York |
| 825 Broadway Medical | 1/7/2003 | | Yakov Raufov Dale Alexander | 825 Broadway, Brooklyn, New York |
| Flatlands 78 Medical | 3/4/2005 | March 2005 to April 10, 2007 (effective date of suspension of license) | Emma Benjamin | 7802 Flatlands Avenue, Brooklyn, New York |

161.    The Defendant PCs were used interchangeably by the Principals and were operated with complete disregard for the requirements that they maintain separate and distinct legal identities.  For all practical and legal purposes, the Defendant PCs are one and the same, utilized independently and collectively for the sole purpose of facilitating the criminal activities of the Enterprise.  By way of example and not limitation:

- At least two or more of the Defendant PCs maintained their offices in the same buildings, with one or more of the Defendant Management Companies: General Medical Care and 825 Broadway Medical purportedly conducted business at the same address, to wit: 825 Broadway, Brooklyn, New York, the same address where Defendant Management Company B-Way Management purportedly maintained its office.

- Lamed Medical and Flatlands 78 Medical purportedly conducted business at the same address, *to wit*: 7802 Flatlands Avenue, Brooklyn, New York, the same address where Defendant Management Company Flatlands Best Management purportedly maintained its office.

- The Certificates of Incorporation for L&B Medical, Dover Medical, 825 Broadway Medical Care, PC, ZDR Medical, Flat-80 Management, Nortmed Management were each filed by Alexander Almonte, with offices located at 41 State Street, Albany, New York, 12207.

- The Certificates of Incorporation for Lamed Medical, Flatlands 78 Medical, Flatlands Best Management, B-Way Management, Hillmed Management f/k/a 97-12 Associates were each filed by ALCO Corporate Services, with offices located at 41 State Street, Albany, New York, 12207.

- Each of the Defendant PCs used one or more of the Defendant Management Companies, who, through the Principals, prepared and generated or caused to be prepared and generated the fictitious narrative reports and bills that were submitted to insurers, in general, and Allstate, in particular.

162.    Each of the Defendant PCs relied on an inventory of common doctors and other licensed healthcare professionals who they indiscriminately shuffled among and throughout the Defendant PCs as needed.  On information and belief, each of these individuals appears on billing and medical records relating to one or more of the Defendant PCs.  For example, although their offices may be located at different locations in Brooklyn, Defendant Doctor Shtender, was

employed by, and purportedly provided services on behalf of S&L Medical, General Medical and Lamed Medical. Similarly, Clausel Cadet, who is not named as a defendant in this complaint, was employed as a physician's assistant by and purportedly provided services on behalf of L&B Medical and S&L Medical, and Aimee Jean Baptiste, who also is not named as a defendant in this complaint, was employed by and purportedly provided services on behalf of Lamed Medical, S&L Medical and Dover Medical.

163. By way of further example of the interchangeability of the personnel within the Defendant PCs, each of the Paper Owners was used and would appear on bills for Defendant PC in which they were not listed as the owner. For instance, Defendant Raufov, who is the Paper Owner of 825 Broadway Medical, appears on billing documentation submitted by Lamed Medical, L&B Medical, S&L Medical and General Medical; Defendant Benjamin, who is the Paper Owner of Flatlands 78 Medical, appears on billing documentation submitted by L&B Medical, Lamed Medical and Dover Medical; and Defendant Lev Bentsianov who is the Paper Owner of L&B Medical, appears on billing documentation submitted by S&L Medical and Dover Medical.

164. In addition to sharing common offices, doctors and healthcare professionals, the Defendant PCs were operated through, among others, one or more of the Defendant Management Companies.

165. On information and belief, the Principals created the Defendant Management Companies to serve as billing and/or management companies for the various Defendant PCs that were ostensibly rendering health services to persons covered by the New York State No-Fault Law. In reality, the Defendant Management Companies were conceived and

functioned as conduits to funnel payments made by the insurance companies in general, and Allstate, in particular, to the Principals.

166.   On information and belief, corporate documentation and public records relating to the Defendant Management Companies demonstrate a nexus to one or more of the Principals.  By way of example and not limitation, according to public records maintained by the New York Department of State:

- Defendant Mirvis signed and filed B-Way Management's Certificate of Amendment while Defendant Statnigrosh signed B-Way Management's Certificate of Dissolution as Vice President although public records identify Defendant Lupolover as the Vice President of B-Way Management;

- Defendant Zhuravsky is the Treasurer of B-Way Management;

- Defendant Lupolover signed Flat 80 Management's Certificate of Dissolution which identified Defendant Lupolover as its President and Defendants Mirvis as Secretary, Bezenyan as Vice President and Zhuravsky as its Treasurer;

- Defendant Zhuravsky filed and signed the Certificate of Amendment to the Certificate of Incorporation for 97-12 Associates which formally changed the name of that entity to Hillmed Management;

- Defendant Katz signed Hillmed Management's Certificate of Dissolution, which identified Defendant Katz as its Present and Defendants Mirvis as Secretary, Zhuravsky as Treasurer and Lupolover and Bezenyan as Vice Presidents;

- Defendant Lupolover is listed as the Chairman or Chief Executive Officer of Flat-80 Management;

- Defendant Bezenyan is listed as the Chairman or Chief Executive Officer of Flatlands Best Management;

- Defendant Katz is listed as the Chairman or Chief Executive Officer of Hillmed Management; and

- Defendant Statnigrosh is listed as the Chairman or Chief Executive Officer of B-Way Management.

167.   On information and belief, each Defendant Management Company was created prior to the incorporation of a Defendant PC.  For example:

- Ocean L. Management was incorporated on or about October 24, 1995, approximately three months prior to the incorporation of S&L Medical on or about January 25, 1996.

- Flatlands Best Management was incorporated on or about February 5, 1997, less than three months prior to the incorporation of Lamed Medical, on or about May 1, 1997.

- 97-12 Associates Inc. was incorporated on or July 30, 1997, approximately six months prior to the incorporation of L&B Medical, on or about January 23, 1998.

- B-Way Management was incorporated on or February 11, 1999, approximately two months prior to the incorporation of General Medical on or about April 20, 1999.

- Flat-80 Management was incorporated on or March 21, 2000, approximately two months prior to the incorporation of Dover Medical, on or about April 26, 2000.

- Nortmed Management was incorporated on or August 10, 2000, approximately three months prior to the incorporation of ZDR Medical on or about November 17, 2000.

168.    On information and belief, each of the Defendant Management Companies served as a clearinghouse for the Defendant PCs, receiving significant transfers of cash and checks from the Defendant PCs which they funneled to the Principals and their co-conspirators either directly or through other corporations unknown to Allstate, which were established to disassociate the Principals from the proceeds of their enterprise as well as conceal their ownership and control of the Defendant PCs.

169.    On information and belief, in furtherance of the scheme to defraud, the Defendant Management Companies employed support staff that was responsible for preparing, generating and submitting fraudulent claim documentation, medical records and bills to insurers, in general, and Allstate, in particular.  Each of the Defendant PCs' document creation and billing was conducted through the support staff, acting under and pursuant to the Principals' directions and instructions, that was employed by and through the Defendant Management Companies and/or the Defendant PCs.

170.    On information and belief, the Defendant Management Companies and the Principals, through their ownership, control and operation of the Defendant PCs, played an integral role in the elaborate scheme to fraudulently bill No-fault insurance carriers for services that were never rendered or materially misrepresented or of no diagnostic or treatment value. Once the No-fault patients appeared at one of the Defendant PCs, the Principals, through the Defendant PCs and/or Defendant Management Companies, caused to be produced, generated and manufactured false and fraudulent medical bills and reports.

A.    **A Centralized Scheme To Defraud**

171.    The Principals conducted their business, affairs and operations from various locations and through various individuals and entities, known and unknown to Allstate.

172.    On information and belief, the Principals were intimately involved in Defendants' scheme to defraud, and virtually every corporate document and public filing associated with the Defendant PCs can be traced to the Principals and one centralized scheme to defraud. Although the Principals positioned themselves in the background in an apparent attempt to avoid scrutiny and conceal their ownership interests in the Defendant PCs, retaining front persons as sham owners of their PCs, the Principals exercised tight oversight and control over the criminal enterprise.

173.    By way of example and not limitation, on information and belief, Flatlands Best Management was the management company for one or more of the Defendant PCs, including but not limited to Lamed Medical and Flatlands 78 Medical. According to public record searches, Defendant Bezenyan is listed as the owner of Flatlands Best Management, with a business address of 7802 Flatlands Avenue, Brooklyn, New York, the same address where Flatlands 78 Medical and Lamed Medical purportedly maintained an office.

174.    In addition, according to public records maintained by the New York Department of State, Defendant Bezenyan was the Vice President of Hillmed Management, which on information and belief, is the management company associated with L&B Medical. Moreover, according to public records maintained by the New York Department of State, Defendants Katz, Zhurvasky, Mirvis and Lupolover are identified as Officers of Hillmed Management, with a business address of 153-25 Hillside Avenue, Jamaica, New York, the same address where L&B Medical purportedly maintained an office.

175.    By way of further example, according to public records maintained by the New York Department of State, Defendants Mirvis, Lupolover, Zhuravsky and Benzenyan are identified as Officers of Flat-80 Management, which, on information and belief, was the management company associated with Dover Medical.

176.    On information and belief, the Defendant Management Companies were used to prepare, create, generate and mail fraudulent bills in the names of the Defendant PC to insurers, in general, and Allstate, in particular.

177.    On information and belief, all of the Defendant PCs and Money Laundering Companies maintained a bank account at one or more branches of JP Morgan Chase located in Brooklyn, New York.

178.    Although the Defendant PCs are purportedly independent PCs, public records on file with local and/or state offices reveal that each is operated through and controlled by the Principals through the Defendant Management Companies.

179.    By way of further example of the centralized scheme to defraud, although Defendant Lev Bentsianov is the purported owner of L&B Medical, Defendant Hillmed Management is listed as a debtor in connection with Uniform Commercial Code filing, number

303050482725, secured by L&B Medical's "Equipment and Proceeds; Assets and Proceeds," at the same address, *to wit*: 153-25 Hillside Avenue, Jamaica, New York.  Similarly, although Defendant Ivanushkin is the purported owner of General Medical, the certificate of incorporation lists 825 Broadway Avenue, Brooklyn, New York, as the designated address to which the Secretary of State is instructed to mail process on its behalf, which is the same address at which Defendants B-Way Management and Statnigrosh are listed as debtors in connection with Uniform Commercial Code filing, number 57766, secured by General Medical's "Leased Equipment."

180.    By way of further example of the centralized scheme to defraud, although Defendants Raufov and Alexander were purported owners at different times of 825 Broadway Medical, the certificate of incorporation lists 825 Broadway Avenue, Brooklyn, New York, as the designated address to which the Secretary of State is instructed to mail process on its behalf, which is the same address at which Defendant B-Way Management is listed as a debtor in connection with Uniform Commercial Code filing, number 302100309057, secured by 825 Broadway Medical's "Assets; Equipment."   Similarly, although Defendant Shperling was the purported owner of Lamed Medical from August 2001 through January 2004, the certificate of incorporation lists 7802 Flatlands Avenue, Brooklyn, New York, as the designated address to which the Secretary of State is instructed to mail process on its behalf, which is the same address at which Defendant Flatlands Best Management is listed as a debtor in connection with Uniform Commercial Code filing, number 303140562089, secured by Lamed Medical's "Assets and Proceeds; Equipment and Proceeds."

181.    By way of further example and not limitation, although Defendant L. Bentsianov is the purported owner of ZDR Medical, the certificate of incorporation lists 79-09B

Northern Boulevard, Jackson Heights, New York, as the designated address to which the Secretary of State is instructed to mail process on its behalf, which is the same address at which Defendant Nortmed Management is listed as a debtor in connection with Uniform Commercial Code filing, number 512146089351.

182.   Additional examples of the Defendants' centralized scheme are evident from the following:

- The Defendant PCs, Defendant Management Companies and Dummy Corporations were used interchangeably, as reflected by the fact that, although purportedly separate and distinct entities, the Defendant PCs and Dummy Management Companies were inextricably intertwined with each other, often using the same address in public filings, and at all relevant times were operated, controlled, and managed by the Principals. A table identifying the Defendant PCs and the Defendant Management Companies operating out of the same address follows:

| Name of Defendant P.C. | Date of Incorporation | Owner(s) | Office Location | Management Company doing business at the same address as Defendant P.C. |
|---|---|---|---|---|
| S&L Medical | 1/25/1996 | Sofia Bentisianov Lev Bentsianov | 1724 Ocean Ave. Brooklyn, New York | Ocean L. Management |
| Lamed Medical | 3/3/1997 | Leonid Slutsky Emma Benjamin Gary Tsirelman Irena Shperling | 7802 Flatlands Ave. Brooklyn, NY | Flatlands Best Management |
| L&B Medical | 1/1231998 | Lev Bentsianov | 153-25 Hillside Ave. Jamaica, New York | Hillmed Management |
| General Medical | 4/20/1999 | Andrey Ivanushkin Lyubov Moysik | 825 Broadway Ave., Brooklyn, New York | B-Way Management |

| Name of Defendant P.C. | Date of Incorporation | Owner(s) | Office Location | Management Company doing business at the same address as Defendant P.C. |
|---|---|---|---|---|
| Dover Medical | 4/26/2000 | Sofia Bentisianov | 8008 Flatlands Ave. Brooklyn, New York | Flat 80 Management |
| ZDR Medical | 11/17/2000 | Zhanna Roit Lev Bentsianov | 79-08 Northern Blvd. Jackson Heights, New York | Nortmed Management |
| 825 Broadway Medical | 1/7/2003 | Yakov Raufov Dale Alexander | 825 Broadway Ave. Brooklyn, New York | B-Way Management |
| Flatlands 78 Medical | 3/4/2005 | Emma Benjamin | 7802 Flatlands Ave. Brooklyn, New York | Flatlands Best Management |

- Dover Medical and Flat 80 Management purportedly conducted business at the same address, *to wit*: 8008 Flatlands Avenue, Brooklyn, New York.

- L&B Medical and Hillmed Management purportedly conducted business at the same address, *to wit*: 153-25 Hillside Avenue, Jamaica, New York.

- ZDR Medical and Nortmed Management purportedly conducted business at the same address, *to wit*: 79-09B Northern Boulevard, Jackson Heights, New York.

- S&L Medical and Ocean L. Management purportedly conducted business at the same address, *to wit*: 1724 Ocean Avenue, Brooklyn, New York.

- The same address is listed with the Department of State for Defendant Mirvis as officer of B-Way Management and for Defendant Doctor Alexander as purported officer of 825 Broadway Medical, *to wit*:  825 Broadway Avenue, Brooklyn, New York.

- On information and belief, the certificates of incorporation relating to the Defendant Management Companies and Defendant PCs were filed or caused to be filed by one or more of the Principals.  By way of example and not limitation, on information and belief, the Certificates of Incorporation for Defendants L&B Medical, Lamed Medical, 97-12 Associates and Flatland Best Management, were each filed by ALCO Corporate Services, Inc.

- The Defendant Management Companies were inextricably intertwined with each other, and at all times were operated, controlled, and managed by the Principals. By way of example and not limitation, Defendant Mirvis signed checks for or on behalf of one or more of the Defendant Management Companies, including but not

limited to Flatlands Best Management, B-Way Management and Hillmed Management; Defendant Katz signed checks for or on behalf of one or more of the Defendant Management Companies, including but not limited to Nortmed Management; and Defendant Zhuravsky signed checks for or on behalf of one or more of the Defendant Management Companies, including but not limited to Flat-80 Management, Ocean L. Management, B-Way Management and Hillmed Management;

- Defendants Zhuravsky, Mirvis and Katz signed checks for or on behalf of Hillmed Management; Defendants Zhuravsky and Mirvis signed checks for or on behalf of B-Way Management; Defendants Zhuravsky, Mirvis and Bezenyan signed checks for or on behalf of Flatlands Best Management; and Defendants Zhuravsky and Mirvis signed checks for or on behalf of Flat-80 Management.

- Notwithstanding that they were purportedly separate and distinct medical clinics, Defendants submitted bills and supporting documentation on behalf of the Defendant PCs containing identical results for examinations, findings and diagnostic testing including neurological testing purportedly rendered to different Covered Persons involved in distinct accidents.

- On information and belief, the bills, boilerplate narratives and medical records submitted by Defendants for a number of the Defendant PCs contained similar formats and type and point settings.

- Dover Medical, Lamed Medical, S&L Medical, L&B Medical, and ZDR Medical each used letterhead which contained their respective names under the same heading, *to wit*: Family Care Medical Center.

- Two or more Defendant PCs shared office addresses and personnel.

- Many of the Defendant PCs shared the same physicians, including but not limited to Doctor Aimee Jean Baptiste and Physician Assistant Clausel Cadet who are not named as defendants in this action.  On information and belief, the signatures of each of the foregoing, along with Defendant Doctors Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Sosonkin, Shtender, Israeli, Mirer, Shperling, Moysik, Roit, Sukhov, Lai and Francois were contained on false and fraudulent evaluation and narrative reports, and prescriptions for neurological testing, which included fictitious test results.

- Defendant Bezenyan is listed on public records maintained by the New York Department of State and database searches as the owner of Flatlands Best Management, which is a Management Company established to funnel money from one or more of the Defendant PCs, including but not limited to Lamed Medical and Flatlands 78 Medical to the Principals and others unknown to Plaintiffs.

- Defendant Katz is listed on public records maintained by the New York Department of State and database searches as the owner of Hillmed Management, which is a Management Company established to funnel money from one or more of the Defendant PCs, including but not limited to L&B Medical, to the Principals and others unknown to Plaintiffs.

- Defendant Mirvis is listed on public records maintained by the New York Department of State and database searches as the owner of B-Way Management, which is a Management Company established to funnel money from one or more of the Defendant PCs, including but not limited to General Medical and 825 Broadway Medical to the Principals and others unknown to Plaintiffs.

- Defendant Lupolover is listed on public records maintained by the New York Department of State and database searches as the owner of Flat-80 Management, which is a Management Company established to funnel money from one or more of the Defendant PCs, including but not limited to Dover Medical, to the Principals and others unknown to Plaintiffs.

- According to the Annual Report filed by Defendant El Dorado One on March 19, 2008, with the Florida Department of State, Defendant Doctor Lev Bentsianov was added as an officer of El Dorado One.  On information and belief, one or more of the Principals including but not limited to Mirvis, Lupolover and Katz are officers of El Dorado One.

- On information and belief, the Principals used the Defendant PCs' bank accounts to receive payments from Allstate to enrich themselves and to pay those involved in their organization including office managers, physicians, and support staff, for their roles in carrying out the scheme.

- On information and belief, the Principals used the Defendant Management Companies' to funnel money from the Defendant PCs through the Defendant Management Companies to them.  By way of example and without limitation, Defendant Zhuravsky signed checks payable to Defendant Mirvis that were drawn on the accounts of one or more Defendant Management Companies, including Flat-80 Management, Ocean L. Management, B-Way Management and Hillmed Management, which are associated with Dover Medical, S&L Medical, General Medical, Broadway Medical and L&B Medical, respectively.

- On information and belief, as further evidence that the Principals funneled money from the Defendant PCs through the Defendant Management Companies to themselves, the Principals, including but not limited to Defendant Mirvis, wrote themselves checks for substantial sums of money from one or more of the Defendant Management Companies' bank accounts including but not limited to Flatlands Best Management, B-Way Management and Hillmed Management.  In addition, Defendant Katz signed checks payable to Defendant Mirvis that were drawn on the accounts of one or more Defendant Management Companies, including Nortmed Management, which is associated with ZDR Medical.

- Despite operating out of two different counties and six different locations, at least five of the Defendant PCs (Lamed Medical, S & L Medical, General Medical Care, Flatlands 78 Medical and 825 Broadway Medical) referred to the same ancillary healthcare providers, including but not limited to chiropractic care, acupuncture treatment and diagnostic MRI facilities.

- Uniform Commercial Code searches on file with the Department of State, list B-Way Management as a debtor in connection with two filings, each of which

indicates that its address is 825 Broadway Avenue, Brooklyn, New York, the same address where General Medical and 825 Broadway Medical purportedly maintains an office.

- Uniform Commercial Code searches on file with the Department of State, list Flatlands Best Management as a debtor in connection with two filings, each of which indicates that its address is 7804 Flatlands Avenue, Brooklyn New York, the same address where Flatlands 78 Medical purportedly maintains an office.

- On information and belief, as further evidence of the interchangeability of the Defendant Dummy Corporations, although purportedly distinct entities, each of the Defendant Dummy Corporations designated the same address for services of process and as their principal place of business, to wit:  528 Burgandy K, Delray Beach, Florida and each was incorporated by the same company, i.e., ALCO Corporate Services, Inc.

**B.**    **Defendants' Medical Clinic Scheme**

183.    Once the Defendant PCs were created, the Defendant Management Companies and/or other management companies unknown to Allstate, but owned, controlled and operated by the Principals, generated medical records, reports and bills for services purportedly provided by legitimate professional corporations, when in fact they were not.  The Defendant PCs provided the avenue through which the Principals and/or others unknown to Allstate were able to engage in a systematic, bogus medical documentation and billing scheme premised entirely on their ability to pass millions of dollars through fraudulently incorporated professional corporations.

184.    On information and belief, between 1996 and 2005, the Principals created the Defendant PCs, ostensibly owned by different healthcare professionals, in order to deceptively lead No-fault insurance carriers, in general, and Allstate, in particular, to believe that each were separate, distinct and independent entities. The formation of multiple PCs operating out of at least six different locations were instrumental in furthering that deception, by allowing the Defendant PCs to submit bills indicating that either their offices or the offices where the services were rendered were different from one another.

185.    On information and belief, to avoid suspicion and detection by insurance companies, almost annually, the Principals would incorporate a new Defendant PC under a new name during the twelve year racketeering activity described herein.

186.    When a new Defendant PC was incorporated and operated out of the same address, the one incorporated immediately before it was gradually phased out and stopped billing insurance companies, in general, and Plaintiffs, in particular, allowing for an overlap between two or more of the Defendant PCs at a time.  By way of example, Flatlands 78 Medical replaced and was the successor to Lamed Medical, both of which were purportedly owned by Defendant Benjamin, who was criminally convicted of insurance related crimes committed in the State of New York, and whose license was suspended from April 9, 2007 through February 10, 2008.  Similarly, 825 Medical replaced and was the successor to 825 Broadway Medical.

187.    On information and belief, the Principals concealed the fact that they were the true beneficial owners of the PCs in order to circumvent Article 15 of the BCL, which prohibits individuals who are not licensed to practice medicine from controlling and operating professional corporations in the medical field.  Specifically, Section 1507 of the BCL permits the ownership of a professional corporation by only those "individuals who are authorized by law to practice in this state [New York] a profession which such corporation is authorized to practice...."

188.    On information and belief, the Principals and others unknown to Allstate created Defendants Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, and Tropicana One, which served as alter egos, for the purpose of concealing and laundering money that they received from insurers, in general, and Allstate, in particular, as a result of the fraudulent and unlawful conduct alleged herein.  By way of example and not limitation of the money that was laundered through one or more of these

companies, Defendant Mirvis received approximately $253,000.00 from one or more of the Money Laundering Companies and used one or more of the Defendant Management Companies to make payments to one or more of the Money Laundering Companies totaling approximately $860,000.00.

189.    On information and belief, the money funneled by the Principals and others unknown to the Plaintiffs to the Money Laundering Companies constituted and reflected profits of the criminal enterprise alleged herein.

190.    On information and belief, the Principals, directly and through their co-conspirators operated, managed, supervised, participated in, conducted and oversaw the day-to-day billing operations of the Defendant PCs.

191.    On information and belief, the Principals employed, supervised and directed the personnel and support staff who were responsible for creating and generating fraudulent bills, fictitious medical records and No-fault forms to be submitted to insurance carriers, in general and Allstate, in particular.

192.    At all relevant times mentioned herein, each of the Principals shared in the ownership, control and operations of the Defendant PCs and Defendant Management Companies and were intimately involved in all facets of the Defendant PCs' business operations and management.

193.    Although each of the Principals shared in all of the proceeds generated by the Defendant PCs, on information and belief, each of the Principals were responsible for activities relating to one or more of the Defendant PCs.  By way of example, on information and belief:

- Defendant Mirvis, acting in concert with the other Principals, and pursuant to a common scheme to defraud, was responsible for the day-to-day and fraudulent

billing operations of the Defendant PCs, including but not limited to General Medical Care, and additionally was a principal/officer of one or more of the Defendant Management Companies, including but not limited to Hillmed Management, Flatlands Best Management, B-Way Management and Flat-80 Management, which was used to launder money from Dover Medical to other corporations owned and controlled by the Principals and their co-conspirators.

- Defendant Lupolover acting in concert with the other Principals, and pursuant to a common scheme to defraud, was responsible for the day-to-day and fraudulent billing operations of the Defendant PCs, including but not limited to Dover Medical and was also a principal/officer of Flat-80 Management, which was used to launder money from Dover Medical to other corporations owned and controlled by the Principals and their co-conspirators.

- Defendant Katz acting in concert with the other Principals, and pursuant to a common scheme to defraud was responsible for the day-to-day and fraudulent billing operations of the Defendant PCs, including but not limited to L&B Medical, and was also an officer of Hillmed Management which was used to launder money from L&B Medical to other corporations owned and controlled by the Principals and their co-conspirators.

- Defendant Bezenyan, acting in concert with the other Principals, and pursuant to a common scheme to defraud, was responsible for the day-to-day and fraudulent billing operations of the Defendant PCs, including but not limited to Lamed Medical, and was also an officer of Flat-80 Management, which was used to launder money from Lamed Medical to other corporations owned and controlled by the Principals and their co-conspirators.

- Defendant Zhuravsky acting in concert with the other Principals, and pursuant to a common scheme to defraud was responsible for the day-to-day and fraudulent billing operations of the Defendant PCs, including but not limited to L&B Medical, 825 Broadway Medical, General Medical and Dover Medical and was also an officer of Hillmed Management, Flat-80 Management, B-Way Management which were used to launder money from L&B Medical to other corporations owned and controlled by the Principals and their co-conspirators.

- Defendant Statnrosh acting in concert with the other Principals, and pursuant to a common scheme to defraud was responsible for the day-to-day and fraudulent billing operations of the Defendant PCs, including but not limited to 825 Broadway Medical and General Medical, and was also an officer of B-Way Management which was used to launder money from 825 Broadway Medical and General Medical to other corporations owned and controlled by the Principals and their co-conspirators.

194.    On information and belief, at all times mentioned herein, the Principals, through the Defendant Management Companies, Dummy Corporations and their co-conspirators, and acting in concert and in furtherance of the scheme to defraud alleged herein, knowingly

managed, supervised, participated in, conducted and oversaw the day-to-day operations of the

Defendant PCs.

195. On information and belief, the responsibilities and activities of the

Principals and their co-conspirators included, *inter alia*:

- Hiring, managing and supervising the support staff and office managers they employed at the Defendant PCs;

- Managing and supervising the support staff they employed on behalf of the Defendant Management Companies where, on information and belief, the phony medical records and fraudulent bills that were submitted by the Defendant PCs to insurance companies, in general, and Allstate, in particular, were manufactured;

- Preparing fraudulent medical documents and mailing them to Allstate;

- Preparing fraudulent bills and mailing them to Allstate;

- Maintaining records and computer databases that were used to fraudulently create bogus medical documentation and bill insurance companies;

- Creating, preparing, generating, signing and mailing correspondence and collection letters that were sent with fraudulent billing documentation to insurance companies;

- Falsifying the information contained in the New York State NF-3 forms submitted by the Defendant PCs to No-Fault insurance carriers, in general, and Plaintiffs, in particular, by preparing and submitting fraudulent support documentation;

- Billing for services never rendered and altering test results and medical findings to justify expensive diagnostic testing, ROM testing and synaptic treatment;

- Generating fraudulent supporting documentation, such as narratives and tests results in order to bill for NCVs, EMGs, and other expensive diagnostic tests and medical services that were never conducted or were conducted in such a manner that rendered the test results of no diagnostic or treatment value;

- Billing for neurological testing and other medical services that were never rendered, were materially misrepresented and/or of no diagnostic or treatment value;

- Manufacturing bogus test data and results to substantiate billing for NCV, EMG and other expensive diagnostic tests that were never conducted or that were of no diagnostic value; and

- Creating or instructing and directing other support staff to create forged, false and fraudulent narrative reports of patients' conditions and other documentation that Defendants mailed to Allstate to obtain payments.

196.    On information and belief, the Principals devised and carried out a scheme to maximize the production of fraudulent bills by routinely billing insurers for essentially the same battery of treatments, tests and other services, all supported by bogus template reports and medical documentation.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

197.    In furtherance of Defendants' fraudulent billing scheme, individuals who were purportedly involved in automobile accidents in which they ostensibly sustained soft-tissue injuries would present to one of the Defendant PCs, where the Covered Person would be interviewed by the support staff employed by the Principals.   Upon satisfying the initial threshold inquiry for "treating" at one of the Defendant PCs, the Covered Person would be given various No-fault forms to complete upon entering a particular PC for the first time.  The No-fault forms set forth all the information necessary for the Defendant PCs to establish and prepare bills, including but not limited to the Covered Person's address, claim number, policy number, name of insured, name of No-fault carrier and assignment of benefits forms.

198.    On information and belief, regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit, the Defendant PCs would initiate a series of template reports and related medical documentation to justify the extensive and aggressive prescription of treatments and diagnostic testing that would immediately follow.

199.    On information and belief, as further part of the fraudulent billing scheme, a Covered Person's initial office consultation at any one of the Defendant PCs would automatically trigger the internal generation of bogus reports and billing practices and procedures in which Defendants would create bogus medical documentation and bill for services, including but not limited to evaluations, examinations, diagnostic testing (including but not

limited to EMGs and NCVs), ROM Testing, nerve destruction procedures and Synaptic Treatment, regardless of whether such treatments and tests were actually performed or medically necessary.

200.    On information and belief, based on the results of purported examinations and testing, the claimants were then referred for extensive physical therapy and other therapeutic services.

201.    On information and belief, Defendants failed to follow-up on the diagnoses and apparent medical conditions they had fabricated to justify the aggressive physical therapy and expensive diagnostic tests for which they billed and for which they submitted fraudulent documentation, including material misrepresentations concerning the services rendered.

202.    On information and belief, the bills and documentation submitted by the Defendant PCs, in support of their claims, included fraudulent reports and records that intentionally misrepresented, exaggerated and falsified the condition and test results of Covered Persons.

203.    On information and belief, Defendants' billing documents, in these and every other submission, also contained the implicit misrepresentation that the services were administered and the bills were generated by lawful professional service corporations, operated by medical doctors.  Instead, the Defendant PCs were operated and controlled by the Principals.

204.    On information and belief, as part of the fraudulent billing scheme, the Principals, their co-conspirators, and others, caused the signatures of doctors, physical therapists and other healthcare professionals to appear on medical reports and bills submitted to Allstate in the names of the Defendant PCs.

## THE ELECTRODIAGNOSTIC SCHEME TO DEFRAUD

A.     **Electrodiagnostic Fraud**

205.     On information and belief, the Principals, through and for the benefit of the Defendant PCs, routinely billed for Electrodiagnostic Testing that was never rendered and/or materially misrepresented and/or was of no diagnostic value.

206.     The AMA is the publisher of the CPT Code Book, which is the definitive medical source used by licensed medical professionals to accurately describe, among other things, medical and diagnostic services performed and billed to third-party payors, such as insurance companies.

207.     Pursuant to Section 5108 of the Insurance Law, the Department of Insurance has adopted the Fee Schedule published by the Workers' Compensation Board, which sets forth the charges for professional health services that are reimbursable under the No-fault Law.  The Fee Schedule incorporates the CPT codes published by the AMA, and the coding rules and regulations set forth by the AMA.

208.     At all relevant times mentioned herein, Defendants submitted bills to Allstate wherein using CPT codes that intentionally and materially misrepresented the services, if any, performed and for which they sought reimbursement and were paid.

209.     In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendants billed Allstate for NCVs, EMGs, ROM Testing and Synaptic Treatment when in fact such services were not performed and/or the tests results relating thereto were fabricated and/or of no diagnostic or treatment value.

210.     On information and belief, virtually all of the claims in which the Defendant PCs submitted bills and supporting medical records to ostensibly demonstrate that the

services were rendered and, as a result thereof were paid by Allstate, involved patients who were purportedly in automobile accidents in which they suffered soft-tissue injuries.

211.   On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, the Defendant Doctors routinely referred patients treated at one or more of the Defendant PCs for multiple neurological consultations that they knew or should have known were medically unnecessary and/or would produce medically invalid recommendations that were of no clinical or diagnostic value.

212.   The nervous system is divided into two major anatomical divisions: the central nervous system and the peripheral nervous system.  The central nervous system includes the brain and the spinal cord, while the peripheral nervous system includes the peripheral nerves. The purpose of the neurological examination is to identify the presence of any abnormality in the nervous system.  The standard neurological examination checks the function and integrity of each component of the nervous system, including examination for the presence of generalized diseases of the peripheral nerves, known as neuropathy.  Neuropathy can result from many diseases such as diabetes, kidney failure, cancer, AIDs and from systemic inflammatory disease of the small arteries of the body.  In accordance with accepted medical practice, when a physician conducts an examination of a patient where the complained of symptoms may affect the nervous system or where the examination shows findings suggestive of nervous system disease or injury, it is essential that the physician rule out the existence of neuropathy, which may be done by performing an NCV.

213.   On information and belief, virtually all of the medical documentation submitted by Defendants relating to Electrodiagnostic Testing was based on reports that fraudulently documented and/or materially misrepresented the results.

214.    On information and belief, Defendants, through the Defendant PCs, as a matter of practice, procedure and protocol fraudulently billed for Electrodiagnostic Testing that intentionally misrepresented the services purportedly rendered, which, in fact, were not performed as billed and/or were otherwise fabricated.

215.    In numerous instances, the reported results associated with the Electrodiagnostic Testing were fictitious, meaning that Defendants routinely and as an integral element of their scheme to defraud, submitted fabricated reports, findings and data to insurance companies, in general, and Allstate, in particular, to substantiate their fraudulent claims and induce payment.

216.    Radiculopathy is defined as injury or dysfunction of spinal nerve roots, which may affect the nerve root of a sensory nerve, motor nerve or both.  With respect to trauma cases, such as those suffered as a result of automobile accidents, for the few cases in which radiculopathy occurs, the usual cause of radiculopathy is direct pressure on the nerve root by a herniated intervertebral disc causing inflammation of the nerve root.  The presence or absence of radiculopathy is determined by performing an EMG.  It is impossible to correctly interpret an EMG unless the NCV is properly performed and interpreted in accordance with the prevailing standard of practice.

217.    With respect to neurological examinations preceding electrodiagnostic studies, the Defendant Doctors fraudulently misrepresented the presence of objective cervical motor deficits in 53% of the patients and objective cervical sensory deficits in 74% of the patients.  By comparison, generally accepted peer reviewed medical literature (Hong, C. "Cervical Radiculopathy Clinical, Radiographic and EMG Findings," Orthopedic Review, 15:433-439, 1986) found that among patients diagnosed with clinical radiculopathy, the

frequency of objective motor deficit was 24% and the frequency of objective sensory deficit was 6%.

218.   On information and belief, the frequency of motor to sensory objective findings reported by the Defendant PCs is completely inconsistent with the frequency of motor to sensory objective findings as documented by Dr. Hong and generally accepted in medical literature.

219.   On information and belief, the frequency of abnormal findings documented by Defendants is medically impossible.

220.   Another generally accepted peer reviewed study (Yoss et. al., "Significance of Symptoms and Signs in Localization of Involved Root in Cervical Disk Protrusion," Neurology 7 (10):673-683, 1957), reported that 100 Mayo Clinic patients with severe symptoms of cervical radiculopathy that required surgical intervention to repair herniated discs, had a frequency of objective motor deficit of 75% and frequency of objective sensory deficit of 24%. In comparison, the Defendant Doctors fraudulently misrepresented the presence of objective cervical motor deficits in 53% of the patients and objective cervical sensory deficits in 74% of the patients. This frequency of motor to sensory objective findings reported by the Defendant PCs is completely inconsistent with the frequency of motor to sensory objective findings as documented by Dr. Yoss and generally accepted in the medical literature.

221.   On information and belief, the frequency of abnormal findings as documented by the Defendant is medically impossible.

222.   Compared to the findings of Dr. Hong, the Defendant Doctors fraudulently misrepresented the ratio of objective cervical sensory deficits in (74% of the patients) to objective cervical motor deficits (53% of the patients) at a ratio of 3 motor deficits for every 4

sensory deficits (ratio 3:4).  This frequency of motor to sensory objective findings reported by the Defendant PCs is completely inconsistent with the frequency of motor to sensory objective findings as documented by Dr. Hong (24% motor to 6% sensory deficits is a ratio of 4:1) which is generally accepted in the medical literature for patients with cervical radiculopathy not requiring surgery.  Compared to the Hong ratio of motor to sensory deficits of 4:1, the ratio of these abnormal findings as documented by the Defendants (3:4) is medically impossible.

223.    On information and belief, the significantly higher frequency of sensory to motor deficits reported in the medical reports and records submitted to Allstate by the Defendant PCs, for patients who suffered only minor soft-tissue injuries, are completely implausible and can only be explained as a willful, intentional and fraudulent misrepresentation of the documented objective examination findings by the Defendant Doctors.

224.    The reported findings by the Defendant Doctors relating to the frequency of objective motor and sensory deficits among patients suspected of suffering radiculopathy are at an incredible variance from those reported in the Hong and Yoss studies. On information and belief, the only explanation for the higher frequency of purportedly objective sensory findings submitted to Allstate by the Defendant PCs is Defendants' willful, intentional and fraudulent misrepresentation of those findings.

225.    On information and belief, the Defendant PCs' patients were reported to have a frequency of objective motor deficit (53.39%) compared to a frequency of objective sensory deficit (73.36%) that is contrary to what is known as manifestation of motor and sensory deficit in radiculopathy.  By contrast, the patients in both the Hong and the Yoss populations demonstrate a ratio of motor to sensory deficit of approximately 5 to 1.  This finding that patients with radiculopathy have far more motor than sensory deficits is consistent with the anatomical

fact that the motor root is adjacent to the disc while the sensory root is relatively protected by its anatomic location.  The higher frequency of sensory compared to motor deficits documented by the Defendant PCs' doctors defies logic and the generally accepted causes of radiculopathy.

226.    On information and belief, the Defendant PCs, as a matter of procedure, practice, and protocol, routinely submitted to Allstate medical records, reports and bills for reimbursement of Electrodiagnostic Testing that was purportedly performed to diagnose radiculopathy, but were instead false and used merely to fraudulently justify the administering of the expensive Electrodiagnostic Testing and to intentionally overstate and misrepresent the extent of injury to justify further expensive treatment.

227.    On information and belief, Defendants devised a scheme whereby they frequently documented objective examination findings of radiculopathy when, in fact, statistically the documented frequency and distribution of clinical neurologic findings could not exist and, therefore, were fraudulently reported.  The fraudulently documented clinical findings were subsequently used to justify the performance of expensive Electrodiagnostic Testing.

228.    On information and belief, in numerous instances, the clinical documentation produced by Defendants relating to the Electrodiagnostic Testing was the product of a sophisticated scheme to produce large volumes of clinical documentation that was totally divorced from and intended to misrepresent the true clinical status of the patient documented by the Defendant Doctors who purportedly treated the claimants.

**B.**    **NCV Fraud**

229.    On information and belief, the Defendant PCs routinely submitted bills for reimbursement to Allstate for expensive NCV tests that reflected services (to the extent any were

performed) that were materially misrepresented, fabricated and/or never performed or performed in a way that could not possibly produce valid data or results.

230. On information and belief, to confirm or rule out a diagnosis through an NCV and EMG, the data and results produced from the NCV must be performed and interpreted in a medically valid manner according to the standard of practice. Notwithstanding the foregoing, Defendants routinely billed for NCV and EMG testing allegedly performed to evaluate neurological symptoms, even though the NCV and EMG tests were performed and interpreted in an invalid manner that violated the standard of care and lacked medical efficacy. The billing for such services constitutes and represents fraudulent billing for services that were never performed, fabricated and/or misrepresented. By way of example and not limitation, such instances where EMGs were purportedly performed and interpreted in the absence of a medically valid NCV are found in Exhibit "30," in the accompanying Compendium of Exhibits.

### 1. Duplication of Nerve Conduction Data

231. On information and belief, in numerous instances, Defendants submitted to Allstate for reimbursement identical NCV studies, including duplicate data and graphic waveforms, purportedly performed on separate and distinct patients, who allegedly sustained injuries in different automobile accidents. The extent of NCV data duplication ranged from the duplication of a specific sensory or motor nerve study, to the duplication of an entire report, including waveforms, EMG findings, and recommendations. Since it is impossible for different patients to have identical NCV waveforms, (or even the same patient to have identical waveforms on different days), the existence of these identical NCV waveforms is dispositive of the fact that these Electrodiagnostic Tests were never performed and that Defendants submitted bills to insurers, in general, and Allstate, in particular, for fictitious tests. By way of example and

not limitation, Exhibit "31," in the accompanying Compendium of Exhibits, is a table identifying 27 NCV studies submitted by Defendants to Allstate for reimbursement wherein the data and/or graphic waveforms for one patient's NCV is identical to all the data and/or graphic waveforms of another patient.

232.    On information and belief, the billing and supporting documentation submitted by the Defendant PCs to Allstate for Electrodiagnostic Testing reflect numerous instances where three or more data values for latency, amplitude, area, duration and velocity for a nerve tested on a patient are identical to the values for a nerve tested on another patient.

233.    On information and belief, as the constellation of data values and graphic waveforms are unique to a specific person at a specific moment in time, the submission of duplicate data and graphic waveforms demonstrates that the documentation submitted and mailed by the Defendants in support of their billing for Electrodiagnostic Testing was manufactured and fictitious, and that the related bills were also fraudulent. Each of the claim submissions identified in Exhibit "31" reflect examples of such fraudulent documentation and billing.

234.    By way of further example, in Exhibit "32," in the accompanying Compendium of Exhibits, are identical NCV data and waveforms for two Covered Persons, assigned claim numbers 4816071692-02 (S.C.) and 4816170445-04 (O.J.), respectively, which relate to studies purportedly conducted by Defendant Doctor Raufov and submitted by Defendant 825 Broadway Medical to Allstate for payment. As indicated therein, the waveforms and data values for each patient are identical and perfect matches, even though they relate to different patients. As a matter of scientific certainty, it is impossible for patients to have matching graphic data and waveforms.

235.   By way of further example, in Exhibit "33," in the accompanying Compendium of Exhibits, are identical NCV data and waveforms for two persons, one assigned an Allstate claim number 4815911641-01(J.B.) and the other an Encompass claim number P6152123-P12 (E.L.), which relate to studies purportedly conducted by Defendant Doctor Raufov, the former of which was submitted by Defendant 825 Broadway Medical to Allstate for payment.  As indicated therein, the waveforms and data for each patient are identical and perfect matches, even though they relate to different patients.  As a matter of scientific certainty, it is impossible for patients to have matching tabular data and waveforms.

236.   By way of further example, in Exhibit "34," in the accompanying Compendium of Exhibits, are identical NCV data and waveforms for two Covered Persons, assigned claim numbers 4144594753-01 (B.A) and 2679219 (M.T.), respectively, which relate to studies purportedly conducted by Defendant Doctor Israeli, the former of which was submitted by Defendant ZDR Medical to Allstate for payment.  As indicated therein, the waveforms and data for each patient are identical and perfect matches, even though they relate to different patients.  As a matter of scientific certainty, it is impossible for patients to have matching graphic data and waveforms.

237.   On information and belief, not only did the Defendant PCs share NCV data amongst themselves which was submitted to Allstate in support of claims for reimbursement, but they also, on numerous occasions, submitted bills and supporting medical reports and documents to Allstate for reimbursement of Electrodiagnostic Testing on Covered Persons that contained NCV data identical to NCV data submitted by other multidisciplinary providers, not named in this Complaint, in support of their claims for reimbursement, months, and sometimes years earlier.  By way of example and not limitation:

- On or about September 27, 1999, Queens Community Medical Center P.C. mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly rendered to a Covered Person under claim number 1124315233. Nearly four years later, on or about September 3, 2003, Defendant Lamed Medical mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly performed on a Covered Person under claim number 4816062360. Upon review of the purported the data values for the sensory studies and F waves contained in the reports submitted in support of said claims, it is readily apparent that said results are identical, notwithstanding the fact that they are purportedly the product of different examinations pertaining to different individuals at different times.

- On or about July 18, 2000, Grand Medical, P.C. mailed bills and supporting documentation to Nationwide Insurance Company for reimbursement of Electrodiagnostic Testing purportedly rendered to a Covered Person under claim number 6631P774289. Nearly three years later, on or about July 1, 2003, Defendant L&B Medical, mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly performed on a Covered Person under claim number 1125560811. Upon review of the purported the data values contained in the reports submitted in support of said claims, it is readily apparent that said results are identical, notwithstanding the fact that they are purportedly the product of different examinations pertaining to different individuals at different times.

- On or about April 13, 2000, Grand Medical P.C. mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly rendered to a Covered Person under claim number 1125560811. Nearly two years later, on or about March 26, 2002, Defendant General Medical Care, P.C. mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly performed on a Covered Person under claim number 4815759289. Upon review of the purported the data values contained in the reports submitted in support of said claims, it is readily apparent that said results are identical, notwithstanding the fact that they are purportedly the product of different examinations pertaining to different individuals at different times.

- On or about August 21, 2000, Defendant Lamed Medical mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly rendered to a Covered Person under claim number 4815540663. More than one year later, on or about October 1, 2001, Elm Neurological Care P.C. mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly performed on a Covered Person under claim number 6622944046. Nearly one year after that, on or about May 14, 2002, Comprehensive Medial Diagnostic testing, P.C. mailed bills and supporting documentation to Safety Insurance Company for reimbursement of Electrodiagnostic Testing purportedly performed on a Covered Person under

claim number 1347691NY16151.  Several months later, on or about July 29, 2002, Elm Neurological Care, P.C. mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly performed on a Covered Person under claim number 3633959337.  Three months after that, on or about October 8, 2002, Defendant L&B Medical mailed bills and supporting documentation to Allstate for reimbursement of Electrodiagnostic Testing purportedly performed on a Covered Person under claim number 2124816634.  Upon review of the purported the data values contained in the reports submitted in support of said claims, it is readily apparent that said results are identical, notwithstanding the fact that they are purportedly the product of different examinations pertaining to different individuals at different times.

238.   In furtherance of their scheme to defraud, Defendants submitted to Allstate NCV values that failed to correspond with the waveforms submitted in support of their claims for reimbursement meaning that such NCV documentation contained fraudulently altered numeric data because if the waveforms are identical, the numeric data derived by the EMG machine from the waveform must be identical.

239.   By way of example, Exhibit "35," in the accompanying Compendium of Exhibits, contains identical waveforms for two Covered Persons with different NCV values, assigned claim numbers 4815911641-01 (J.B.) and 4815978442-02 (D.H.) respectively, which relate to studies purportedly conducted by Defendant Doctor Raufov which were submitted by Defendant 825 Broadway Medical to Allstate for payment.  Notwithstanding that the waveforms for each of these Covered Persons are identical, the NCV data is different, reflecting that such billing and supporting documentation contains fictitious results because the numeric data was fraudulently altered.   In addition, the NCV data in patient D.H.'s reports is mathematically incorrect.  On information and belief, such mathematical calculations are done by a computer which is part of the machine which performs the testing, and cannot make the arithmetic error that is contained in the reports, further demonstrating that the NCV results were contrived.

240.    On information and belief, as a matter of procedure, practice and protocol, Defendants submitted manufactured and fictitious NCV test results and billing documentation to Allstate for reimbursement.  Additional representative examples where Defendants submitted to Allstate electrodiagnostic studies containing fraudulent NCV findings are in the accompanying Compendium of Exhibits, as Exhibit "36."

## 2.    Protocol Approach to NCVs

241.    As a matter of practice and procedure, the Defendant Doctors used what is known as the "protocol approach" to perform NCVs, when in fact accepted medical practice and the AMA, requires that such tests be performed using what is known as a "dynamic" examination or approach as a prerequisite for billing under EMG and NCV CPT codes.  Unlike the protocol approach utilized by the Defendant Doctors that resulted in the same set of nerves purportedly being tested (8-10 nerves for the upper limbs and 6-8 for the lower limbs) regardless of the patients' symptoms and findings, the dynamic approach (also known as a "progressive" examination) actually takes into account the individual symptoms and the results and findings of each nerve and muscle tested resulting in a logical, coherent and constantly evolving electrodiagnostic evaluation, evidenced by variation of the nerves tested on a case-by-case basis.

242.    On information and belief, even though the NCV must be performed dynamically, the Defendant Doctors used the protocol approach, which fails to recognize that the nerves and muscles studied will change from case to case, and evolve within a case as the study proceeds.

243.    On information and belief, use of the dynamic approach is a prerequisite for the use of the electrodiagnostic CPT codes and, in using the protocol approach as a matter of practice, procedure and protocol, Defendants submitted bills to Allstate for reimbursement of

NCVs wherein they represented the services were validly performed and reimbursable under the No-fault Law, when in fact they were not.

244.    Even though the Defendant Doctors' utilization of a protocol approach to the selection of NCVs was violative of the requirements of the applicable CPT codes, Defendants, through the Defendant PCs, sought reimbursement, and were paid by Allstate, for such services that they knew or should have known were not validly performed, were of no diagnostic value and were fraudulent and not reimbursable under the No-fault Law.

245.    By way of example and not limitation, in a random sample of 269 electrodiagnostic studies where the Defendant PCs submitted medical records to Allstate in support of claims for reimbursement for 269 electrodiagnostic tests, in 268 (99.6%) of the studies, the Defendant PCs sought reimbursement for the performance of testing on a standard protocol of nerves on each patient, regardless of the patient's symptoms or findings.  A table identifying the 268 random electrodiagnostic studies where the "protocol approach" was used is in the accompanying Compendium of Exhibits, as Exhibit "37."

246.    On information and belief, the use of the "protocol approach," which, if administered at all, was uniformly employed by the Defendant Doctors, increases the likelihood of invalid diagnoses and unreasonable and unnecessary testing.

247.    On information and belief, the use of the "protocol approach," was uniformly employed by the Defendant PCs, virtually assuring the likelihood of medically unreasonable and unnecessary Electrodiagnostic Testing, assuming the purported testing was administered at all.

248.   The Defendant Doctors' purported use of the "protocol approach" (as opposed to utilizing the "progressive" or "dynamic" examination approach) in performing NCVs is contrary to the well accepted practices of the medical community.

249.   The Defendant Doctors use of the "protocol approach" is contrary to the requirements for billing for electrodiagnostic services under the CPT codes used by the Defendant PCs in seeking reimbursement from Allstate, and reflects a pattern and practice of billing for services that were never rendered, were fabricated and/or materially misrepresented and of no diagnostic value.

250.   On information and belief, since the NCV testing was substantially or wholly fabricated and/or routinely performed in a manner that could not possibly produce medically valid results, none of the medically accepted electrodiagnostic procedures were followed, rendering the purported services billed by Defendants to Allstate of no diagnostic value and fraudulent.

251.   By submitting to Allstate fictitious bills and documentation for NCV testing, Defendants misrepresented the services purportedly rendered, and billed for services which were not rendered or services performed in an invalid manner, rendering the results of no diagnostic value.

252.   By manufacturing phony tests and supporting documentation and/or performing medically invalid testing, Defendants willfully and materially misrepresented their findings and conclusions as valid when in fact they were not.

253.   By way of further examples of Defendants' practice of billing for services never rendered, Defendants submitted bills to Allstate for NCVs that fraudulently represented that such studies were provided when in fact they were of no diagnostic value and were

misrepresented, fabricated and/or never performed.       Representative instances where the electrodiagnostic studies contained fraudulent findings that Defendants submitted to substantiate neurological billing pertaining to multiple different Covered Persons, are illustrated as follows:

- On or about 5/24/04, 825 Broadway Medical, P.C. mailed bills and supporting documentation to Allstate for neurological testing purportedly rendered to a Covered Person (C.M.) under claim number 4816096425-02.

- On or about 2/28/05, Dover Medical, P.C. mailed bills and supporting documentation to Allstate for neurological testing purportedly rendered to a Covered Person (R.C.) under claim number 4816225561-01.

- On or about 12/1/05, Flatlands 78 Medical, P.C. mailed bills and supporting documentation to Allstate for neurological testing purportedly rendered to a Covered Person (T.H.) under claim number 2126028113-03.

- On or about 1/10/03, General Medical Care, P.C. mailed bills and supporting documentation to Allstate for neurological testing purportedly rendered to a Covered Person (J.M.) under claim number 4815866761-01.

- On or about 8/4/05 and 8/30/05, L&B Medical, P.C. mailed bills and supporting documentation to Allstate for neurological testing purportedly rendered to a Covered Person (J.H.) under claim number 4144293612-01.

- On or about 4/22/03, Lamed Medical, P.C. mailed bills and supporting documentation to Allstate for neurological testing purportedly rendered to a Covered Person (M.N.) under claim number 2124978095-01.

- On or about 11/10/04, S&L Medical, P.C. mailed bills and supporting documentation to Allstate for neurological testing purportedly rendered to a Covered Person (M.R.) under claim number 4143972646-02.

- On or about 9/24/02 and 10/7/02, ZDR Medical, P.C. mailed bills and supporting documentation to Allstate for neurological testing purportedly rendered to a Covered Person (P.S.) under claim number 6623093595-02.

- Additional representative examples where Defendants submitted to Allstate electrodiagnostic studies containing fraudulent findings are in the accompanying Compendium of Exhibits, as Exhibit "36."

3.      **Overutilization of NCVs**

254.    On information and belief, as a matter of procedure, practice and protocol, the Defendant Doctors over-utilized NCV studies to fraudulently bill Allstate for services that were excessive and performed, if at all, solely to maximize reimbursement to Defendants.

255.    By way of example and not limitation, in a review of 269 random sample NCV studies (not including H and F-wave studies), relating to 162 patients, where Defendants PCs submitted to Allstate medical records in support of claims for reimbursement for performing such tests, 255 out of 269 (94.8%) of them were excessive and overutilized.  A table identifying the 255 random sample studies reflecting excessive and over utilized NCVs is in the accompanying Compendium of Exhibits, as Exhibit "38."

256.    Assuming that Defendant Doctors actually performed the billed for studies, the over utilization of such studies served no purpose other than to enrich Defendants through higher reimbursement, while needlessly exposing their patients to increased pain associated with the electrical stimulations required by the testing.

257.    To increase and maximize reimbursement from insurers, in general, and Allstate, in particular, as a matter of practice, procedure and protocol, Defendants intentionally over-utilized NCVs to fraudulently bill Allstate for unnecessary services.

258.    On information and belief, because NCV testing is reimbursed for each nerve tested, Defendants intentionally overutilized NCV testing and fraudulently misrepresented that the NCV testing purportedly rendered was performed, when in fact, it was not.

259.    Despite the official position of the AMA and the standard of practice that five (5) is the maximum number of NCVs necessary for the evaluation of 90% of all radiculopathy cases, the Defendant PCs, as a matter of practice, procedure and protocol, billed

Allstate for 28 NCVs per patient (8-10 upper limbs, 6-8 lower limbs, 8 F waves and 2 H reflexes) having both upper and lower limb studies. A table identifying 255 random sample patients for which the Defendant PCs submitted bills for 28 NCV studies is in the accompanying Compendium of Exhibits, as Exhibit "38."

260.    The systematic and intentional billing for 28 NCVs per patient by the Defendant PCs was, and is, contrary to widely accepted medical practices and intentionally designed to fraudulently maximize reimbursement from Allstate by over-utilizing NCV testing, which if performed at all, would make the fraudulently billed test more painful for the patient.

**4.      Abnormal NCV Parameters**

261.    On information and belief, in numerous instances, the NCV studies submitted by Defendants to Allstate in support of claims for reimbursement were routinely interpreted by one or more of the Defendant Doctors to be within normal limits, when in fact, the data submitted by the Defendants, upon which these interpretations were purportedly based, contained data values and abnormal electrodiagnostic findings that if taken at face value are suggestive or diagnostic of an underlying neuropathy that were entirely ignored.

262.    By way of example and not limitation, in 141 of 269 electrodiagnostic studies (52.4%) of the random sample studies submitted by Defendants to Allstate in support of claims for reimbursement, there were abnormalities with such parameters as latencies, amplitudes and nerve conduction velocities that were not accounted for in the final diagnoses. Although these abnormalities typically are hallmarks of various types of neuropathy, none of abnormal parameters were noted in the Defendant Doctors' reports, and no explanation of or accounting for them occurred in the final diagnoses. A table identifying the 141 random sample

NCV studies which contain abnormal parameters is in the accompanying Compendium of Exhibits, as Exhibit "39."

263.    On information and belief, the understanding of abnormal parameters such as latency, amplitude and nerve conduction velocity are critical and fundamental to the practice of medicine and successful diagnosis of a patient's condition.

264.    On information and belief, were the reported abnormal data values submitted by Defendants to Allstate true, and the cause of the apparent neuropathy not diagnosed and treated, the "patient" would be placed at risk for progressive neurological disorders and/or underlying disease.

265.    On information and belief, the abnormal data values were ignored by the Defendant Doctors because they knew the results were contrived and that there was nothing wrong with the patients on whom the tests were purportedly administered.

### 5.    **Duplicate Tabular Data**

266.    On information and belief, in a review of 269 random sample NCV studies, 197 (73.2%) of the studies, contained tabular data reflecting at least one instance of two identical values.  A representative sample of the foregoing is contained in Exhibit "40" in the accompanying Compendium of Exhibits.

267.    On information and belief, although identical values can be reported on occasion, such occurrences are rare and it is extremely unlikely that 73.2% of the NCVs performed by Defendants would contain at least one instance of two identical data values.

268.    On information and belief, notwithstanding that the presence of identical data values requires that the studies be repeated to ensure that they reflect real values, the Defendant Doctors failed to repeat the tests and failed to mention the identical values in their

reports, reflective of the fact that the Defendant Doctors knew the results of the studies were false.

269.    Notwithstanding that Defendants knew or should have known that the amplitude and/or latency values containing identical data points were false, Defendants submitted bills to Allstate for reimbursement of NCV tests that Defendants claimed to have performed when, in fact, they did not, and in reporting medically improbable duplicate data, potentially endangered the welfare of their patients if they received the wrong diagnosis and received improper treatment by other professionals relying thereon.

270.    On information and belief, there are only two plausible explanations for the impossible occurrence of identical amplitude and latency values in Defendants' NCV reports: (1) many, if not all, of the reported nerve measurements were never performed and the data was medically improbable; or (2) the tests were performed, but the results that appear on the reports submitted to Allstate were not the values measured by the electrodiagnostic machine, meaning they were altered and are, therefore, false.

271.    On information and belief, the identical data values were ignored by the Defendant Doctors because they knew the electrodiagnostic reports contained contrived data and there was nothing wrong with the patients on whom the tests were purportedly administered, or else they failed to perform the professional services for which they billed including data verification in real time and supervision of the technician as required.

6.    **Impossible Distribution of Amplitude Values**

272.    On information and belief, in furtherance of Defendants' scheme to defraud, in numerous instances, the Defendant PCs submitted to Plaintiffs NCV test results in support of claims for reimbursement in which proximal stimulation reportedly yielded

significantly higher amplitude than distal stimulation of the nerve.  In each such instance, the data of such reports is indicative that:  (1) the NCV testing was fabricated and/or the tests were performed in a manner contrary to accepted medical practice and contrary to the AMA rules that govern the use of CPT codes; and/or that the test results were (2) intentionally misrepresented; or (3) the product of incorrectly performed NCV studies that the Defendant Doctors knew or should have known required verification and immediate re-testing in order to obtain valid data rather than medically impossible findings.

273.   On information and belief, since the reported NCV findings cannot actually exist in nature, the Defendant Doctors should have repeated the study to obtain valid data.  The only reasonable explanation for the Defendant Doctors' failure to correct the testing is that they were not supervising the technician in real time and reviewing the results before the patient left the room as required, and they believed that such real time supervision was unnecessary since they knew there was nothing wrong with the patients to whom the tests were purportedly administered.

274.   By way of example and not limitation, in 101 of 269 (37.5%), of electrodiagnostic studies submitted by Defendants to Allstate in support of claims for reimbursement, there were instances in which a nerve conduction study showed significantly higher amplitude (at least 25%) on proximal stimulation than on distal stimulation.   A table identifying the 101 random sample NCV studies which contain impossible amplitude findings is in the accompanying Compendium of Exhibits, as Exhibit "41."

7.   **Failure to Report Conduction Block**

275.   On information and belief, 35% of the Defendant PCs' submissions to Allstate of NCV test results in support of claims for reimbursement contained a significant drop

in proximally evoked responses as compared to distal response.  In each such instance, the data of such reports is indicative that the test results were: (1) intentionally misrepresented; (2) the product of incorrectly performed NCV studies that the Defendant Doctors knew or should have known required correction, but failed to do so in real time because they were not performing the services for which they were billing under the Electrodiagnostic CPT codes; or (3) indicative of "conduction block," which is an electrodiagnostic finding indicative of a serious medical problem that the Defendant Doctors failed to further evaluate because they knew the electrodiagnostic findings were fictitious and there was nothing actually wrong with the patients to whom the tests were purportedly administered.

276.    By way of example and not limitation, in a review of  269 random sample NCV studies submitted by Defendants to Allstate in support of claims for reimbursement,  95 (35.3%) reflect a significant (at least 50%) drop in the proximally evoked response as compared to the distal response on nerve conduction studies, indicative of a conduction block.   A table identifying the 95 NCV studies in which a conduction block was present but failed to be noted is in the accompanying Compendium of Exhibits, as Exhibit "42."

277.    According to the AMA, conduction block is an important pathologic finding.  The AMA's CPT Advisor ( Apr 2002 Volume 12, Issue 4),  states that NCV studies are performed to assess the integrity of and diagnose diseases of the peripheral nervous system and an NCV Report should document the nerves evaluated, the distance between the stimulation and recording sites, conduction velocity, latency values, and amplitude, and include a final diagnosis. Notwithstanding its potential seriousness, the Defendant Doctors' reports failed to report that a conduction block was present in any of the 95 studies in which it occurred, and in none of the 95

studies was conduction block taken into account in the final diagnosis, nor was there a mention of an appropriate diagnostic evaluation in the Defendant Doctors' recommendations.

278. On information and belief, by failing to indicate that a conduction block was present in any of the 95 studies in which it occurred, the Defendant Doctors' reports failed to meet the basic criteria for the use of this CPT code, thereby such services were not rendered as billed and in accordance with the applicable CPT code.

279. On information and belief, as a matter of practice, procedure and protocol, Defendants fraudulently submitted NCV studies to Plaintiffs in which the data values relating to latency, amplitude and other parameters of the evoked responses were, in part or wholly, fictitious, contrived and invalid, meaning that Defendants routinely submitted to Plaintiffs test results and data containing material misrepresentations to substantiate their fraudulent claims and induce payment.

280. In numerous instances, the NCV studies submitted by Defendants were routinely interpreted by the Defendant Doctors to be within normal limits, when in fact, the data submitted by the Defendants, upon which these interpretations were purportedly based, contained data values and abnormal electrodiagnostic findings that if taken at face value are suggestive or diagnostic of an underlying neuropathy that were entirely ignored. Representative examples of the foregoing are contained in the table in Exhibit "42" in the accompanying Compendium of Exhibits. By ignoring these obvious abnormalities, the Defendant Doctors failed to provide the fundamental professional medical services for which the Defendant PCs fraudulently submitted bills to Allstate for reimbursement under the No-fault Law.

281. On information and belief, were the reported abnormal data values submitted by the Defendants to Plaintiffs true and the cause of the apparent neuropathy not

diagnosed and treated, the "patient" would be placed at risk for progressive neurological disorders and/or underlying disease.

282.   On information and belief, if the reported findings were in fact true, these abnormal electrodiagnostic results required emergent diagnostic work-ups to identify the cause of said neuropathy or other nerve injury.   In each instance, the claimant did not receive the required follow-up or diagnostic testing consistent with the abnormal findings.   Rather, the abnormal findings were often reported as being within normal limits or were otherwise ignored.

283.   On information and belief, the results of the Electrodiagnostic Testing were ignored because they were known to be fictitious and therefore not indicative of any underlying condition warranting additional evaluation or diagnostic testing of the Covered Person.

284.   On information and belief, if the abnormal test results and data values reported by the Defendant Doctors were true and went untreated, the "patients" would have been left to suffer from various neuropathies, including potentially grave neuropathies and undiagnosed systemic diseases, such as Guillaume-Barre syndrome (GBS), chronic inflammatory demyelinating polyneuropathy (CIDP) and multifocal motor neuropathy with persistent conduction block (MMN).

285.   On information and belief, the Defendant Doctors did not either rule out conduction blocks or diagnose the potentially serious conditions that cause conduction blocks in the aforementioned studies because they knew that the studies were bogus, fictitious, and therefore not indicative of any underlying condition warranting additional evaluation or diagnostic testing of the Covered Person.

8.      **Impossible Math Errors**

286.      In a review of 269 random sample NCV studies, 34 (12.6%) of those studies, contained errors in the mathematical calculations of data, and in six of those, the mathematical errors affected or should have affected the diagnosis.  A table identifying the 34 NCV studies which contained errors in math is in the accompanying Compendium of Exhibits as Exhibit "43."

287.      On information and belief, calculation errors such as those reflected in the aforementioned studies cannot be explained by machine error; instead, they can only be explained as the fraudulent manipulation of data by the Defendants.

9.      **Overutilization of F-Waves**

288.      In furtherance of Defendants' scheme to defraud, as a matter of procedure, practice, and protocol, Defendants billed Allstate for 4 F-wave studies on virtually every electrodiagnostic study for which they submitted bills for reimbursement.

289.      On information and belief, the performance of 4 F-waves in almost all studies on patients who have been involved in automobile accidents, or even on patients with suspected radiculopathy, is contrary to accepted medical practices, which dictates the use of an EMG to diagnose radiculopathy as opposed to the F-waves that were purportedly performed by the Defendants.

290.      In a review of 269 random studies in which F-waves were utilized, each and every study, or 100%, reflects the over-utilization of F-waves.  On information and belief, the over-utilization of F-waves was intentionally designed to fraudulently increase reimbursement from Allstate through Defendants' purported routine performance of unnecessary