testing.   A table, identifying the 269 studies where F-waves were over-utilized is in the accompanying Compendium of Exhibits, as Exhibit "44."

      **10.**    **Improper use of F-Waves**

      291.    In addition to the intentional and fraudulent over utilization of F-waves, in numerous instances, Defendants did not even correctly administer the test in that they failed to obtain the minimum of ten (10) F-wave responses required by the AMA to obtain an accurate F-wave latency.   Failure to do so renders the F-wave results invalid and unusable for clinical purposes.  In that regard, Defendants routinely, intentionally and fraudulently billed Allstate for F-waves that were not medically necessary to diagnose radiculopathy, the ostensible justification for the test in the first place, and then, in performing this wholly unnecessary test, failed to stimulate a sufficient number of motor axons to conduct a valid test.

      292.    By way of example and not limitation, in 75 of 93 random sample studies (80.6%) that included waveform graphics, the studies fail to reflect the performance of at least 10 F-wave stimulations, which is required by the CPT codes, and which is the prevailing standard in the field of Electrodiagnostic Testing in order to arrive at a reasonably accurate F-wave latency. Despite the prevailing standard in the field, the studies reflect the performance of a minimum of 10 or more stimulations in only 18 of the 93 studies having waveform graphics of the F-waves. The number of stimulations was as few as one, with a mean number of only 6.0 stimulations per F-wave test, rendering the studies completely invalid and unusable for clinical diagnostic purposes.   A table identifying patients who received F-waves in which the Defendants failed to conduct sufficient stimulations to bill for the service is in the accompanying Compendium of Exhibits, as Exhibit "45."

**11.**   **Inaccurate Reporting of F Latencies**

293.   In addition to the intentional and fraudulent over utilization and improper use of F-waves, in numerous instances, Defendant Doctors also failed to accurately report F-wave latencies.  By way of example and not limitation, in 42 of 93 (45.2%) of random sample studies which have waveform graphics, and which are reflected in a table in the accompanying Compendium of Exhibits as Exhibit "46," the marking of the latency of the F-wave is not accurate.

294.   In many instances, the studies reflect only one F-wave response.   On information and belief, it is not possible to accurately determine the latency of the F-wave from a single F-wave response, as a minimum of ten (10) must be analyzed.

295.   By way of further example, in numerous studies, although the F-wave latencies are unreadable, a latency was nevertheless recorded as a data value.   By failing to accurately mark the F-wave latencies, the Defendant Doctors endangered the welfare of their patients by potentially exposing them to incorrect treatment by other healthcare professionals who might rely on their findings or offer no treatment at all with respect to misdiagnosed or undiagnosed conditions.

**12.**   **Failure to Consider H- Reflex**

296.   In a review of 130 random sample of lower limb studies, Defendants submitted medical records reflecting diagnoses that did not take into account the H reflex findings or was contrary to the H-reflex findings in 11 (8.5%) of those studies, potentially exposing the patients to harm if the results were relied on to make a diagnosis and to create a treatment plan.   A table identifying such instances is in the accompanying Compendium of Exhibits, as Exhibit "47."

297.    On information and belief, the Defendant Doctors failed to consider patients' H-reflex data because they knew that the studies were bogus, fictitious, and therefore not indicative of any underlying condition warranting additional evaluation or diagnostic testing of the Covered Person.

298.    The failure to consider the H-reflex finding underscored that the tests were ordered not based on need, but rather to generate payments from insurance companies, in general, and Allstate in particular.

## A.    EMG Fraud

299.    On information and belief, in addition to committing thousands of acts of mail fraud by the submission of fraudulent NCV data to Allstate in connection with claims for reimbursement, Defendants, as a matter of procedure, practice and protocol, routinely submitted, on behalf of the Defendant PCs, bills for reimbursement to Allstate for EMG tests that reflected services that were invalid, materially misrepresented, fabricated, of no diagnostic value, and/or never performed.   By way of example of EMG tests that were never performed:

- On information and belief, Defendant L&B Medical mailed bills and supporting documentation to Allstate for needle EMGs purportedly rendered to a Covered Person (A.B.) under claim number 1125974961. During an examination under oath conducted on or about April 25, 2004, said Covered Person denied ever receiving any type of testing involving the insertion of needles.

- On information and belief, Defendant L&B Medical mailed bills and supporting documentation to Allstate for needle EMGs purportedly rendered to a Covered Person (A.R.) under claim number 1125974961. During an examination under oath conducted on or about April 25, 2004, said Covered Person denied ever receiving any type of testing involving the insertion of needles.

- On information and belief, Defendant General Medical mailed bills and supporting documentation to Allstate for needle EMGs purportedly rendered to a Covered Person (V.A.) under claim number 3634042067. During an examination under oath conducted on or about February 14, 2003, said Covered Person denied ever receiving any type of testing involving the insertion of needles.

1.     **Medically Unacceptable Utilization of Protocol**
       **Approach to  Selection of Muscles for EMG**

300.    On information and belief, Defendants' production of large volumes of fraudulent clinical documentation was facilitated by, among other things, the use of a Synergy Electrodiagnostic Testing machine (the "Synergy EMG Machine") which was used by Defendants to generate, manipulate, and/or fabricate numerous fraudulent medical documents which were submitted to Allstate in support of claims for reimbursement.

301.    In a review of a 267 random sample of EMG studies, the Defendant Doctors utilized a protocol approach to the selection of muscles in nearly 246 studies (92.1%), regardless of the patient's symptoms or findings.  A table identifying such instances is in the accompanying Compendium of Exhibits, as Exhibit "48."

302.    A protocol approach to electrodiagnostic studies is clinically unacceptable and does not meet the standard required for billing for services under the applicable CPT code and therefore bills submitted by Defendants to Allstate in connection therewith were fraudulent and potentially exposed the patients to an incorrect diagnosis and treatment plan.

2.     **Failure to Test Adequate Number of Limb Muscles**

303.    With respect to the EMGs, as a matter of procedure, practice, and protocol, Defendants fraudulently billed for EMG tests that were not performed, and, if they were performed, tested an inadequate number of limb muscles, thereby rendering the EMG medically invalid and misrepresenting that they had performed a "complete" EMG as required by the AMA for utilization of CPT code 95861.

304.    The standard, and only medically valid and accepted practice in electromyography, is to perform EMG testing on a minimum of five muscles per limb to reliably

diagnose the absence of radiculopathy in a limb or determine the spinal level of the radiculopathy if radiculopathy is indeed present, with required testing of additional limb muscles if abnormalities are found.

305.    To bill for EMGs under CPT codes 95861 though 95864, the AMA requires a complete study.

306.    Failure to test and study the minimum number of limb muscles is violative of the AMA requirements for the use of the applicable CPT codes.

307.    On information and belief, failure to perform EMG testing of at least five limb muscles renders the EMG invalid and misleading for purposes of making a diagnosis (positive or negative) relating to radiculopathy.   In that regard, Defendants routinely, intentionally and fraudulently billed Allstate for EMGs that failed to study a sufficient number of muscles per limb to constitute a valid EMG.  In a random sample of 267 electrodiagnostic studies performed on 162 patients, where the patients received EMGs, Defendants failed to test or study a sufficient number of muscles per limb in approximately 68 (25.5%) of the studies in which Defendants billed for the service.  A table identifying the aforementioned 68 studies is in the accompanying Compendium of Exhibits, as Exhibit "49."

**3.    Failure to Study a Key Muscle**

308.    As a matter of practice, procedure and protocol, the Defendant Doctors failed to sample one or more key muscles that would have clarified which root was involved in patients' radiculopathy, which in the vast majority of the reviewed studies involved radiculopathies of a single root.

309.    Notwithstanding the foregoing, in a review of 63 random sample EMG studies submitted by Defendants to Allstate for reimbursement in which radiculopathy was

diagnosed, in 61 (96.8%) of those studies, there was a failure by Defendants to test one or more key muscles that would have aided in clarifying which root was involved in the radiculopathy. A table identifying the aforementioned 61 studies is in the accompanying Compendium of Exhibits, as Exhibit "50."

310.    Each bill submitted by Defendants to Allstate for reimbursement of EMGs included the inherent representation that the service as billed was provided, when in fact, it was not.

311.    The Defendant Doctors' failure to study key muscles in the limb was a material misrepresentation of the services rendered and was fraudulent.

### 4.    Improper Specific Root Diagnoses Made Solely on the Basis of Paraspinal Findings

312.    In a review of 63 random sample EMG studies submitted by Defendants to Allstate for reimbursement in which radiculopathy was diagnosed, the level of the radiculopathy was determined solely from the paraspinal abnormalities in 24 (38%) of the studies.   A table identifying the 24 random sample studies where the Defendant Doctors falsely claimed to diagnose radiculopathy based solely on a paraspinal examination is in the accompanying Compendium of Exhibits, as Exhibit "51."

313.    On information and belief, while the paraspinal muscles are useful indicators of radiculopathy at some level, the exact level of radiculopathy cannot reliably be determined solely from the paraspinal examination, and the Defendant Doctors' diagnoses based thereon constituted a material misrepresentation and was false when made.

314.    On information and belief, the Defendant Doctors' purported diagnosis of the exact root level(s) of radiculopathy based solely on findings in the paraspinal muscles was fraudulent, and constituted a material misrepresentation of medical fact.

**5.     Unreliable Recruitment Read in the Paraspinal Muscles**

315.     In a review of 267 random sample EMG studies submitted by Defendants to Allstate for reimbursement, in 239 (89.5%) of the studies, recruitment was read in the paraspinal muscles.  A table identifying the 239 random sample studies is in the accompanying Compendium of Exhibits, as Exhibit "52."

316.     On information and belief, recruitment requires that the patient fire the muscle being sampled in a progressive manner, from minimal to moderate and then to maximal firing, a procedure which is difficult for the patient to do, and can usually only be done well enough to allow a recruitment determination in the limb muscles.   As, the firing rate and the number of motor units firing at each rate have to be assessed by the electrodiagnostician for recruitment to be read, it is difficult for an electrodiagnostician to read the recruitment in limb muscles, and is extremely difficult in the paraspinal muscles.

317.     On information and belief, recruitment in the paraspinal muscles of the random sample of EMG studies cannot be reliably determined and as such, any report indicating normal or abnormal recruitment is equally unreliable and highly indicative that the findings were fabricated and/or materially misrepresented.

**6.     Improbable Imbalance in the Frequency of Positive
        Waves Versus Fibrillation Potentials**

318.     In a review of 63 random sample EMG studies submitted by Defendants to Allstate for reimbursement for performance of EMGs in which radiculopathy was diagnosed, 13 (20.6%) of such studies, reflected an imbalance in the number of positive waves and fibrillations reported.   A table identifying these 13 random sample studies is in the accompanying Compendium of Exhibits, as Exhibit "53."

319.    This imbalance in the number of positive waves and fibrillations reported is medically unlikely and highly indicative that the findings made by the Defendant Doctors were fabricated and/or materially misrepresented.

### 7.    Over-Diagnosis of Multilevel Radiculopathy

320.    It is well recognized in accepted medical practice that the great majority of radiculopathies occur at a single level rather than at multiple spinal levels, particularly cervical radiculopathies.

321.    Contrary to the recognized medical literature and authorities, in the review of 63 random sample EMG studies in which radiculopathies were diagnosed, 44 (69.8%) were diagnosed with more than one level of radiculopathy (multi-level radiculopathy).    A table identifying the 44 random sample studies containing multi-level radiculopathy diagnoses is in the accompanying Compendium of Exhibits, as Exhibit "54."

322.    Contrary to the recognized medical literature and authorities, in a review of 32 random sample EMG studies in which cervical radiculopathies were diagnosed, 21 (65.6%) were diagnosed with multiple cervical nerve root involvement and multiple lumbar nerve root involvement was diagnosed in all (100%) of the alleged lumbosacral radiculopathy cases, which is medically improbable and indicative that the findings were fabricated.

323.    The over-diagnosis of multiple levels of radiculopathy and multi-level nerve root radiculopathy is medically improbable and indicative that the studies were fabricated, of no diagnostic value and that the billed for services were never rendered, showing a disregard for the welfare of the patients, since it could result in other health care professional relying thereon to prescribe the wrong treatment plan.

8.     **Improbable Root Levels Radiculopathy**

324.    The levels of cervical radiculopathy diagnosed in 32 random sample EMG studies submitted by Defendants to Allstate in support of claims for reimbursement of Electrodiagnostic Testing are atypical of those seen in legitimate medical practices and are contrary to the known distribution of nerve root involvement in radiculopathy in which published studies have found most cervical radiculopathies occur at C7 (46%-76%) or C8 (4%-15%).

325.    Contrary to published studies and accepted medical authorities, in a review of 32 random sample cervical radiculopathy studies purportedly performed by Defendants, the Defendant Doctors diagnosed 15% of the cervical radiculopathies at C5 and 12% at C6, with only 6% having radiculopathy at the C7 level, and none (0%) at the C8 level.

326.    The pattern of root levels seen in 32 random sample cervical radiculopathy studies are so medically improbable as compared with Gold Standard published medical studies that these alleged findings cannot be the product of mere incompetence, but rather reflect intentional material misrepresentations as to the services, if any, provided.  A table identifying 32 random sample cervical radiculopathy studies in which the Defendant Doctors falsely claimed to diagnose radiculopathy that were submitted to Allstate for reimbursement is in the accompanying Compendium of Exhibits, as Exhibit "55."

327.    The levels of lumbosacral radiculopathy diagnosed in 31 random sample EMG studies submitted by Defendants to Allstate in support of claims for reimbursement of Electrodiagnostic Testing are atypical of those seen in legitimate medical practices and are contrary to the known distribution of nerve root involvement in radiculopathy in which published studies have found most lumbar radiculopathies to occur at L5 or S1 (76%-90%).

328.   Contrary to published studies and accepted medical authorities, in a review of the 31 random sample lumbar radiculopathy studies purportedly performed by Defendants, the Defendant Doctors diagnosed 16% of the lumbar radiculopathies at the L5 and S1 levels.

329.   The pattern of root levels seen in 31 random sample lumbar radiculopathy studies is so medically improbable as compared with Gold Standard published medical studies that they cannot be the product of mere incompetence, but rather reflect intentional material misrepresentations as to the services, if any, provided.  A table identifying 31 random sample studies, which reflect false diagnoses for lumbosacral radiculopathy is in the accompanying Compendium of Exhibits, as Exhibit "56."

330.   Similar to the Defendant Doctors' false diagnoses of cervical radiculopathy, their purported diagnosis based on lumbosacral radiculopathy studies were also at gross deviation from what one would expect in a legitimate medical practice and, as such, the findings reported by the Defendant Doctors are indicative of willful misrepresentations and fraud.

**9.      Diagnosis not Justified by the Reported Findings**

331.   In a review of 272 random sample EMG studies submitted by Defendants to Allstate for reimbursement, the Defendant Doctors made a diagnosis that could not be justified by the reported findings in 127 (46.7%) of them, since: (1) the number of muscles tested by the Defendant Doctors was insufficient; (2) the H-reflex data was incompatible with the diagnosis; and/or (3) the diagnosis failed to recognize the presence of a conduction block.  The 127 random sample studies where the Defendant Doctors misrepresented the diagnosis based on an invalid EMG are identified in a table in Exhibit "57" in the accompanying Compendium of Exhibits.

332.    By making unsupported diagnoses, Defendants endangered the health and welfare of their patients by potentially exposing them to incorrect treatment by other healthcare professionals who might rely on their findings, as well as billed Allstate for services that were not rendered and were of no diagnostic value.

333.    On information and belief, the Defendant Doctors' report reflect unsupported diagnoses because the Defendant Doctors knew that the studies were bogus, fictitious, and not intended to actually diagnose a Covered Person's medical condition, but instead, intended solely to generate payments from insurance companies, in general, and Allstate, in particular.

**10.    Diagnosis Did Not Take Into Account Other Possible Pathologies**

334.    In numerous other instances with respect to EMGs, the Defendant Doctors made diagnoses that were not supported by the electrodiagnostic findings submitted by the Defendant PCs to Allstate for reimbursement. Based on a sample of 272 electrodiagnostic studies, 165 studies (60.7%) contained diagnoses that did not take into account other possible pathologies, meaning that they failed to report the required differential diagnoses.  A table identifying the 165 studies patients in which the medical records failed to support the diagnosis made by the Defendants is in the accompanying Compendium of Exhibits, as Exhibit "58."

335.    By making unsupported diagnoses, Defendants endangered the health and welfare of their patients by potentially exposing them to incorrect treatment by other healthcare professionals who might rely on their findings.

336.    On information and belief, the Defendant Doctors' failure to note abnormalities that indicate that other diagnoses, such as conduction block and carpal tunnel syndrome, were potentially present was a misrepresentation of the services rendered.  If these

studies were actually performed, the Defendant Doctors' failure to account for these pathologies could have potentially harmed the patient by resulting in improper treatment, and in doing so showed a disregard for the standard of medical practice.

337.    On information and belief, the Defendant Doctors failed to consider other possible patient pathologies because the Defendant Doctors knew that the studies were bogus, fictitious, and not intended to actually diagnose a Covered Person's medical condition, but instead, intended solely to generate payments from insurance companies, in general, and Allstate, in particular.

### 11.    Improbable Paraspinal and Limb Findings

338.    On information and belief, the pattern of abnormalities in the paraspinals versus the limbs indicated in the medical reports submitted by Defendants to Allstate in support of claims for reimbursement is completely unlike what is seen in medical literature and practice. It is commonly accepted in the medical community that approximately one-third (33.3%) of radiculopathy cases will have EMG findings only in the paraspinal muscles, one-third (33.3%) will have findings only in limb muscles, and one third (33.3%) will have abnormal findings in both the paraspinals and the limb muscles.

339.    Notwithstanding the foregoing, in a review of 63 random sample EMG studies submitted by Defendants to Allstate for reimbursement where radiculopathy was diagnosed, the paraspinals had only positive findings in 38%; the limb muscles had only positive findings in 5%; and the limbs and paraspinals both had positive EMG findings in 57%.   The foregoing ratio is medically unlikely, and highly indicative that the findings made by the Defendant Doctors were fabricated and/or materially misrepresented.  A table identifying the 63 random sample studies is in the accompanying Compendium of Exhibits, as Exhibit "59."

12.   **Over-diagnosis of Radiculopathy**

340.   On information and belief, accepted medical literature and published studies have determined that the rate of abnormal EMGs and NCVs typically seen in ambulatory patients who have been involved in motor vehicular accidents, such as those purportedly treated at the Defendant PCs, is in the range of 1-5%.

341.   Contrary to the published reports concerning ambulatory post motor vehicle accident patients diagnosed with radiculopathy, Defendants diagnosed radiculopathy in 63 out of 267 (23.6%) of the reviewed studies as identified in a table in the accompanying Compendium of Exhibits, as Exhibit "60."

342.   On information and belief, the difference in the frequency of radiculopathy between what is typically found in ambulatory post-motor vehicle accident patients and the 23.6 % radiculopathy rate purportedly found by the Defendant Doctors in the 267 random sample studies is indicative of fraud and an intentional misrepresentation of the electrodiagnostic studies for which Defendants billed Allstate.

343.   The false diagnosis of radiculopathy by Defendants in the 63 random sample studies reflect a disregard for the welfare of the patients, since the wrong diagnosis could result in selection of the wrong treatment plan.

## THE RANGE OF MOTION SCHEME TO DEFRAUD

344.   On information and belief, the Principals, through and for the benefit of the Defendant PCs and in furtherance of the scheme to defraud alleged herein, routinely submitted bills for reimbursement to Allstate for Range of Motion ("ROM") Testing that (to the extent it was provided) was materially misrepresented, fabricated and/or never performed or performed in a way that could not possibly produce valid data or results.  A table listing a

random sample of claims Allstate paid to the Defendant PCs for reimbursement of ROM Testing that was not performed, fabricated, contained material misrepresentations as to the purported services, if any, that were performed and/or, were of no diagnostic value is in the accompanying Compendium of Exhibits, as "Exhibit "61"

345. On information and belief, Defendants utilized a ROM machine manufactured by JTech Medical Industries ("JTech") to perform the ROM Testing that is the subject of this Complaint.

**A.     Implausible Range of Motion Abnormalities**

346. On information and belief, virtually all ROM test results submitted by Defendants to Allstate for reimbursement indicated that the subject patient suffered from at least one ROM impairment -- a finding which was necessary in order for Defendants to justify further billing for testing and treatment on the patients.

347. By way of example and not limitation, in a review of 163 random sample cervical ROM reports submitted by Defendants to Allstate in support of claims for reimbursement for cervical ROM Testing, 160 (98%) showed ROM impairment for at least one plane of cervical motion, and 119 (73%) showed abnormal values for all cervical ROM components. A table identifying the 160 random sample cervical ROM reports having ROM impairment for at least one plane of cervical motion is in the accompanying Compendium of Exhibits, as Exhibit "62." A table identifying the 119 random sample cervical ROM reports having abnormal values for all cervical ROM components is in the accompanying Compendium of Exhibits, as Exhibit "63."

348. On information and belief, to have virtually all patients who undergo cervical ROM testing display an abnormality, and a majority of patients to display abnormalities

114

for all cervical ROM components, is medically unlikely and highly indicative that the findings contained in the cervical ROM reports submitted by Defendants for reimbursement were fabricated and/or materially misrepresented.

349. By way of further example of the bogus ROM abnormalities reflected in Defendants' reports, with regard to lumbar ROM Testing, in a review of 170 random sample lumbar ROM reports submitted by Defendants to Allstate in support of claims for reimbursement, 164 (96%) showed ROM impairment for at least one plane of lumbosacral motion, and 105 (62%) showed abnormal values for all lumbar ROM components. A table identifying the 164 random sample lumbar ROM reports showing ROM impairment for at least one plane of lumbosacral motion is in the accompanying Compendium of Exhibits, as Exhibit "64." A table identifying the 105 random sample lumbar ROM reports showing abnormal values for all lumbar ROM components is in the accompanying Compendium of Exhibits, as Exhibit "65."

350. On information and belief, as is the case with cervical ROM testing, to have virtually all patients who undergo lumbar ROM testing display an abnormality is medically unlikely and highly indicative that the findings contained in the lumbar ROM reports submitted by Defendants for reimbursement were fabricated and/or materially misrepresented.

351. On information and belief, in a review of 158 random sample ROM reports submitted by Defendants to Allstate in support of claims for reimbursement which contained cervical and lumbar range of motion exams, 86 (54%), had abnormal values for every ROM component.

352. On information and belief, to have the vast majority of patients who undergo both cervical and lumbar ROM exams yield abnormal values for every ROM component

is medically unlikely and highly indicative that the findings contained in these ROM reports submitted by Defendants for reimbursement were fabricated and/or materially misrepresented. A table identifying the 86 random sample ROM reports which reflected both cervical and lumbar range of motion abnormalities is in the accompanying Compendium of Exhibits, as Exhibit "66."

**B.**    **Duplicate ROM Test Results**

353.    On information and belief, as a matter of procedure, practice, and protocol, Defendants submitted to Allstate for reimbursement, ROM reports which, although purportedly relating to different patients tested on different days, contained identical ROM data and muscle test waveforms.

354.    Since it is medically impossible for different patients to have identical ROM data and muscle test waveforms, the existence of these identical data and waveforms is dispositive of the fact that these ROM test were never performed and that the Defendants submitted bills to insurers, in general, and Allstate, in particular, for fictitious tests. By way of example and without limitation, Exhibit "67" in the accompanying Compendium of Exhibits shows claim files relating to claimants wherein the data and graphic waveforms for one patient's ROM Testing are identical to all the data and graphic waveforms of another patient.

355.    By way of further example, in Exhibit "68" in the accompanying Compendium of Exhibits, are identical ROM data and waveforms for two Covered Persons, assigned claim numbers 4815974250-02 (A.H.) and 4815965274-01 (E.K.), respectively, which relate to studies purportedly conducted by Erwin Cheng, a physical therapist not named in this Complaint and submitted by Defendant S&L Medical to Allstate for payment. As indicated therein, the waveforms and data for each patient are identical and perfect matches, even though they relate to different patients, and were purportedly performed on different dates.

116

356.    By way of further example, in Exhibit "69" in the accompanying Compendium of Exhibits are identical ROM data for two Covered Persons, assigned claim numbers 4815956679-02 (V.D.) and 4815956679-03 (T.S.), respectively, which relate to studies purportedly conducted by Erwin Cheng, a physical therapist not named in this Complaint and submitted by Defendant S&L Medical to Allstate for payment.   As indicated therein, the waveforms and data for each patient are identical and perfect matches, even though they relate to different patients, and were purportedly performed on different dates.

357.    By way of further example, in Exhibit "70" in the accompanying Compendium of Exhibits are identical ROM data and waveforms for two Covered Persons, assigned claim numbers  4815956679-01 (C.D.) and 4815973047-01 (M.S.), respectively, which relate to studies purportedly conducted by Erwin Cheng, a physical therapist not named in this Complaint, and submitted by Defendant S&L Medical, PC to Allstate for payment. As indicated therein, the waveforms and data for each patient are identical and perfect matches, even though they relate to different patients, and were purportedly performed on different dates.

## C.    **Fabrication of Cervical Strength Testing Data**

358.    On information and belief, in furtherance of their scheme to defraud, Defendants submitted bills to Allstate for reimbursement for Covered Persons' strength testing, which contained medically improbable, fabricated, and fraudulent test results with regard to the ratio of isometric cervical flexion strength to isometric cervical extension strength, commonly referred to as the F/E strength ratio.

359.    By way of example and not limitation, in a review of a random sample of 132 patient records submitted by Defendants to Allstate in support of claims for reimbursement

which reflected cervical flexion and extension (F/E) strength measurements, the average F/E strength ratio for those patients was 1.02.

360.   By comparison, according to generally accepted peer reviewed medical literature (Vernon, Howard T, Aker P, et al., Evaluation of neck muscle strength with a modified sphygmomanometer dynamometer: reliability and validity. Journal of Manipulative and Physiological Therapeutics 1992:343-349), a normal population in the has a F/E strength ratio of 0.57, while a "whiplash group, or those who were described as having a recent whiplash-type cervical sprain/strain injury (most similar to they type of injury sustained by an individual involved in an automobile accident,) had a F/E strength ratio of 0.25.

361.   On information and belief, to have an average F/E strength measurement of 1.02, or approximately twice the ratio of Vernon's normal subject group, in a random sample of patients who have allegedly been involved in automobile accidents, is medically unlikely and highly indicative that the findings contained in the F/E strength measurement reports submitted by Defendants for reimbursement were fabricated and/or materially misrepresented.   A table identifying the 132 random sample patients whose records reflect an average F/E strength ratio of 1.02 is in the accompanying Compendium of Exhibits, as Exhibit "71."

362.   On information and belief, the Defendant PCs, as a matter of procedure, practice, and protocol, routinely submitted to Allstate medical records, reports and bills for F/E strength ratio testing that contained fabricated and invalid data.

## THE SYNAPTIC SCHEME TO DEFRAUD

363.   In addition to their Electrodiagnostic and Range of Motion Testing schemes to defraud, Defendants also used a Synaptic transcutaneous electrical nerve stimulator

(the "Synaptic") to perpetrate their massive fraud on insurers in general, and Allstate, in particular.

364.    On information and belief, the Synaptic is the substantial equivalent of a transcutaneous electrical nerve stimulator (TENS) device, which may be used by a patient, at home, as a non-invasive pain control treatment.

365.    On information and belief, any services rendered which involve the Synaptic must be reported with a CPT Code specific to treatment with a TENS device.

366.    On information and belief, the only CPT code specific to a TENS device is CPT code 64550, defined by AMA and the Fee Schedule as the "application of surface (transcutaneous) neurostimulator."

367.    On information and belief, beginning in or about May 2000, in furtherance of their scheme to defraud, Defendants, as a matter of procedure, practice and protocol, submitted bills to Allstate relating to Synaptic treatment using CPT codes that intentionally and materially misrepresented the services, if any, performed and for which they sought reimbursement, and were paid, by Allstate ("Synaptic Treatment").

368.    By way of example and not limitation, Defendants routinely billed Allstate for: (1) two or more instances of synaptic treatment for Covered Persons using CPT code 64550, "application of surface (transcutaneous) neurostimulator," when the AMA rules only permits for the billing of one instance of synaptic treatment per Covered Person, with a prohibition of billing the single instance of this code on more than one day per patient; (2) nerve destruction treatments using CPT codes 64613 and 64222 (in addition to billing using CPT code 64550 for the same procedure) when in fact the nerve destruction testing was never performed; and (3)  CPT code

64999, defined as "Unlisted procedure, nervous system," despite the CPT rules mandating that unlisted procedure cannot be reported if there already is a CPT code that describes the procedure.

**A.      Fraudulent Billing for CPT Code 64550 on Multiple Days**

369.    On information and belief, as of May 1, 2002, the AMA's rule for the proper billing of CPT code 64550, stated that it may only be reported once per patient, for the day which the provider demonstrates to the patient how to apply, and use, the TENS device at home.  Pursuant to the AMA rules, CPT code 64550 may not be reported on multiple days for the same patient, nor can it be reported more than once on day which it is demonstrated to the patient.

370.    Notwithstanding the AMA's rules for the proper billing of CPT code 64550, Defendants, as a matter of procedure, practice and protocol, submitted bills to Allstate for reimbursement containing CPT code 64550 for more than one instance per patient, both on the same day and across multiple days.

371.    In a review of Allstate billing data submitted by the Defendant PCs to Allstate in support of claims for reimbursement using CPT code 64550 (after May 1, 2002), Defendants billed Allstate for multiple instances of CPT code 64550 for 201 Covered Persons. Of those, Defendants billed Allstate for ten or more instances of CPT 64450 for 41 patients.  A table identifying the 201 random sample patients whose records reflect billing for more than one instance of CPT code 64550 is in the accompanying Compendium of Exhibits, as Exhibit "72."

372.    On information and belief, in their pursuit of greed, Defendants generated billing, reflecting multiple instances of Synaptic Treatment pursuant to CPT code 65540, in clear violation of the AMA rule which precludes such billing, for services that were never rendered or which materially represented the services performed.

**B.**     **Fraudulent Billing for Nerve Destruction**

373.    In furtherance of the scheme to defraud alleged herein, as a matter of procedure, practice, and protocol, Defendants billed Allstate for expensive nerve destruction treatments purportedly performed on Covered Persons in connection with Synaptic Treatment, when in fact such services were not performed and/or the tests relating thereto were fabricated and/or of no diagnostic value.  In total, at all times relevant herein, Defendants billed Allstate over $2.3 Million for Synaptic Treatment, including but not limited to nerve destruction procedures, that were misrepresented, unbundled and medically unnecessary.

374.    On information and belief, in furtherance of their scheme to defraud, Defendants submitted bills for Synaptic Treatment (including nerve destruction procedures) to Allstate for approximately one-third of all Allstate Covered Persons allegedly treated at the Defendant PCs.  A table showing the breakdown of the over $2.3 Million billed by the Defendant PCs for nerve destruction/Synaptic treatments that were misrepresented, unbundled and medically unnecessary is in the accompanying Compendium of Exhibits, as Exhibit "73."

375.    By way of example and not limitation, Defendants routinely submitted bills to Allstate for the Synaptic Treatment of patients using CPT codes relating to nerve destruction procedures, including CPT code 64622, which relates to a medical procedure for the destruction of the paravertebral facet joint nerve by a neurolytic agent, and CPT code 64613, which relates to a medical procedure for the destruction of neck muscles by a neurolytic agent. On information and belief, because the Synaptic treatments were rendered with a device that is substantially equivalent to a TENS unit, those treatments do not in any way equate to the invasive procedures described by CPT codes 64613 and 64622.

376.   In addition, on information and belief, Defendants, as a matter of procedure, practice and protocol, submitted bills and supporting documents to Allstate seeking reimbursement for invasive and irreversible nerve destruction treatment (using codes CPT codes 64613 and 64622) purportedly performed on "patients" within one week of their alleged involvement in automobile accidents.  On information and belief, Defendant Doctors knew or should have known that performing nerve destruction procedures within one week of the commencement of a patient's treatment is contrary to the standard of care and medically unnecessary.  By way of example and not limitation, in a review of billing documents submitted by Defendants to Allstate in support of claims for reimbursement for nerve destruction procedures, approximately 359 (65%) "patients" were reported by Defendants as having nerve destruction and chemodenervation procedures commencing within one week of the date of their alleged automobile accidents, without the "patients" first having received adequate conservative therapy.  A table identifying the 359 Covered Persons that treated at a Defendant PC and had a nerve destruction or chemodenervation procedures under CPT Code 64613 commencing within one week of the date of their alleged automobile accidents is in the accompanying Compendium of Exhibits, as Exhibit "74."  A table identifying the 346 Covered Persons that treated at a Defendant PC and had a nerve destruction or chemodenervation procedures under CPT Code 64622 commencing within one week of the date of their alleged automobile accidents is in the accompanying Compendium of Exhibits, as Exhibit "75."

377.   By way of further example and not limitation, Defendants submitted bills to Allstate for 2,539 instances of "Destruction by neurolytic agent, paravertebral facet joint nerve; lumbar or sacral, single level" under CPT 64622 on 535 patients, when in fact such services were never provided.  In addition, Defendants submitted bills to Allstate for 2539

instances of "Destruction by Neurolytic Agent (e.g., Chemical, Thermal, Electrical, Radiofrequency) of neck muscle(s) (e.g., for spasmodic torticollis, spasmodic dysphonia)" under CPT 64613 on 549 patients, when in fact such services were never provided.   A table identifying the 549 Covered Persons for whom the Defendant PCs submitted bills for nerve destruction or chemodenervation procedures misrepresented as CPT 64613 is in the accompanying Compendium of Exhibits, as Exhibit "76"  A table identifying the 535 Covered Persons for whom the Defendant PCs submitted bills for nerve destruction or chemodenervation procedures misrepresented as CPT 64622 is in the accompanying Compendium of Exhibits, as Exhibit "77."

C.      **Misrepresentation of Synaptic Treatments as an Unlisted Procedure**

378.    On information and belief, the AMA's CPT rules state that a medical procedure may not be reported by the provider as "unlisted" pursuant to CPT code 64999 if there already is a CPT code which describes the procedure.   As described above, CPT code 64550 is the only CPT code which may be used to describe the application of a Synaptic TENS device to a patient.

379.    Notwithstanding the AMA's CPT rules, Defendants, as a matter of procedure, practice, and protocol, submitted bills and supporting documents to Allstate in which they materially misrepresented that they performed Synaptic Treatment pursuant to CPT code 64999, which is entitled "Unlisted procedure, nervous system." A table identifying 262 random sample studies wherein Defendants impermissibly billed Allstate for Covered Persons' Synaptic Treatment using CPT code 64999, instead of the correct CPT code 64450, is in the accompanying Compendium of Exhibits, as Exhibit "78."

380.    In addition, despite the AMA's restriction limiting the billing of the application of a TENS device to one time, Defendants, as a mater of procedure, practice and

protocol, routinely billed for multiple application of a TENS device to the same patient using CPT code 64999 with modifier 51, indicating a separate and distinct instance of the same (synaptic) procedure on a different region of the body or by a different provider.  A table identifying 90 random sample studies in which Defendants impermissibly used CPT code 64999 with modifier 51 to bill Allstate for synaptic treatments is in the accompanying Compendium of Exhibits, as Exhibit "79."

381.   On information and belief, Defendants, through the Defendant PCs, for their own pecuniary benefit and motivated solely by greed, as a matter of procedure practice, and protocol, fraudulently billed Allstate for nerve destruction testing, intentionally misrepresenting that the testing was purportedly rendered, when in fact, it was never performed as billed and/or was otherwise fabricated.

<u>**THE MEDICAL PROVIDERS**</u>

382.   The Defendant Doctors, including Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Sosonkin, Shtender, Israeli, Mirer, Shperling, Moysik, Roit, Sukhov, Lai and Francois, and other physicians not named as Defendants in this action, purportedly treated ambulatory patients (Covered Persons), who sustained soft-tissue injuries in automobile accidents, at the Defendant PCs.

383.   On information and belief, through a series of agreements, the Principals purchased the names and medical licenses of various providers (including but not limited to the Paper Owners) for the purpose of submitting fraudulent claims to No-fault carriers, in general, and Allstate, in particular.  Defendants then billed for services that were never rendered or of no diagnostic or treatment value under those providers' names as well as under the names of other

providers. The names of the providers that the Principals purchased include, but are not limited to, the Defendant Doctors.

384. On information and belief, the Principals paid these "professionals" to use their names and licenses through compensation agreements wherein the providers were paid a salary (and/or other financial considerations) in connection with billing for services submitted on behalf of the Defendant PCs that were never rendered or of no diagnostic or treatment value.

385. By selling their names and licenses, these "professionals" provided the essential means in which laypersons were able to own the Defendant PCs in contravention of New York State Law.

386. At all relevant times herein, the Defendant Doctors participated in the affairs of the Medical Network Enterprise herein under the direction of the Principals, who functioned as the Enterprise's "upper management."

387. At all relevant times herein, the Defendant Doctors exercised discretion and/or knowingly implemented decision-making practices, procedures, and protocols in furtherance of the Enterprise's scheme to defraud.

388. At all relevant times herein, the Defendant Doctors had their own discrete, defined and integral role in furtherance of the scheme to defraud and had discretionary authority to carry out their particular role in the scheme to defraud, as well as to carry out the instructions of the Principals.

389. In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, the Defendant Doctors performed or caused to be performed Electrodiagnostic Testing, ROM Testing and Synaptic Treatment for one or more of the Defendant PCs that they knew or should have known would produce medically invalid test

results of no diagnostic value and/or that were medically unnecessary. Exhibits "4" through "29" in the accompanying Compendium of Exhibits contain examples of claims in which the Defendant Doctors knowingly performed Electrodiagnostic Testing, ROM Testing and/or Synaptic Treatments for one or more of the Defendant PCs that were medically unnecessary and of no diagnostic or treatment value.

390.    On information and belief, the Defendant Doctors' role went beyond the mere taking of directions from and performance of tasks at the direction of the Principals; instead, the Defendant Doctors were an essential and integral decision making component of the Enterprise that acted under the direct control of the Principals.

391.    On information and belief, as a matter of protocol, the Covered Persons purportedly treated at the Defendant PCs were referred by the Defendant Doctors for a standard battery of treatments, including Synaptic Treatment, and referrals for Electrodiagnostic Testing. In that regard, the Defendant Doctors ordered and/or performed Electrodiagnostic Testing for Covered Persons, signed and/or authorized their signature stamp to be applied to boilerplate medical records, reports and bills where they falsely represented that the services were medically necessary when, in fact, they were not; were actually performed, when, in fact, in many instances they were not; and were of diagnostic value when, in fact, they were not.

392.    As set forth in the Electrodiagnostic Scheme to Defraud section above, the Defendant Doctors knew or should have known that the Electrodiagnostic Testing they purportedly performed was: (1) not medically necessary; (2) incorrectly performed and of no diagnostic value; (3) of no diagnostic value because the data was falsely reported; and (4) the product of fraud as they reported impossible identical NCV and/or EMG data which were impossible and/or identical to the results of other patients and therefore medically impossible.

393. Notwithstanding that the Defendant Doctors knew or should have known that the Electrodiagnostic Testing was medically unnecessary and riddled with fraudulent findings and interpretations that were used to justify further expensive treatment and testing; they signed or authorized their signature to be applied to medical records, reports and/or bills to enable the Defendant PCs to recover payments from Allstate under the No-fault Law.

394. As set forth in the Range of Motion Scheme to Defraud section, as a matter of procedure, practice and protocol, the Defendant Doctors ordered and/or performed ROM Testing for Covered Persons, signed and/or authorized their signature stamp to be applied to boilerplate medical records, reports and bills for services that were of no diagnostic or treatment value.

395. As with the Electrodiagnostic Testing, the Defendant Doctors knew or should have known that the ROM Testing they purportedly performed was incorrectly performed and of no diagnostic or treatment value, because the data was falsely reported and served no other purpose than to fraudulently induce payments from insurance companies in general, and Allstate, in particular.

396. As set forth in the Synaptic Scheme to Defraud, as a matter of procedure, practice and protocol, the Defendant Doctors ordered and/or performed Synaptic Treatment for Covered Persons, signed and/or authorized their signature stamp to be applied to boilerplate medical records, reports and bills for services that were of no treatment value.

397. On information and belief, the Defendant Doctors knew or should have known that the Synaptic Treatment they purportedly performed was of no treatment value and served no other purpose than to fraudulently induce payments from insurance companies in general, and Allstate, in particular.

398. Notwithstanding that the Defendant Doctors knew or should have known that the ROM Testing and Synaptic Treatment for which bills were submitted to issuers under their names was medically unnecessary, riddled with fraudulent findings and of no diagnostic or treatment value, they signed or authorized their signature to be applied to medical records, reports and/or bills used to justify further expensive treatment and testing to enable the Defendant PCs to recover payments from Allstate under the No-fault Law.

399. Based on the provision of medically unnecessary services and the generation of false and invalid findings made by the Defendant Doctors, the Defendant PCs sought reimbursement for No-fault benefits from Allstate through the submission of medical records, reports and bills that contained false and material misrepresentations as to medical necessity and services rendered.

400. As alleged herein, the medical records, reports and bills submitted by the Defendant PCs contained fraudulent, material misrepresentations. Defendants knowingly submitted or caused to be submitted such documents to Allstate to induce payment for services that were never performed, or if performed in a manner that was of no diagnostic or treatment value and/or contained findings that were otherwise false.

401. In contravention of the New York State Education Law, each of these providers never reviewed the bills that were submitted, never verified the CPT codes that were used and never verified the referrals that were purportedly made based on their recommendations.

402. On information and belief, these providers never reviewed any of the medical documentation because they were aware it was fraudulent and that it was meaningless in terms of necessary treatment.

128

403.    In contravention of New York State Law, each of these providers agreed to and followed a treatment protocol dictated by the Principals, who as laypersons were unqualified to operate a medical facility.

404.    On information and belief, the Principals also used the names of other doctors, physical therapists and additional health care providers, with and without their permission, misrepresenting that those practitioners had actually rendered services, that the services were performed by licensed personnel, or that the services were medically necessary.

## DEFENDANTS' MONEY LAUNDERING SCHEME

405.    On information and belief, Defendants laundered money from the Defendant PCs to the Principals, the Defendant Management Companies and the Money Laundering Companies.

406.    On information and belief, to sweep the money, including but not limited to the profits, out of the Defendant PCs, the PCs made wire transfers and check payments to one or more of the corporate entities owned, controlled and operated by the Principals and others unknown to Allstate, including but not limited to the Defendant Management Companies and the Money Laundering Companies (Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24 and Tropicana One).

407.    On information and belief, the Defendant Management Companies were the vehicles from which the proceeds, including but not limited to the profits, from the Defendant PCs were diverted to the Principals and others.  On information and belief, the Principals, and their co-conspirators, received payments from the Defendant Management Companies, the Money Laundering Companies and other entities owned, controlled and operated by the Principals.

408.    On information and belief, the corporate structure created by Defendants was intended to disassociate the Principals and their associates from the criminal activities alleged herein.

409.    On information and belief, the Principals were able to pass millions of dollars through the unlawful activities of the Defendant PCs, Management Companies and Money Laundering Companies.

410.    On information and belief, the Principals knew that the money paid by insurers, in general, and Allstate, in particular, to the Defendant PCs represented the proceeds and profits of their unlawful activity.  On information and belief, to ensure that they would ultimately receive their ill-gotten gains, the Principals funneled the money from the Defendant PCs through the Defendant Management Companies to the Money Laundering Companies, which were then used to make vacant land purchases in the State of Florida.

411.    On information and belief, the vacant land purchases made by the Money Laundering Companies were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds and profit of the criminal enterprise alleged herein.

412.    On information and belief, with the intent to conceal or disguise the money generated by the Defendant PCs' massive fraudulent billing scheme, the Principals, through the Money Laundering Companies, used the proceeds, including but not limited to profits, gained from the Enterprise alleged herein to purchase vacant property located at various locations within the State of Florida.  By way of example and not limitation:

- The Principals, through Del Prado One, purchased one or more parcels of vacant property in the State of Florida for $2M;
- The Principals, through Del Prado Two, purchased one or more parcels of vacant property in the State of Florida for $1.3M;

- The Principals, through Del Prado Three, purchased one or more parcels of vacant property in the State of Florida for $3.8M;
- The Principals, through NE 24, purchased one or more parcels of vacant property in the State of Florida for $1.25M;
- The Principals, through NE 10, purchased one or more parcels of vacant property in the State of Florida for $1.1M; and
- The Principals, through M&M Ocean Management, purchased one or more parcels of vacant property in the State of Florida for $972K.

413.    On information and belief, each of these vacant land purchases were part of a money laundering scheme, as that term if defined under 18 U.S.C.A. § 1956, and in and of themselves constitute independent acts and pattern of racketeering activity (18 U.S.C. § 1961(5)) that were designed to ensure that the proceeds of the criminal enterprise alleged herein were ultimately directed to the Principals.

### STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

414.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

415.    The Medical Network Enterprise (consisting of L&B Medical, P.C., Lamed Medical, P.C., 825 Broadway Medical Care, P.C., Dover Medical, P.C., Flatlands 78 Medical, P.C., General Medical Care, P.C., S&L Medical, P.C., ZDR Medical, P.C., Ocean L. Management Group, Inc., Flatlands Best Management Group, Inc., Hillmed Management, Inc. f/k/a 97-12 Associates, Inc., B-Way Management, Inc., Flat-80 Management, Inc., Nortmed Management, Inc., Del Prado One, LLC, Del Prado Two, LLC, Del Prado Three, LLC, Del Prado

Four, LLC, El Dorado One, LLC, M&M Oceanfront, LLC, NE 10, LLC, NE 24, LLC, Tropicana One, LLC, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 is an Enterprise as that term is defined by 18 U.S.C § 1961(4), and within the meaning of 18 U.S.C. § 1962(c). The Medical Network Enterprise engaged in activities, including defrauding insurers that are based outside of New York, that affect interstate commerce.

416.    Defendants Mirvis, Lupolover, Bezenyan, Katz, Statnrosh and Zhuravsky, at all relevant times, were the principals of, exerted control over, and directed the operations of the Medical Network Enterprise and each of its component parts.  The Defendant Principals utilized that control to conduct the affairs of the Medical Network Enterprise through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately twelve years.

417.    Defendants Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Sosonkin, Shtender, Moysik, Israeli, Mirer, Roit, Shperling, Sukhov, Lai, Francois and John Does 1 through 20 were employed by or associated with the Medical Network Enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity.

418.    Each of the doctors, professional and general business corporations and limited liability companies (Defendant PCs, Management Companies, Money Laundering Companies, ABC and XYZ Corporations) that are named as Defendants were associated with the Medical Network Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

419.    On information and belief, Defendants Ocean L. Management Group Inc., Flatlands Best Management Group, Inc., Hillmed Management, Inc. f/k/a 97-12 Associates, Inc.,

B-Way Management, Inc., Flat-80 Management, Inc., Nortmed Management, Inc. and ABC Corporations 1 through 20, among others, prepared or caused to be prepared fraudulent bills in the name of the other corporate entities, including and on behalf of the Defendant PCs, and collected the proceeds of those claims. Each of the doctors furnished their names and professional licenses to the Medical Network Enterprise and provided the essential means for the Enterprise to fraudulently incorporate bogus professional service corporations and fraudulently bill insurance companies. Each of the professional corporations furnished the Medical Network Enterprise with the identities of patients for the purpose of generating fraudulent claims, and with facilities that were essential prerequisites to an insurance fraud scheme. The remaining corporate entities, on behalf of the Defendant PCs, participated in and conducted the affairs of the Medical Network Enterprise, including concealing Defendants' scheme to defraud and money laundering activities.

420.    As a whole, Defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Allstate into paying bills for medical services that were not supplied and/or of no diagnostic and/or treatment value.

## THE PATTERN OF RACKETEERING ACTIVITY

421.    Defendants engaged in at least a twelve-year period of criminal activity that continues as of the date of the filing of this Complaint.

422.    During the period in which the individual Defendants operated the Medical Network Enterprise, they submitted tens of thousands of fraudulent claim forms seeking payment for services that were purportedly (but not actually) provided to many hundreds of patients.

423.    Although Allstate has not yet identified all of the bills that Defendants submitted to them, the records identified to date include tens of thousands of bills for thousands of separate patients. Those bills resulted in payments totaling more than $16,000,000.00. The bills and supporting documents that were sent by Defendants, as well as the payments that Allstate made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Medical Network Enterprise through the date of the filing of this Complaint.

424.    A random list of predicate acts is set forth in the Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of their scheme. In addition to the specific misrepresentations identified for each of the mailings on that list, each and every document identified on the list contains the implicit material misrepresentation that the bill was generated by a legitimate professional corporation that was owned and operated by a licensed physician and was properly formed and operated under the mandates of the New York Business Corporation Law.

425.    As a part of the pattern of racketeering activity, for the purpose of executing the scheme to defraud Allstate that is described above, Defendants, overall, submitted thousands of insurance claims to Allstate during the time period relevant to this Complaint. Defendants participated in the preparation and mailing of those claims knowing that they contained materially false and misleading information.

426.    Each of the thousands of submissions constitutes mail fraud pursuant to 18 U.S.C. § 1341.

427. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b). By causing the mailing of over one thousand false claims, Defendants have conducted the affairs of the Medical Network Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

## DAMAGES SUSTAINED BY ALLSTATE

428. Allstate was injured in its business or property, by reason of Defendants' violation of 18 U.S.C. § 1962(c). Allstate was defrauded into paying higher settlement amounts and paying for alleged medical services that were materially misrepresented, often were not provided, and if provided, of no diagnostic or treatment value and that generally were not prescribed by any physician. Allstate paid millions of dollars to Defendants based upon forged signatures, fictitious narratives describing patients' conditions, and misrepresentations of the treatment provided to patients. Defendants were not legally entitled to those payments, and Allstate would not have made those payments if they had not been deceived by Defendants' fraudulent conduct.

429. Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Defendants, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY, STATNROSH, SLUTSKY, SOFIA BENTSIANOV, RAUFOV, SHTENDER, LEV BENTSIANOV, ALEXANDER, LAI, OCEAN L. MANAGEMENT, DEL PRADO ONE, DEL PRADO TWO, DEL PRADO THREE, DEL PRADO FOUR, EL DORADO ONE, M&M OCEANFRONT, NE 10, NE 24, TROPICANA ONE, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20 AND XYZ CORPORATIONS 1 THROUGH 20**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

135

430.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

431.    At all times relevant herein, S&L Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

432.    From in or about 1996 through the date of the filing of this Complaint, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Sofia Bentsianov, Raufov, Shtender, Lev Bentsianov, Alexander, Lai, Ocean L. Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 conducted and participated in the affairs of S&L Medical enterprise through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Allstate's "FIRST CLAIM FOR RELIEF," and in the accompanying Compendium of Exhibits, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

433.    The racketeering acts set forth herein were carried out over a twelve year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Defendant PCs to defraud insurers and if not stopped will continue into the future.

434.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Mirvis, Lupolover,

Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Sofia Bentsianov, Raufov, Shtender, Lev Bentsianov, Alexander, Lai, Ocean L. Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the S&L Medical enterprise based upon materially false and misleading information.

435.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

436.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### THE DAMAGES

437.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Allstate has been injured in its business and property and Allstate has been damaged in the aggregate amount presently in excess of $40,000,000.00, the exact amount to be determined at trial.

438.    Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Sofia Bentsianov, Raufov, Shtender, Lev Bentsianov, Alexander, Lai, Ocean L. Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF

**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY,  STATNROSH, RAUFOV, SHTENDER, BENJAMIN, TSIRELMAN, SLUTSKY, SHPERLING, FLATLANDS BEST MANAGEMENT, DEL PRADO ONE, DEL PRADO TWO,  DEL PRADO THREE, DEL PRADO FOUR, EL DORADO ONE, M&M OCEANFRONT, NE 10, NE 24, TROPICANA ONE, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20 AND XYZ CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

439.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

440.    At all times relevant herein, Lamed Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

441.    From in or about 1997 through the date of the filing of this Complaint, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Raufov, Shtender, Benjamin, Tsirelman, Slutsky, Shperling, Flatlands Best Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 conducted and participated in the affairs of the Lamed Medical enterprise through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Allstate's "FIRST CLAIM FOR RELIEF," and in the and in the accompanying Compendium of Exhibits, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

442.    The racketeering acts set forth herein were carried out over an eleven year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Defendant PCs to defraud insurers and if not stopped will continue into the future.

443.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Raufov, Shtender, Benjamin, Tsirelman, Slutsky, Shperling, Flatlands Best Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the Lamed Medical enterprise based upon materially false and misleading information.

444.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

445.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## THE DAMAGES

446.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Allstate has been injured in its business and property and Allstate has been damaged in the aggregate amount presently in excess of $40,000,000.00, the exact amount to be determined at trial.

447.    Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Raufov, Shtender, Benjamin, Tsirelman, Slutsky, Shperling, Flatlands Best Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY, STATNROSH, SLUTSKY, RAUFOV, LEV BENTSIANOV, ALEXANDER, BENJAMIN, ISRAELI, SUKHOV, HILLMED MANAGEMENT, DEL PRADO ONE, DEL PRADO TWO, DEL PRADO THREE, DEL PRADO FOUR, EL DORADO ONE, M&M OCEANFRONT, NE 10, NE 24, TROPICANA ONE, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20 AND XYZ CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

448.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

449.    At all times relevant herein, L&B Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

450.    From in or about 1998 through the date of the filing of this Complaint, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Raufov, Lev Bentsianov, Alexander, Benjamin, Israeli, Sukhov, Hillmed Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24,

Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 conducted and participated in the affairs of the L&B Medical enterprise through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Allstate's "FIRST CLAIM FOR RELIEF," and in the accompanying Compendium of Exhibits, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

451.    The racketeering acts set forth herein were carried out over a ten year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Defendant PCs to defraud insurers and if not stopped will continue into the future.

452.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Raufov, Lev Bentsianov, Alexander, Benjamin, Israeli, Sukhov, Hillmed Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the L&B Medical Enterprise based upon materially false and misleading information.

453.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

454.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## THE DAMAGES

455.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Allstate has been injured in its business and property and Allstate has been damaged in the aggregate amount presently in excess of $40,000,000.00, the exact amount to be determined at trial.

456.    Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Raufov, Lev Bentsianov, Alexander, Benjamin, Israeli, Sukhov, Hillmed Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### FIFTH CLAIM FOR RELIEF

**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY, STATNROSH, SLUTSKY, MOYSIK, IVANUSHKIN, SOSONKIN, RAUFOV, LEV BENTSIANOV, SHTENDER, B-WAY MANAGEMENT, DEL PRADO ONE, DEL PRADO TWO, DEL PRADO THREE, DEL PRADO FOUR, EL DORADO ONE, M&M OCEANFRONT, NE 10, NE 24, TROPICANA ONE, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20 AND XYZ CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

457.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

458.   At all times relevant herein, General Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

459.   From in or about 1999 through the date of the filing of this Complaint, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Moysik, Ivanushkin, Sosonkin, Raufov, Lev Bentsianov, Shtender, B-Way Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, conducted and participated in the affairs of the General Medical enterprise through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Allstate's "FIRST CLAIM FOR RELIEF," and in the accompanying Compendium of Exhibits, all of which are incorporated by reference.   Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

460.   The racketeering acts set forth herein were carried out over a nine year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Defendant PCs to defraud insurers and if not stopped will continue into the future.

461.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Moysik, Ivanushkin, Sosonkin, Raufov, Lev Bentsianov, Shtender, B-Way Management, Del Prado One, Del Prado Two, Del Prado Three,

Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the General Medical enterprise based upon materially false and misleading information.

462.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

463.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## THE DAMAGES

464.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Allstate has been injured in its business and property and Allstate has been damaged in the aggregate amount presently in excess of $40,000,000.00, the exact amount to be determined at trial.

465.    Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Moysik, Ivanushkin, Sosonkin, Raufov, L. Bentsianov, Shtender, B-Way Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SIXTH CLAIM FOR RELIEF

**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY, STATNROSH, ROIT, LEV BENTSIANOV, MIRER, ISRAELI, SUKHOV, NORTMED MANAGEMENT, DEL PRADO ONE, DEL PRADO TWO, DEL PRADO THREE, DEL PRADO FOUR, EL DORADO ONE, M&M OCEANFRONT, NE 10, NE 24, TROPICANA ONE, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20 AND XYZ CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

466.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

467.    At all times relevant herein, ZDR Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

468.    From in or about 2000 through the date of the filing of this Complaint, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Roit, Lev Bentsianov, Mirer, Israeli, Sukhov, Nortmed Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 conducted and participated in the affairs of the ZDR Medical enterprise through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Allstate's "FIRST CLAIM FOR RELIEF," and in the accompanying Compendium of Exhibits, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

469.    The racketeering acts set forth herein were carried out over a eight year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Defendant PCs to defraud insurers and if not stopped will continue into the future.

470.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Roit, Lev Bentsianov, Mirer, Israeli, Sukhov, Nortmed Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20  caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the ZDR Medical enterprise based upon materially false and misleading information.

471.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

472.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## THE DAMAGES

473.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Allstate has been injured in its business and property and Allstate has been damaged in the aggregate amount presently in excess of $40,000,000.00, the exact amount to be determined at trial.

474.     Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Roit, Lev Bentsianov, Mirer, Israeli, Sukhov, Nortmed Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### SEVENTH CLAIM FOR RELIEF

**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY, STATNROSH, SOFIA BENTSIANOV, BENJAMIN, LEV BENTSIANOV,  FRANCOIS, RAUFOV, SOSONKIN, FLAT-80 MANAGEMENT, DEL PRADO ONE, DEL PRADO TWO, DEL PRADO THREE, DEL PRADO FOUR, EL DORADO ONE, M&M OCEANFRONT, NE 10, NE 24, TROPICANA ONE, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20 AND XYZ CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

475.     The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

476.     At all times relevant herein, Dover Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

477.     From in or about 2000 through the date of the filing of this Complaint, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Sofia Bentsianov, Benjamin, Lev Bentsianov, Francois, Raufov, Sosonkin, Flat-80 Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10,

NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 conducted and participated in the affairs of the Dover Medical enterprise through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Allstate's "FIRST CLAIM FOR RELIEF," and in the accompanying Compendium of Exhibits, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

478. The racketeering acts set forth herein were carried out over a eight year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Defendant PCs to defraud insurers and if not stopped will continue into the future.

479. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Sofia Bentsianov, Benjamin, Lev Bentsianov, Francois, Raufov, Sosonkin, Flat-80 Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the Dover Medical enterprise based upon materially false and misleading information.

480.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

481.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## THE DAMAGES

482.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Allstate has been injured in its business and property and Allstate has been damaged in the aggregate amount presently in excess of $40,000,000.00, the exact amount to be determined at trial.

483.    Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Sofia Bentsianov, Benjamin, Lev Bentsianov, Francois, Raufov, Sosonkin, Flat-80 Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### EIGHTH CLAIM FOR RELIEF

**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY, STATNROSH, ALEXANDER, RAUFOV, B-WAY MANAGEMENT, DEL PRADO ONE, DEL PRADO TWO, DEL PRADO THREE, DEL PRADO FOUR, EL DORADO ONE, M&M OCEANFRONT, NE 10, NE 24, TROPICANA ONE, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20 AND XYZ CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

484.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

485.    At all times relevant herein, 825 Broadway Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

486.    From in or about 2003 through the date of the filing of this Complaint, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Alexander, Raufov, B-Way Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 conducted and participated in the affairs of the 825 Broadway Medical enterprise through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Allstate's "FIRST CLAIM FOR RELIEF," and in the accompanying Compendium of Exhibits, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

487.    The racketeering acts set forth herein were carried out over a five year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Defendant PCs to defraud insurers and if not stopped will continue into the future

488.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Alexander, Raufov, B-Way Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M

Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the 825 Broadway Medical enterprise based upon materially false and misleading information.

489.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

490.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## THE DAMAGES

491.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Allstate has been injured in its business and property and Allstate has been damaged in the aggregate amount presently in excess of $40,000,000.00, the exact amount to be determined at trial.

492.    Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Alexander, Raufov, B-Way Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## NINTH CLAIM FOR RELIEF

**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY, STATNROSH, SLUTSKY, BENJAMIN, FLATLANDS BEST MANAGEMENT, DEL PRADO ONE, DEL PRADO TWO, DEL PRADO THREE, DEL PRADO FOUR, EL DORADO ONE, M&M OCEANFRONT, NE 10, NE 24, TROPICANA ONE, JOHN DOES 1 THROUGH 20, ABC CORPORATIONS 1 THROUGH 20 AND XYZ CORPORATIONS 1 THROUGH 20**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

493.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

### THE RICO ENTERPRISE

494.    At all times relevant herein, Flatlands 78 Medical was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

495.    From in or about 2005 through the date of the filing of this Complaint, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Benjamin, Flatlands Best Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 conducted and participated in the affairs of the Flatlands 78 Medical enterprise through a pattern of racketeering activity, including the many thousands of acts of mail fraud described in Allstate's "FIRST CLAIM FOR RELIEF," and in the accompanying Compendium of Exhibits, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

496.   The racketeering acts set forth herein were carried out over a three year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Defendant PCs to defraud insurers and if not stopped will continue into the future.

497.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Benjamin, Flatlands Best Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce Allstate to issue checks to the Flatlands 78 Medical enterprise based upon materially false and misleading information.

498.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

499.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## THE DAMAGES

500.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Allstate has been injured in its business and property and Allstate has been damaged in the aggregate amount presently in excess of $40,000,000.00, the exact amount to be determined at trial.

501.   Pursuant to 18 U.S.C. § 1964(c), Allstate is entitled to recover from Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Slutsky, Benjamin, Flatlands Best Management, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## TENTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### [Conspiracy to Violate RICO, pursuant to 18 U.S.C. § 1962(d)]

502.   The allegations of paragraphs 1 through 501 are hereby repeated and realleged as though fully set forth herein.

## THE RACKETEERING CONSPIRACY

503.        From approximately October 1995 through the date of the filing of this Complaint, both dates being approximate and inclusive, within the Counties of Kings, Queens, and elsewhere, Defendant, Mirvis, being a person associated in fact with the enterprise of Defendants Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh Ocean L. Management, Flatlands Best Management, Hillmed Management, B-Way Management, Flat-80 Management, Nortmed Management, L&B Medical, Lamed Medical, 825 Broadway

Medical, Dover Medical, Flatlands 78 Medical, General Medical, S&L Medical, ZDR Medical, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Shperling, Moysik, Sosonkin, Shtender, Israeli, Mirer, Roit, Sukhov, Lai, Francois, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 described above, was engaged in, and the activities of which affected interstate commerce, did unlawfully, willfully and knowingly combine, confederate, conspire and agree together and with Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Ocean L. Management, Flatlands Best Management, Hillmed Management, B-Way Management, Flat-80 Management, Nortmed Management, L&B Medical, Lamed Medical, 825 Broadway Medical, Dover Medical, Flatlands 78 Medical, General Medical, S&L Medical, ZDR Medical, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Shperling, Moysik, Sosonkin, Shtender, Israeli, Mirer, Roit, Sukhov, Lai, Francois, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 and others, to violate 18 U.S.C. §§ 1961(1) and (5), through the commission, as principals or as aids and abettors, of multiple racketeering acts (mail fraud), as set forth at length herein, all in violation of 18 U.S.C. § 1962(d).

504.    It was an objective of the conspiracy that Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Ocean L. Management, Flatlands Best Management, Hillmed Management, B-Way Management, Flat-80 Management, Nortmed Management, L&B Medical, Lamed Medical, 825 Broadway Medical, Dover Medical, Flatlands 78

Medical, General Medical, S&L Medical, ZDR Medical, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Shperling, Moysik, Sosonkin, Shtender, Israeli, Mirer, Roit, Sukhov, Lai, Francois, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 would enrich themselves by submitting and causing to be submitted to Allstate and other No-fault insurance carriers, claims for health services purportedly rendered or given to Covered Persons, knowing the medical bills and records submitted in support of their claims were false and fraudulent in that the services were never rendered or provided or were performed for the purpose of generating fraudulent bills.  By submitting fraudulent medical bills and records, Defendants falsely induced and caused millions of dollars in claims to be paid by Allstate.

505.   It was further an objective of the conspiracy that Defendants would, and did, devise a scheme and artifice to defraud Allstate and other No-fault insurance carriers by means of false, misleading and fraudulent pretenses and representations, and to cause Allstate to pay claims arising from the intentional filing of false claims and supporting documentation through the Defendant PCs for the benefit of the co-conspirators who include, among others, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Ocean L. Management, Flatlands Best Management, Hillmed Management, B-Way Management, Flat-80 Management, Nortmed Management, L&B Medical, Lamed Medical, 825 Broadway Medical, Dover Medical, Flatlands 78 Medical, General Medical, S&L Medical, ZDR Medical, Del Prado One, Del Prado Two, Del Prado Three, Del Prado Four, El Dorado One, M&M Oceanfront, NE 10, NE 24, Tropicana One, Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Shperling, Moysik, Sosonkin, Shtender,

Israeli, Mirer, Roit, Sukhov, Lai, Francois, John Does 1 through 20, ABC Corporations 1 through 20 and XYZ Corporations 1 through 20 for the purpose of executing such scheme and artifice, and attempting to do so, Defendants would, and did place, and caused to be placed, in post offices and authorized depositories certain mail matter and things to be sent and delivered by the United States Postal Service, and would, and did, take and receive such matter and things therefrom, in violation of 18 U.S.C. § 1341.

506.    In furtherance of the racketeering conspiracy and to effect the objective thereof, Defendants committed, and caused to be committed as overt acts, among others, the racketeering predicate acts alleged above.

## THE DAMAGES

507.    The allegations of paragraphs 1 through 506 above, describing the injury and damages sustained by Allstate are repeated and realleged as though fully set forth herein.

### ELEVENTH CLAIM FOR RELIEF
**AGAINST MIRVIS, LUPOLOVER, BEZENYAN, KATZ, ZHURAVSKY, STATNROSH, SLUTSKY, SOFIA BENTSIANOV, LEV BENTSIANOV, TSIRELMAN, BENJAMIN, SHPERLING, IVANUSHKIN, RAUFOV, ALEXANDER, MOYSIK, ROIT AND THE DEFENDANT PCS**

**(Common Law Fraud)**
**(Fraudulent Incorporation of the Defendant PCs)**

508.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

509.    Pursuant to Section 1504(a) of the New York State Business Corporation Law and regulations promulgated by the New York State Department of Health, professional service corporations may only render professional services through individuals authorized by law to render such professional services.

510.   Section 1504(c) of the Business Corporation Law requires, among other things, that:

> each report, diagnosis, prognosis, and prescription made or issued by a corporation practicing medicine, ... physiotherapy or chiropractic shall bear the signature of one or more physicians, ... physiotherapists, or chiropractors, respectively, who are in responsible charge of such report, diagnosis, prognosis, or prescription.

511.   Section 1507 of the Business Corporation Law of the State of New York prohibits a shareholder of a professional service corporation from issuing shares, entering into an agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice. "All shares issued, agreements made or proxies granted in violation of this section [1507] are void."

512.   Similarly, under Section 1508 of the Business Corporation Law, no individual may be a director or officer of a professional service corporation unless that individual is authorized by law to practice in the same profession that the corporation is authorized to practice.

513.   Section 1503(b) of the Business Corporation Law of the State of New York requires that the certificates of incorporations for an entity seeking to practice as a professional service corporation state the profession to be practiced by such corporation and the names and resident addresses of all individuals who are to be the original shareholders, directors and officers of such corporation.

514.   In purported compliance with Section 1503(b) of the Business Corporation Law, the certificates of incorporation for each of the Defendant PCs indicated that the profession to be practiced by each was medicine.

515.   In purported compliance with Section 1503(b) of the Business Corporation Law, the respective original certificates of incorporation for each of the PCs set forth a medical doctor as the sole shareholder, officer and director.  The certificates of incorporation filed with the New York Department of State indicate that the doctors ("shareholder-doctor") associated with each of the Parallel PCs are as follows:

| Name of P.C. | Name of Doctor/Shareholder | Type of Profession |
| --- | --- | --- |
| S&L Medical | Sofia Bentisianov<br>Lev Bentsianov | Medicine |
| Lamed Medical | Leonid Slutsky<br>Gary Tsirelman<br>Irena Shperling<br>Emma Benjamin | Medicine |
| L&B Medical | Lev Bentsianov | Medicine |
| General Medical | Andrey Ivanushkin<br>Lyubov Moysik | Medicine |
| Dover Medical | Sofia Bentisianov | Medicine |
| ZDR Medical | Zhanna Roit<br>Lev Bentsianov | Medicine |
| 825 Broadway Medical | Yakov Raufov<br>Dale Alexander | Medicine |
| Flatlands 78 Medical | Emma Benjamin | Medicine |

516.   With the exception of Defendant Slutsky, each of the shareholder-doctor defendants associated with each of the Defendant PCs was a nominal shareholder that had no financial interest or involvement in his or her respective clinic.  At all times mentioned herein, Defendant Slutsky, along with Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh, each of whom is a layperson unlicensed to practice any healthcare profession in the State of New York were undisclosed principals, and the true beneficial owners of, or otherwise

maintained a financial interest in, S&L Medical, Lamed Medical, Flatlands 78 Medical, L&B Medical and General Medical in violation of the Corporate Practice of Medicine Doctrine, codified in Article 15 of the Business Corporation Law of New York State. In addition, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh, were also undisclosed principals, and the true beneficial owners of, or otherwise maintained a financial interest in 825 Broadway Medical, Dover Medical and ZDR Medical.

517.    At all relevant times mentioned herein, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, and Statnrosh were among the true, undisclosed and illegal owners of the Defendant PCs.

518.    From the inception of their respective incorporations, the shareholder-doctors of the Defendant PCs agreed to transfer their ownership and control to Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh for a fee.

519.    In accordance with the shareholder-doctors transfer of ownership and control, and in contravention of Sections 1503, 1504(a) and (c) and 1508 of the Business Corporation Law, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh exercised control over all aspects of the Defendant PCs.

520.    On information and belief, the shareholder-doctors of the Defendant PCs had no meaningful involvement with their respective operations and rarely, if at all, provided or supervised the services allegedly rendered to Covered Persons at the Defendant PCs.

521.    On information and belief, consistent with their being nominal, paper owners and providing a conduit through which Defendants could implement their fraudulent billing scheme, the shareholder-doctors did not maintain or control the corporate books and records for their respective clinics; did not, and were not permitted to, sign corporate checks

for their respective clinics; and were generally not involved in the hiring or firing of medical personnel, including physicians, chiropractors, physical therapists and assistant physical therapists or the support staff that were employed by their respective clinics.

522.   On information and belief, with respect to the medical practice at their respective medical clinics, the shareholder-doctors did not review bills, medical reports, narratives and/or prescriptions that were submitted to Allstate in support of claims submitted by their respective clinics.

523.   At all relevant times mentioned herein, the Defendant PCs were controlled and operated by lay people, who were also responsible for supervising and directing treatment.

524.   On information and belief, the Defendant shareholder-doctors signed and/or authorized Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh to sign or cause to be signed medical bills and reports on their behalf.   The signing of reports, diagnosis, prognosis, or prescriptions by and through Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh was in violation of Section 1504(c) of the New York State Business Corporation Law, which requires that such items bear the signature of a physician, physiotherapist or chiropractor.

525.   Section 1507 of the Business Corporation Law prohibits a shareholder of a professional service corporation from issuing shares, entering into an agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.   Specifically, Section 1507 of the Business Corporation Law provides that, "All shares issued, agreements made or proxies granted in violation of this section [1507] are void."

526.   Pursuant to Section 1507 of the Business Corporation Law, the constructive, if not actual, issuance of shares by the Defendant PCs to Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh are void and the formation of the professional corporations under which Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh controlled the practice of medicine are void.   Similarly, the agreements by the shareholder-doctors to transfer ownership of the Defendant PCs to Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh are void *ab initio* as a matter of law.

527.   Pursuant to the Department of Insurance Regulations, 11 NYCRR 65-3.16(a)(12), only providers licensed in accordance with applicable New York State law is entitled to reimbursement under the No-fault Law.  Pursuant to 11 NYCRR 65-3.16(a)(6), only health services provided by a licensed provider acting within the scope of his or her license are reimbursable under the No-fault Law.

528.   In violation of Section 1508 of the Business Corporation Law, Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh maintained a financial interest in and were the true beneficial owners of the Defendant PCs, which, at all relevant times mentioned herein, were formed and operated in violation of Article 15 of the Business Corporation Law.

529.   The Defendant PCs and Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh received substantial monies from Allstate based on their justifiable and good faith reliance that the Defendant PCs were in compliance with applicable statutes and administrative regulations governing the provision of health services in New York and therefore were compensable under the No-fault Law.

530.    The services that were allegedly rendered by the Defendant PCs and paid for by Allstate were rendered pursuant to a corporate practice of medicine structure not permitted under New York Law.

531.    Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Moysik, Roit, Shperling and the Defendant PCs intentionally, knowingly, fraudulently, and with an intent to deceive Allstate, made various misleading statements intended to hold out the Defendant PCs as legal professional service corporations incorporated in accordance with applicable New York State Law when in fact they were not, thereby inducing Allstate to make payments that Defendants were not entitled to because of their fraudulent incorporation and illegal corporate structure.

532.    As part of the fraudulent scheme implemented by Defendants, the Defendant PCs, with the assistance and knowledge of Defendants (doctors and principals), made material misrepresentations and/or omitted material statements in submitting no fault claims to Allstate for payment.

533.    Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Moysik, Roit, Shperling and the Defendant PCs intentionally, knowingly, fraudulently, and with an intent to deceive Allstate, concealed the fact that Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh, not the shareholder-doctors, were among, if not the sole, true owners, operators, officers and directors of the Defendant PCs by making false representations of material facts, including, but not limited to, the following fraudulent misrepresentations:

a) Each and every bill and report set forth the name of each Defendant PC as a professional corporation owned by a medical doctor when in fact they were not. The submission of bills and reports containing the signatures of the Defendant Doctors was a fraudulent misrepresentation, intended to deceive and mislead Allstate into believing that the Defendant PCs were legal professional corporations when in fact they were not;

b) False and misleading statements and information regarding who owned, controlled and operated the Defendant PCs;

c) False and misleading statements and information intended to mislead Allstate into believing that the Defendant PCs were being operated by the Defendant Doctors whose names were listed on the respective certificates of incorporation when in fact they were not;

d) False and misleading statements and information intended to circumvent Article 15 of the New York State Business Corporation Law, which prohibits ownership by individuals not licensed to practice the profession for which a professional corporation was incorporated;

e) False and misleading statements and information, as contained in the signed medical reports and NYS NF-3s, that were intended to deceive and conceal the fact that the Defendant PCs were engaged in the illegal corporate practice of medicine in contravention of New York State law, and that Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky and Statnrosh, laypersons, were billing for physician services through fraudulently incorporated PCs; and

f) False and misleading statements and information set forth in NYS NF-3 forms, medical narrative reports, prescriptions and referrals indicating that the Defendant Doctors were actively involved in the operations of the Defendant PCs and the rendering of services relating thereto when in fact they were not.

534. Defendants knew the foregoing material misrepresentations regarding the corporate structure of the Defendant PCs to be false when made, particularly that the Defendant PCs were fraudulently incorporated, and made these false representations with the intention and purpose of inducing Allstate to rely thereon.

535. Allstate did in fact reasonably and justifiably rely on the foregoing material misrepresentations and/or omissions and upon a state of facts that Allstate was led to believe existed as a result of Defendants' acts of fraud and deception, and which led to Allstate making substantial payments to the Defendant PCs.

536.    Had Allstate known of the fraudulent corporate formation and content of the medical reports, treatment verifications, and bills for medical treatment, contrary to all indications of a legal and properly licensed professional service corporation structure and operation, it would not have paid the Defendant PCs' claims for No-fault insurance benefits submitted in connection therewith.

537.    Allstate was thus injured as a proximate result and is entitled to recover and recoup the payments it made to the Defendant PCs, which were fraudulently incorporated in violation of New York State Law.

538.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Allstate to recovery of exemplary and punitive damages.

539.    By reason of the foregoing, Allstate has sustained compensatory damages and been injured in its business and property and is entitled to recover all payments made to the Defendant PCs after April 4, 2002, an amount in excess of $1,000,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWELFTH CLAIM FOR RELIEF

### AGAINST ALL DEFENDANTS
### (Common Law Fraud)

540.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

541.    On information and belief, the Defendant PCs' illegal corporate structure was used to facilitate the billing fraud alleged herein.

542.    The Defendant PCs and Defendants Mirvis, Lupolover, Bezenyan, Katz, Zhuravsky, Statnrosh, Raufov, Alexander, Sofia Bentsianov, Benjamin, Ivanushkin, Lev Bentsianov, Slutsky, Tsirelman, Sosonkin, Shtender, Moysik, Israeli, Mirer, Roit, Shperling, Sukhov, Lai and Francois made material misrepresentations and/or omitted material statements in submitting No-fault claims to Allstate for payment.

543.    On information and belief, each and every bill, report and test result submitted by Defendants to Allstate set forth fictional symptoms, diagnoses and representations of services provided.  The false representations contained therein not only were intended to defraud Allstate but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

544.    On information and belief, Defendants intentionally, knowingly, fraudulently, and with an intent to deceive, submitted patient medical reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements and information as to the type, existence and extent of the Covered Persons' symptoms and injury;

- False and misleading statements and information designed to conceal the fact that the treatment and diagnostic testing for said injury was not rendered or was of no diagnostic or treatment value;

- False and misleading statements and information as to the results of treatment and diagnostic testing, as well as the diagnosis, for said injury;

- False and misleading statements and information designed to conceal the fact that the referral of Covered Persons for further treatment and diagnostic testing was medically unnecessary;

- False and misleading statements and information as to the underlying causes of said injury;

- False and misleading statements contained in each and every bill and report, which set forth the name of each Defendant PC as a professional corporation, owned by medical doctors when, in fact, they were not;

- False and misleading statements contained in each and every bill and report wherein they represented that the Defendant PCs were lawfully licensed and authorized to render the billed for services when, in fact, they were not;

- False and misleading test results for neurological testing, which was never or improperly performed;

- False and misleading test results, which included duplicate and identical test results, submitted to Allstate on behalf of different Covered Persons;

- False and misleading statements and information designed to conceal the fact that the billed for ROM Testing that was not performed and/or of no diagnostic value;

- False and misleading statements and information as to the results of the ROM Testing which included identical ROM data and muscle test waveforms relating to different patients tested on different days;

- False and misleading statements and information as to the strength testing submitted to Allstate, which contained medically improbable, fabricated, and fraudulent test results;

- False and misleading statements for Synaptic Treatment, which was never performed or, if performed, of no treatment value;

- False and misleading statements and information in the bills submitted by Defendants which represented that Synaptic Treatment under CPT Code 64550 was rendered on multiple days, when it was not;

- False and misleading statements in the bills submitted by Defendants, which represented that nerve destruction treatments were rendered (using CPT codes 64613 and 64222 -- in addition to billing using CPT code 64550 for the same procedure) when in fact the nerve destruction testing was never performed; and

- False and misleading statements and information which represented Synaptic Treatment as an "Unlisted procedure, nervous system," (under CPT code 64999) despite the CPT rules mandating that unlisted procedure cannot be reported if there already is a CPT code that describes the procedure.

545.    The foregoing was intended to deceive and mislead Allstate into paying the Defendant PCs' claims under the No-fault Law.  Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the appendix annexed hereto and the accompanying Compendium of Exhibits.

546.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Allstate to rely thereon.

547.    Allstate did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Allstate was led to believe existed as a result of Defendants' acts of fraud and deception.

548.    Had Allstate known of the fraudulent content of the medical reports, treatment verifications, and bills for medical treatment, it would not have paid the Defendant PCs' claims for No-fault insurance benefits submitted in connection therewith.

549.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Allstate to recovery of exemplary and punitive damages.

550.    By reason of the foregoing, Allstate has sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be near $40,000,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRTEENTH CLAIM FOR RELIEF
## AGAINST ALL DEFENDANTS

### (Unjust Enrichment/Restitution)

551.    The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

552.    By reason of their wrongdoing, Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Allstate that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

553.    Allstate is therefore entitled to restitution from Defendants in the amount by which Defendants have been unjustly enriched.

554.    By reason of the foregoing, Allstate has sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $40,000,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**FOURTEENTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**

(Injunctive Relief)

555.    The allegations of paragraph 1 through 413 are hereby repeated and realleged as though fully set forth herein.

556.    For a period of over twelve years, Defendants engaged in a pattern of fraudulent conduct to induce Allstate to make payments to the Defendant PCs by submitting bills and supporting medical records that contained materially false and misleading information or misrepresentations designed to conceal the fact that the treatments, diagnostic testing, and referrals billed for by the Defendant PCs for services rendered to Covered Persons were never rendered or were of no diagnostic or treatment value and were performed, if at all, for the sole purpose of obtaining payment on fraudulent claims.

557.    Defendants, acting separately and in concert with each other, defrauded Allstate, who are required to process claims for No-fault insurance benefits pursuant to

Sections 5101, *et seq.*, of the New York Insurance Law and 11 NYCRR 65, *et seq.*, of the New York State Insurance Department Regulations, and implemented a fraudulent billing scheme in which all Covered Persons purportedly treated at the Defendant PCs received substantially similar treatments, testing and referrals to providers regardless of the nature of the alleged complained of injuries.  As part of the fraudulent billing scheme, a Covered Person's initial office consultation at the Defendant PCs would automatically trigger a series of internal billing practices and procedures in which the Defendant PC would bill for services, including but not limited to Diagnostic Testing (EMGs and NCVs), ROM Testing and Synaptic Treatment, regardless of whether such tests or treatment(s) were actually performed, of any diagnostic or treatment value or medically required.   The initial office consultation also triggered automatic billing for follow-up examinations, testing, treatment and a referral regimen that the Defendant PCs would bill for regardless of whether the Covered Persons appeared for same or whether the treatment was medically necessary.

558.    At the time the foregoing material misrepresentations were made by Defendants, they were known by Defendants to be false.  Defendants nevertheless submitted the claims for insurance benefits with the intent to deceive and to defraud Allstate  and to induce Allstate to pay the fraudulent claims, which Allstate did in fact pay in reliance thereon, and which Allstate would not have otherwise paid had Allstate known the true facts.

559.    Defendants' conduct warrants the grant of a permanent injunction against them requiring that Defendants cease further submission to Allstate of any bills seeking payment for any examinations, testing, treatment and referrals rendered to Covered Persons.

560.    Defendants' conduct warrants the grant of a permanent injunction against them precluding their initiation against Allstate of any legal proceedings, including but not

limited to arbitration proceedings or lawsuits, in any forum or jurisdiction seeking payment for, or equitable relief regarding, any examination, testing, treatment and referral rendered to Covered Persons.

561. As a direct result of Defendants' fraudulent conduct, Allstate and the public suffered irreparable harm for which there exists no adequate remedy at law via a money judgment for damages. In addition to the economic injury caused to Allstate's business and property, Defendants' practices have resulted in the requirement that the driving public pay increased insurance premiums to allay the cost of the fraudulent scheme perpetrated by the Defendants.

562. As the foregoing recitation of Defendants' endeavors demonstrates, a balancing of the equities favors granting the requested injunctive relief. That is, denial of the relief sought will cause far greater harm to Allstate than the granting of the relief will cause Defendants.

563. Granting the injunctive relief sought will foster Allstate' responsibility to combat fraud and will protect Allstate's respective rights to legal and equitable remedies. Moreover, granting the injunctive relief will foster and protect the public interest in obtaining proper and affordable health care, as well as in stemming the increase in the costs of insurance.

564. Furthermore, granting the injunctive relief sought will serve the imperative of denying Defendants further opportunity to unjustly enrich themselves through the ill-gotten proceeds of illegal activity; to continue to capitalize on their fraud through accumulation of funds, assets, and property by use of tainted proceeds; and to disserve Allstate and the public's rights and interests.

565.   Based upon the foregoing, there is an immediate need for the injunctive relief requested by Allstate.

### FIFTEENTH CLAIM FOR RELIEF

### AND THE DEFENDANT PCs

#### (Declaratory Judgment)

#### (Corporate Practice Of Medicine
New York State Business Corporation Law §§ 1501, *et seq.*)

566.   The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

567.   For a period of at least twelve years, Defendants have purchased the names and licenses of at least ten doctors to circumvent the strict tenets of Article 15 of the Business Corporation Law and incorporate at least eight sham PCs that are not licensed in accordance with New York State Law.   Under New York law, an insurer is not required to reimburse first-party claims by those who are not eligible and do not have standing to seek reimbursement under the No-fault Law.   As a matter of eligibility and standing, the New York Court of Appeals held, in State Farm v. Mallela, 4 N.Y.3d 313; 827 N.E.2d 758; 794 N.Y.S.2d 700 (2005), that a fraudulently incorporated and/or licensed professional corporation, such as the Defendant PCs, not formed and/or operated in accordance with Article 15 of the Business Corporation Law, is not entitled to recover No-fault benefits.

568.   As the Defendant PCs are fraudulently incorporated and/or licensed professional corporations, with nominal owners listed on the certificate of incorporation filed with the Department of State, concealing the true owners, it is respectfully requested that this Court issue an order declaring that Allstate is under no obligation to pay any of Defendants'

No-fault claims because the Defendant PCs are not properly licensed in accordance with New York State Law.

569.     As the Defendant PCs are fraudulently incorporated and/or fraudulently licensed entities, with nominal owners listed on the certificate of incorporation filed with the Department of State, concealing the true beneficial owners, it is respectfully requested that this Court issue an order declaring that Allstate is under no obligation to pay any of Defendants' No-fault claims because of the Defendant PCs' illegal corporate structure.

570.     Allstate has no adequate remedy at law.

571.     The Defendant PCs will continue to bill Allstate for No-fault services despite their illegal corporate form and fraudulent incorporation absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay the pending, previously-denied and any future No-fault claims submitted by any of the Defendant PCs due to their fraudulent incorporation.

**SIXTEENTH CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**
**(Declaratory Judgment)**

572.     The allegations of paragraphs 1 through 413 are hereby repeated and realleged as though fully set forth herein.

573.     Defendants' fraudulent and deceptive scheme to induce Allstate to make payments to Defendants for examinations, treatments, diagnostic testing, and referrals that were never rendered or were medically unnecessary warrants the grant of a judgment declaring that Allstate is under no obligation to pay any of Defendants' No-fault claims arising from any examinations, testing, treatment and referrals provided to Covered Persons.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Allstate demands a trial by jury.

**WHEREFORE,** Allstate demands judgment as follows:

i)      Compensatory damages in an amount in excess of $40,000,000.00, the exact amount to be determined at trial;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs and reasonable attorneys' fees on the First through Tenth Claims for Relief;

iv)     Compensatory and punitive damages on the Eleventh Claim for Relief;

v)      Compensatory and punitive damages on the Twelfth Claim for Relief;

vi)     Compensatory damages on the Thirteenth Claim for Relief;

vii)    Injunctive relief on the Fourteenth Claim for Relief, enjoining and restraining Defendants, their officers, agents, servants, employees, affiliates and attorneys, and any business entities and/or persons controlled by them or acting on their behalf, or those in active concert or participation with them, and any persons or other entities having joint ownership of assets with them from:

a.      Submitting to Allstate any bills seeking payment for any examinations, testing, treatment and referrals arising from services purportedly rendered by or through Defendants to Covered Persons; and

b.      Initiating against Allstate any legal proceedings, including but not limited to arbitration proceedings or lawsuits, in any forum or jurisdiction seeking payment for, or equitable relief regarding, any examinations, testing,

treatment and referrals arising from services purportedly rendered by or through Defendants to Covered Persons.

viii) Declaratory relief on the Fifteenth Claim for Relief declaring that Allstate is under no obligation to pay any of Defendants' No-fault claims because of the Defendant PCs' illegal corporate structure;

ix) Declaratory relief on the Sixteenth Claim for Relief declaring that Allstate is under no obligation to pay any of Defendants' No-fault claims arising from any examinations, testing, treatment and referrals provided to Covered Persons because of Defendants' fraudulent and deceptive scheme to induce such payments.

Dated: New York, New York,
October 16, 2008

Stern & Montana, LLP

By

Robert A. Stern (RAS-1282)
Sandra P. Burgos (SB-5856)
Daniel S. Marvin (DM-7106)
Attorneys for Plaintiffs
Trinity Centre
115 Broadway
New York, New York 10006
(212) 532-8100