UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-----------------------------X  Docket#
ALLSTATE INSURANCE COMPANY,    : 08-cv-04405-SLT-PK
          et al.,              :
              Plaintiffs,      :
    - versus -                 : U.S. Courthouse
                               : Brooklyn, New York
MIRVIS, et al.,                : June 6, 2017
              Defendants       :
-----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

<u>**For the Plaintiffs**</u>:  **Robert A. Stern, Esq.**
Stern & Montana, LP
Trinity Centre
115 Broadway
New York, NY 10006

**William J. Natbony, Esq.**
Cadwalader, Wickersham & Taft
1 World Financial Center
New York, NY 10281

**Daniel Scott Marvin, Esq.**
**Kristy Eagan, Esq.**
Morrison Mahoney LLP
120 Broadway, Suite 1010
New York, NY 10271

<u>**For Defendant Mirvis**</u>:  **Meyer Y. Silber, Esq.**
The Silber Law Firm, LLC
233 Broadway
Suite 900
New York, NY 10007

**For Defendants**  **Mark L. Furman, Esq.**
<u>**Judgment Debtor**</u>:  Abrams Fensterman
1 MetroTech Center, Suite 1701
Brooklyn, NY 11201

<u>**Transcription Service**</u>:  <u>**Transcriptions Plus II, Inc.**</u>
61 Beatrice Avenue
West Islip, New York 11795
laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          (Microphones not positioned and functioning

2    properly, thereby creating indiscernible portions in the

3    record.)

4          THE CLERK:  The Honorable Magistrate Judge

5    Peggy Kuo presiding.

6          Civil Cause for a Motion Hearing, docket number

7    08-cv-4405, Allstate Insurance Company, et al. v. Mirvis,

8    et al.

9          Counsel, please state your name for the record.

10          MR. NATBONY:  For plaintiffs, William Natbony

11    from Cadwalader, Wickersham & Taft.

12          Good afternoon, your Honor.

13          MR. STERN:  Good morning, your Honor.

14          Robert Stern, along with Daniel Marvin and

15    Kristy Eagan (indiscernible).

16          MR. FURMAN:  For judgment debtor, Georgy

17    Statnigrosh and additionally, the third-party, Nelly

18    Zhuravsky, Abrams, Fensterman by Mark Furman.

19          MR. SILBER:  Good morning, your Honor.

20          Meyer Silber for nonparties Tatyana Mirvis,

21    Lyubov Mirvis and (indiscernible).

22          THE COURT:  All right.  Good morning, everyone.

23          So we're here on a motion to avoid fraudulent

24    conveyance filed by the plaintiffs and there are two, so

25    I would like to start with the Mirvis -- the motion

3

                    Proceedings

1    regarding to the Mirvis judgment debtor.

2            So as a preliminary matter, there was an issue

3    about whether we needed to have a special proceeding in

4    this case.  And I have seen -- I have read the pleadings

5    and it seems to me that there's no need for a special

6    proceeding in this case.  There's no issue with regard to

7    personal jurisdiction but I wanted to give defendants an

8    opportunity to argue on this point.

9            Mr. Silber, did you want to convince me

10   otherwise?

11           MR. SILBER:  That argument was put forth

12   (indiscernible).  I am not going to (indiscernible).

13           THE COURT:  Okay.  Great.  Mr. Furman, let me

14   give you an opportunity.  Did you want to speak to that?

15           MR. FURMAN:  Your Honor, I believe this raises

16   the issue of personal jurisdiction with regard to Mrs.

17   Zhuravsky, who is not before the Court.  Now I know that

18   she was served here but not being able or not -- not

19   being -- having come into the Court today, I believe that

20   she should have been served with all the papers and that

21   she -- the issue of jurisdiction should have been raised

22   or raised, and should have been decided earlier than

23   this.  So I am raising that now.

24           THE COURT:  When you say earlier than this,

25   when would have been --

4

Proceedings

1      MR. FURMAN:  Well, earlier than they've raised

2  it in their opposition papers.

3      THE COURT:  This is a motion by the plaintiff.

4      MR. FURMAN:  Yes.

5      THE COURT:  You were the ones who are supposed

6  to raise the opposition.

7      MR. FURMAN:  In reply papers.

8      THE COURT:  Well, but I thought that you --

9  okay, let me just backtrack.  My understanding is that

10  one of the grounds for your argument in opposition is

11  that there should be a special proceeding that we can't

12  just have a proceeding as we have now.

13      MR. FURMAN:  That's correct.

14      THE COURT:  So you're the one who brought it

15  up.

16      MR. FURMAN:  And the alternative is that if --

17  there should not be a special proceeding, then there's a

18  question of personal jurisdiction over it in this case.

19      THE COURT:  I see.  So if I -- but I am still

20  not understanding your argument that it should have been

21  raised earlier.  It was you who raised the issue and if

22  you didn't raise it until now, who was supposed to raise

23  it earlier?

24      MR. FURMAN:  Well, when we raised it --

25  initially, we raised it as being a special proceeding and

5

Proceedings

1  the alternative of it not being a special proceeding is

2  then is there a question -- it's not in this -- in this

3  action, then how is she here?  It's not a special

4  proceeding because they've argued there shouldn't be a

5  special proceeding.  So it's in this action.  So how is

6  she in this action?

7           THE COURT:  Okay.  So you're saying that the

8  reason we should have a special proceeding is that there

9  is, in fact, a personal jurisdiction issue.

10          MR. FURMAN:  Yes.

11          THE COURT:  Okay.  So Mr. Natbony, did you want

12  to say something?

13          MR. NATBONY:  Sure.  Thank you, your Honor.  In

14  their opposition papers, they don't make a challenge

15  specifically to the issue of personal jurisdiction.  What

16  they say and according to their opposition papers is

17  simply a vague recitation that Ms. Zhuravsky has not been

18  afforded, "the opportunity to be heard or defend

19  herself," whatever that means.

20          There's no allegation here that there's no

21  personal jurisdiction.  In fact, based on questions that

22  she's answered, she works in Rego Park, New York.  So I

23  don't see how there is an issue of personal jurisdiction

24  here.  That's (indiscernible).

25          THE COURT:  Okay.  So I don't -- is there

6

Proceedings

1    anything further, Mr. Furman?

2              MR. FURMAN:  No.

3              THE COURT:  All right.

4              MR. FURMAN:  No, Judge.

5              THE COURT:  So I find that the special

6    proceeding is not necessary here and we could just move

7    forward on the proceeding in this case.

8              So let's turn to the substantive part of it.

9    So the crux of the case is whether there was fair

10   consideration given for this property with regard to the

11   Mirvis debtor -- judgment debtor, the issue is with

12   regard to 289 Bayberry Drive and even though there were

13   conveyances on -- back and forth, I think the relevant

14   conveyance here is the one from May 11th, 2015 from Mark

15   Mirvis to his daughter, Tatyana Mirvis.

16             The consideration that's alleged was or that

17   was written, it was -- what was the document again where

18   it was written that the consider was $10 and other

19   valuable consideration?  Was that --

20             MR. SILBER:  The deed.

21             THE COURT:  That was in the deed, okay.  And

22   obviously $10, it's not fair consideration for this

23   property but there is this whole other valuable

24   consideration aspect.  So Mr. Furman -- I'm sorry, Mr.

25   Silber, can you tell me what the other valuable

7

Proceedings

1  consideration is?  Is it the payment of the carrying

2  costs?

3           MR. SILBER:  Principal.

4           THE COURT:  All right.

5           MR. SILBER:  There's the -- we can understand

6  that the property is not -- is a -- has in excess of

7  $800,000 of mortgage debt.  That was picked up, in

8  addition to all of the carrying costs, by Ms. Tatyana

9  Mirvis.  Her affidavit -- both affidavits, her father's

10  (indiscernible) specify the amounts of money that were

11  earned by her specifically, picked up on her tax return

12  specifically, taxes paid specifically and that those

13  funds were used to pay the carrying costs.

14           I don't think there's a challenge to the fact

15  that those funds were, in fact, used to pay the carrying

16  costs.  Allstate claims that it's not her money which is

17  not really relevant in these considerations, unless they

18  can prove to the Court that, in fact, the money is not

19  hers.

20           On its face, the money is hers.  They have

21  their -- you know, they've got a series of self-serving

22  arguments that the money is not hers but she's explained

23  -- it's not him, your Honor, she's explained that between

24  2000 and 2012, '13, the money was not hers.  The money

25  was the proceeds of Oceania Condominium that was sold in

8

Proceedings

1    Brooklyn, put into her account and from her account, the

2    carrying costs were paid.  She doesn't lay claim to that

3    money.

4            She makes claim to money subsequent to that,

5    2013, '14, 2015 -- I'm sorry, '13, '14, '15, in excess of

6    a million and a half dollars in declared, taxable income.

7    There's clearly enough money from the money she's earned

8    between her and her husband, to have paid the $340,000 in

9    carrying costs of the property.  So she's paid $300,000

10   in carrying costs that were over a two or three year

11   period.

12           THE COURT:  What was that period?

13           MR. SILBER:  2013, '14, and '15.

14           THE COURT:  Before or after May 11, 2015?

15           MR. SILBER:  I'm sorry?

16           THE COURT:  Or are you saying it doesn't

17   matter?  Because the last -- the conveyance -- I'm

18   focused on the conveyance on May 11, 2015, which is when

19   Mark Mirvis turned it --

20           MR. SILBER:  So before --

21           THE COURT:  -- signed it over to her but you're

22   saying before because it went in March -- I'm sorry, May

23   20th, 2013, from Mark Mirvis to her and for no

24   consideration, and then it went back to Mr. Mirvis on

25   October 20th, 2013, again for no consideration and then

9

Proceedings

1  finally, a week after the judgment was entered, May 11th,

2  2015, it went from Mark Mirvis to her again.

3          MR. SILBER:  Right.

4          THE COURT:  So I am not clear on how you're

5  counting the payments -- the consideration.  You're

6  adding up all the money that she already paid?

7          MR. SILBER:  I'm adding --

8          THE COURT:  Even when it wasn't her property?

9  I mean, when it was -- the deed was in Mark Mirvis' name,

10  why would it matter that she's paying?

11          MR. SILBER:  Well, the question is did she pay

12  consideration -- fair consideration for the property?

13          THE COURT:  Then --

14          MR. SILBER:  I don't know that it matters that

15  she paid before or afterwards?

16          THE COURT:  Yes, it does because then I don't

17  know if it's fair, right?  Fair consideration is a dollar

18  amount.

19          MR. SILBER:  Right.

20          THE COURT:  And so if I don't know what the

21  dollar amount is that she paid, I don't know if it's

22  fair.

23          MR. SILBER:  But we do know what dollar amount

24  she paid.

25          THE COURT:  Okay.  So what's the dollar amount?

10

                                Proceedings

1          MR. SILBER:  More in -- in four or up until

2    that point and (indiscernible) market worth

3    (indiscernible) dated specified that she paid in excess

4    of $300,000 in carrying costs to the property.

5          Now the reason why the transfer happened at

6    that point is because she realized that she wanted to --

7    she was informed and understood that she was able to pick

8    up the carrying costs of the property as a deductible

9    (indiscernible) on return but when she tried to do that,

10   she was told she couldn't do that, okay?

11         So I don't know that it matter -- if the idea

12   is that she is carrying the property and in her mind and

13   her parents's mind, the property is essentially hers, so

14   much so that she is going to deduct the carrying costs of

15   the property.  I don't know that it matters when exactly

16   the money was paid.

17         THE COURT:  Well, you're using some curious

18   words there to say in her mind or in their mind they

19   thought the property was hers but deeds mean something

20   and the name on the written deed is important, so the

21   fact that it went back and forth is not inconsequential.

22   I mean it means something, right?

23         MR. SILBER:  (Indiscernible).

24         THE COURT:  So that's why I am -- just because

25   -- and actually if what you're saying is the deeds don't

11

Proceedings

1   matter, it was her property and it just went back and

2   forth, then that kind of plays into the plaintiff's

3   argument that the property -- there was no delineation

4   between Tatyana and Mark.  That they just kind of shared

5   property and it went back and forth despite what the

6   papers say.

7              MR. SILBER:  Well --

8              THE COURT:  So that's the part that I am a

9   little curious about and I would like you to explain it

10  more.

11             MR. SILBER:  It wasn't -- my (indiscernible)

12  wasn't intended to express this (indiscernible) the

13  Court.  As far as the transfers, let's just address that

14  for a second.

15             THE COURT:  Uh-hum.

16             MR. SILBER:  In 2013, there informed -- and

17  Allstate can quibble with who informed them or why they

18  were informed, they were -- it's true, I mean for estate

19  planning purposes, the initial transfer (indiscernible)

20  the house two times, your Honor.

21             I don't know if that's right or that's wrong

22  but the point is that's what they were informed.  They

23  relied on that counsel and they did that.

24             THE COURT:  50 percent?  I thought the whole

25  thing went to her.  It was 100 percent.

12

Proceedings

1          MR. SILBER:  This was in 2013.

2          THE COURT:  On May 20th, 2013, only 50 percent

3    went over to Tatyana?

4          MR. SILBER:  Yes.

5          THE COURT:  All right.

6          MR. SILBER:  Thereafter, they were instructed

7    that it's not a good idea, given the Allstate lawsuit and

8    it looks bad and the estate planning purposes were not

9    (indiscernible).  And that's what happened.  That's why

10   there is no consideration because there was -- Tatyana at

11   that point was paying almost none of the expenses.  She

12   picked up the expenses around that time but --

13         THE COURT:  Around what time?  That's what I

14   keep asking, from when did she start paying?

15         MR. SILBER:  In 2000- -- let me give you the

16   exact dates -- in 2013, '14, and '15, she picked up the

17   principal payments on the house.  Her father did pull out

18   money from pensions and earned a few dollars

19   (indiscernible) but principally the money came from her,

20   '13, '14 and '15 but the transfer from her parents to her

21   in '13, was not as a result of the -- of her payments.

22   Counsel were (indiscernible) from estate planning

23   purposes.

24              The '15 transfer came about because she was

25   carrying the property at that point and I get it, I don't

13

Proceedings

1    think Allstate disputes the money was coming from her

2    pocket.  They're just arguing that the money was put into

3    her pocket by her father.

4            So I don't think that that really is an issue

5    and if you look at the source of the funds, the money

6    from the Oceania Condo was extended by late '12 and early

7    '13.  There was no funds from the proceeds of the sale

8    that could have been used because they were gone.  And

9    Tatyana doesn't say that she did pay her expenses before

10   that time.  That money did, in fact, come from her

11   parents -- from proceeds of the sale of her parents

12   condo.

13           It was afterwards and she doesn't make any

14   money at that point.  She makes money in 2013.

15           THE COURT:  When you say make money, you mean

16   she has income?

17           MR. SILBER:  Income.  Yes, her income begins in

18   2013.

19           THE COURT:  All right.

20           MR. SILBER:  She could not have paid the

21   carrying costs prior to that because she had no income.

22   Her income matured.  In '13, she had $250,000 in income.

23   In '14, she had $646,000 in income and in '15, she had

24   $560,000.

25           THE COURT:  And what is the source of her

14

Proceedings

1   income?

2           MR. SILBER:  Principally, two -- one -- it's

3   kind of a (indiscernible) but one or two pharmacies that

4   she was a partner in.

5           THE COURT:  Okay.

6           MR. SILBER:  She picked up this income on her

7   tax return and is paying taxes on it.  So if Allstate is

8   going to argue the money is not hers, it's a nice

9   argument but every indication is she (indiscernible).

10           THE COURT:  Well, my understanding is the

11   argument is one step before that.  I think the idea is

12   that the conveyance itself, the deed says in 2015 from

13   Mark Mirvis to Tatyana Mirvis which is 100 percent,

14   right, that's not 50 percent.

15           MR. SILBER:  Yes.

16           THE COURT:  That's 100 percent was for -- and

17   it's written down, $10 and other valuable consideration.

18   So if the -- if it was for some amount of money which

19   you're saying was paid before this date, 2013, 2014, why

20   not just write that down?

21           MR. SILBER:  Because the --

22           THE COURT:  Why be so vague about it?

23           MR. SILBER:  I don't think it's being vague at

24   all.

25           THE COURT:  Well other valuable consideration

15

Proceedings

1   is pretty vague.  If you know the -- if it's a dollar

2   amount in the future, you could say because it's going to

3   be some dollar amount, we don't know what it is yet but

4   it's going to be something covering this.  But you're

5   saying that the money has already been paid, 2013, 2014.

6   Everyone knows -- if that's the case, if it's been paid

7   already, every knows what it is and if Mark Mirvis is

8   saying that it's over $300,000, why not just put hat

9   down?

10         MR. SILBER:  Because as transactional lawyers,

11  (indiscernible) undoubtedly tell the Court and I assuming

12  the Court knows, every contract is $10 for consideration.

13  It's a legal (indiscernible).

14         THE COURT:  Wait, everybody -- every contract

15  says that?  I have never seen a contract that says that.

16         MR. SILBER:  Pretty much a contractor talks

17  about the transactions says legal -- promises and

18  consideration being acknowledged or $10 legally

19  (indiscernible).

20         THE COURT:  Yes, but this is the sale of real

21  estate.  This is not just --

22         MR. SILBER:  It wasn't the sale of real estate.

23  It was interfamily transfer.

24         THE COURT:  Ah, okay.  So --

25         MR. SILBER:  That -- and I don't think we're

16

Proceedings

1   focusing -- you know what?  That actually proves a point,

2   that they weren't trying to hide from Allstate because if

3   they were trying to hide from Allstate, if this

4   transaction was a mechanism to avoid Allstate's judgment,

5   then maybe they would have done just that but because

6   they weren't concerned that Allstate would come hunting

7   them done as a result of that transfer, they put in the

8   -- let's say the minimum required legal language in a

9   transactional document that allowed -- that provided

10  consideration for the transactions.

11          THE COURT:  But you're saying they had no idea

12  that Allstate would come looking at this.  This was --

13  this occurred a week after the judgment.  So how did they

14  -- how were they not on notice?

15          MR. SILBER:  Exactly.  Not that they weren't on

16  notice, the transfer was not intended to avoid the

17  judgment.  The transfer was intended so that Tatyana

18  could pick up these expenses on her tax return and deduct

19  them, not to avoid Allstate.  If they wanted to avoid

20  Allstate, they could have done two dozen other things to

21  hide the transaction.

22          THE COURT:  Okay.  So --

23          MR. SILBER:  The bottom line is that

24  everything, even though she had a transfer, was the

25  transparently humanly possible, paper trail is a mile

17

Proceedings

1    long, if they were trying to hide from Allstate, they did

2    a pretty darn bad job.

3           THE COURT:  Okay.  All right.  So plaintiffs?

4           MR. NATBONY:  Thank you, your Honor.  A few

5    points.  First of all, I -- when it comes to a deed on

6    the documents on the property, at least the ones that

7    I've dealt with in my career, don't say $10 and other

8    valuable consideration.

9           And, in fact, my understanding is that the $10

10   amount is also the amount that is being used under the

11   ACRIS system to determine real property transfer tax.  So

12   I mean, you (indiscernible) them out in a deed for those

13   purposes, as well.

14          But in particular, I think you need to go back

15   to at the time of the deed, the argument from the other

16   side is that there were carrying costs that were paid and

17   what the record here shows -- we have to go back and

18   understand what Tatyana first alleged.  Right?  She first

19   alleged in a sworn affidavit that she was paying all the

20   carrying costs.  That was her first affidavit.

21          We've now shown that to be a lie, a dead,

22   straight-on lie.  We've put before the Court evidence

23   that shows that, in fact, Mr. Mirvis was paying a fair

24   portion of the carrying costs.  We've also shown that at

25   the time that he sold -- that the Brooklyn property was

18

Proceedings

1  sold, approximately $305,000 was put into Tatyana Mirvis'

2  account, an account that Mr. Mirvis specifically asked

3  her to set up literally to avoid paying the judgment in

4  Brooklyn.  So this is a family affair.  The $300,000 that

5  was paid came from Mr. Mirvis, was given to Tatyana

6  Mirvis in an absolute attempt to basically commit fraud

7  and that's what occurred here.

8          So we showed that Mr. Mirvis was paying part of

9  the carrying costs.  Now she says that oh, it's really

10 her money.  Well, it's not her money.  It's $300,000

11 that was put into her account with a preconceived plan to

12 make it seems like it was her money when it was not and

13 that was the money that was used, that forms the basis of

14 the argument that at the time of the transfer, it's

15 counting to pay these old carrying costs.

16         THE COURT:  But --

17         MR. NATBONY:  And more importantly, where's the

18 documentary proof?  Do we have a single document from her

19 that says here's my income, here's the payments that I

20 made.  Here's what I agreed.  Is there an assumption of

21 the mortgage?  Is there an assumption of carrying costs?

22 Nothing.  We have a simple, seven paragraph affidavit

23 that says believe me.  Here's what I did.

24         Well you know what?  She's already proven that

25 she will tell lies to the Court that shouldn't be

Transcriptions Plus II, Inc.

19

Proceedings

1   considered.

2          THE COURT:  Well, let me ask a question.  You

3   said that it's been shown that Mark Mirvis paid a fair

4   portion of the carrying costs.  Is it --

5          MR. NATBONY:  Fair, not equitable but -- okay.

6          THE COURT:  Yes, but is that a direct payment

7   or is it through this roundabout way that you've

8   described?

9          MR. NATBONY:  No, no, we showed about $135,000

10  was paid between 2010 and 2015.  It's on page 5 of our

11  brief, Exhibits A through E.  Payments for mortgage, for

12  home equity line of credit, property tax payments,

13  insurance payments.  No, those were direct.

14         THE COURT:  Okay.

15         MR. NATBONY:  So what I am saying is what that

16  goes to show is that the initial allocation by Tatyana

17  Mirvis, that she was carrying or any -- all of the

18  carrying costs was not true.  So now she's backtracked

19  from that and said oh, okay, I really only obtained a

20  portion.  Well, that's not even true because what was

21  coming into her account was this $305,000 from Mr. Mirvis

22  that he put in there specifically (indiscernible) -- this

23  wasn't I'm going to put it into your account.  It's a

24  gift.  No, I want you to set up a new account that the

25  two of us can use.

20

Proceedings

1          And don't forget, your Honor, when we were

2    before you on the PI motion, right, we demonstrated to

3    you that Mr. Mirvis had control over that account.  That

4    he was writing checks.  That he was doing deposit slips

5    that would say that this is Tatyana Mirvis' money.

6    That's all.

7          THE COURT:  Okay.  All right.

8          MR. SILBER:  Your Honor, I'm sorry.  Can I jump

9    in there for a second?

10          THE COURT:  I will give you an opportunity to

11    respond to that and then we need to move on.

12          MR. SILBER:  The only way for Allstate to win

13    the day here is simply to confuse the facts.  The money

14    counts were just referred to, you know, she had the

15    money, was gone by 2012.

16          THE COURT:  Gone from where?

17          MR. SILBER:  It was spent.  The two --

18          THE COURT:  Spent how?

19          MR. SILBER:  On Mark Mirvis used the money --

20    in 2010, Oceania sold for approximately $300,000 -- more

21    than $300,000 went into an account in Tatyana's name.  We

22    don't dispute that . The reason why that was done was

23    because Mark had -- the accounts had been closed by Mark

24    based on the Florida foreclosures and again, if he was

25    trying to avoid Allstate, he did a pretty bad job.  He

21

Proceedings

1   would have --

2          THE COURT:  But Mr. Silber, that's not a very

3   good argument.

4          MR. SILBER:  Look, my point is is that

5   everything he's done was transparent and a paper trail.

6   If he was trying to find the Oceania proceeds, he would

7   have stuck it in an account that didn't have his

8   daughter's name on it.

9          THE COURT:  But then he wouldn't have control

10  over it.

11         MR. SILBER:  Who said?  Of course he could.

12         THE COURT:  How?

13         MR. SILBER:  He could have put it into an

14  entity.  He could have some -- his brother take care of

15  his cousin, I don't know.  I mean --

16         THE COURT:  The fact that his daughter rather

17  than a brother is of no consequence, right?  I mean, it's

18  still a family member, so that he can have control over

19  it.

20         MR. SILBER:  My point, your Honor, is that he

21  did what was easy and convenient --

22         THE COURT:  Okay.

23         MR. SILBER:  -- because that's what he was

24  trying to do.

25         THE COURT:  Okay.

22

Proceedings

1          MR. SILBER:  He was trying to make those funds

2    available to pay his and his family's expenses.

3          THE COURT:  So it was still his money even

4    though it was in Tatyana's name.

5          MR. SILBER:  Agreed.

6          THE COURT:  Okay.

7          MR. SILBER:  Agreed.

8          THE COURT:  Okay.

9          MR. SILBER:  That money -- this is a critical

10   section that Allstate completely smudges.

11          THE COURT:  Okay.

12          MR. SILBER:  That money was spent by 2012.

13          THE COURT:  Right, but when you say spent, I am

14   curious what you mean by spent.  You can spend the money

15   by paying off a mortgage.  You can spend the money by

16   throwing a big party.  How was it spent?  Was the money

17   spent to pay off --

18          MR. SILBER:  All the above.

19          THE COURT:  Okay.

20          MR. SILBER:  All of the above.

21          THE COURT:  So some of that money went to pay

22   the mortgage.

23          MR. SILBER:  Mark and his wife used the money

24   that belonged to them, it was their money in Tatyana's

25   name, to pay the mortgage and to go on vacation and to

23

Proceedings

1   buy food and to do whatever they're going to do for

2   approximately a three year -- almost a three-year period.

3          THE COURT:  Okay.

4          MR. SILBER:  At the end of 2012, that money was

5   gone.  It was spent.

6          THE COURT:  So that account went to zero?

7          MR. SILBER:  Pretty much.  I can't represent to

8   the Court that it was -- because I don't have that

9   information in front of me but it was pretty --

10          THE COURT:  Okay.  So the money that you said

11   Tatyana paid, the carrying costs, where did that money --

12   which account did that money come from?

13          MR. SILBER:  That came from that - largely from

14   that account.

15          THE COURT:  The same account, okay.

16          MR. SILBER:  Because that was the money that

17   came in 2013, that's when she started burning her own

18   money.

19          THE COURT:  I see.

20          MR. SILBER:  In 2013 --

21          THE COURT:  Okay.  I understand the point.

22          MR. SILBER:  -- she (indiscernible) $250,000.

23          THE COURT:  Right.

24          MR. SILBER:  In 2000- --

25          THE COURT:  But it's all going into the same

24

Proceedings

1    account.  She didn't open a different account to say --

2          MR. SILBER:  (Indiscernible) she did.

3          THE COURT:  Okay.  So that --

4          MR. SILBER:  But my point is that they keep

5    saying the money was given to her by Mark.

6          THE COURT:  Right.

7          MR. SILBER:  It wasn't.  The money that Mark

8    put in that account --

9          THE COURT:  I understand what you're saying.

10          MR. SILBER:  -- he was spending --

11          THE COURT:  I understand what you're saying.

12   Okay.  So that's the -- I just want to be clear, right,

13   so you're saying for the 2015 transfer --

14          MR. SILBER:  The --

15          THE COURT:  Hold on.  For the 2015 transfer,

16   the fair consideration is the $10 plus what?

17          MR. SILBER:  Plus $300,000 and change that --

18          THE COURT:  And change.  You don't have an

19   actual number.

20          MR. SILBER:  It's (indiscernible) $300,000 that

21   Tatyana used from her proceeds -- from her income that

22   she did (indiscernible) the carrying costs of the

23   property and to -- the carrying costs of the property.  I

24   apologize, I don't have a breakdown.  I might.

25          THE COURT:  Okay.

25

Proceedings

1          MR. NATBONY:  Your Honor?

2          THE COURT:  You were never provided that,

3    right?

4          MR. SILBER:  And --

5          THE COURT:  Did you provide it to the Court?

6          MR. SILBER:  Yes, absolutely.

7          THE COURT:  Okay.  Which one is that?

8          MR. NATBONY:  No, your Honor,

9    (indiscernible) --

10          THE COURT:  Hold on.  Let me just look -- I

11   want to give Mr. Silber an opportunity.  In which exhibit

12   did you show me exactly how much Tatyana paid?

13          MR. SILBER:  In her affidavit --

14          THE COURT:  In her affidavit but you don't have

15   any supporting documentation, right?

16          MR. SILBER:  Well --

17          THE COURT:  Like a receipt, a canceled check.

18          THE COURT:  Yes, yes, yes.

19          MR. SILBER:  A bank statement that --

20          THE COURT:  Yes.  In Mr. Furman's opposition,

21   attached to Mr. Furman's opposition, there are -- in

22   document 363, there are expenses that she paid --

23          MR. NATBONY:  Which is after --

24          THE COURT:  Well, hold on.  What's the time

25   period?

Proceedings

1          MR. SILBER:  Well, these are recent bills.

2          THE COURT:  Yeah, but if you're saying that the

3  consideration for the transfer on May 11th, 2015 was for

4  payments up to that point, the transfers after what

5  matter because --

6          MR. SILBER:  But there's --

7          THE COURT:  You're talking -- you can't have it

8  -- you sound like you're -- it sounds like you're the one

9  not being clear.  If you're talking about the amounts

10 paid before, that's what I am asking you, how much was

11 paid up until that point

12         MR. SILBER:  I can --

13         THE COURT:  You don't have documentation of

14 that.

15         MR. SILBER:  I do -- between 2010 and 2012,

16 approximately $300,000 was paid by Mark's money into

17 Tatyana's account and in '13, '14 and '15, approximately

18 $300,000 was paid in -- from Tatyana's money.  I don't

19 think -- I am going to speak out of line perhaps, I don't

20 think there's a dispute that the money went to carry the

21 property.  The question is whose money it was.

22         I don't think that there's a -- if there's an

23 argument that money wasn't expended -- I mean, the

24 mortgage was paid, the electric was paid.  Allstate

25 argues that Mark actually -- there are checks that came

27

Proceedings

1   from Mark.  That's not disputed in the supplemental

2   papers.  Mark says that he took money out of a -- not a

3   retirement account, a pension account and he earned some

4   money and he did -- he wasn't interested in having his

5   daughter carry the property.  It was humiliating for him

6   to do that.

7              THE COURT:  But --

8              MR. SILBER:  He used whatever money he did have

9   at his disposal to pay what he could but the bottom line

10  was that he couldn't.  So --

11             THE COURT:  So why -- you're saying that your

12  clients are making things clear and plaintiffs are making

13  it unclear, why if the account that was set up from the

14  proceeds from Oceania, was clearly for Mark Mirvis' use,

15  all right, then why would Tatyana use that same account

16  to use -- when she had income and was trying to pay her

17  own expenses.  Now she's created a lack of clarity by

18  mixing all the money up into one pool.  Right?

19             MR. SILBER:  Well, but --

20             THE COURT:  Do you have an explanation for why

21  she --

22             MR. SILBER:  Could she have opened another

23  account?

24             THE COURT:  It's fairly simple.

25             MR. SILBER:  She could have.  The bottom line

Proceedings

1   is that was the primary account that was used to pay the

2   expenses.  There were electronic transfers that were

3   already set up into that account and paid.  There were

4   (indiscernible) --

5           THE COURT:  It's very easy to set up electronic

6   transfers and if indeed she is keeping her money --

7           MR. SILBER:  I can't --

8           THE COURT:  -- separate from her father's, then

9   that's what you would do and today we wouldn't

10  necessarily be having this argument if the lines were

11  drawn more clearly.

12          MR. SILBER:  I don't -- again, as far as her

13  putting the money in a different account, I can't explain

14  that.

15          THE COURT:  Okay.

16          MR. SILBER:  I think she just did it because it

17  was easy.  As far as the money being commingled, I don't

18  think that it was commingled because by the time '12 --

19  2012, '13, came around, the money from Oceania had been

20  expended.  So I don't have a statement in 2012 -- I don't

21  have (indiscernible) statement from him.  I still didn't

22  get one.  I don't have one in front of me to show the

23  balance went from 300 in 2010 to 3,500 in 2013.  I'm

24  picking a number.  But that's generally what the idea

25  was.  The --

29

Proceedings

1        THE COURT:  But you haven't presented that to

2   the Court.

3        MR. SILBER:  The estate -- I have not presented

4   that to the Court.

5        THE COURT:  Okay.  All right.

6        MR. SILBER:  I would be happy to do so if the

7   Court wishes me.

8        THE COURT:  Well, today is the day, so I don't

9   know what you're waiting for.  And so then --

10        MR. SILBER:  But I think that (indiscernible)

11   again --

12        THE COURT:  Then my other point is there's no

13   assumption of mortgage here, right?  There's no document.

14        MR. SILBER:  There's no assumption of mortgage.

15   I would just add that if -- I think that's further proof

16   that this wasn't a scheme.

17        THE COURT:  Well, I think it for the proof that

18   everybody just mixed all their finances together and

19   weren't really paying any heed to the important

20   formalities of ownership.

21        MR. SILBER:  I don't think that an assumption

22   of mortgage would have helped because the mortgage

23   (indiscernible) would not have (indiscernible).

24        THE COURT:  Wasn't assumed.

25        MR. SILBER:  I'm sorry.

30

Proceedings

1          THE COURT:  May the result of -- I mean, maybe

2     the reason is that the mortgage wasn't assumed.

3          MR. SILBER:  Well, I am not saying it was

4     assumed but my point is that she could not --

5     (indiscernible) couldn't have assumed the mortgage

6     because I think it's Chase and another lender.  We never

7     agreed to that.

8          THE COURT:  Right.

9          MR. SILBER:  But I find it a little -- I find

10    it troubling that the lack of formality is going to

11    override the fact of where the money came from.

12          THE COURT:  Well, let --

13          MR. SILBER:  It's a troubling idea.

14          THE COURT:  Well, no, the question for me --

15    our discussion this morning is -- has highlighted to me

16    kind of the blurred lines between father and daughter

17    here in terms of who owned want and the father is the one

18    who is in trouble because he has this big judgment

19    against him.  And so if he's just going to put it in his

20    daughter's name and thereby say it's his daughter's, I

21    don't think it's that easy and that's the whole point of

22    this exercise is that the plaintiffs are trying to go

23    beyond that to say actually it's still the fathers, so --

24          MR. SILBER:  Put what in the daughter's name,

25    the house or the (indiscernible).

31

Proceedings

1          THE COURT:  The house.  The house.  No, we're

2   talking about the house.  This is the --

3          MR. SILBER:  No, I understand that.

4          THE COURT:  It's about the Bayberry Drive,

5   right?

6          MR. SILBER:  I understand that.

7          THE COURT:  So --

8          MR. SILBER:  But even if -- even if that's true

9   and Mark put the house in the daughter's name --

10          THE COURT:  But it's still his because he still

11   lives there, right?

12          MR. SILBER:  They all live there.  She lives

13   there, too.

14          THE COURT:  Okay.

15          MR. SILBER:  They all live there.

16          THE COURT:  Okay.

17          MR. SILBER:  She lives there with her son, her

18   husband, (indiscernible).

19          THE COURT:  Yeah, it's a family house, right.

20          MR. SILBER:  But even if that's true -- even if

21   it's true that Mark put or transfers or he did -- that

22   Mark and his wife transferred the house to his daughter -

23   -

24          THE COURT:  Right.

25          MR. SILBER:  -- if there was consideration paid

32

Proceedings

1  --

2          THE COURT:  Fair consideration.

3          MR. SILBER:  Fair consideration paid -- now

4  let's -- if I may, fair consideration of hundreds of

5  thousands of dollars in light of no equity in his house,

6  then who determined -- why isn't that fair consideration?

7          THE COURT:  Well, what --

8          MR. SILBER:  She has a house with no equity for

9  $300,000 essentially.  She overpaid.

10          THE COURT:  All right.  So there's a

11  presumption for interfamily transfers that it's

12  fraudulent.

13          MR. SILBER:  I understand.

14          THE COURT:  And you then need to show that it's

15  not fraudulent but --

16          MR. SILBER:  I even understand that.  It's an

17  assumption, it's not (indiscernible).

18          THE COURT:  And so this is your best argument

19  as to why it's --

20          MR. SILBER:  Well, it's not argument, it's what

21  happened to the fact.

22          THE COURT:  No, I am just saying that I wanted

23  to make sure that you have said everything you need to

24  say.

25          MR. SILBER:  Yes.

33

Proceedings

1      THE COURT:  Yes, okay.  All right.  And is
2  there anything you want to say?
3      MR. NATBONY:  No, your Honor.
4      THE COURT:  No.
5      MR. NATBONY:  I think the point has been made.
6      THE COURT:  Okay.  So then let's move onto the
7  Statnigrosh matter.
8      MR. SILBER:  My presence, is it still required?
9      THE COURT:  You're welcome to stay but if you
10  want to leave, I don't -- I am turning to Mr. Furman's
11  matter now.
12      MR. SILBER:  (Indiscernible).
13      THE COURT:  Okay.  All right.  So this is with
14  regard to the property at 72 Laguna Hills and in this
15  case, there was a transfer -- the properties owned
16  jointly by Mr. Statnigrosh and his wife, Ms. Rozenfeld
17  and 50 percent of that interest was transferred to Nelly
18  Zhuravsky, who is married to Igor Zhuravsky and Nelly
19  happens to be the sister of Ms. Rozenfeld.  It looks here
20  -- and the transfer is in 2013 and it looks like this was
21  a $10 consideration.  Is that right, Mr. Furman?
22      MR. FURMAN:  As to the last point, I
23  acknowledge that that's what the deed says.
24      THE COURT:  Okay.
25      MR. FURMAN:  But I am not -- I think that the

34

Proceedings

1   facts are that it is not in fact a $10 transfer or a $10

2   payment and I know the Court has had a fair amount of

3   colloquy about the $10 issue from -- I'm not even sure

4   whether we would call this an inter-family transfer

5   because it's -- there are other less than immediate

6   family members involved.

7           THE COURT:  A sister is pretty immediate

8   family.

9           MR. FURMAN:  Yes, but it's brother-in-law.

10          THE COURT:  Well, but the transfer was from the

11  -- it was 50 percent was transferred from the sister --

12  one sister to another sister and the fact that the

13  sisters were married to men of different families doesn't

14  make them no longer families.

15          MR. FURMAN:  They're trying to set aside --

16  withdrawn.  Okay.

17          THE COURT:  Okay.

18          MR. FURMAN:  But notwithstanding that, I don't

19  think it's uncommon to have a small nominal consideration

20  in the deed.  As a matter of fact, I believe in

21  plaintiff's papers, they mention the fact that there

22  should be an affidavit explaining the reason for the low

23  amount in the transfer deed.  There is no such affidavit.

24          Now therefore, when they did this, they were

25  risking that the statements that -- well, where's your

35

Proceedings

1   affidavit on this?  So it's not that they expect -- that

2   they had an expectation that this would nevertheless

3   happen.  If that had happened, they would explain it but

4   they were taking that risk at the time.  So they

5   acknowledge that risk.  But I don't think that that means

6   that the transfer was a fraudulent conveyance.

7          And let's go back a great deal of time, if I

8   may, and I would like to talk about number one, the time

9   of the transfer or the time of the entry into the lease

10  purchase agreement which is the subject, in large

11  measure, of the plaintiff's reply papers.

12         Now first of all, what we said in our

13  opposition is that the agreement to purchase that

14  interest -- to actually purchase to buy the house, not

15  just 50 percent, was done before this action commenced --

16  three months before this action commenced.

17         THE COURT:  When would that have been?

18         MR. FURMAN:  That would be in or around August

19  of 2008.  And the action I believe was begun in October

20  of 2008.  Now what the significance of all of this is is

21  -- and I would like the Court just to consider this, this

22  is a house that these people or that Ms. Zhuravsky lives

23  in and if the Court were to issue that this was a

24  fraudulent conveyance, number one, she is going to lose

25  all of the funds that she did pay into this house which

36

Proceedings

1   were to pay the mortgage, which were to pay a down

2   payment, which is documented -- all of which are document

3   and there's a risk that they won't be able to live there

4   anymore.

5          So I respectfully ask that it be considered, as

6   much as your Honor -- but quite seriously, this is not

7   just dollars, this is a residence.

8          THE COURT:  Well, but for purposes of

9   considering a motion to avoid fraudulent conveyance, am I

10  suppose to consider equities like that?  Do I even have

11  the authority to care about who lives there?  If the

12  property was fraudulently conveyed, there are simply --

13         MR. FURMAN:  I'm not asking to consider equity.

14         THE COURT:  Okay.

15         MR. FURMAN:  I'm asking --

16         THE COURT:  But you said that she lives there

17  and she would lose her house.

18         MR. FURMAN:  -- I'm asking to look at it as

19  openly and fairly as openly and fairly as they can and

20  not in the one-sided way that the plaintiffs have painted

21  it.  So --

22         THE COURT:  Well, I still have to apply the law

23  and the law is set up in a certain way with regard to

24  fraudulent conveyances.  Number one, this is an

25  interfamily transfer, so there's a presumption that it's

37

Proceedings

1  fraudulent.

2          What you've told me as far as August 2008, I

3  understand you've said that Nelly Zhuravsky gave her

4  sister $68,000 --

5          MR. FURMAN:  Yes.

6          THE COURT:  -- for the down payment.  Do you

7  have any proof of that?

8          MR. FURMAN:  Yes, that's part of one of our

9  exhibits.

10          THE COURT:  There's a document that says she

11  paid?

12          MR. FURMAN:  There's document number 3964

13  and --

14          THE COURT:  All right.  And --

15          MR. FURMAN:  -- has a check from Nelly

16  Zhuravsky to her sister, $68,000.

17          THE COURT:  Uh-hum.

18          MR. FURMAN:  It has the word down payment on

19  it.

20          THE COURT:  Okay.

21          MR. FURMAN:  Now I know what counsel is

22  probably about to say which is well, it's dated 12-1-08

23  which is after the actions and in her affidavit, she

24  explains that. And what she says is we were unable to

25  come up with the funds because we were selling our house

38

Proceedings

1  and before we could sell our house, which was which

2  wasn't until November of 2008, we couldn't pay the

3  $68,000.

4          THE COURT:  And when did Ms. Rozenfeld and her

5  husband buy the house?

6          MR. FURMAN:  I'm sorry?

7          THE COURT:  When was the house purchased?

8          MR. FURMAN:  What --

9          THE COURT:  In August of 2008?

10          MR. FURMAN:  Nelly Zhuravsky's house?

11          THE COURT:  No, the house that's owned by --

12  the house at issue here that's --

13          MR. FURMAN:  I'm sorry, Judge, I couldn't hear

14  you.

15          THE COURT:  The house at issue here when was

16  that purchased at --

17          MR. FURMAN:  The house --

18          THE COURT:  -- in 2008.  You said it was

19  purchased in August of 2008, right?

20          MR. FURMAN:  They entered into the lease to buy

21  in 2008.

22          THE COURT:  What does that mean the lease to

23  buy?  When was it purchased?

24          MR. FURMAN:  Well, I think it would be

25  technically date of the deed.

```
                                                              39
                              Proceedings
1             THE COURT:  Which is what?  August?
2             MR. FURMAN:  No, the -- are we talking about
3    the 72 Laguna --
4             THE COURT:  Yes.  You said that the house --
5    you said that Mr. Statnigrosh and his wife, Ms.
6    Rozenfeld, needed money to buy the house in 2008.  And
7    that Nelly Zhuravsky gave them money.  The check is dated
8    December 1st, '08.  My question is when was that house
9    purchased in '08, was it August?
10            MR. FURMAN:  I have to go back and look to see
11   where the deed is (indiscernible).
12            THE COURT:  All right.
13            MR. FURMAN:  So give me just a second or two
14   (indiscernible).
15   (Pause)
16            MR. FURMAN:  The deed is 3966.  That is May of
17   2013.                        l
18            THE COURT:  Okay.  So the -- you're not talking
19   about 2008 anymore.
20            MR. FURMAN:  No.  And in the interim --
21            THE COURT:  No, but I am trying -- you wanted
22   to take the story back to 2008 --
23            MR. FURMAN:  I did.
24            THE COURT:  -- which is why I am looking at
25   2008.
```

Proceedings

1           MR. FURMAN:  Okay.

2           THE COURT:  And you said that Nelly Zhuravsky

3    gave her sister $68,000 and you have a check --

4           MR. FURMAN:  Yes.

5           THE COURT:  -- but -- in order to make the down

6    payment.

7           MR. FURMAN:  Yes.

8           THE COURT:  My question is when did that --

9    when was the purchase of the house?

10          MR. FURMAN:  Years later because it was a

11   lease --

12          THE COURT:  But what was the down payment for

13   then?

14          MR. FURMAN:  It was a lease -- if we're talking

15   about a fraudulent conveyance, the question is what is

16   the intent of the parties --

17          THE COURT:  I don't think the intent is so

18   important, right?  I mean, the actions speak louder than

19   thoughts.  So I -

20          MR. FURMAN:  Well (indiscernible) the papers

21   from the plaintiff, they seem to think that intent is

22   very important.

23          THE COURT:  Well, no, but they're focused on

24   the -- what the transfers need somebody looking at it to

25   infer and so all I am asking is, you took us back to

41

Proceedings

1  2008, so that's why I was talking about 2008.  And I

2  still haven't gotten an answer there.

3          MR. FURMAN:  Well, I (indiscernible) --

4          THE COURT:  Because you said -- there's

5  somebody raising his hand but he's not -- I don't know

6  who that is.  If you want to confer with somebody -- is

7  that your client?

8          MR. FURMAN:  I'm sorry.

9          THE COURT:  There's somebody in the audience

10 who keeps raising his hand like he wants to say

11 something.

12         MR. NATBONY:  Your client is raising his hand.

13         THE COURT:  Who is that?  Is that your client?

14         MR. FURMAN:  Yes, yes, that's Igor Zhuravsky.

15         THE COURT:  Do you want to confer with him?  He

16 keeps --

17         MR. FURMAN:  Sure.

18         THE COURT:  Why don't you ask him.

19 (Counsel and client confer)

20         MR. FURMAN:  Are you interested in when Ms.

21 Rozenfeld bought the house?

22         THE COURT:  I am interested in --

23         MR. FURMAN:  Back in (indiscernible).

24         THE COURT:  -- I'm interested in your

25 contention that part of the fair consideration here for

42

Proceedings

1   2013 is a payment that Nelly Zhuravsky made in 2008 for

2   $68,000.  You've proffered a check to that effect.  And

3   my question is when did that purchase in 2008 occur

4   because I am interested in knowing whether, in fact, that

5   check was part of the down payment.  And that's why the

6   date matters to me.  So I was just trying to establish

7   the date.

8                MR. FURMAN:  It was (indiscernible).

9                THE COURT:  When?

10               MR. FURMAN:  It was (indiscernible).

11               THE COURT:  So when was the house bought in

12  2008?

13               MR. FURMAN:  The house that -- the

14  transaction --

15               THE COURT:  Yes.

16               MR. FURMAN:  -- was consummated --

17               THE COURT:  Yes.

18               MR. FURMAN:  -- in 2013.

19               THE COURT:  So it took five years to purchase

20  this house?

21               MR. FURMAN:  It was a lease to purchase the

22  house.

23               THE COURT:  So for what purpose -- what was the

24  $68,000 for?

25               MR. FURMAN:  It was a down payment --

43

Proceedings

1        THE COURT:  A down payment --

2        MR. FURMAN:  -- on the lease.

3        THE COURT:  A down payment on a lease?

4        MR. FURMAN:  Yes.  And that's what the -- and

5   the lease is and exhibit to our (indiscernible).

6        THE COURT:  And the lease of-- who owned the

7   house while it was being leased?

8        MR. FURMAN:  The -- Gary Statnigrosh and Alvina

9   Rozenfeld.

10       THE COURT:  Okay.  So --

11       UNIDENTIFIED SPEAKER:  Your Honor, may I say

12  something?

13       THE COURT:  Well, no.  I -- Mr. Furman is the

14  lawyer here, so I really want to just get the information

15  from him.

16       Okay.  Let me do it this way.  Prior to 2008,

17  who owned that house?

18       MR. FURMAN:  Gary Statnigrosh and Alvin

19  Rozenfeld.

20       THE COURT:  Okay.  All right.  That's all I

21  needed.  So then you're saying part -- my understanding

22  from your papers is that part of the fair consideration

23  you're arguing here for the house or the 50 percent

24  interest in the house was about $200,000 in mortgage and

25  home equity line of credit between January 2009 and May

44

Proceedings

1   2013, is that correct?

2           MR. FURMAN:  And the $68,000.

3           THE COURT:  And the $68,000, right.

4           MR. FURMAN:  And --

5           THE COURT:  And do you --

6           MR. FURMAN:  And I may add that there are --

7   they're not -- I grant you they're not in these papers --

8           THE COURT:  Okay.

9           MR. FURMAN:  But there are also carrying

10  charges for this house.

11          THE COURT:  But you don't have any

12  documentation for that.

13          MR. FURMAN:  Your Honor, it was for that reason

14  that I had asked an opportunity to put some papers in

15  which your Honor respectfully declined.

16          THE COURT:  Well, why did you not have them

17  earlier?

18          MR. FURMAN:  We didn't have them earlier.  We

19  just haven't recovered them as of yet.

20          THE COURT:  What was the --

21          MR. FURMAN:  Again,

22          THE COURT:  The reason they were denied is that

23  you had plenty of opportunity to put everything -- put

24  your best case forward and you made no argument as to why

25  you were unable to do that.  That's why you were denied

45

Proceedings

1  not because I don't think that it's important

2  information.  If it was so important, you would have put

3  it out immediately when you responded and if you couldn't

4  have responded at that time, you could have asked for

5  more time to get the relevant documents and you didn't.

6          So to say now that somehow I've precluded you

7  from an opportunity to put the papers in seems a little

8  bit out of line.

9          MR. FURMAN:  Well, I am still trying to show

10  what actually happened here.

11          THE COURT:  Okay.

12          MR. FURMAN:  I mean, the --

13          THE COURT:  But the record before me is what it

14  is.  Right?  Okay.

15          MR. FURMAN:  Well --

16          THE COURT:  Well, let me then ask you this.

17  Since when have Nelly Zhuravsky and Igor Zhuravsky been

18  living at 72 Laguna Hills?

19          MR. FURMAN:  I believe since 2009.

20          THE COURT:  Okay.  And are they paying any rent

21  there?

22          MR. FURMAN:  They were paying -- well, at this

23  point, Nelly Zhuravsky owns half of the house.

24          THE COURT:  Okay, but until then were they

25  paying rent?

46

Proceedings

1          MR. FURMAN:  Yes, they were paying the carrier

2    charges.

3          THE COURT:  Okay.  And that constitutes their

4    rent.

5          MR. FURMAN:  (Indiscernible) paying the

6    mortgage.

7          THE COURT:  Okay.

8          MR. FURMAN:  And they were saying the carrier

9    charges.

10          THE COURT:  Okay.  And that constituted their -

11    -

12          MR. FURMAN:  And they were also paying --

13          THE COURT:  Mr. Furman?

14          MR. FURMAN:  They were also paying an

15    assessment from the condo association and the reason that

16    they were paying the mortgage is that because I know it

17    came up, the issue before about the assumption of a

18    mortgage -- there are two issues here.  One is, they were

19    paying the bank directly because they were concerned that

20    Mr. Statnigrosh who had not made several payments when he

21    owned the house, would not continue to do so.  So they

22    just paid directly.

23          And this time period is 2008 and a lot of

24    people, including Ms. Zhuravsky are not able to get a

25    mortgage or assume a mortgage.  So the most simplest

47

Proceedings

1   thing to do, to maintain the equity in the house, and

2   prevent the bank from foreclosing is to pay it directly,

3   which was done.

4            THE COURT:  Okay.  So --

5            MR. FURMAN:  And the intent -- to go back to

6   the intent, when this all began, it precedes this action.

7            THE COURT:  Okay.  So you're saying that in

8   lieu of paying rent, they paid the carrying costs, which

9   was the mortgage, the assessment and the co-op fees.

10           MR. FURMAN:  Yes.

11           THE COURT:  Okay.

12           MR. FURMAN:  Now if I may go back once again to

13  the lease to purchase documents which is again, one of

14  our exhibits, and I would like to talk about the

15  plaintiff's reply to that.

16           THE COURT:  Which document is that?  Do you --

17           MR. FURMAN:  The plaintiff's reply?

18           THE COURT:  No, no, the lease to purchase

19  document.  I just want to take a look at it.

20           MR. FURMAN:  Bear with me, please.  This would

21  be 3962, recorded Exhibit A to our affidavit --

22           THE COURT:  Okay.

23           MR. FURMAN:  Or document number 3962.

24           THE COURT:  All right.  Go ahead.  You wanted

25  to talk about it?

48

Proceedings

1        MR. FURMAN:  No, in the opposition and so --

2    withdrawn.

3            This document was negotiated and tendered to be

4    entered into before the action began.  This is the

5    document that presupposes the ultimate transfer.

6            In their opposition, they raise questions about

7    the bona fides of this document.  In their opposition --

8    I don't know, I trust your Honor has reviewed it, they

9    question it and say well, this form came from a company

10   and it matches that company's form and that company

11   wasn't formed until 2011.  So therefore, their argument,

12   this document couldn't have been signed in 2008.

13           What we don't have is we don't have an

14   affidavit from anybody from the company.  We have hearsay

15   allegations or hearsay statements based upon what

16   plaintiff's conversation was.  We don't have a -- we

17   don't know whether or not or how that particular company

18   came to write this document, whether it was -- maybe if

19   it was taken from something else.

20           Maybe this document in its form, that was a

21   2008 one, maybe that was the original.  Maybe that was

22   what the so-called RocketLawyer document was derived

23   from.  We don't have any information about that.

24           They then go in and they say, well, we went in

25   and we saw Mrs. Zhuravsky's bank account when it was

49

Proceedings

1    company's, he paid $10 to RocketLawyer in 2011.

2         Well how come they don't have an invoice from

3    RocketLawyer which if they were speaking to RocketLawyer,

4    they would be able to get an invoice as to what he

5    purchased for $10.

6         So those are all open questions and where this

7    house is going to be or who is going to own this house is

8    being decided on that.  And I respectfully believe that

9    they should have had that affidavit if there was

10   something to it.

11        THE COURT:  Mr. Furman, I am looking at this

12   document and it's a rent to own agreement that's dated

13   August 8th, 2008 and it says it will terminate August

14   8th, 2028, 20 years -- it's a 20-year-long contract.  And

15   is it still in effect?  Because 50 percent of it has now

16   been transferred to one of the signatories to this.

17        MR. FURMAN:  No, I don't believe it's still in

18   effect.

19        THE COURT:  So --

20        MR. FURMAN:  I mean, what happened --

21        THE COURT:  -- how was it terminated?  When was

22   it terminated?

23        MR. FURMAN:  At the end -- they just couldn't

24   continue in the way that it was, so she just purchased

25   her 50 percent.  She (indiscernible) get a mortgage to

50

Proceedings

1   continue to make these payments.

2          THE COURT:  Okay.  And so it was five years

3   later and I calculated that at $4,500 a month, that would

4   be 60 payments, it's $270,000.  Right?

5          MR. FURMAN:  I don't have -- I have the math.

6          THE COURT:  Right.

7          MR. FURMAN:  I will accept that --

8          THE COURT:  Approximately.

9          MR. FURMAN:  I will accept that.

10          THE COURT:  So if that's the amount, then

11   that's what they were supposed to be paying as part of

12   this lease agreement, how is that now also or is that in

13   addition to -- you said that it was instead of the

14   carrying costs.

15          MR. FURMAN:  That was --

16          THE COURT:  They paid the carrying costs

17   instead.

18          MR. FURMAN:  -- they paid the carrying costs.

19          THE COURT:  Right.

20          MR. FURMAN:  And they paid the mortgage.

21          THE COURT:  So you're saying that --

22          MR. FURMAN:  They carried the house.

23          THE COURT:  Okay.  So basically what you're

24   saying is that after five years, 50 percent of the house

25   became theirs instead of after 20 years, 100 percent of

51

Proceedings

1   the house became theirs.  Is that what you're saying?

2           MR. FURMAN:  Yes, in effect that's what -- it

3   had some of these things not happen, it would have

4   possibly taken 20 years under this agreement, unless the

5   agreement was changed.

6           THE COURT:  And where was the agreement

7   changed?

8           MR. FURMAN:  No, it wasn't.  I'm saying it -- I

9   don't have any actual surrender of the agreement but we

10  do have the 2013 deed.

11          THE COURT:  Which doesn't say that it was to

12  accelerate this document.  It just says the consideration

13  was $10.  So was your client -- there's been talk about

14  how the $10 might be important.  Were your clients trying

15  to evade having to register that transfer and pay a

16  transfer fee on it by making the amount so low when, in

17  fact, it was an actual consideration of $200,000 or --

18          MR. FURMAN:  Well --

19          THE COURT:  -- how do you explain that?

20          MR. FURMAN:  -- as I said before, I believe in

21  the real estate world, the transfers are often

22  understated --

23          THE COURT:  Right.

24          MR. FURMAN:  -- for a host of reasons.

25          THE COURT:  $10?

52

Proceedings

1      MR. FURMAN:  I am not a real estate lawyer but

2  I don't know whether or not this was done by lawyers

3  but --

4      THE COURT:  I mean it may well be that it

5  happens where people do make transfers for $10 and if

6  nobody challenges it, that's fine but if there's a

7  challenge like there is here, then it's up to the Court

8  to look at it to see if, in fact, it was a real

9  conveyance or whether it was a fraudulent one.

10      And so I am still not clear --

11      MR. FURMAN:  Well, what I am --

12      THE COURT:  -- on why it was -- the deed,

13  itself, which was the operative document for the transfer

14  of the ownership of that 50 percent would say something

15  that isn't accurate.

16      MR. FURMAN:  But it strikes me --

17      THE COURT:  Because you've got this other

18  documentation about the lease agreement.  Why not just

19  say this lease agreement from 2008 is being accelerated

20  so in fact everything they have paid up to now

21  constitutes the fair consideration and we're going to

22  just sell it to them for the $270,000.  That's not what

23  it says.

24      MR. FURMAN:  Your Honor, I can't speak to my --

25  I can only speculate on the motivation on my end --

53

Proceedings

1          THE COURT:  Well, I --

2          MR. FURMAN:  -- but I would say the worse thing

3     that you could say is that they didn't -- or they didn't

4     want to pay the real estate taxes.

5          THE COURT:  Okay.  All right.  So --

6          MR. FURMAN:  But if that is a motivation --

7          THE COURT:  Uh-hum.

8          MR. FURMAN:  -- then there becomes a question

9     of whether or not their other intent is -- they had some

10    other intent, not just (indiscernible).  Either they

11    evade the real estate taxes or they had some other

12    intent.

13         THE COURT:  Okay.  Thank you.  Let me hear from

14    the plaintiff.

15         MR. NATBONY:  Thank you, your Honor.  I'm not

16    sure where to begin but I will try and be brief but make

17    a couple of points if I may.

18              So first of all, unlike the Mirvis situation,

19    we are not only talking about a deed here, there are two

20    other documents.  There is a State of New York affidavit

21    of consideration for us by seller that was signed by

22    Georgy Statnigrosh and in there he lists the

23    consideration as $10, not $10 and other value for

24    consideration, $10.

25         THE COURT:  Well, Mr. Furman has somewhat

54

Proceedings

1   conceded that --

2         MR. NATBONY:  Right.

3         THE COURT:  -- maybe his clients were trying to

4   engage in tax evasion.

5         MR. NATBONY:  Right.  And also the seller's

6   residence certification.  So you have three documents

7   that talk about the consideration.

8         Again, like the Mirvis situation, we're also

9   dealing with a situation of no documentation.  You've got

10  family transfer, you know, you've got enhanced scrutiny

11  and they have not -- they keep saying, oh, we paid the

12  carrying costs, we paid them -- there's no documentation

13  in this record at all.

14        What you have is this rent to own agreement

15  that he keeps relying on.  Now let's be clear what that

16  rent to own agreement says.  It talks about the $67,000.

17  And what does it say?  It says it's a security deposit,

18  not a down payment for the purchase.  It's a security

19  deposit.

20        What does it also say?  It talks about a

21  purchase price for the property of $720,000, less the

22  rental payments.  Well, we don't have any evidence that

23  any rental payments were paid.  All we have is a $68,000

24  "security deposit," under the lease and we do have

25  payment evidence that they put in showing approximately

55

Proceedings

1    $49,000 in carrying costs over the years that were paid.

2           So even if you say, you know, to me, that's not

3    fair consideration given the value of the property.  So

4    no assumption of debt evidence.  No proof of payment.

5           You know, and he also talks about, you know,

6    the RocketLawyer, you know, situation.  Look, there's no

7    doubt and we did put in the California Secretary of State

8    business entity document that shows that RocketLawyer

9    wasn't even incorporated until days after the lease was

10   reportedly executed.  It just raises a question.  I'm not

11   saying it gets all the way but I think that your Honor

12   can certainly consider that and based on the testimony

13   that way.  So --

14          THE COURT:  So you're contending that that

15   document 396-2, the lease to purchase is a false

16   document?

17          MR. NATBONY:  We do believe that there's

18   evidence that's it's sham -- that it is a sham document.

19          THE COURT:  That was created after the fact

20   or --

21          MR. NATBONY:  Yes.

22          THE COURT:  All right.

23          MR. NATBONY:  Yes.  But, you know, the bottom

24   line is even if you get past that, your Honor, at best

25   you've got $49,000 and you've got a lease that was not

56

Proceedings

1   follow-up.  Okay?  They didn't pay rental payments.  They

2   didn't follow the purchase price and by the way, is there

3   any evidence that the lease was ever terminated?  The

4   lease on its face says in order to modify it, in order to

5   amend it, in order to change it, there's got to be a

6   document written, signed by both parties.  That's in

7   here.  I haven't seen any changes or amendments.

8          So look, there's no evidence here of an

9   assumption of a fair equivalent debt.  There is a

10  question about the authenticity.  You also have to look

11  at the timing.  The timing still, of this transfer, you

12  kept asking Mr. Furman, when was the purchase?  When was

13  the purchase in 2008?  Never occurred.

14         What occurred was this fraudulent transfer in

15  2013.  That's what he is claiming the purchase is and

16  that's why when you put it all together, when you put the

17  document together, you put a lack of documentation, you

18  put the question about the validity of the lease

19  agreement together, you know, when you put what was

20  supposed to happen and the actions of evidence that it

21  did, when you put all that together, you know, frankly,

22  your Honor it smells.

23         MR. FURMAN:  May I just be heard briefly, very

24  briefly?

25         THE COURT:  Yeah, I will give you a brief

57

Proceedings

1   reply.

2          MR. FURMAN:  There's just one thing.  Counsel

3   just talks about $49,000 but Exhibit D which is document

4   396-5 -- 396-5, has payments, regular payments in the

5   neighborhood of just short of $4,000, $3,500, $3,500

6   every year for years.

7          MR. NATBONY:  That's the 49- I was talking

8   about.

9          MR. FURMAN:  Well, that's more than 49-.

10         THE COURT:  If you add all that up?  Is that

11  what you're saying?  If it's -- how many years are we

12  talking here?  Mr. Furman, when you total all of those

13  payments, how much does it come to?

14         MR. FURMAN:  I think it's around $200,000.

15         MR. NATBONY:  Your Honor, you have to remove

16  the duplicates and the payments post-dating the

17  transcript.  When you do that, it's $49,000.  And if you

18  look at footnote 6 of our responding brief, that will

19  tell you precisely the payments and that we removed the

20  duplicates and post-transfers.

21         THE COURT:  Why would there be duplicates?

22         MR. NATBONY:  That, your Honor, you would have

23  to ask Mr. Furman that.  I don't know.

24         THE COURT:  All right.  Well, I can't look at

25  it now but I don't see that it's every single month.

58

Proceedings

1        MR. NATBONY:  Based on our analysis, your

2   Honor, there were fourteen payments and they were

3   sporadic and we list the dates of the payments in our

4   footnote 6.

5        THE COURT:  All right.  So I'll take a look at

6   those --

7        MR. NATBONY:  Thank you.

8        THE COURT:  -- numbers.

9        MR. FURMAN:  And then there's also -- and then

10  there are also some checks at the end --

11       THE COURT:  Of Exhibit D?

12       MR. FURMAN:  -- of that document.

13       THE COURT:  Would that not be reflected in the

14  bank statements?

15       MR. FURMAN:  I don't believe they are.

16       THE COURT:  Why not?  So the bank statements in

17  Exhibit D, are those of Nelly Zhuravsky?

18       MR. FURMAN:  Those are -- yes.

19       THE COURT:  And those are payments -- is it

20  from her?

21       MR. FURMAN:  Those are payments that are on --

22       THE COURT:  From her bank?

23       MR. FURMAN:  -- both the bank and on her credit

24  line.

25       THE COURT:  Okay.  So but the --

59

                              Proceedings

1            MR. FURMAN:  And the other one --

2            THE COURT:  The footer on that says a bank name

3    and then it looks like it's the -- her bank account at

4    that bank and it shows payment to -- or no, I am confused

5    now.  This is the record of payments to the -- for the

6    mortgage?

7            MR. FURMAN:  To the mortgage directly.

8            THE COURT:  From her --

9            MR. FURMAN:  One second, Judge.  May I?

10   (Pause)

11           THE COURT:  Mr. Furman, I have had a chance to

12   look at it now.  If your Exhibit 4 -- I'm sorry, your

13   Exhibit D, only the first four pages are payments that

14   pre-date the 2013 transfer.  The subsequent payments are

15   for 2014, 2015 or later in 2013.  But if the transfer was

16   May 3rd, 2013, there's only the first four pages that

17   have relevant payments.

18           MR. NATBONY:  And are (indiscernible).

19           THE COURT:  I'm sorry?

20           MR. NATBONY:  And (indiscernible).

21           THE COURT:  Okay.  But I am just looking at the

22   large number.  And those are later, though --

23           MR. FURMAN:  But she's continuing to pay.

24           THE COURT:  I understand but how is that the

25   fair consideration then?  That's a future payment.  How

60

Proceedings

1   is that part of the consideration that I am looking at?

2            MR. FURMAN:  Well, it's --

3            THE COURT:  Because by then as you pointed out

4   --

5            MR. FURMAN:  (Indiscernible).

6            THE COURT:  Hold on, Mr. Furman.  As you

7   pointed out, now half of the property is hers, so the

8   fact that she is paying a mortgage makes perfect sense.

9            MR. FURMAN:  Your Honor, I have some of this

10  document and I wanted to offer it and that is that -- and

11  I did err on one thing but there was rent payments that

12  were being made (indiscernible).

13            I meant maintenance fees which they were paying

14  for $365 a month, that's $20,000.  Assuming that is

15  correct and it's $49,000 -- let's assume he is correct

16  and there's $49,000 before the 2013 deed, that would be

17  added to the $68,000 plus the additional checks that are

18  attached.  And that leaves us with $125,000.

19            THE COURT:  But that $68,000 is the security

20  deposit because there was no purchase in 2008 that would

21  require a down payment.

22            MR. FURMAN:  No, the check says down payment.

23            THE COURT:  I know it says that but there was

24  no purchase.  You told me that the house was owned

25  already in 2008, so there -- what are you needing a down

Transcriptions Plus II, Inc.

61

Proceedings

1  payment for?

2          MR. FURMAN:  Because it was a lease to

3  purchase.

4          THE COURT:  But the document -- the lease to

5  purchase document says $67,000 is the security deposit.

6          MR. FURMAN:  Yes, but the amount is $68,000.

7          THE COURT:  So it's a different number?

8          MR. FURMAN:  Yes, it is.

9          THE COURT:  So it -- what is it?  What -- is

10  there a check for a security deposit?

11          MR. FURMAN:  No.

12          THE COURT:  Okay.  So the only check is one for

13  $68,000 which is like you said, pretty close and even

14  though it says down payment, there's no documentation

15  anywhere talking about a down payment and there's from

16  the history of the transaction, no need for a down

17  payment, so how is it a down payment?

18          MR. FURMAN:  Because there was a period between

19  the time that they entered into the agreement and -- or

20  at the time that they began the agreement and then the

21  time that they actually were able to start making

22  payments on.  So there was a gap and I believe part of

23  that was paid by the $68,000 where they were already

24  occupying the house and had already begun to live there

25  towards the eye of ultimately purchasing the house.

62

Proceedings

1        THE COURT:  When did they move into the house?

2        MR. FURMAN:  I don't have that exact

3   information.

4        THE COURT:  Your client is here.  You could ask

5   him.  You could ask him when he moved into that house.

6        MR. FURMAN:  I will.

7   (Counsel and client confer)

8        THE COURT:  And the question is just -- it's a

9   simple one, Mr. Furman, when did he --

10       MR. FURMAN:  Beginning of 2009.

11       THE COURT:  That's when he started living in

12   the house?

13       MR. FURMAN:  Yes.

14       THE COURT:  Okay.  All right.  So do you have

15   anything further?

16       MR. FURMAN:  Sorry.

17       THE COURT:  Do you have any further argument?

18       MR. FURMAN:  Again, I will state to the Court

19   when --

20       THE COURT:  You don't need to repeat anything.

21   I just want to see if you missed anything.

22       MR. FURMAN:  No, I am not repeating something.

23       THE COURT:  Okay.  You said again, that's why

24   I --

25       MR. FURMAN:  No, I -- well, one of the issues

63

Proceedings

1   was I did mention that they were concerned about the

2   mortgage not being paid and, in fact, the mortgage was in

3   a negative situation at the time that they began making

4   the payments because the house -- the original mortgage

5   was 540 and it was 588 when they started or he bought the

6   house but started to make payments.

7          THE COURT:  How did the mortgage go up?  Was it

8   a balloon loan or something?  You said the mortgage

9   started at 540 and went to 580?

10          MR. FURMAN:  I can't tell you if there was, you

11   know, equity taken out of the house during --

12          THE COURT:  Oh, I see.

13          MR. FURMAN:  -- the time that it was purchased

14   in 2004, so obviously a mortgage can --

15          THE COURT:  Right.  Okay.  Because you had

16   mentioned the home equity line of credit.

17          MR. FURMAN:  Yeah.

18          THE COURT:  Okay.  I understand.

19          MR. FURMAN:  But just to summarize for my last

20   statement is that there was not a partial sale in 2013,

21   that was just securing the deed from all the payments

22   that were being made from 2008 on.

23          THE COURT:  Okay.

24          MR. NATBONY:  One concluding sentence?

25          THE COURT:  Okay.

64

Proceedings

1          MR. NATBONY:  I just want to emphasize that I

2     appreciate Mr. Furman's testimony but he's not a proper

3     witness at this time.  And it's his burden to show fair

4     and equitable value consideration (indiscernible).

5          THE COURT:  All right.  So let me turn to the

6     final part of the heariNational Grid today and that is

7     that the remedy.

8          You've proposed a remedy here that's in the

9     alternative, so I wanted to understand.  I'm not very

10    familiar with what it means to have the conveyance set

11    aside or disregard the conveyance.  What's the

12    difference?  And what form will this take because you

13    haven't submitted a proposed order.  So in my report and

14    recommendation, I need to have more guidance on what

15    exactly you want the Court to do.

16         MR. NATBONY:  I think what we're asking for,

17    your Honor, is for the transactions to be set aside and

18    for an execution on the property not to (indiscernible).

19         THE COURT:  You said execution of the property?

20         MR. NATBONY:  On the property.

21         THE COURT:  On the property, sorry, which means

22    having the property sold?  I'm just trying to figure out

23    what it actually means.

24         MR. NATBONY:  May I have one moment, your

25    Honor?

65

Proceedings

1       THE COURT:  Sure.

2   (Pause)

3       MR. NATBONY:  So with respect to the Mirvis

4   situation, we would ask for a second (indiscernible) in

5   the transaction, have the ability that (indiscernible)

6   execute on the property through a sale.

7           With respect to Zhuravsky, because we're

8   dealing with a New Jersey situation, we would basically

9   ask for setting aside the transaction and we'll do what

10  we have to do, you know, beyond that in New Jersey.

11      THE COURT:  So just set aside the transaction

12  and then --

13      MR. NATBONY:  That's correct.

14      THE COURT:  -- you would pursue it through a

15  separate proceeding?

16      MR. FURMAN:  And I would say, your Honor, in

17  terms of the execution, if you were to set aside the

18  transaction, it would still be a nondebtor who owned one-

19  half of the property.

20      MR. NATBONY:  Well, there should be a judgment

21  against Nelly Zhuravsky also through the amount -- I

22  mean, that's the other thing that we're asking for.

23      THE COURT:  Oh, okay.  So you want the

24  transaction to be set aside and what?

25      MR. NATBONY:  A judgment against Nelly

Proceedings

1   Zhuravsky.

2           THE COURT:  For what?

3           MR. NATBONY:  For the amount --

4           MR. FURMAN:  I feel that, your Honor --

5           THE COURT:  Hold on.  Wait.

6           MR. FURMAN:  -- (indiscernible) remedy, he

7   should have made that (indiscernible).

8           THE COURT:  Hold on.  He didn't finish his

9   sentence, so I am trying to figure out what he is trying

10  to say.

11          MR. NATBONY:  Well, it's a judgment in the

12  amount of the transfer that was fraudulently conveyed.

13          THE COURT:  But if you were reversing -- if

14  you're setting aside the transaction --

15          MR. NATBONY:  Right.

16          THE COURT:  -- then it's reversed, so that 50

17  percent --

18          MR. NATBONY:  That's true.

19          THE COURT:  -- goes back --

20          MR. NATBONY:  That's true.

21          THE COURT:  -- to the original owners and

22  nothing should happen to Ms. Zhuravsky.

23          MR. NATBONY:  You're right (indiscernible).

24          THE COURT:  Okay.  All right.  So just setting

25  aside the transaction, and so that -- the net effect of

67

Proceedings

1  that is that 100 percent of the property at 72 Laguna

2  Hills will go back to Mr. Statnigrosh and Ms. Rozenfeld.

3  Correct?

4            MR. FURMAN:  Jointly.

5            THE COURT:  However it was before the 2013

6  transaction.

7            MR. FURMAN:  That (indiscernible).

8            THE COURT:  Yes, is that right?

9            MR. NATBONY:  I'm sorry.  Yes, your Honor.

10            THE COURT:  Yes.  So you'll just go back to the

11  way it was before May 2013.  So that Mr. Statnigrosh and

12  Ms. Rozenfeld jointly own the property.  Yes?  And --

13            MR. FURMAN:  So they would have a -- they would

14  have a -- best case, they would have fifty percent

15  (indiscernible).

16            THE COURT:  Well, that's why I wanted to know

17  what the Court is supposed to do and if you're not asking

18  to do anything -- asking the Court to do anything beyond

19  that, then it would all stop there.

20            MR. NATBONY:  Can we just have one minute to

21  talk, your Honor?

22            THE COURT:  Okay.

23  (Pause)

24            MR. NATBONY:  So we're going to go back to the

25  way it was.  That's what we're going to do.

68

Proceedings

1    THE COURT:  Okay.  Great.  So it would be
2  helpful if you submitted a proposed order, so that I can
3  consider it and incorporate it into my report and
4  recommendation to Judge Townes, okay?
5    MR. NATBONY:  Yes, your Honor.
6    THE COURT:  Was there anything that I needed to
7  go through that I did not?
8    MR. FURMAN:  No, I would just like to
9  (indiscernible) --
10    THE COURT:  Yes, go ahead, Mr. Furman.
11    MR. FURMAN:  I would just like a little time to
12  look at the proposed order when it's being submitted.
13    THE COURT:  Well, I'll allow you to say
14  something about it if it wasn't -- if it contains
15  information that was not the subject of the briefing to
16  date.  So in other words, if it's what they've talked
17  about, all of that -- all the order is doing is
18  summarizing what is supposed to be done.
19    MR. FURMAN:  And I would expect that you will
20  (indiscernible) --
21    THE COURT:  Okay.
22    MR. FURMAN:  -- that I could point out
23  (indiscernible).
24    THE COURT:  If it's beyond that.
25    MR. FURMAN:  That would be against Nelly

69

Proceedings

1    Zhuravsky.  I just want to be sure that --

2              THE COURT:  I understand.

3              MR. FURMAN:  -- (indiscernible).

4              MR. NATBONY:  This (indiscernible) be looking

5    at.

6              THE COURT:  Yes, if it's asking for anything

7    other than undoing the transaction in May of 2013 --

8              MR. NATBONY:  For Zhuravsky.

9              THE COURT:  For Zhuravsky, yes.  Then certainly

10   you can -- I'll give you the opportunity to respond to it

11   but if it only says that, that has been fully discussed

12   and briefed.  So -- okay, good.  But please submit those

13   and I will take this under advisement and issue a written

14   report and recommendation for the district judge.  Okay?

15             MR. NATBONY:  Thank you, your Honor.

16             MR. FURMAN:  Thank you, your Honor.

17             THE COURT:  Thank you.

18                  (Matter concluded)

19                       -o0o-

20

21

22

23

24

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **7th** day of **June**, 2017.

*Linda Ferrara*

Linda Ferrara

AAERT CET**D 656
Transcriptions Plus II, Inc.