**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**ALLSTATE INSURANCE COMPANY,** *et al.*,

                                    **Plaintiffs,**                    **08-CV-4405 (SLT) (PK)**

                    **-against-**

**MARK MIRVIS,** *et al.*,

                                    **Defendants.**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO TURN OVER PROPERTY OF JUDGMENT DEBTORS MARK MIRVIS AND MARK LUPOLOVER FRAUDULENTLY CONVEYED TO OR OTHERWISE IN THE POSSESSION OF TATYANA A/K/A TANYA MIRVIS, LYUBOV MIRVIS, AND/OR ALEXANDER BORISKIN**

**MORRISON MAHONEY LLP**
**120 BROADWAY, SUITE 1010**
**NEW YORK, NEW YORK 10271**
**TELEPHONE NO.: (212) 825-1212**

**CADWALADER, WICKERSHAM & TAFT LLP**
**ONE WORLD FINANCIAL CENTER**
**NEW YORK, NEW YORK 10281**
**TELEPHONE NO.: (212) 504-6531**

**ATTORNEYS FOR ALLSTATE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

I.    The Underlying No-Fault Insurance Scheme to Defraud Plaintiffs ................................. 4

II.   Post-Judgment Scheme to Further Defraud Plaintiffs ..................................................... 4

   A.   Precipitous Dissipation of His Assets With the Direct Assistance of T. Mirvis and his Other Family Members and Associates ................................................................. 5

   B.   The Subject Transfers ................................................................................................. 6

      1.   Fraudulent Diversion of the Oceana Sale Proceeds ................................................. 6

      2.   Fraudulent Diversion of Unit 2307 Proceeds ........................................................ 8

      3.   The Fraudulent Cash Transfers ............................................................................. 8

   C.   The Fraudulent Circumstances Surrounding the Opening of the Subject Accounts ........................................................................................................ 8

      1.   Mirvis' Retention of the Fraudulently Transferred Funds and Control and Use of the Subject Accounts for his Benefit ................................................ 11

      1.   The HSBC Accounts ........................................................................................... 11

         a.   Fraudulent Transfers to HSBC Accounts ................................................ 11

         b.   Other Transactions Demonstrating M. Mirvis' Domination and Control of the HSBC Accounts ................................... 13

      2.   The TD Accounts ................................................................................................ 15

      3.   The Capital One Accounts ................................................................................... 17

THE STATUTORY FRAMEWORK................................................................................... 19

i

STANDARD OF REVIEW ............................................................................................... 20

ARGUMENT ............................................................................................................... 24

   I.    THE SUBJECT TRANSFERS WERE FRAUDULENT CONVEYANCES ............................. 24

      A.     The Subject Transfers Were Made With Actual Intent to Defraud ................................... 24

      B.     The Subject Transfers Were Conveyances with Fraudulent Intent
           Implied by Law          .................................................................................... 27

           1.    M. Mirvis and Lupolover Were Defendants When the Subject Transfers Were
              Made, and the Judgment Remains Unsatisfied .................................................. 27

           2.    M. Mirvis and Lupolover Did Not Receive "Fair Consideration" ...................... 27

      C.     Appropriate Remedies for the Fraudulent Subject Transfers ............................................. 28

   II.    THE SUBJECT ACCOUNTS ARE PROPERTY OF M. MIRVIS ............................................. 31

CONCLUSION ............................................................................................................ 33

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. Mattikow*,
225 F.R.D. 407 (E.D.N.Y. 2004) ...................................................................................20

*Allstate Ins. Co. v. Mirvis*,
No. 08-CV-4405 (SLT) (PK), 2017 WL 3981297 (E.D.N.Y. Sept. 8, 2017) ...........................6

*Allstate Ins. Co., et al. v. Buziashvili*,
No. 603776/2003 (Sup. Ct. N.Y. Cnty.)........................................................................10

*Am. Federated Title Corp. v. GFI Mgmt. Services, Inc.*,
126 F. Supp. 3d 388, 406 n.8 (S.D.N.Y. 2015)...............................................................23

*Atlanta Shipping Corp., Inc. v. Chem. Bank*,
818 F.2d 240 (2d Cir. 1987)......................................................................................20

*Baron v. Port Auth. of N.Y. & N.J.*,
271 F.3d 81 (2d Cir. 2001)........................................................................................29

*Beauvais v. Allegiance Sec., Inc.*,
942 F.2d 838 (2d Cir. 1991)......................................................................................23

*Bingham v. Zolt*,
647 N.Y.S.2d 220 (1st Dep't 1996) .............................................................................32

*City of New York v. Venkataram*,
06 CIV. 6578 NRB, 2011 WL 2899092 (S.D.N.Y. July 13, 2011) ......................................32

*Domino Media, Inc. v. Kranis*,
9 F. Supp. 2d 374, (S.D.N.Y. 1998)
*aff'd*, 173 F.3d 843 (2d Cir. 1999) ........................................................................22, 27

*F.D.I.C. v. Conte*,
204 A.D.2d 845 (3rd Dep't 1994)...........................................................................19, 29

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*,
871 F. Supp. 2d 103 (E.D.N.Y. 2012).........................................................................30

*Gasser v. Infanti Int'l, Inc.*,
353 F. Supp. 2d 342 (E.D.N.Y. 2005).........................................................................22

*Gelbard v. Esses*,
96 A.D.2d 573 (2nd Dep't 1983) ...............................................................................19

*Grace v. Bank Leumi Tr. Co. of NY*,
443 F.3d 180 (2d Cir. 2006).....................................................................................22

*Hassett v. Goetzmann*,
  10 F. Supp. 2d 181 (N.D.N.Y. 1998) ...............................................................26, 31

*Howland v. Resteiner*,
  No. 07 CV 2332 ILG/SMG, 2008 WL 1740531 (E.D.N.Y. Apr. 10, 2008) ..............................23, 29, 30

*In re All Am. Petroleum Corp.*,
  259 B.R. 6 (Bankr. E.D.N.Y. 2001) ...............................................................30

*In re Bernard L. Madoff Inv. Secs., LLC*,
  445 B.R. 206, 223 n.15 (Bankr. S.D.N.Y. 2011) ...............................................21

*In re Cadarette*,
  601 F.2d 648 (2d Cir. 1979) ...............................................................21, 26

*In re Cassandra Grp.*,
  338 B.R. 583 (Bankr. S.D.N.Y. 2006) ...............................................................34

*In re Kaiser*,
  722 F.2d 1574 (2d Cir. 1983) ...............................................................20, 21

*In re Khan*,
  10-46901-ESS, 2014 WL 10474969 (E.D.N.Y. Dec. 24, 2014) .................................24

*In re MarketXT Holdings Corp.*,
  376 B.R. 390 (Bankr. S.D.N.Y. 2007) ...............................................................26

*In re Patrizzo*,
  105 F.2d 142 (2d Cir. 1939) ...............................................................21

*In re Saba Enterprises, Inc.*,
  421 B.R. 626 (Bankr. S.D.N.Y. 2009) ...............................................................21

*In re Singh*,
  434 B.R. 298 (Bankr. E.D.N.Y. 2010) ...............................................................21

*In re Suntech Power Holdings Co., Ltd.*,
  520 B.R. 399 (Bankr. S.D.N.Y. 2014) ...............................................................31

*In re Trib. Co. Fraudulent Conveyance Litig.*,
  11-MD-2296 (RJS), 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ...............................21

*In re USA United Fleet, Inc.*,
  559 B.R. 41 (Bankr. E.D.N.Y. 2016) ...............................................................20

*Integrity Elecs., Inc. v. Garden State Distributors, Inc.*,
  No. 14 CIV. 3197 BMC, 2016 WL 3637004 (E.D.N.Y. June 30, 2016) .....................29, 30

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*,
313 F.3d 70 (2d Cir. 2002) ............................................................................................... 31, 32

*Kirton v. Nw. Mut. Life Ins. Co.*,
2006 WL 3051772 (E.D.N.Y. Oct. 24, 2006) ............................................................ 30

*Kolodziejczyk v. Wing*,
261 A.D.2d 927 (4th Dep't 1999) ............................................................................. 32

*Leser v. U.S. Bank Nat'l Ass'n*,
No. 09-CV-2362 KAM, 2013 WL 3788877 (E.D.N.Y. July 18, 2013),
*appeal withdrawn* (Dec. 17, 2013) ....................................................................... 19, 29

*Lyman Com. Sols., Inc. v. Lung*,
12 CIV. 4398 TPG, 2015 WL 4545089 (S.D.N.Y. July 16, 2015) ........................... 3

*Manufacturers and Traders Tr. Co. v. Lauer's Furniture Acq., Inc.*,
641 N.Y.S.2d 947 (4th Dep't 1996) .......................................................................... 19

*Marfia v. T.C. Ziraat Bankasi*,
147 F.3d 83 (2d Cir. 1998) ....................................................................................... 29

*Marine Midland Bank v. Murkoff*,
120 A.D.2d 122, 126, 508 N.Y.S.2d 17 (2d Dep't 1986),
*appeal dismissed* 69 N.Y.2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322) ............... 23

*Mogil v. Bldg. Essentials, Inc.*,
12 N.Y.S. 3d 346 (3rd Dep't 2015) .......................................................................... 29

*N. Mariana Islands v. Millard*,
845 F. Supp. 2d 579 (S.D.N.Y. 2012) ...................................................................... 23

*Neshewat v. Salem*,
365 F. Supp. 2d 508 (S.D.N.Y. 2005) ...................................................................... 29

*Perrone v. Amato*,
No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) ........................................................ 20, 21, 26

*Pollock v. Rapid Indus. Plastics Co.*,
113 A.D.2d 520, 497 N.Y.S.2d 45 (2d Dep't 1985) ................................................. 32

*Port of New York Authority v. 62 Cortlandt Street Realty Co.*,
18 N.Y.2d 250, 273 N.Y.S.2d 337, 219 N.E.2d 797 (1966) .................................... 23

*Priestley v. Panmedix Inc.*,
18 F. Supp. 3d 486 (S.D.N.Y. 2014) ........................................................................ 27

*Sardis v. Frankel*,
113 A.D.3d 135 (1st Dep't 2014) .............................................................................. 27

*Symbax, Inc. v. Bingaman*,
    631 N.Y.S.2d 829 (1st Dep't 1995) ........................................................................23

*Techno-Comp, Inc. v. Arcabascio*,
    No. 14-5152, 2015 WL 5244406 (E.D.N.Y. Sept. 8, 2015)...........................................22, 29

*U.S. v. McCombs*,
    30 F.3d 310 (2d Cir. 1994)........................................................................22, 27

*Universitas Educ., LLC v. Nova Grp., Inc.*,
    No. 11CV1590-LTS-HBP, 2014 WL 3883371 (S.D.N.Y. Aug. 7, 2014) ........................................19, 29

*Valintine v. Richardt*,
    126 N.Y. 272, 27 N.E. 255 (1891) ........................................................................19

*Wacikowski v. Wacikowski*,
    93 A.D.2d 885, 461 N.Y.S.2d 888 (2d Dep't 1983) ........................................................................32

## Statutes

18 U.S.C. § 1961 ........................................................................4

C.P.L.R. § 5001 ........................................................................29

C.P.L.R. § 5004 ........................................................................30

C.P.L.R. § 5201 ........................................................................19

C.P.L.R. § 5225 ........................................................................ *passim*

D.C.L. § 272 ........................................................................22, 27

D.C.L. § 273–a ........................................................................ *passim*

D.C.L. § 276 ........................................................................ *passim*

D.C.L. § 278 ........................................................................ *passim*

Fed. R. Civ. P. 69 ........................................................................19, 23

## INTRODUCTION

Plaintiffs-Judgment Creditors ("Plaintiffs") respectfully submit this Memorandum of Law in support of their motion (the "Motion"), pursuant to Rule 69 of the Federal Rules of Civil Procedure ("F.R.C.P."), Section 5225(b) of the New York Civil Practice Law and Rules ("C.P.L.R."), and Sections 273–a, 276, 276–a and 278 of the New York Debtor and Creditor Law ("D.C.L."), for an order: (1) directing garnishee HSBC Bank, N.A. ("HSBC") to turn over $45,155.81 and $97,990.93 held in two accounts (the "HSBC -3710 Account" and the "HSBC -9713 Account," respectively) in the name of non-party Tatyana a/k/a Tanya Mirvis ("T. Mirvis") (the "HSBC Accounts"); (2) directing garnishee TD Bank, N.A. ("TD Bank") to turn over $2,902.37 and $28,446.54 held in two accounts (the "TD -0319 Account" and the "TD -8848 Account," respectively) in the names of T. Mirvis and non-party Lyubov Mirvis ("L. Mirvis"), and T. Mirvis and non-party Alexander Boriskin ("Boriskin"), respectively (the "TD Accounts"); (3) directing garnishee Capital One, N.A. ("Capital One") to turn over $280.55 and $824.43 in one checking account and one trust account (the "Capital One -5283 Account" and the "Capital One -9992 Account," respectively) in the name of T. Mirvis (the "Capital One Accounts," and with the HSBC Accounts, TD Accounts, and Capital One Accounts, the "Subject Accounts"); and (4) entering a judgment against T. Mirvis for the difference ($52,801.75) between the value of the Subject Transfers (as defined herein) and the Restrained Funds (as defined herein), as well as an award of prejudgment interest and attorneys' fees.

## PRELIMINARY STATEMENT

By this Motion, Plaintiffs seek, *inter alia*, the turnover of the entire balance of $175,600.63 in the Subject Accounts (the "Restrained Funds"), which have been frozen by TD Bank, HSBC, and Capital One in accordance with the Court's Orders dated December 2, 2016 and March 22, 2017. Indeed, Plaintiffs have already sought – and won – injunctive relief on two occasions as to the Restrained Funds, and as to any property of M. Mirvis otherwise in the possession of his daughter, T. Mirvis (the "Injunctions"), based on Plaintiffs' demonstration of their likelihood of success on the merits of this very Motion. Since that time, Plaintiffs' case that the Restrained Funds are comprised of judgment debtor property, whether because

they are the product of fraudulent conveyances from judgment debtor Mark Mirvis ("M. Mirvis") and judgment debtor Mark Lupolover ("Lupolover"), including those at issue herein totaling $228,402.38 (the "Subject Transfers"), or because it is M. Mirvis himself who truly owns the Subject Accounts, has only strengthened.  Meanwhile, despite several opportunities (including litigation of the aforementioned Injunctions), none of M. Mirvis, Lupolover, or M. Mirvis' daughter, non-party T. Mirvis, has adduced any credible evidence or coherent explanation rebutting Plaintiffs' evidence or contradicting these allegations. On the contrary, their own testimony and representations regarding the Subject Transfers, and of the creation, funding, and use of the Subject Accounts, remove any doubt of their involvement in a post-judgment scheme to defraud Plaintiffs.

Through these proceedings, and in the face of relentless obstruction and delay from M. Mirvis and Lupolover, aided by their family members and other associates who have abetted their concealment and dissipation of assets, Plaintiffs seek to enforce this Court's Judgment in the original principal amount of $45,657,401.01, for which M. Mirvis is jointly and severally liable.  Since the Judgment was entered <u>more than two years ago,</u> M. Mirvis and Lupolover have largely snubbed these post-judgment proceedings, but they have been veritably frenetic in their efforts to divert assets or otherwise feign judgment-proof status, including suspect financial entanglements with M. Mirvis' daughter, T. Mirvis, as well as his wife, L. Mirvis, and his son-in-law, Boriskin, who are by now quite familiar to the Court.  In any event, the Subject Transfers plainly run afoul of at least two sections of New York's Uniform Fraudulent Conveyance Act, *see* D.C.L. Art. X, §§ 270, *et seq*., and the Restrained Funds are subject to turnover on that basis, and/or because the Subject Accounts are controlled and used by M. Mirvis despite the sham nominal title to the Subject Accounts of T. Mirvis.  Moreover, Plaintiffs are entitled to a judgment against T. Mirvis for any shortfall in the amount of Restrained Funds compared with the total amount of Subject Transfers and any related damages, including prejudgment interest and attorneys' fees.

First, the Subject Transfers were fraudulent conveyances because they were made by M. Mirvis and Lupolover with actual intent to hinder, delay, or defraud Plaintiffs as judgment creditors.  *See* D.C.L. § 276.  M. Mirvis and T. Mirvis have admitted that the proceeds from the sale of M. Mirvis'

condominium located at 100 Oceana Drive West, Unit 5D (the "Oceana Sale Proceeds") were transferred to T. Mirvis for the express purpose of enabling M. Mirvis "easier access" to cash without holding it in his own name. Moreover, the Subject Transfers are supported by every classic badge of fraud, including (1) the intrafamily and/or close association of the parties to the transactions, (2) the absence of any consideration whatsoever, (3) the hasty or unusual circumstances (including the inconsistent and incredible attempts to explain them), (4) the knowledge of Plaintiffs' action at the time of the transactions, (5) the use of dummy strawmen and sham owners of the Subject Accounts, and (6) M. Mirvis' retention of control over the fraudulently conveyed funds and the Subject Accounts at all relevant times. Particularly relevant to this last point is the unrebutted analysis of Plaintiffs' forensic handwriting expert and other evidence demonstrating that M. Mirvis actually wrote checks and deposit slips on, and otherwise controlled or directed the creation and use of, the Subject Accounts.

Second, even if the Subject Transfers were not attended by circumstances exhibiting the full array of traditional badges of fraud (which they are), they are nevertheless conveyances made with intent implied by law, or "constructive" fraudulent conveyances. *See* D.C.L. § 273–a. As required by the statute, each of the Subject Transfers was made to T. Mirvis at a time when M. Mirvis and Lupolover were defendants in this action for money damages, and each was made without receiving fair consideration in return, with the Judgment entered and remaining unpaid. Both M. Mirvis and T. Mirvis have utterly failed to provide any legitimate explanation for the Subject Transfers, even if one could accept as true any of their multiple, inconsistent versions of relevant events. Even in the most forgiving light, M. Mirvis' and T. Mirvis' sworn statements and submissions demonstrate only that T. Mirvis opened deposit accounts in her own name to serve as a conduit for concealing and laundering her father's funds. Thus, upon a determination that the Subject Transfers were fraudulent conveyances under either of the foregoing provisions of the D.C.L., Plaintiffs will have established that, as matured judgment creditors, their rights to the property involved in the Subject Transfers are superior to the rights of the transferee, T. Mirvis, and thus that they are entitled to an order disregarding the Subject Transfers or executing upon the property transferred and any proceeds. *See* D.C.L. § 278.

3

Third, even if the Subject Transfers were not fraudulent conveyances, the Restrained Funds are alternatively subject to turnover directly under Section 5225 of the C.P.L.R. as property of M. Mirvis. Plaintiffs have presented uncontroverted evidence, including two affidavits of handwriting expert Peter. A. Smerick, that the Subject Accounts were created at the behest of, and have been controlled by, M. Mirvis. Thus, the record in these proceedings contains evidence thoroughly rebutting any presumption that the Subject Accounts belong to their nominal accountholders (T. Mirvis, L. Mirvis, and/or Boriskin), and the record further demonstrates that that they have been used by M. Mirvis to support a fiction whose purpose is to conceal hundreds of thousands of dollars, in evasion of Plaintiffs and the Judgment.

## FACTUAL BACKGROUND

### I.   The Underlying No-Fault Insurance Scheme to Defraud Plaintiffs

During a period of at least thirteen years, M. Mirvis, along with other defendants herein, presided over an extensive criminal organization that created and used sham professional corporations and shell companies to steal and launder tens of millions of dollars from Plaintiffs. *See* ECF No. 1 ¶¶ 1-3. The Complaint asserted causes of action against M. Mirvis and Lupolover under RICO (18 U.S.C. §§ 1961, *et seq.*) and the doctrine of common law fraud. *See id.* at ¶ 38. As noted by the Clerk, M. Mirvis and Lupolover were in default as of February 2, 2009. *See* ECF Nos. 79, 81. Plaintiffs subsequently moved for default judgment (ECF No. 265), and on March 31, 2015, Judge Townes adopted (ECF No. 297) Judge Pohorelsky's Report and Recommendation (ECF No. 293) that judgment be entered in Plaintiffs' favor with trebled damages in the amount of $45,657,401.01, for which each of the judgment debtors, including M. Mirvis and Lupolover, is jointly and severally liable. As of the date of this Motion, the Judgment remains unsatisfied, and neither M. Mirvis, Lupolover, nor any other judgment debtor, has expressed any plan or intention to satisfy it. *See* Declaration of Daniel S. Marvin ("Marvin Decl."), at ¶¶ 5, 28.

### II.   Post-Judgment Scheme to Further Defraud Plaintiffs

In the more than two years since the original entry of the Judgment, *see* ECF No. 298, during which time neither M. Mirvis nor Lupolover has made any payment or indicated any commitment to do so, Plaintiffs have conducted post-judgment discovery in order to locate their hidden assets. Those efforts not

only uncovered the Subject Accounts, but also the machinations employed to evade the Judgment, particularly by M. Mirvis, including his rapid divestiture of assets and blatant stonewalling of post-judgment discovery, as well as enlisting relatives and other associates to aid in the diversion and concealment of his property.

A.    **Precipitous Dissipation of His Assets with the Direct Assistance of T. Mirvis and Other Family Members and Associates**

After his default was entered on February 2, 2009, *see* ECF No. 79, M. Mirvis closed or depleted funds in 16 bank accounts (*i.e.*, all bank accounts discovered by Plaintiffs to be in his name), and liquidated and divested himself of all known interests in real property in the United States. *See* ECF No. 386-39 at pp. 6-7, 11-13.[1]  First, on January 15, 2010, less than one year after the notice of default was entered against him, *see* ECF No. 79, M. Mirvis and his wife, L. Mirvis, sold their condominium unit located at 100 Oceana Drive West, Unit 5D ("100 Oceana") for $690,000.  *See* ECF No. 386-39 at p. 12; ECF No. 386-1 (July 5, 2016 Marvin Declaration), at ¶ 48; ECF No. 386-16 (deed transferring 100 Oceana to Strizhevsky family). T. Mirvis and M. Mirvis have both admitted that all of the net proceeds from the sale of 100 Oceana were paid to T. Mirvis and used to open three of the Subject Accounts.[2]

Second, on November 3, 2010, M. Mirvis and Lupolover sold their condominium unit located at 19333 Collins Avenue, Sunny Isles, Florida 33169 ("Unit 2307") to an entity called Tinad, Inc.  *See* ECF No. 386-39, at p. 13; ECF No. 386-1, at ¶ 50; ECF No. 386-18 (recorded warranty deed regarding Judgment Debtor and Lupolover's interest in Unit 2307).  Out of the proceeds from the sale of Unit 2307 (the "Unit 2307 Proceeds"), $39,000 was funneled by Lupolover through his son, non-party Michael Lupolover, to

---

[1] Pin cites to "ECF" documents refer to the pagination generated by the Court's electronic docketing system, and not such documents' internal pagination.

[2] *See* ECF No. 386-39, at p. 12; ECF No. 386-1, at ¶ 49; ECF No. 386-17 (relevant HSBC checks); ECF No. 386-38, at p. 99 (Jan. 19, 2010 Deposit Slip annexed to First Smerick Aff. and Report), ECF No. 386-21 (HSBC -9713 statements), at p. 1; ECF No. 386-22 (HSBC -3710 statements), at p. 1; ECF No. 481-1, at pp. 17-19; ECF No. 481-9, at p. 2 (Check from real estate attorney Albert Feinstein ("Feinstein")); ECF No. 481-10, at p. 1 (Capital One -9992 Account statement); ECF No. 459-1 (Dec. 15, 2016 T. Mirvis Aff.), at ¶ 5; ECF No. 466-1 (Dec. 15, 2016 M. Mirvis Aff.), at ¶ 7; *see also* ECF No. 481-3 (July 6, 2016 HSBC Letter Confirming Restraint of HSBC Accounts).

T. Mirvis and deposited into one of the Subject Accounts, within ten days.  *See* ECF No. 386-39, at p. 13; ECF No. 386-1, at ¶ 51; 386-19 (deposit slip and three checks regarding Unit 2307 Proceeds).

Third, beginning in May of 2013, M. Mirvis, his wife, and T. Mirvis entered into a series of transactions purporting to convey their interest in their residence, 289 Bayberry Drive, Hewlett Harbor, New York 11557 ("289 Bayberry"), property that they had owned since 1999, and where they continue to reside.[3]  These suspicious transactions culminated in the conveyance on May 11, 2015 (six days after the Judgment was entered), of all of M. Mirvis and his wife's interest to T. Mirvis for no consideration. *See* ECF No. 335-8 (May 11, 2015 Deed conveying 100% ownership of 289 Bayberry to T. Mirvis).  Plaintiffs moved to set aside these conveyances, *see* ECF No. 335, and on September 8, 2017, the Court granted Plaintiffs' motion and issued a writ of execution. *See* ECF No. 505, *report and recommendation adopted*, *Allstate Ins. Co. v. Mirvis*, No. 08-CV-4405 (SLT) (PK), 2017 WL 3981297 (E.D.N.Y. Sept. 8, 2017); ECF No. 512-1 (Writ).

**B.     The Subject Transfers**

Thus far, Plaintiffs have identified at least $228,402.38 that was transferred from judgment debtors ($39,000 from Lupolover and $189,402.38 from M. Mirvis) to T. Mirvis without fair consideration after the Complaint was filed, and/or with actual intent to defraud Plaintiffs.

**1.     Fraudulent Diversion of the Oceana Sale Proceeds**

As noted above, *see* Section II(A), *supra*, less than one year after the notation of default was entered against him, M. Mirvis and his wife sold 100 Oceana, and directed that the buyers divert the Oceana Sale Proceeds to T. Mirvis, thereby providing initial funding for  three of the Subject Accounts.  Specifically, on January 19, 2010, a sum of $258,129.75, representing the majority of the Oceana Sale Proceeds, was transferred to T. Mirvis directly from the buyers of 100 Oceana and deposited into and used to open the

---

[3] *See* ECF No. 459-1, at ¶ 1 (T. Mirvis' testimony that she continues to live with parents at 289 Bayberry).  ECF No. 386-39, at p. 13; ECF No. 335-2 (Feb. 23, 2016 Marvin Decl.), at ¶ 6; ECF No. 335-5 (289 Bayberry Land Records Abstract); ECF No. 335-6 (May 20, 2013 Deed by M. Mirvis and L. Mirvis conveying 289 Bayberry to T. Mirvis and themselves jointly); ECF No. 335-7 (Oct. 20, 2013 Deed reversing May 20, 2013 deed);

HSBC Accounts.  *See* ECF No. 386-39 at p. p. 15; ECF No. 386-1, at ¶¶ 49, 53; ECF No. 386-17 (three checks from Strizhevsky purchasers); ECF Nos. 386-21 (HSBC -9713 Statements), at p. 1; ECF No. 386-22 (HSBC -3710 Statements), at p. p. 1.  On the very same day, the remaining Oceana Sale Proceeds of $46,675 were deposited into and used to open the Capital One -9992 Account.  *See* ECF No. 481-2 (Mar. 2, 2017 Marvin Declaration), at ¶ 32; ECF No. 481-9, at p. 2 (Feinstein Check); ECF No. 481-10 (Capital One -9992 Account statements), at p. 1; ECF No. 459-1, at ¶ 5; ECF No. 466-1, at ¶ 7 (Mirvis' testimony that diversion of Oceana Sale Proceeds to T. Mirvis "was a combination of easier access to the sales proceeds and the difficulty in doing it our self (sic)").

M. Mirvis asked T. Mirvis to open bank accounts in her name to deposit the Oceana Sale Proceeds and that M. Mirvis used the Oceana Sale Proceeds to pay his expenses, as both T. Mirvis and M. Mirvis have admitted in this action. *See* ECF No. 430-3 (T. Mirvis Dep. Tr.), at 119:24-122:24, ECF No. 459-1 at ¶¶ 4-5; ECF No. 466-1 at ¶¶ 5-7.  Furthermore, M. Mirvis admitted that he asked T. Mirvis to open bank accounts because he and his wife were "liable to lenders" and "[a]s a result, their access to bank and banking services became limited[,]" and that this arrangement permitted M. Mirvis "easier access to the sales proceeds" if they were kept T. Mirvis' accounts.  ECF No. 466-1, at ¶¶ 5-7.  T. Mirvis also admitted that she knew that her parents' "access to their bank accounts had been restricted," "due to significant real estate investments in Florida that turned on them in 2008 and 2009[,]" and that when her parents asked her to open bank accounts to receive the Oceana Sale Proceeds, "she was happy to oblige."[4]  ECF No. 459-1 at ¶ 5; ECF No. 430-3, at 119:24-120:20.

T. Mirvis never questioned her father as to whether she could get into any trouble for opening an account with money that her father gave her, stating only that she "trust[ed] him" and that they were "very close."  ECF No. 430-3, at 130:7-131:9.  T. Mirvis denied having any knowledge of what M. Mirvis did for

---

[4] While T. Mirvis indicated in her affidavit that two checks for $258,129 and $46,675, representing the Oceana Sale Proceeds, were deposited into her account at HSBC, *see* ECF No. 459-1, at ¶ 5, Plaintiffs' review of all checks and statements for the HSBC Accounts has not revealed any deposits for $46,675.  *See* Marvin Decl. ¶ 22.  However, in reviewing records produced by Capital One, Plaintiffs identified a check for $46,675 deposited into the Capital One -9992 Account, apparently representing the remainder of the Oceana Sale Proceeds.  *See id.*; ECF No. 481-9, at p. 2.

a living, despite having lived with him her whole life, except to say that M. Mirvis used to work when she was a child, but stopped working at some point in time, yet continued to help her with her business, 7E14, Inc. d/b/a Eight Turn Crepe, ("7E14"), including the preceding 14-month period when she had ceased managing 7E14 and was working full-time as a stay-at-home mother. *See id.* at 187:14-191:11.

### 2. **Fraudulent Diversion of Unit 2307 Proceeds**

On November 26, 2010, Lupolover, who has been a close friend of the Mirvis Family for many years, *see* ECF No. 430-3, at 339:25-340:11, transferred $39,000 to T. Mirvis, funneling the funds through his son, Michael Lupolover, *see id.* at 339:23-24, within a matter of days after he received his portion of the proceeds from the sale of a Florida condominium that he owned with M. Mirvis. *See* ECF No. 386-39 at p. 10; ECF No. 386-1, at ¶¶ 50-51; ECF No. 386-18; ECF No. 386-19.   At her deposition, T. Mirvis claimed that, at some date prior to November 2010,[5] she made a personal loan to Lupolover, because M. Mirvis "asked her to." ECF No. 430-3, at 338:12-340:17.   T. Mirvis could not recall the date the loan was made, the specific amount (other than that it was "around $39,000"), what the loan was for, its terms, or whether she charged interest.[6] ECF No. 430-3 at 338:22-339:8, 340:16-17, 342:14-25.

### 3. **The Fraudulent Cash Transfers**

In addition to transferring proceeds from his condominium sales to accounts in T. Mirvis' name, Plaintiffs have thus far identified an additional $37,000 in cash transfers by M. Mirvis to T. Mirvis after the notation of default was entered against him.   Specifically, on or about December 17, 2012 and May 15, 2013, respectively, M. Mirvis transferred (A) $30,000 from his joint account with L. Mirvis at Roslyn Savings Bank (n/k/a New York Community Bank) (the "Roslyn Account") to T. Mirvis (the "$30,000

---

[5] In November of 2010, T. Mirvis was 25 years old, *see id.* at 12:13-15, and had not yet earned any significant income. *See id.* at 72:11-14, 74:9-12, 75:9-12, 127:6-8, 128:12-14 (admitting that she "made little to no money" working for an attorney in 2008, no money working for an internship thereafter, and no money from any of her purported other businesses (the Pharmacies and 7E14) prior to or during 2010).

[6] While T. Mirvis claimed that she "may" have documentation evidencing the loan and Plaintiffs' counsel demanded that she produce them, *see id.* at 342:4-13, T. Mirvis has produced no documents or other evidence corroborating her claim that she loaned Lupolover $39,000.   Marvin Decl. ¶ 23.   Moreover, both Lupolover and his son Michael Lupolover have failed to respond to Plaintiffs' information subpoenas.   *See id.*

Transfer"), and (B) $7,000 from his individual account at Citibank, N.A. to T. Mirvis (the "$7,000 Transfer"). *See* ECF No. 386-39, at p. 10; ECF No. 386-1, at ¶ 55; ECF No. 386-23 (cancelled checks produced by HSBC). The $30,000 Transfer was funded nearly entirely with funds from a $53,430.90 check made out to M. Mirvis and deposited into his Roslyn Account just one week prior to the $30,000 Transfer. *See* ECF No. 481-1, at p. 17; ECF No. 481-2, at ¶ 36; ECF No. 481-13 (MetLife check). In September of 2011, L. Mirvis testified that she had not worked since 2003, could not recall whether she maintained any bank accounts, either individually or jointly, even after being shown portions of bank records listing her as a joint owner, and reiterated on no fewer than nine separate occasions that M. Mirvis took care of all of the Mirvis Family's finances. *See* ECF No. 386-39 at p. 13;ECF No. 386-1, at ¶ 52; ECF No. 386-20 (L. Mirvis Dep. Tr.), at 94:3-10, 96:8-9, 102:9-11, 103:14-18, 23-25, 105:7-13, 107:7-9, 20-21, 109:5-7, 25, 110:2-3, 11-14. T. Mirvis could not recall anything with respect to either of these transfers, including whether they were loans or gifts. *See* ECF No. 430-3, at 182:2-184:21, 327:12-329:17.

### C.  Fraudulent Circumstances Surrounding the Opening of the Subject Accounts

The Capital One -5283 Account, a checking account, was opened on November 6, 2009, approximately eight months after the notation of default was entered against M. Mirvis. *See* ECF No. 79 (Notation of Default); ECF No. 481-2, at ¶ 34; ECF No. 481-11 (monthly statements for Capital One -5283 Account), at p. 2. Approximately two months later, on the very same date that the HSBC Accounts were opened,[7] the Capital One -9992 Account was opened in T. Mirvis' name and designated "ITF" (in trust for) M. Mirvis. *See* ECF No. 481-2, at ¶ 33; ECF No. 481-10 at p. 1. It is undisputed that both the Capital One -9992 Account and the HSBC Accounts were opened at M. Mirvis' direction with the Oceana Sale Proceeds in order to provide M. Mirvis with "easier access" to those funds and, thereafter, M. Mirvis used those

---

[7] *See* ECF No. 386-21, at p. 1; ECF No. 386-21, at p. 1 (initial statement for HSBC -9713 Account); ECF No. 386-22, at p. 1 (initial statement for HSBC -3710 Account).

funds to pay for his expenses.[8]  Additionally, M. Mirvis testified that the Capital One -9992 Account and the HSBC Accounts were opened because, after several "foreclosures" in 2008, his "access to bank and banking services [in his name] became limited" and his own accounts "in Chase, for example, were unusable." ECF No. 459-1 at ¶ 5; ECF No. 466-1, at ¶¶ 5, 7. While M. Mirvis has maintained that "there was nothing wrong with this and [he was] not trying to avoid any party or obligation in doing it," ECF No. 466-1, at ¶ 7, M. Mirvis failed to offer any explanation why it was not easier for him to deposit the Oceana Sale Proceeds into his then-active bank accounts at HSBC, Apple Bank for Savings, TD Bank, New York Community Bank (f/k/a Roslyn Savings Bank), or Morgan Stanley & Co. f/k/a Smith Barney.[9]

Less than six months after Plaintiffs filed their second motion for default judgment against, among others, M. Mirvis, *see* ECF No. 265, and while Plaintiffs' similar RICO and insurance fraud action was pending in the New York County Supreme Court against L. Mirvis, *see Allstate Ins. Co., et al. v. Buziashvili*, No. 603776/2003 (Sup. Ct. N.Y. Cnty.), the TD -0319 Account was opened.  *See* Marvin Decl. ¶30; Exh. "A" (Monthly Statements and Signature Cards for TD -0319 Account) at p. p. 1.  The TD -0319 Account was initially funded almost entirely with $68,145.45 from Feinstein, *see* Exh. "A," at p. p. 5, presumably representing proceeds from the sale of L. Mirvis' property located at 2407 SW 52nd Street, Cape Coral, Florida 33914 ("2407 SW") that was sold on or about August 14, 2013.[10]  *See* Marvin Decl. ¶ 36; Exh. "H" (2407 SW Deed) at p. p. 1; ECF No. 481-2, at ¶ 32; ECF No. 481-9 at p. 7 (Aug. 16, 2013 check for $30,000 from Feinstein to T. Mirvis, with memo "Escrow Release 2407 SW 52 (Mirvis)").  Although

---

[8] *See* ECF No. 459-1, at ¶ 5; ECF No. 466-1 at ¶¶ 5, 7; ECF No. 386-39, at p. 10; ECF No. 386-1, at ¶¶ 49, 53; ECF No. 386-17; ECF No. 386-21, at p. 1; ECF No. 386-22 at p. 1; ECF No. 481-2, at ¶ 32; ECF No. 481-9, at p. 2; ECF No. 481-10, at p. 1.

[9] *See* ECF No. 386-39 (discussing 11 open bank accounts in Mirvis' name at time 100 Oceana sale); ECF No. 386-1, at ¶¶ 39, 41-45; ECF No. 386-7 (checks for HSBC Accounts); ECF No. 386-9 (account activity and withdrawal ticket for Apple Bank account); ECF No. 386-10 (2011 final statement for Apple Bank account); ECF No. 386-10 (TD Bank statements); ECF No. 386-12 (NYCB statements); ECF No. 386-13 (Morgan Stanley statements).

[10] According to the website for the Lee County, Florida Property Appraiser, this sale is "disqualified as a result of credible, verifiable, and documented evidence[,]" because the "property was not exposed to the open-market" and " involve[ed] participants who were atypically motivated or not knowledgeable/informed of market conditions or property characteristics." *See* Marvin Decl. ¶ 45; Exh. "I" (Lee County Online Parcel Inquiry).

L. Mirvis appears to have been the sole owner of 2407 SW, *see* Exh. "H", M. Mirvis, who co-signed the mortgage on 2407 SW, *see* Marvin Decl. ¶ 34; Exh. "F" (2407 SW Mortgage), also financially benefitted from this sale. *See* Marvin Decl. ¶ 35; Exh. "G" (Release of 2407 SW Mortgage).

The TD -8848 Account was opened on July 21, 2014, while Plaintiffs' second motion for default judgment against M. Mirvis was pending. *See* Marvin Decl. ¶ 30; Exh. "B" (Monthly Statements and Signature Cards for TD -8848 Account) at p. 1; ECF No. 265. The vast majority of the initial deposits into the TD -8848 Account came from A.T. United Corp. ("A.T. United"), *see* Marvin Decl. ¶ 31; Exh. "C" (TD -8848 Account Deposits) at pp. 2, 4-5, 7, 10 ($46,644 from A.T. United from 12/19/2014 through 5/6/2015)[11], a company incorporated just two weeks before the TD -8848 Account was opened, *see* Marvin Decl. ¶ 39; Exh. "K" at (DOS Abstract), with suspicious ties to a criminal Medicare fraud and money laundering case currently pending in the E.D.N.Y. *Compare* Exh. "K" *with* Marvin Decl. ¶ 40; Exh. "L" (Indictment) at ¶¶ 20(d), 21(c) (identifying shell entities Project Design A2Z, LLC and MGMS, Inc., which purported to do business at 1208 Broadway, Hewlett, NY 11557). Handwriting expert Peter A. Smerick examined handwriting found on the front of checks from A.T. United and determined that it was "Highly Probable" that M. Mirvis wrote 3 checks from A.T. United that were deposited into either the TD -8848 Account or the TD 8814 Account. *See* Marvin Decl. ¶"18"; Affidavit of Peter A. Smerick filed herewith ("Second Smerick Aff.") at ¶¶ 2(c), 3(c), 19(c); Exh. "D" to Second Smerick Aff. (three A.T. United checks).

1.   **The HSBC Accounts**

The HSBC Accounts consist of two linked checking and savings accounts in the name of T. Mirvis that were opened on January 17, 2010, using Oceana Sale Proceeds. *See* ECF No. 386-1, at ¶¶ 49, 53; ECF No. 386-17; ECF No. 386-21, at p. 1; ECF No. 386-22, at p. 1. At her deposition, T. Mirvis conceded that she permitted M. Mirvis to deposit checks into the HSBC Accounts and issue checks drawn off of the HSBC

---

[11] An additional $80,000 from AT United was deposited into a linked TD Growth Money Market Account, designated by an account number ending in -8814 (the "TD 8814 Account"), opened on the same day as the TD -8848 Account. *See* Marvin Decl. ¶41; Exhs. "M" (Signature Card); "N" (remaining A.T. United Checks).

Accounts, designating the payees and, in some instances, possibly signing those checks. *See* ECF No. 430-3, at 122:4-129:19 (explaining the extent to which she permitted M. Mirvis to use and benefit from any of the Subject Accounts). T. Mirvis has not produced any evidence in opposition to Plaintiffs' allegations regarding M. Mirvis' use and control of the HSBC or the TD Accounts. *See* ECF No. 419; ECF No. 493 (T. Mirvis Opp'n to first and second applications for preliminary injunction, respectively). Instead, T. Mirvis claims that M. Mirvis first used his own funds in the HSBC Accounts (the proceeds from the sale of 100 Oceana) to pay his expenses, and then, when those funds were exhausted – and after M. Mirvis began entering into a suspicious series of transactions in an attempt to transfer his interest in his residence (289 Bayberry) to T. Mirvis – he continued to use funds in the HSBC Accounts (which now came from two pharmacies in Boston, in which T. Mirvis claims to have an ownership interest) to continue to pay T. Mirvis' expenses related to, *inter alia*, 289 Bayberry (since the property was now in her name). *See id.*

Plaintiffs provided all of the deposit slips and checks drawn on the HSBC Accounts that were produced by HSBC on June 2, 2016[12] (as well as known handwriting exemplars of M. Mirvis and T. Mirvis), to Mr. Smerick, their forensic handwriting expert, *see* ECF No. 386-1, at ¶ 24, who concluded that it was "Probable" that M. Mirvis prepared the fronts of 58 out of 65 checks drawn on the HSBC Accounts[13] and there were "very strong indications" that M. Mirvis prepared 41 out of 69 deposit slips.[14]

---

[12] After receiving Mr. Smerick's expert conclusions with respect to the June 2, 2016 production, Plaintiffs learned that 2 checks deposited into and 31 checks drawn on the HSBC -3710 Account, together with eight deposit slips, were omitted from HSBC's production of June 2, 2016. *See* ECF No. 386-1, at ¶ 24. With the exception of one check, HSBC produced to Plaintiffs the omitted documents on 6/16/16 and 6/17/16. *See id.* at ¶ 24, 56. Nevertheless, it is noted that a perfunctory review of the omitted checks reveals that they were similarly issued for the benefit of M. Mirvis, including 17 checks to 7E14, as well as eight checks that were used to pay M. Mirvis' expenses. *See id.*; ECF No. 386-24 (HSBC -3710 Account documents); ECF No. 386-1, at ¶ 27.

[13] Checks deposited into the HSBC Accounts have been introduced as separate exhibits throughout Plaintiffs' papers in order to prove particular facts. All records produced by HSBC in response to Plaintiffs' subpoena are set forth in a combination of Exhibits. *See* ECF No. 386-1, at ¶ 57; ECF No. 386-19, at p. 4; ECF No. 386-21 through 386-25; 386-29, ECF No. 386-38 (First Smerick Aff.) at pp. 24-168, 207.

[14] Mr. Smerick concluded that it was "highly probable" that T. Mirvis prepared six (6) deposit slips, four (4) checks, and signed fourteen (14) checks, but indicated that it was "probable" that M. Mirvis prepared the fronts of those checks. *See* ECF No. 386-38 (Smerick Aff.) ¶ 21(a), (c)-(d).

ECF No. 386-38 (First Smerick Aff.) ¶¶ 3, 21.  In addition, Plaintiffs have also uncovered the following

information with respect to the HSBC Accounts:

### a.  Fraudulent Transfers to HSBC Accounts

As detailed herein, at least $334,129.75 was transferred and deposited for no consideration into the

HSBC Accounts for which T. Mirvis is listed as the account holder, with in excess of $151,000.00 directly

transferred from M. Mirvis; $39,000 directly transferred by Lupolover and approximately $129,000.00

directly transferred from L. Mirvis.  *See* ECF No. 386-1, at ¶¶ 24, 48-49, 51, 55-56; ECF Nos. 386-17

through 386-19; ECF No. 386-23.

- On or about January 6, 2010, $258,129.75, representing the proceeds from the sale of 100 Oceana Drive, inclusive of M. Mirvis' full interest in the property, was transferred to T. Mirvis directly from the buyers. *See* ECF No. 386-1, at ¶ 49; ECF No. 386-17.  The funds were used to open both HSBC Accounts and deposited into the HSBC -9713 Account. *See* ECF No. 386-1, at ¶¶ 49, 53; 386-17, ECF No. 386-21 at p. 1, 386-22 at p. p. 1.

- In November of 2010, five days after Lupolover received his proceeds from the sale of Unit 2307, he transferred $39,000.00 to Michael Lupolover, who, five days later, transferred $39,000.00 to T. Mirvis, with the funds deposited into the HSBC -9713 Account.  *See* ECF No. 386-1, at ¶¶ 50-51; ECF No. 386-18; ECF No. 386-19.

- On December 17, 2012 and May 15, 2013, $37,000.00 was transferred from M. Mirvis and his wife to T. Mirvis, and the funds were deposited into the HSBC -3710 Account. *See* ECF No. 386-1, at ¶ 55; ECF No. 386-23.[15]

Each of the foregoing transfers occurred during the course of the underlying proceeding and was used for

the benefit of M. Mirvis, who controlled the HSBC Accounts.

### b.  Other  Transactions  Demonstrating  M. Mirvis' Domination and Control of the HSBC Accounts

Additionally, as detailed herein, the HSBC Accounts were used to facilitate several transactions for

M. Mirvis' benefit and were regularly used (often by M. Mirvis himself) to pay M. Mirvis' expenses.  *See*

ECF No. 386-1, at ¶ 9.

- On June 23, 2011, a check issued from the HSBC -3710 Account to "FREE" indicates "Donation Mark Mirvis" in the memo line and written besides T. Mirvis' name in the top left corner is "& Mark." *See id.* at ¶ 54; ECF No. 386-38 (First Smerick Aff.), at p. 37.  There were at least four

---

[15] Though the checks appear to indicate "loan" and "loan return" in the memo lines, Plaintiffs' extensive post-judgment discovery has not revealed any instances where T. Mirvis transferred any of her funds to any of the judgment debtors or members of their families.  *See* Marvin Decl. ¶ 9.

other checks to "FREE," issued from the HSBC -3710 Account. *See* ECF No. 386-1, at ¶ 54; ECF No. 386-38 (First Smerick Aff.), at pp. 59, 75-76; ECF No. 386-24, at p. 6. It is "Probable" that M. Mirvis wrote four (out of five) of the above-mentioned checks to "FREE." *See* ECF No. 386-38 (First Smerick Aff.), at ¶ 21(f), pp. 37, 59, 75-76, 169-173.

- On July 7, 2011, $60,151.89 was wired from the HSBC -3710 Account to Salpeter Gitkin, LLP, "OBI: Mark Mirvis Settlement." *See* ECF No. 386-1, at ¶ 53; ECF No. 386-22, at p. 34. There was an additional check from the HSBC -3710 Account for $1,500.00 to Salpeter Gitkin, LLP (memo: El Dorado One), dated 6/17/13. *See* ECF No. 386-1, at ¶ 56; 386-24 at p. 16 (cancelled checks produced by HSBC. On 12/21/12, M. Mirvis prepared a check for $1,500.00 from his and his wife's New York Community Bank account to Salpeter Gitkin, LLP (memo: El Dorado One). *See* ECF No. 386-1, at ¶ 61; 386-26 p. 1. Salpeter Gitkin, LLP also received checks from judgment debtor Tropicana One, LLP, and Nelly Zhuravsky, the wife of judgment debtor Igor Zhuravsky. *See* 386-26 pp. 2-3. Salpeter Gitkin, LLP, is a real estate firm in Florida that represented M. Mirvis and other judgment debtors, including El Dorado One, LLC ("El Dorado"), in litigation stemming from the foreclosure of certain parcels of property that were purchased by the judgment debtors with the ill-gotten gains from the scheme to defraud for which they have been adjudged liable. *See* ECF No. 386-1, at ¶ 62; 386-27 (2011 judgment against Judgment Debtor and Lupolover, *et al.*, in Florida case); *see also* Compl. ¶¶ 410-413.

- On September 4, 2012, $50,000 was wired from Goldpartners PTE LTD, from Oversea Chinese Banking Corp. Ltd. in Singapore to the HSBC -3710 Account for "pmt for services under contract." *See* ECF No. 386-1, at ¶ 53; 386-22 at p. 61. On April 20 and June 5, 2012, $20,000 was wired from Goldpartners, and $30,000 was wired from Moscow-City Trade + Investment PTE LTD, respectively, from Oversea Chinese Banking Corp. in Singapore to pay for T. Mirvis and Alexander Boriskin's $116,394.06 wedding at Cipriani Wall Street. *See* ECF No. 386-1, at ¶ 63; ECF No. 386-28, at pp. 7, 11, 13 (Cipriani's response, through GC Ballroom Operator, LLC, to information subpoena). M. Mirvis paid $39,482.40 of the remaining wedding expenses using two credit cards.[16] *See* ECF No. 386-1, at ¶ 63; 386-28, at pp. 7-8, 12.

- From May 11, 2011 through November 21, 2016, at least $1,625,948.78 was transferred to the Subject Accounts from Central Pharmacy Boston, Inc. and Century Pharmacy Inc. (f/k/a Century Pharmacy LLC) (the "Pharmacies"),[17] two Massachusetts pharmaceutical companies, and nearly all of that amount ($1,584,898.7) came in checks to T. Mirvis. *See* ECF No. 386-1, at ¶¶ 56, 64; ECF No. 386-86. M. Mirvis and L. Mirvis also received funds from the Pharmacies. *See* ECF No. 386-1, at ¶ 65; 386-30 (canceled checks to M. Mirvis and L. Mirvis); ECF No. 527-1, at pp. 5-6. Plaintiffs' handwriting expert concluded that there are "very strong indications" that M. Mirvis wrote many of the deposit slips associated with those deposits.[18] *See* ECF No. 386-38 (Smerick

---

[16] The remaining amount of approximately $33,741.38 was paid from a Chase account in the names of Leonid Boriskin and Bella Boriskina. *See* ECF No. 386-1, at ¶ 63; 386-28 at pp. 9-10.

[17] On many occasions, several checks, each for less than $10,000.00, were issued to T. Mirvis on the same day. *See* ECF No. 527. For example, on June 3, 2014, the Pharmacies wrote (A) six checks for $9,000 each to T. Mirvis that were deposited into the HSBC -3710 Account, (B) a seventh check for $9,000 that was deposited into the TD -0319 Account, and (C) a check for $1,400 that was deposited into the HSBC -3710 Account. *See* ECF No. 527-1, at p. 7.

[18] In connection with the First Smerick Affidavit, Mr. Smerick could not reach a conclusion with respect to 16 deposit slips due to the fact that the only handwriting appearing on those slips were numerals that were not unique enough for identification purposes. *See* ECF No. 386-38 (First Smerick Aff.), at ¶ 16, n. 1; ECF No. 386-1, at ¶ 26.

Aff. ¶ 21(b)); ECF No. 386-1, at ¶ 25.  Moreover, it is "Probable" that the front of one of two checks from the HSBC -3710 Account to Century Pharmacy was prepared by Judgment Debtor. ECF No. 386-38, at ¶ 21(f), pp. 62, 169-73; ECF No. 386-1, at ¶ 54.[19]

- From February 21, 2012 through October 8, 2015, approximately $286,429.60 was transferred from the HSBC -3710 Account to 7E14.  *See* ECF No. 386-1, at ¶ 54; ECF No. 386-38 (First Smerick Aff.), at pp. 44-48, 50, 52, 54, 56, 62, 64-65, 67-68, 70-74, 77-80, 83-84, 87; ECF No. 386-24 at pp. 3-5, 8-12, 15, 22, 24-25, 29-33.  Additionally, from August 20, 2013 through February 11, 2015, approximately $33,200 was transferred from the TD -0319 Account to 7E14, and from December 22, 2015 through March 4, 2015, approximately $39,000.00 was transferred from the TD -8848 Account to 7E14.  *See* Second Smerick Aff. ¶ 14, Exh. B, at pp. 3, 5-6, 9, 11, 24, Exh. C, at pp. 13, 16, 22.  T. Mirvis is the purported majority shareholder of 7E14.  *See* ECF No. 386-1, at ¶ 67; 386-32 (7E14's response to information subpoena).  Oleg Fabrikant, the owner of 18.75% of the shares and president of 7E14, *see id.*, received $21,000.00 from judgment debtor El Dorado from October 14, 2008 through October 12, 2009, after which all activity in El Dorado's only known bank account ceased.  *See* ECF No. 386-1, at ¶ 68; ECF No. 386-33 (checks from El Dorado to Fabrikant).  Chase reported to Plaintiffs that M. Mirvis' employer was "7 East 14 Street Inc."  *See* ECF No. 386-15 (response to subpoena by J.P. Morgan Chase, N.A. Mr. Smerick has concluded that it is "Probable" that the payee name on the fronts and the endorsement on the backs of checks totaling $183,328.53 from the HSBC -3710 Account to 7E14 were prepared by the same writer, that writer is not T. Mirvis, and a few handwriting characteristics indicate that M. Mirvis may have prepared those entries. ECF No. 386-38 (Smerick Aff.) ¶ 21(g), (h), pp. 44-48, 50, 52, 54, 56, 62, 64, 65, 67, 68, 71-74, 77-80, 83-84, 87, 169-73.  Moreover, it is "Probable" that M. Mirvis prepared the fronts of these checks and there are indications that the account numbers appearing on the backs of the checks were also prepared by M. Mirvis.  *Id.* at ¶ 21(h)-(i), pp. 44-48, 50, 52, 54, 56, 62, 64, 65, 67, 68, 71-74, 77-80, 83-84, 87, 169-173.

- On September 11, 2014, $20,010.00 was wired from the HSBC -9713 Account to Multibank Inc. in Panama for the benefit of Panama Green Innovations, SA.  *See* ECF No. 386-1, at ¶ 53; 386-21 at p. 51.

### 2.  **The TD Accounts**

As with the HSBC accounts, the TD Accounts have been similarly controlled by M. Mirvis, used to facilitate transactions for M. Mirvis' benefit, and regularly used (at least in many cases by M. Mirvis himself) to pay M. Mirvis' own expenses.  In particular, Plaintiffs' handwriting expert, Mr. Smerick, reviewed 86 checks and 100 deposit slips relating to the TD Accounts, and his conclusions overwhelmingly

---

[19] Moreover, the Pharmacies have apparently continued transferring money to T. Mirvis, *see* ECF No. 526, even after the Subject Accounts were restrained by the Court, *see* ECF Nos. 456, 497.  Plaintiffs have continued to conduct discovery into the Pharmacies and this ever-growing collection of significant cash transfers, which aggregate to an amount many times the value of the Restrained Funds.  *See* ECF No. 527.

demonstrate that M. Mirvis controlled the TD Accounts and that the accounts were used for his benefit.

Specifically, Mr. Smerick concluded that

- It is HIGHLY PROBABLE that M. Mirvis prepared at least 42 of the 56 checks from the TD -0319 Account. *See* Second Smerick Aff. ¶¶ 3(a)(i), 19(a)(i). These 42 checks prepared by M. Mirvis include checks numbered: 101-23, 125-29, 133-34, 136-38, 140-43, 145, 147, and 153-55. *See id.*; Exh. B to Second Smerick Aff., at pp. 3-17, 19-25, 27-29, 31-32. The aforementioned 42 checks transferred $138,147.26 out of the TD -0319 Account. *See* Second Smerick Aff. at ¶¶ 2-3, 19; Exh. B to Second Smerick Aff. at pp. 3-17, 19-25, 27-29, 31-32.

- It is PROBABLE that M. Mirvis prepared another 4 checks from the TD 0139 Account. *See* Second Smerick Aff. ¶¶ (3)(a)(i), 19(a)(ii). This group of 4 checks includes checks numbered 150, 152, 156, and 158. *See id.*; Exh. B to Second Smerick Aff. at pp. 32-35. These four checks transferred $6,578.94 from the TD -0319 Account. *See* Second Smerick Aff. ¶¶ 3(i), 19(ii); Exh. B to Second Smerick Aff. at pp. 32-35.

- It is PROBABLE that M. Mirvis prepared at least 36 out of 46 deposit slips reviewed from the TD -0319 Account. *See* Second Smerick Aff. ¶¶ 3(v), 19(vi). These 36 deposit slips include deposit slips bearing the dates 11/12/13, 01/06/14, 1/31/14, 01/28/14, 02/03/14, 2/4/14, 2/10/14, 2/11/4, 2/14/14, 3/7/14, 2/8/14, 03/17/14, 3/19/14, 4/9/14, 4/11/14, 4/14/14, 4/25/14, 4/29/14, 5/18/14, 6/2/14, 6/4/14, 6/06/14, 6/13/14, 7/1/14, 8/08/14, 8/11/14, 8/18/14, 8/26/14, 11/24/14, 01/05/15, 03/11/15, 03/25/15, 04/28/15, 5/26/15, 06/02/15, and 10/07/15. *See* Second Smerick Aff. ¶¶ 3(v), 19(vi); Exh. B to Second Smerick Aff., at pp. 44, 46-51, 53-77, 79-81, 83. The aforementioned deposit slips deposited $303,304.58 into the TD -0319 Account. *See* Second Smerick Aff. at ¶¶ 3(v), 19(vi); Exh. B to Second Smerick Aff. at pp. 44, 46-51, 53-77, 79-81, 83.

Additionally, transfers involving the TD -0319 Account demonstrate that the account was used for

the benefit of M. Mirvis and that he controlled the account:

- A $5,000.00 check dated April 11, 2014 and issued from the TD -0319 Account was payable to M. Mirvis himself. *See* Exh. B to Second Smerick Aff. at p. 14. A $180.00 check dated August 29, 2013 and issued from the TD -0319 Account was made payable to "FREE" with "Donation" in the Memo Line. *See id.* at p. 5. An $800.00 check, dated November 1, 2014, was made payable to "Cash." *See id.* at p. 20. Mr. Smerick concluded that it is HIGHLY PROBABLE that M. Mirvis prepared each of these checks, which total $5,980.00. *See id.* at pp. 5, 14, 20; Second Smerick Aff. ¶¶ 3(a)(i), 19(a)(i).

- From September 29, 2013 through February 11, 2015, $33,200.00 was transferred from the TD -0319 Account to 7E14. *See* Exh. B to Second Smerick Aff. at pp. 3, 5-6, 9, 11, 24. As discussed *supra*, a substantial connection exists between M. Mirvis and 7E14, as his daughter, T. Mirvis, is the largest shareholder of the company; numerous bank accounts controlled by M. Mirvis, including the TD -0319 Account, have transferred money to 7E14; and Chase reported to Plaintiffs

that M. Mirvis' employer was "7 East 14 Street Inc." *See* ECF No 386-1, at ¶¶ 54, 66, 67; 386-15, ECF No. 386-31; ECF No. 386-32.  Mr. Smerick concluded that it is HIGHLY PROBABLE that six of the seven checks payable to 7E14, totaling $32,000, were written by M. Mirvis. *See* Second Smerick Aff. ¶¶ 3(a)(i), 19(a)(i); Exh. B to Second Smerick Aff. at pp. 3, 5-6, 9, 11, 24.

Mr. Smerick's conclusions indicate that M. Mirvis exercised control over the TD -8848 Account:

- It is HIGHLY PROBABLE that M. Mirvis prepared at least 18 of the 33 checks reviewed from the TD -8848 Account in the amount of $129,007.26. *See* Second Smerick Aff. at ¶¶ 2(b), 3(b)(i), 19(b)(i).  This group of 18 checks includes checks numbered 98, 101-09, 112-13, 115, 119, 124, and 127-29.  *See id.*; Exh. C to Second Smerick Aff. at pp. 3-12, 16-18, 22.

- It is HIGHLY PROBABLE that M. Mirvis prepared at least 34 of the 54 deposit slips from the TD -8848 Account, totaling $392,240.00. *See* Second Smerick Aff. at ¶¶ 2, 3, 19.  This group of 34 deposit slips includes deposit slips bearing the dates 12/20/14, 12/30/14, 1/26/15, 5/15/15, 6/17/15, 7/06/15, 7/11/15, 8/10/15, 8/13/15, 8/18/15, 9/22/15, 10/08/15, 10/16/15, 11/08/15, 11/15/15, 12/08/15, 11/18/15, 12/22/15, 01/04/16, 01/08/16, 01/11/2016, 1/12/16, 01/14/15, 1/20/16, 01/18/16, 02/04/16, 2/08/16, 02/18/16, 2/25/16, 03/22/16, 3/31/16, 4/12/16, 4/13/16, and 4/22/16.  *See id.*; Exh. C to Second Smerick Aff. at pp. 26, 29, 31, 34-35, 37-40, 43-45, 47-48, 51, 53-65, 69-70, 72-73, 77.

Additionally, certain transfers involving the TD -8848 Account demonstrate that the account was used for the benefit of M. Mirvis and that he controlled the account:

- A $3,500 check made payable to "Cash" was issued from the TD -8848 Account on August 26, 2015. *See* Exh. C to Second Smerick Aff. at p. 9.  According to Mr. Smerick, it is HIGHLY PROBABLE that M. Mirvis wrote this check. *See* Second Smerick Aff. at ¶ 19(b)(i); Exh. C to Second Smerick Aff. at p. 9.

- Between December 22, 2015 and March 4, 2016, $39,000 was transferred from the TD -8848 Account to 7E14. *See* Exh. C to Second Smerick Aff. at pp. 13, 16, 22.  Mr. Smerick concluded that it is HIGHLY PROBABLE that M. Mirvis prepared at least one of the checks payable to 7E14, in the amount of $10,000, from the TD -8848 Account.  *See* Second Smerick Aff. at ¶ 19(b)(i).  The Memo Line of the $10,000 Check says "Loan". *See* Exh. C to Second Smerick Aff. at p. 16.

### 3.  The Capital One Accounts

With the exception of an opening deposit of $317.77, *see* ECF No. 481-11, at p. 1, the Capital One -5283 Account has at all times been exclusively funded by transfers (totaling $159,060) from the Capital One -9992 Account held by T. Mirvis "in trust for" M. Mirvis. *See id.* at pp. 46, 85-86. After it was opened with a portion of the proceeds from the sale of 100 Oceana, the Capital One -9992 Account was funded

with checks from various sources, including more than $51,692 from the Pharmacies and an additional $30,000 from Feinstein, representing a portion of the proceeds from the sale of 2407 SW.  *See* ECF No. 481-2, at ¶ 32; ECF No. 481-9.  As with the TD Accounts and HSBC Accounts,[20] $24,560 was issued from the Capital One -5283 Account to 7E14, and $18,565.61 was used to pay 289 Bayberry's property taxes. *See* ECF Nos. 481-2, at ¶ 38; 481-15 (Transfers from Capital One Checking Acct.). The Capital One -5283 Account has only been used to make six payments since it was opened. *See id.*; *see also* ECF No. 481-11. Excluding transfers to the Capital One -5283 Account (the checking account), the Capital One -9992 Account has only been used to make two payments since it was opened.  *See* ECF No. 481-2, at ¶ 37; ECF No. 481-14 (Transfers from Trust Acct.); *see also* ECF No. 481-10.

At her deposition, T. Mirvis admitted to having at least one bank account at Capital One, but could not recall the account number, whether it was a checking or savings account, whether she ever deposited any funds from the Pharmacies into the account, or used any funds from the account to pay 7E14.  *See* ECF No. 430-3, at 200:21-201:17, 261:10-13. Moreover, when asked if she gave M. Mirvis access to her Capital One and First Republic bank accounts, T. Mirvis replied: "First Republic, no. Capital One, I don't remember." *Id.* at 260:22-261:6. When asked if anything would refresh her recollection, T. Mirvis answered: "no." *Id.* at 261:7-9.  At the hearing on March 22, 2017, T. Mirvis' counsel stated that T. Mirvis was not even aware of the Capital One -9992 Account, *see* Mar. 22, 2017 H'g Tr. 10:25-11-3, despite the undisputed facts that she was the accountholder listed on statements for the Capital One -9992 Account (and the only accountholder listed as of April 1, 2012), *see* ECF No. 481-10, and that the Capital One -5283

---

[20] *See* ECF No. 386-39 at pp. 11-12, 15; ECF No. 386-1 at ¶¶ 54, 56, 66; 386-38 (First Smerick Aff.), Ex. B, at pp. 11, 14, 18-26, 28, 30, 3-33, 37-38, 40-41, 43-44, 46-50, 53-56, 59-60, 63; ECF No. 386-24 at pp. 3-5, 8-12, 15, 22, 24-25, 28-33; ECF No. 386-31.

Account, also solely in T. Mirvis' name, was exclusively funded with funds transferred from the Capital One -9992 Account.  *See* ECF No. 481-11, at pp. 46, 85-86.

## THE STATUTORY FRAMEWORK

Rule 69 of the Federal Rules of Civil Procedure provides that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69(a)(1).  Accordingly, federal courts seated in this State look to Article 52 of the C.P.L.R., which prescribes post-judgment remedies in New York.  *See* C.P.L.R. § 5201 (subjecting to execution "any property which could be assigned or transferred . . . unless it is exempt from application to the satisfaction of the judgment").  In turn, Section 5225 authorizes a proceeding for turnover of a judgment debtor's property in the possession of a third party.  *See* C.P.L.R. § 5225(b).

Where, as here, a judgment debtor has fraudulently conveyed property, Section 5225 of the C.P.L.R. works in concert with New York's version of the Uniform Fraudulent Conveyance Act to permit recovery of property so transferred, and any proceeds.  *See* D.C.L. art. X, §§ 270, *et seq.*; *Leser v. U.S. Bank Nat'l Ass'n*, No. 09-CV-2362 KAM, 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013), *appeal withdrawn* (Dec. 17, 2013) ("A judgment creditor may use Section 5225(b) 'as the means to set aside a transfer made by a judgment debtor to defraud his creditors.'") (quoting *Gelbard v. Esses*, 96 A.D.2d 573, 575 (2nd Dep't 1983)).  Section 5225 also "furnishes a mechanism for obtaining a money judgment against the recipient of a fraudulent conveyance who has, in the interim, spent or dissipated the property conveyed."  *Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11CV1590-LTS-HBP, 2014 WL 3883371, at *11 (S.D.N.Y. Aug. 7, 2014) (quoting *F.D.I.C. v. Conte*, 204 A.D.2d 845, 846 (3rd Dep't 1994)); *see also Manufacturers and Traders Tr. Co. v. Lauer's Furniture Acq., Inc.*, 641 N.Y.S.2d 947, 948 (4th Dep't 1996) (finding that "where the assets of [a judgment debtor] have been sold and commingled with those of [a transferee], a money judgment was properly granted as a substitute for those assets" (citing *Valintine v. Richardt*, 126 N.Y. 272, 277, 27 N.E. 255 (1891)).

## STANDARD OF REVIEW

Under Section 276 of the D.C.L. "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." D.C.L. § 276; *see In re USA United Fleet, Inc.*, 559 B.R. 41, 87 (Bankr. E.D.N.Y. 2016) (explaining the three elements required to establish a conveyance made with intent to defraud under D.C.L. § 276: "(1) the thing transferred has value out of which the creditor could have realized a portion of its claim; (2) that this thing was transferred or disposed of by debtor; and (3) that the transfer was done with actual intent to defraud"). Under New York law, "only an actual intent to hinder and delay need be established, not an actual intent to defraud). *Perrone v. Amato*, CV 09-316 (AKT), 2017 WL 2881136, at *27 (E.D.N.Y. July 5, 2017) (citations omitted); *see Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 252 (2d Cir. 1987) ("Though DCL § 276 is triggered by an actual intent to hinder, delay, or defraud, all three [of those] means of damaging creditors are within a general category that the statute categorizes as 'fraudulent.'" (internal citations omitted)). Courts have repeatedly held that a party "is not required to establish actual intent 'to hinder, delay, or defraud … present or future creditors' by direct evidence," but may instead infer fraud from the circumstances surrounding the transaction, commonly referred to as the 'badges of fraud.'" *Aaron v. Mattikow*, 225 F.R.D. 407, 413 (E.D.N.Y. 2004); accord *Perrone*, 2017 WL 2881136, at *27; *Fannie Mae v. Olympia Mortg. Corp.*, No. 04-CV-4971, 2013 WL 417352, at *11 (E.D.N.Y. Jan. 29, 2013) (citation omitted).

Among the most typical badges of fraud are: "(1) a close relationship between the parties to the transaction, (2) a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance." *Fannie Mae*, 2013 WL 417352, at *11 (citation omitted); *see In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983). Additionally, courts consider "the general chronology of the events and transactions under inquiry[,]" *Ostashko v. Ostashko*, No. 00-CV-7162, 2002 WL 32068357, at *18 (E.D.N.Y. Dec. 12, 2002) (citation omitted), and "[c]oncealment of facts and false pretenses by the

20

transferor." *In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983); *see also In re Bernard L. Madoff Inv. Secs., LLC*, 445 B.R. 206, 223 n.15 (Bankr. S.D.N.Y. 2011) ("[B]adges of fraud include (1) lack or inadequacy of consideration, (2) family, friendship, or close associate relationship between parties, (3) retention of possession, benefit, or use of property, (4) financial condition of party sought to be charged before and after transaction, (5) existence or cumulative effect of pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors, (6) general chronology of event and transactions under inquiry, (7) questionable transfer not in usual course of business, and (8) secrecy, haste, or unusualness of transactions." (citing *In re Saba Enter, Inc.*, 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009)).

While the "presence or absence of one badge of fraud is not conclusive, the presence of multiple indicia will increase the strength of the inference[.]" *In re Trib. Co. Fraudulent Conveyance Litig.*, 11-MD-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) (internal quotation marks and citations omitted). Courts have found that "[t]he existence of several badges constitutes 'clear and convincing evidence of actual intent.'" *Madoff*, 445 B.R. at 223, n.15. (citing *In re Saba*, 421 B.R. at 644); *accord In re Singh*, 434 B.R. 298, 312 (Bankr. E.D.N.Y. 2010); *see Tribune*, 2017 WL 82391, at *13 ("[T]he confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." (citation omitted)).

"'[T]ransfers among family members raise special concerns, and receive different scrutiny.'" *Perrone*, 2017 WL 2881136, at *27 (quoting *Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010)). Consequently, the Second Circuit has repeatedly stated that "[t]he transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property, is a classic badge of fraud." *In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983) (citing *In re Cadarette*, 601 F.2d 648, 651 (2d Cir. 1979). Likewise, the Second Circuit has found that "[t]he retention of the use of transferred property very strongly indicates fraudulent motive underlying transfer." *Cadarette*, 601 F.2d 648 at 651 (citations omitted); *accord In re Patrizzo*, 105 F.2d 142, 143 (2d Cir. 1939) ("[S]eller's retention of possession and enjoyment of the property after the transfer is a well-known badge of fraud.").

21

A transfer may also be a fraudulent conveyance if it was made with fraudulent intent implied by law.  One way to demonstrate such a "constructive" fraudulent conveyance is under Section 273–a of the D.C.L., which provides that "[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." D.C.L. § 273–a; *accord Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 188 (2d Cir. 2006) ("To prevail on a claim under DCL § 273–a, a plaintiff must establish (1) that the conveyance was made without fair consideration; (2) that the conveyor is a defendant in an action for money damages or that a judgment in such action has been docketed against him; and (3) that the defendant has failed to satisfy the judgment.").  As used in this context, "fair consideration" means not only that the transferee paid a "fair equivalent" of value for the conveyance, but also that he or she received the property "in good faith."  D.C.L. § 272.  A judgment debtor's transfers to family members that are unsupported by any tangible consideration are presumptively fraudulent, and it is incumbent upon the transferee to rebut that presumption. *See U.S. v. McCombs*, 30 F.3d 310, 325 (2d Cir. 1994) ("[S]hifting the burden of persuasion to an intrafamily transferee is triggered under New York law by the presence of: (1) the absence of any tangible consideration, or (2) a clandestine transfer of property designed to conceal the nature and value of the consideration."); *Domino Media, Inc. v. Kranis*, 9 F. Supp. 2d 374, 387 (S.D.N.Y. 1998), *aff'd*, 173 F.3d 843 (2d Cir. 1999) ("In an intrafamily transfer . . . the burden of demonstrating the fairness of consideration is on the transferee."); *Gasser v. Infanti Int'l, Inc.*, 353 F. Supp. 2d 342, 354 (E.D.N.Y. 2005) (same).

Where a conveyance is determined to be fraudulent under either of the foregoing provisions, Section 278 provides that such conveyance may be set aside, or that the Court may disregard the transfer and levy execution upon the subject property.  D.C.L. § 278(1); *Techno-Comp, Inc. v. Arcabascio*, No. 14-5152, 2015 WL 5244406, at *9-10 (E.D.N.Y. Sept. 8, 2015) (Townes, D.J.) (fraudulent conveyances may be set aside under D.C.L. § 278).  Moreover, "[c]ourts have interpreted the [D.C.L.] as providing a basis to award damages to judgment creditors against those who participate in and benefit from a fraudulent

conveyance, particularly when setting aside the transfer is not possible or will not adequately compensate the creditor." *Howland v. Resteiner*, 07-CV-2332, 2008 WL 1740531, at *5 (E.D.N.Y. Apr. 10, 2008) (citations omitted); *see Const. Realty, LLC v. Oltarsh*, 766 N.Y.S. 2d 425, 427 (1st Dep't 2003) (court "may award a personal judgment against a party in lieu of setting aside a transfer") (citation omitted).

In addition, executable property in the possession of a non-debtor may be turned over in satisfaction of a judgment directly under Section 5225(b) of the C.P.L.R., irrespective of fraudulent conveyances, where "the judgment debtor is entitled to the possession of such property" or "the judgment creditor's rights to the property are superior" to those of the transferee. *N. Mariana Islands v. Millard*, 845 F. Supp. 2d 579, 583 (S.D.N.Y. 2012) (quoting *Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 841 (2d Cir. 1991)).

Finally, "in a special proceeding under New York C.P.L.R. § 5225(b), applicable in the District Court via Fed.R.Civ.P. 69(a), a court may grant summary relief where there are no questions of fact, and trial is only necessary as to "disputed issues of fact on adverse claims in a turnover matter.'" *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir. 1995) (citations omitted); *see Port of New York Authority v. 62 Cortlandt Street Realty Co.*, 18 N.Y.2d 250, 273 (1966) (summary judgment standard applies to special proceedings), *cert. denied*, 385 U.S. 1006, (1967). The burden of proof for fraudulent conveyances under Section 276 of the D.C.L. is "clear and convincing evidence." *Symbax, Inc. v. Bingaman*, 631 N.Y.S.2d 829, 831 (1st Dep't 1995) (citing *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17 (2d Dep't 1986), *appeal dismissed* 69 N.Y.2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322). By contrast, some courts have held that fraudulent conveyances under D.C.L. § 273–a need only be proven by a preponderance of the evidence. *See Am. Federated Title Corp. v. GFI Mgmt. Services, Inc.*, 126 F. Supp. 3d 388, 406, n.8 (S.D.N.Y. 2015) (discussing unresolved conflict in lines of cases finding that D.C.L. § 273–a claims must be proven by either preponderance or clear and convincing evidence), *reconsideration denied*, 13-CV-6437 (KMW), 2016 WL 4290525 (S.D.N.Y. Aug. 11, 2016). Based on the foregoing standards, the relief requested herein should be granted.

## ARGUMENT

### I. THE SUBJECT TRANSFERS WERE FRAUDULENT CONVEYANCES

As discussed herein, the Subject Transfers totaling $228,402.38 were made with constructive or actual intent to defraud M. Mirvis' and Lupolover's creditors. *See* D.C.L. §§ 273–a, 276. Accordingly, the value of the Subject Transfers is subject to avoidance and execution in favor of Plaintiffs, who are judgment creditors with a matured claim. *See id.* at § 278.

### A. The Subject Transfers Were Made With Actual Intent to Defraud

The Subject Transfers are fraudulent conveyances because they were made with actual intent to defraud M. Mirvis' and Lupolover's creditors, including Plaintiffs. *See* D.C.L. § 276. As noted above, the Court's inquiry into whether the Subject Transfers were made with actual intent to defraud is informed by certain time-worn "badges of fraud." *See Fannie Mae*, 2013 WL 417352, at *11 (classic badges of fraud include: "(1) a close relationship between the parties to the transaction, (2) a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance.") (citations omitted); *Ostashko*, 2002 WL 32068357, at *18 (recognizing "the general chronology of the events and transactions under inquiry" as a further indication of fraudulent intent) (citation omitted).

The Subject Transfers strongly exhibit <u>all</u> of the commonly recognized badges of fraud. First and foremost, the father-daughter relationship between M. Mirvis and T. Mirvis clearly amounts to a "close relationship between the parties." *See In re Khan*, 10-46901-ESS, 2014 WL 10474969, at *25 (E.D.N.Y. Dec. 24, 2014) (stating that a transfer between parties who share a close relationship, such as parent and child, supports a finding of actual fraudulent intent).

Second, T. Mirvis provided no consideration in exchange for funds deposited into the Subject Accounts in her name pursuant to the Subject Transfers. *See* ECF No. 481-9, at p. 2; ECF No. 481-10, at p. 1; ECF No. 386-39, at pp. 10-11; ECF No. 386-1, at ¶ 55; ECF No. 386-23. Moreover, with regard to

cash transfers totaling $37,000, T. Mirvis claimed that she could not even recall if they were loans or gifts. *See* ECF No. 430-3, at 182:2-184:21, 327:12-329:17.

Third, the absence of any legitimate explanation for the intrafamily Subject Transfers, coupled with T. Mirvis' ostensible lack of knowledge (or outright fabrications) concerning the Subject Accounts reflected in her testimony and submissions to date, supports inferences that (1) the Subject Transfers were "secret and hasty" or otherwise "not in the usual course of business," (2) T. Mirvis and the Subject Accounts in her name served as "dummies" for M. Mirvis, and (3) M. Mirvis retained control of the funds even after the Subject Transfers.  These inferences are reinforced by overwhelming evidence that (A) M. Mirvis created and managed numerous accounts in the name of T. Mirvis, (B) M. Mirvis himself wrote many of the checks and deposits on the Subject Accounts, and (C) the actions surrounding the creation of and transactions involving the Subject Accounts were taken in close proximity to events in this litigation, such as M. Mirvis' defaults, in an attempt to divert assets despite M. Mirvis' limited access to banking services. *See* ECF No. 386-38 (First Smerick Aff.) at ¶ 2, 3, 21; Second Smerick Aff. at ¶¶ 2, 3, 19; ECF No. 430-3, at 119:24-120:20, 182:2-184:21, 327:12-329:17.

Fourth, M. Mirvis and Lupolover has been on notice of Plaintiffs' claims against them for more than eight years.  *See* ECF Nos. 47, 79.  Mirvis' notice of the action, and the default against him, is further substantiated by his frenetic efforts to divert assets and otherwise feign judgment-proof status.  Following the filing of Plaintiffs' second motion for default, the TD Accounts were opened, and it is "HIGHLY PROBABLE" that M. Mirvis himself was personally responsible for the transfer of funds into and out of these accounts, in the name of his daughter, T. Mirvis.  *See* Second Smerick Aff. ¶¶ 2-3, 19.  M. Mirvis and T. Mirvis even admitted that the Subject Accounts were opened because, with M. Mirvis' access to banking services limited, it was easier to use accounts in T. Mirvis' name.  *See* ECF No. 459-1, at ¶ 5; ECF No. 430-3, at 119:24-120:20.

Finally, the general chronology of relevant events strongly supports an inference of actual fraudulent intent: (1)  less than one year after the notation of default was entered against him, M. Mirvis and his wife sold 100 Oceana and had the entire sale proceeds diverted to and used to open three of the

Subject Accounts; (2) M. Mirvis asked T. Mirvis to open bank accounts because he and his wife had limited access to bank and banking services, (3) on December 17, 2012 and May 15, 2013, M. Mirvis made the $30,000 Transfer and the $7,000 Transfer respectively to T. Mirvis; and (4) the Subject Transfers were each made after M. Mirvis' and Lupolover's default and despite their knowledge of this action for more than eight years, *see* ECF Nos. 47, 79.  Indeed, evidence adduced herein which tends to show that T. Mirvis opened the Subject Accounts for, and ceded control of them to, her father, M. Mirvis, supports not only the conclusion that these accounts and funds truly belong to M. Mirvis, but also the conclusion that the Subject Transfers were made by M. Mirvis and Lupolover—and received (at least nominally) by T. Mirvis—with actual fraudulent intent.

Accordingly, the Subject Transfers were made by M. Mirvis and Lupolover with actual intent to defraud, and accordingly are subject to avoidance and execution.  *See, e.g.*, *Cadarette*, 601 F.2d at 651-52 (district court "clearly erred in finding that the bankrupt transferred [a vehicle] and provided answers to the pertinent questions on the schedule without intent to defraud his creditors[,]" where debtor transferred the vehicle to his fiancee for no consideration, retained the use of the vehicle, initially "responded 'no' to questions on the bankruptcy petition asking whether he had made a gift of or transferred any personal property within the preceding year", and amended his answer only after being questioned about the transfer); *Perrone*, 2017 WL 2881136, at *29 (debtor transferred proceeds from sale of property into joint account with husband with actual intent to hinder or delay, based on the close relationship between the debtor and transferee, the lack of any consideration for the transfer, and debtor's retention of control of the property); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 410 (Bankr. S.D.N.Y. 2007) (debtor's financial condition at time, parties' concealment of details of transaction, close relationship between parties, and continued control over proceeds of stock by debtor's principal were all badges of fraud supporting an inference of fraud and finding of actual fraud under D.C.L. § 276); *Hassett v. Goetzmann*, 10 F. Supp. 2d 181, 186 (N.D.N.Y. 1998) (finding actual fraud under D.C.L. § 276 by both the judgment debtor and his son, where the judgment debtor's son opened a bank account in his own name into which the judgment debtor transferred $400,000 when the son was twenty-five years old, the son claimed that he never inquired

why his father wanted to open an account, only admitted to vaguely knowing about his father's creditors and admitted to allowing the judgment debtor to issue checks on the account, and statements were received at an address "where they were apparently picked up by the Judgment Debtor").

**B.     The Subject Transfers Were Conveyances Made <u>With Fraudulent Intent as Implied by Law</u>**

Moreover, and in the alternative, the Subject Transfers are subject to avoidance and execution as constructive fraudulent conveyances because they were made by M. Mirvis, without receiving fair consideration therefor, while he was a defendant in this action, and because a final judgment has now been docketed against him. *See* D.C.L. § 272; 273–a; 278.

**1.     M. Mirvis and Lupolover Were Defendants When the Subject Transfers Were Made, and the Judgment Remains Unsatisfied**

It is beyond dispute that on the date of each of the Transfers to his daughter, T. Mirvis, M. Mirvis was a defendant in this action for money damages, and that at the time of the Subject Transfers, he had defaulted. *See* ECF Nos. 1; 79. Plaintiffs also have an unsatisfied Judgment for which M. Mirvis is jointly and severally liable. *See* ECF No. 303.

**2.     M. Mirvis and Lupolover Did Not Receive "Fair Consideration"**

Once again, because the Subject Transfers were almost all made among family members, and because they are unsupported by any tangible consideration, such conveyances are presumptively fraudulent, and the transferee bears the burden of rebutting that presumption. *See McCombs*, 30 F.3d at 325; *Domino Media*, 9 F. Supp. 2d at 387 (S.D.N.Y. 1998); *Gasser*, 353 F. Supp. 2d 342 at 354. Accordingly, the burden of proving fair consideration as defined in D.C.L. § 272 (*i.e.* adequate consideration and good faith)[21] falls to T. Mirvis, who has failed to do so despite being given multiple opportunities, including her deposition testimony and responses in post-judgment discovery, and even in

---

[21] Fair consideration is "not only a matter of whether the amount given for the transferred property was a 'fair equivalent' or 'not disproportionately small,' . . . but whether the transaction is made 'in good faith.'", a requirement which is "imposed on both the transferor and the transferee." *Priestley v. Panmedix Inc.*, 18 F. Supp. 3d 486, 498 (S.D.N.Y. 2014) (quoting *Sardis v. Frankel*, 113 A.D.3d 135, 141 (1st Dep't 2014)).

the context of two applications by Plaintiffs for injunctive relief as to the Subject Accounts and property of M. Mirvis otherwise in her possession.

On the subject of fair consideration, T. Mirvis' various attempts to address this critical issue have not only failed to adduce any consistent, credible evidence demonstrating any consideration paid for the Subject Transfers whatsoever, but have also evinced her conspicuous lack of knowledge and/or candor concerning the Subject Accounts, suggesting that she accepted the Subject Transfers in bad faith. T. Mirvis has failed to provide any reasonable explanation for the Subject Transfers, but admitted that the Subject Accounts were opened in her name for use by her father, M. Mirvis, to divert funds that he could no longer deposit in accounts bearing his own name. ECF No. 430-3, at 119:24-122:24; ECF No. 459-1, at ¶¶ 4-5. In this regard, T. Mirvis transparently claimed that $39,000 deposited into her accounts as part of the Unit 2307 Proceeds was related to a loan she had made to Lupolover. ECF No. 430-3, at 338:12-340:17. Tellingly, T. Mirvis, who was 25 years old at the time with no significant income, could not recall the date the loan was made, the specific amount (other than that it was "around $39,000"), what the loan was for, its terms, or whether she charged interest. *Id.* at 338:22-339:8, 340:16-17, 342:14-25.

In addition, neither M. Mirvis nor T. Mirvis has even attempted to challenge the conclusions of forensic handwriting expert Mr. Smerick, whose unrebutted testimony demonstrates that M. Mirvis indeed used the Subject Accounts himself. On the contrary, other evidence, including testimony and submissions by T. Mirvis, only further supports the inference that M. Mirvis has been writing checks and making deposits on the Subject Accounts as though they are his own. Accordingly, the Subject Transfers were unsupported by fair consideration and made by a defendant against whom an unsatisfied final judgment has been docketed, *see* ECF No. 303, and thus were fraudulent conveyances under D.C.L. Section 273–a.

C.      **Appropriate Remedies for the Fraudulent Subject Transfers**

Because the Restrained Funds of $175,600.63 held in the Subject Accounts in the name of T. Mirvis are entirely the product of fraudulent conveyances under New York law, whether based upon actual intent to defraud, *see* D.C.L. § 276, or upon fraudulent intent implied by law, *see* D.C.L. § 273–a, the Court is authorized to set aside those transfers or execute upon the property so transferred. *See* D.C.L. § 278(1);

*Techno-Comp*, 2015 WL 5244406, at *9-10.  Accordingly, Plaintiffs respectfully submit that the Restrained Funds of $175,600.63 should be turned over.  *See Leser*, 2013 WL 3788877, at *8.  Moreover, because the Restrained Funds are $52,801.75 less than the Subject Transfers, Plaintiffs also respectfully submit that the Court should enter a judgment against T. Mirvis for such diverted or dissipated funds.  *See Howland v. Resteiner*, No. 07 CV 2332 ILG/SMG, 2008 WL 1740531, at *5 (E.D.N.Y. Apr. 10, 2008) ("[W]here the assets fraudulently transferred no longer exist or are no longer in possession of the transferee, a money judgment may be entered in an amount up to the value of the fraudulently transferred assets." (quoting *Neshewat v. Salem*, 365 F. Supp. 2d 508, 521–22 (S.D.N.Y. 2005))); *Universitas*, 2014 WL 3883371, at *11; *Conte*, 204 A.D.2d at 846; *see also Integrity Elecs., Inc. v. Garden State Distrib., Inc.*, No. 14 CIV. 3197 BMC, 2016 WL 3637004, at *11, n. 8 (E.D.N.Y. June 30, 2016) ("When a transfer is fraudulent under DCL, the creditor may obtain judgment against any transferee to whom his debtor has transferred the property up to the value of the property.") (citations omitted).

Furthermore, Plaintiffs respectfully submit that an award of prejudgment interest is appropriate, running from the respective date of each transfer.  Under New York law, courts have repeatedly awarded prejudgment interest under § 5001 from the date of the fraudulent conveyance under D.C.L. § 276. *See id.* at *6 ("appropriate date" for calculating interest "would be the date of the fraudulent conveyance"); *In re Cassandra Grp.*, 338 B.R. 583, 599-600 (Bankr. S.D.N.Y. 2006) (prejudgment interest from date of fraudulent conveyance); *Mogil v. Bldg. Essentials, Inc.*, 12 N.Y.S. 3d 346, 348 (3rd Dep't 2015) (affirming award of damages and interest from dates of fraudulent conveyances); *but see Integrity*, 2016 WL 3637004, at *14 (calculating award of prejudgment interest "based on a single, reasonable intermediate date" of multiple fraudulent conveyances).[22]  "Where interest is appropriate, '[C.P.L.R.] § 5001(a) dictates that

---

[22] The method of calculating appropriate prejudgment interest is entrusted to the Court's discretion, and the "reasonable intermediate date" formulation is often chosen for simplicity.  *See Fannie Mae*, 792 F. Supp. 2d 645 at 653–54 (E.D.N.Y. 2011) (Section 5001(b) "leaves to the discretion of the court the choice of whether to calculate prejudgment interest based upon the date when damages were incurred or 'a single reasonable intermediate date,' which can be used to simplify the calculation." (quoting *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 91 (2d Cir. 1998), *modified by Baron v. Port Auth. of N.Y. & N.J.*, 271 F.3d 81 (2d Cir. 2001))).  Calculating interest from the average date of all of the Subject Transfers (May 4, 2013) would not materially alter the calculation.  Marvin Decl. ¶¶ 7-8.

interest is to be computed from the earliest ascertainable date' that the cause of action existed.'" *Howland*, 2008 WL 1740531, at *6 (quoting *Kirton v. Nw. Mut. Life Ins. Co.*, 2006 WL 3051772, at *7 (E.D.N.Y. Oct. 24, 2006)).  Indeed, where a conveyance is deemed constructively fraudulent under D.C.L. ¶§ 273–a, courts have found that interest is appropriate from the date that the judgment was entered.  *See Lyman Commerce Sols., Inc. v. Lung*, 12 CIV. 4398 TPG, 2015 WL 4545089, at *4 (S.D.N.Y. July 16, 2015) (plaintiff entitled to prejudgment interest under New York law from the date that the underlying judgment was entered), *appeal withdrawn* (Oct. 27, 2015).  Based upon the foregoing, Plaintiffs respectfully submit that the Court should award prejudgment interest from the date that each of the Subject Transfers occurred or a reasonable intermediate date (in the event that it finds that the Subject Transfers were actually fraudulent under D.C.L. § 276), or from the date of the judgment, in the event that the Court finds that the Subject Transfers were fraudulent under D.C.L. § 273–a.  In this Circuit, courts routinely hold that, where judgment creditors are hindered by fraudulent conveyances, they may also be awarded "pre-judgment interest of nine percent (9%) per annum pursuant to CPLR § 5004."  *Integrity Elecs., Inc. v. Garden State Distributors, Inc.*, No. 14 CIV. 3197 BMC, 2016 WL 3637004, at *11 (E.D.N.Y. June 30, 2016) (citing *In re All Am. Petroleum Corp.*, 259 B.R. 6, 21 (Bankr. E.D.N.Y. 2001)).

Finally, because there is every indication that M. Mirvis' fraudulent intent for the Subject Transfers was shared by his daughter, T. Mirvis, Plaintiffs respectfully request an award of reasonable attorneys' fees.  *See* D.C.L. § 276–a (authorizing "reasonable attorney's fees" where suspect transfer "is found to have been made by the debtor and received by the transferee with actual intent" to defraud creditors); *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 124 (E.D.N.Y. 2012) (inviting briefing on amount of reasonable attorney's fees following determination of conveyances with actual fraudulent intent).  Here, the admission by T. Mirvis that she knew that her father's legal situation and pursuit by creditors caused him to have limited access to bank accounts, coupled with her admitted assent to her father's use of the Subject Accounts in her name and her entirely unsubstantiated testimony regarding a purported "loan" to Lupolover in an attempt to justify the illegal transfer of the Unit 2307 Proceeds, is compelling evidence of T. Mirvis' intent to hinder, delay, or defraud her father's creditors.  ECF No. 430-

3, at 338:12-340:17, 342:14-25. *See Hassett*, 10 F. Supp. 2d 181, 191 (N.D.N.Y. 1998) (finding transferees acted with actual intent to delay, hinder, or defraud, the judgment debtor's creditors, thus, entitling trustee to attorneys' fees from transferees, where transferees offered vague and conflicting testimony, and explaining that it "simply defie[d] logic that an individual such as [one of the transferees] who holds a bachelor's degree in business administration and works as a money manager c[ould] steadfastly maintain that he had no conceivable idea why his father set up an account in his name and transferred nearly $400,000 into that account[,]" and finding it transferee's claims "[e]qually unbelievable … that despite reading the news accounts of [the judgment debtor's] financial difficulties, they did not 'mean much' to him, that he did not fully comprehend their significance, and that he did not believe they were connected to his father's transfer to him of approximately $400,000). Accordingly, in addition to the turnover of funds in the Subject Accounts, the money judgment against T. Mirvis resulting from the fraudulent Subject Transfers should include an award of prejudgment interest and attorneys' fees.[23]

## II.      THE SUBJECT ACCOUNTS ARE PROPERTY OF M. MIRVIS

Even if the Court finds that the Subject Transfers were not fraudulent conveyances under New York law, the evidence set forth herein more than sufficiently demonstrates that the Subject Accounts (and the Restrained Funds they contain) are themselves property of M. Mirvis, despite T. Mirvis' nominal status as their token accountholder.  Although New York law presumes that the named accountholder is the owner of the account, "this presumption may be rebutted by evidence that the [judgment debtor] actually controlled the disputed funds, or that [garnishee] merely held the funds" on its behalf.  *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) (collecting cases); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014) ("The presumption of ownership may be rebutted by evidence that another person actually owns the property, either by showing that he effectively exercises control over the property or that the ostensible

---

[23]   With regard to the branches of this Motion requesting prejudgment interest and reasonable attorney's fees, Plaintiffs shall submit supplemental briefing on the proper amount of prejudgment interest and/or attorney's fees should the Court so direct.

owner holds the property for his benefit."); *City of New York v. Venkataram*, 06 CIV. 6578 NRB, 2011 WL 2899092, at *5 n.6 (S.D.N.Y. July 13, 2011) ("The presumption of ownership "may be rebutted by evidence" that someone else actually controls or owns the funds."); *Pollock v. Rapid Indus. Plastics Co.*, 113 A.D.2d 520, 525, 497 N.Y.S.2d 45, 49 (2d Dep't 1985) (noting that "possession of tangible property . . . creates a rebuttable presumption of ownership").[24]

In the present case, there is overwhelming evidence that the Subject Accounts belong to M. Mirvis rather than his daughter, T. Mirvis.  Mirvis' fraudulent conveyances to the Subject Accounts, the circumstances of their creation and use as set forth above, T. Mirvis' lack of consistent or credible knowledge of them, and M. Mirvis' handwriting on a significant number of the checks and deposit slips written thereon, all demonstrate that the Subject Accounts belong to M. Mirvis rather than T. Mirvis.  *See Wacikowski v. Wacikowski*, 93 A.D.2d 885 (2d Dep't 1983) ("Plaintiff, a party seeking to establish claim of ownership to funds in joint bank account, satisfied her burden of rebutting presumption of joint tenancy with her son, where she asserted that all money in account had been solely her own, that she had always had exclusive possession of account passbook and that son had never made any deposits to or withdrawals from the account."); *Kolodziejczyk v. Wing*, 261 A.D.2d 927, 928 (4th Dep't 1999) (presumption of joint tenancy of account with two accountholders rebutted by "testimony of petitioner and his mother, [which] established that all of the money in the account belonged to petitioner's mother, that she opened the account herself for her own use, [] that she intended to confer upon her son only the right of survivorship but not a present beneficial interest in the funds, [and that b]y the time the hearing was held, petitioner's mother had closed that account and opened another account in her name alone"); *see also Karaha Bodas*, 313 F.3d at 86 (presumption of ownership rebutted by evidence that non-debtor held funds in the manner of agent or trustee for debtor, whether under New York or Indonesian law).  As such, Plaintiffs are entitled to an order,

---

[24] *See also Bingham v. Zolt*, 647 N.Y.S.2d 220 (1st Dep't 1996) (in the context of one post-judgment remedy supplied by Article 52 of the C.P.L.R., namely the restraining notice of Section 5222, a judgment debtor "has an interest in another's bank account where the evidence shows that he regularly used another's bank account as a 'recipient' of debtor's personal assets or as source for payment of debtor's expenses.").

pursuant to Section 5225(b) of the C.P.L.R., turning over the entirety of the Restrained Funds as property of M. Mirvis.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deem the Subject Transfers to be fraudulent conveyances under D.C.L. § 276, or alternatively under § 273–a, and order garnishees HSBC, TD Bank, and Capital One to turn over the Restrained Funds in the Subject Accounts, and enter a judgment for any shortfall against T. Mirvis, including prejudgmnt interest at a rate of nine percent per annum and, to the extent of any fraudulent conveyances determined to be made with actual fraudulent intent, an award of attorneys' fees.  Furthermore, Plaintiffs respectfully request that the Court enter a judgment against T. Mirvis to the extent of the difference between the value of the Restrained Funds and the Subject Transfers determined to be fraudulent conveyances, plus any award of prejudgment interest or attorney's fees.  Finally, in the event that the Court declines to find that any of the Subject Transfers were fraudulent conveyances, Plaintiffs respectfully submit that the Subject Accounts are property of M. Mirvis, and that garnishees HSBC, TD Bank, and Capital One should nonetheless turn over the Restrained Funds pursuant to C.P.L.R. § 5225.

Dated:  November 17, 2017
New York, New York

Respectfully submitted,

**MORRISON MAHONEY LLP**

By:_____/s/ Daniel S. Marvin_____
Robert A. Stern, Esq.
Daniel S. Marvin, Esq.
Andrew S. Midgett, Esq.
120 Broadway, Suite 1010
New York, New York 10271
Phone:  212-825-1212
Fax:      212-825-1313

**CADWALADER, WICKERSHAM & TAFT LLP**

By:_____/s/ William Natbony_____
William J. Natbony, Esq.
One World Financial Center
New York, New York 10281
Phone:  212-504-6531

*Attorneys for Plaintiffs-Judgment Creditors Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company, and Allstate Fire & Casualty Insurance Company*

34