UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ALLSTATE INSURANCE COMPANY, et al.,  :
                                         :
                      Plaintiffs,         :
                                           :
               -against-            :
                                         :
MARK MIRVIS, et al.,                :
                                         :
                      Defendants.     :
------------------------------------------------------------ x

|  |  |
|---|---|
|  | **REPORT AND RECOMMENDATION** |
|  | 08-CV-4405 (PKC)(PK) |

**Peggy Kuo, United States Magistrate Judge:**

      On March 31, 2015, Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Deerbrook Insurance Company, Allstate New Jersey Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Plaintiffs") obtained a default judgment against several defendants including Mark Mirvis ("Mirvis") and Mark Lupolover ("Lupolover," collectively with Mirvis, "Judgment Debtors") in the amount of $45,657,401.01, for which these defendants are jointly and severally liable ("Judgment").  (Mar. 31, 2015 Mem. & Order, Dkt. 297; *see also* Entry of Default J., Dkt. 298.)  On November 17, 2017, in connection to this Judgment, Plaintiffs filed a Motion for Turnover of the Property of Judgment Debtors ("Motion") currently in possession of Tatyana Mirvis ("Tatyana"), Lyubov Mirvis ("Lyubov"), and Alexander Boriskin ("Boriskin," collectively "Non-Parties").  (Dkt. 533.)

      The Honorable Pamela K. Chen has referred the Motion to the undersigned for a report and recommendation.  (*See* Mar. 2, 2018 Order.)  For the reasons stated herein, the undersigned respectfully recommends that the Motion be granted.

## PROCEDURAL BACKGROUND

      Plaintiffs brought this action on October 30, 2008, pursuant to the United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c)-(d), 1964(c), and

New York common law.  (Compl., Dkt. 1.)  Defendants Mirvis and Lupolover were personally

served with the summons and Complaint on January 3, 2009 and January 5, 2009, respectively.

(Dkts. 47-48; *see also* Mar. 2, 2015 R. & R. at 2-3, Dkt. 293.)  They failed to answer or otherwise

respond to the Complaint.  Certificates of default were requested (Dkts. 56, 58), and entered on

February 2, 2009, (Dkts. 79, 81).  Although the Clerk's entry of default was not served on Mirvis or

Lupolover, Plaintiffs' request for certificates of default were personally served on both Judgment

Debtors.  (*See* Request for Mirvis's Certificate of Default at 7, Dkt. 56; Request for Lupolover's

Certificate of Default at 7, Dkt. 58.)  Plaintiffs' Motion for Default Judgment and related papers

were filed and served upon Mirvis and Lupolover on February 22, 2013.  (Dkt. 265.)  Over

Lupolover's objection, District Judge Sandra L. Townes adopted Magistrate Judge Viktor V.

Pohorelsky's Report and Recommendation in its entirety on March 31, 2015.  (Dkt. 297.)  Mirvis did

not file an objection.  On May 5, 2015, default judgment was entered in the amount of

$45,657,401.01, for which several defendants, including the Judgment Debtors, are jointly and

severally liable.  (Dkt. 303.)  Neither Mirvis nor Lupolover appealed the Judgment to the Second

Circuit.

On April 4, 2016, almost a year after the entry of default judgment, Plaintiffs filed a motion,

pursuant to Federal Rule of Civil Procedure 69(a), Section 5225(b) of the N.Y. Civ. Prac. Law and

Rules ("C.P.L.R."), and Sections 272-a and 276 of the N.Y. Debt. & Cred. Law ("D.C.L."), to void

as fraudulent a transfer of real property located at 289 Bayberry Drive North, Hewlett Harbor, New

York 11557 ("289 Bayberry") from Mirvis and his wife, Lyubov, to their daughter, Tatyana ("289

Bayberry Motion").  (*See* Dkt. 335.)

Plaintiffs also filed a motion for temporary restraining order on July 8, 2016, which was

granted pending a motion for preliminary injunction, to restrain funds in two accounts at HSBC

Bank USA, N.A. ("HSBC") in the name of Tatyana Mirvis and ending in -3710 and -9713 ("HSBC

Accounts"), two accounts at TD Bank, N.A. ("TD") in the name of Tatyana Mirvis and Lyubov

Mirvis, and Tatyana Mirvis and her husband, Alexander Boriskin, ending in -0319 and -8848,

respectively ("TD Accounts"). (*See* Dkt. 386.) After a hearing, the Court granted the motion for

preliminary injunction to enjoin the funds in the HSBC Accounts and TD Accounts until a final

determination on this Motion. (*See* Dec. 2, 2016 Min. Order, Dkt. 454; Dec. 8, 2016 Prelim. Inj.

Order, Dkt. 456.)

On March 2, 2017, Plaintiffs filed another motion for temporary restraining order, which

was granted pending their motion for preliminary injunction, to restrain funds in two accounts at

Capital One, N.A. ("Capital One") in the name of Tatyana Mirvis and ending in -5283 and -9992

("Capital One Accounts" and collectively with HSBC Accounts and TD Accounts, "Subject

Accounts"). (Dkts. 481-82, 486.) This motion also requested that Tatyana be restrained from

transferring "any property in which [Mirvis] is known or believed to have an interest then in and

thereafter coming into [Tatyana's] possession or custody," and specifically her interest in 289

Bayberry, pending resolution of the 289 Bayberry Motion. (Mot. for TRO at 1-2, Dkt. 481.) After a

hearing, the Court granted the motion for preliminary injunction to enjoin the funds in the Capital

One Accounts until a final determination on this Motion, and Tatyana from dissipating her interest

in any property, including 289 Bayberry. (*See* Mar. 22, 2017 Min. Order; Mar. 28, 2017 Prelim. Inj.

Order, Dkt. 497.) The funds restrained in these six Subject Accounts amount to $175,600.63

("Restrained Funds").

On July 31, 2017, the undersigned recommended a finding that the 289 Bayberry transfer

was fraudulent and that Mirvis's interest in 289 Bayberry be levied toward satisfaction of the

Judgment. (Dkt. 506.) The Court adopted this Report and Recommendation in its entirety and

issued a writ of execution. (Dkts. 511-12.)

On October 2, 2017, Plaintiffs filed an *ex parte* motion, pursuant to C.P.L.R. §§ 5222(c),

3

5240, to restrain Central Pharmacy Boston, Inc. ("Central Pharmacy"), Century Pharmacy, Inc.

("Century Pharmacy" and, together with Central Pharmacy, "Pharmacies"), and their president and

CEO Liliya Bespalko ("Bespalko") from transferring any property in which Mirvis is known or

believed to have an interest, including any transfers to Tatyana. (*See* Dkts. 516, 522.)  The Court

granted this motion on October 23, 2017. (Dkt. 524.)  On October 31, 2017, Tatyana filed a motion

to amend the October 23, 2017 Order and requested a hearing, which was granted. (Dkt. 526; Nov.

21, 2017 Order.)

     Plaintiffs filed this Motion on November 17, 2017, pursuant to Federal Rule of Civil

Procedure 69, C.P.L.R. § 5225(b), and D.C.L. §§ 273-a, 276 and 278 (Dkts. 533-35).  Plaintiffs seek a

Turnover Order directing the garnishee banks HSBC, TD, and Capital One to turnover the

Restrained Funds, and a judgment against Tatyana for the difference between the Subject Transfers

and Restrained Funds. (Pls.' Mem. at 1, Dkt. 533-1.)  Plaintiffs present two alternative theories

under which they may be entitled to this Turnover Order:  (1) the Subject Transfers were fraudulent

conveyances, or (2) Mirvis actually controlled all Subject Accounts. (*See id.* at 24-33; Mar. 6, 2018

Transcript ("Tr.") at 29:21-30:4.)  The Non-Parties filed a response on January 10, 2018 (Dkt. 542),

and Plaintiffs filed a reply on February 29, 2018 (Dkt. 548).  A motion hearing was held on March 6,

2018. (Mar. 6, 2018 Min. Order.)  At the hearing, the parties were also heard on Tatyana's October

31, 2017 motion, which was denied. (*Id.*)

## FACTUAL BACKGROUND

     The following facts are not in dispute, although the parties disagree about how these facts

should be interpreted in light of the overall circumstances of this case.

     On November 6, 2009, roughly ten months after Mirvis was served with the Complaint and

nine months after he was served with Plaintiffs' request for an entry of default, Tatyana opened the

Capital One checking account ending in -5283. (*See* Pls.' Mem. at 16; Mar. 2, 2017 Marvin Decl.

("Marvin Decl. 1") Ex. I, Dkt. 481-11.)  Approximately two months later, on January 19, 2010, Tatyana opened three more of the Subject Accounts, including the Capital One Account ending in -9992, which designated "ITF (In Trust For)" Mirvis.  (*See* Pls.'s Mem. at 16; Marvin Decl. 1 Ex. H, Dkt. 481-10.)  With the exception of an opening deposit of $317.77, the Capital One Account ending in -5283 has been exclusively funded by transfers from the Capital One Account ending in -9992; and used to make only seven payments since it was opened.  (*See* Marvin Decl. 1 Ex. I.)  The Capital One Account ending in -9992 was funded with checks from various sources including the Pharmacies.  (*See* Marvin Decl. 1 Ex. G, Dkt. 481-9.)

Also on January 19, 2010, Tatyana opened the two HSBC Accounts.  (*See* Pls.' Mem. at 9 n. 7; July 5, 2016 Marvin Decl. ("Marvin Decl. 2") Ex. 20, Dkt. 386-21.)  The HSBC Accounts and Capital One Account ending in -9992 were all opened with proceeds from the sale of Mirvis and Lyubov's condo located at 100 Oceana Drive West, Unit 5D ("100 Oceana") on January 15, 2010, which totaled $690,000.  (Pls.' Mem. at 5, 9-10.)  Specifically, a sum of $258,129.75 was directly deposited into the HSBC Accounts, and a sum of $46,675 was deposited into the Capital One Account ending in -9992 ("100 Oceana Transfer").  (*Id.* at 6-7.)

On November 3, 2010, Mirvis and Lupolover sold a condo located at 19333 Collins Avenue, Sunny Isles, Florida ("Unit 2307") for $71,613.71, which was deposited into Lupolover's account on November 12, 2010.  (*See id.* at 5; Marvin Decl. 2 ¶ 51, Dkt. 386-1.)  On November 26, 2010, Lupolover transferred $39,000 to his son, Michael Lupolover.  (*See* Marvin Decl. 2 ¶ 51; Marvin Decl. 2 Ex. 18, Dkt. 386-19.)  On December 1, 2010, the same amount was transferred to Tatyana by Michael Lupolover, and deposited into one of the HSBC Accounts.  (*See id.*)  Michael Lupolover's check to Tatyana describes this transfer as "Loan Return" ("Lupolover Transfer").  (Marvin Decl. 2 Ex. 18 at 4.)

On December 17, 2012, a check from Mirvis and Lyubov to Tatyana in the amount of

$30,000 was deposited into one of the HSBC Accounts. (Marvin Decl. 2 ¶ 55; Marvin Decl. 2 Ex. 22 at 1, Dkt. 386-23.) On May 15, 2013, another check from Mirvis to Tatyana in the amount of $7,000 was deposited into one of the HSBC Accounts. (Marvin Decl. 2 ¶ 55; Marvin Decl. 1 Ex. 22 at 2.) The source of these funds was Mirvis's Metlife pension check, which was deposited into Mirvis and Lyubov's joint account one week prior to the $30,000 transfer. (*See* Tatyana Mirvis Aff. ¶ 35 n.4, Dkt. 542-1; Pls.' Mem. at 9; Dkt. 481-13.) Plaintiffs refer to these two instances of cash transfers totaling $37,000 ("Cash Transfers"), as well as the Lupolover Transfer and the 100 Oceana Transfer, as "Subject Transfers." [1]

On July 15, 2013, approximately five months after the Judgment Debtors were served with Plaintiffs' Motion for Default Judgment, the TD Account ending in -0319 was opened. (Nov. 17, 2017 Marvin Decl. ("Marvin Decl. 3") Ex. A, Dkt. 533-3.) This account is jointly held by Lyubov and Tatyana. (*See id.*) On August 12, 2013, Lyubov sold her property located at 2407 SW 52nd Street, Cape Coral, Florida 33914 ("2407 SW"). (*See* Marvin Decl. 3 Ex. H, Dkt. 533-10.) The notarized deed transferring Lyubov's interest in 2407 SW to Lawrence and Joyce Bennett was signed by a witness, Albert Feinstein. (*See id.*) On August 19, 2013, Albert Feinstein deposited $68,145.45 into the TD account ending in -0319. (Marvin Decl. 3 Ex. A at 5.)

On July 7, 2014, A.T. United Corp. ("A.T. United") was incorporated with an address at 1208 Broadway, Hewlett, New York 11557. (*See* Marvin Decl. 3 Ex. K, Dkt. 533-13.) Two weeks later, on July 21, 2014, Tatyana and Boriskin opened the TD Account ending in -8848. (*See* Marvin Decl. 3 Ex. B at 2, Dkt. 533-4.) Between December 19, 2014 and May 6, 2015, A.T. United wrote five checks, totaling $46,644, to Boriskin. (*See* Marvin Decl. 3 Ex. K at 3, 5-6, 8, 11.) All of these checks were deposited into the TD Account ending in -8848. (*See id.*)

---

[1] The Subject Transfers include 50% of the 100 Oceana Transfer to reflect only Mirvis's interest in the property.

## DISCUSSION

### A.  Legal Procedures and Standards

Execution of a judgment is governed by Federal Rule of Civil Procedure 69(a), which

provides, in part:

> The procedure on execution—and in proceedings supplementary to
> and in aid of judgment or execution—must accord with the procedure
> of the state where the court is located, but a federal statute governs to
> the extent it applies.

Here, no federal statute is applicable.  The relevant state law procedure that Plaintiffs invoke is

C.P.L.R. § 5225.  While Section 5225(a) targets property "in possession or custody" of the judgment

debtor and is directed at the judgment debtor himself, Section 5225(b) provides for a procedure

reaching a property "not in the possession of a judgment debtor" and is directed at the garnishee or

the transferee of the property.  N.Y. C.P.L.R. §§ 5225(a)-(b).

Section 5225(b) enables a judgment creditor to initiate a special proceeding to "set aside a

transfer made by a judgment debtor to defraud his creditors."  *Leser v. U.S. Bank Nat'l. Ass'n*, No.

09-CV-2362 (KAM), 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013) (internal quotation marks

and citation omitted).  It also "furnishes a mechanism for obtaining a money judgment against the

recipient of a fraudulent conveyance who has, in the interim, spent or dissipated the property

conveyed."  *Id.*  (internal quotation marks and citations omitted).  Although the rule refers to

"special proceedings," "[n]early every court in [the Second] Circuit to consider the issue has held

that parties can bring a motion under [Rule] 69(a), rather than instituting a special proceeding under

the New York state law."  *N. Mar. I. v. Millard*, 845 F. Supp. 2d 579, 581 (S.D.N.Y. 2012) (internal

footnote omitted); *see also Mitchell v. Lyons Prof'l Servs., Inc.*, 727 F. Supp. 2d 120, 122-25 (E.D.N.Y.

2010); *S.E.C. v. Vuono*, No. 13-MC-405 (JFB), 2013 WL 6837568, at *3 (E.D.N.Y. Dec. 26, 2013.

Thus, no special proceeding is necessary, and Plaintiffs may proceed with the instant Motion.

Section 5225(b) permits notice to "be served upon the judgment debtor . . . by registered or

certified mail, return receipt requested." N.Y. C.P.L.R. § 5225(b). Notice of the Motion was not mailed to the Judgment Debtors. However, Plaintiffs argue that Judgement Debtors were represented by counsel when the Motion was filed via ECF, and thus received notice of this Motion through their counsel. (Pls.' Aug. 15, 2018 Letter at 2-3, Dkt. 575.) The undersigned finds that the Judgment Debtors had actual notice of the Motion, and deems any challenge to improper service waived.

In order to prevail under Section 5225, a judgment creditor must also show that "the judgment debtor 'has an interest' in the property the creditor seeks to reach," and then either that the judgment debtor is "'entitled to the possession of such property,' *or . . .* that 'the judgment creditor's rights to the property are superior' to those of the party in whose possession it is." *Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 840 (2d Cir. 1991) (quoting § 5225(b)) (emphasis in original). For a judgment debtor to be "entitled to the possession" of certain funds, the debtor "must be able to retrieve the disputed assets back from" the third party currently in possession of them. *Dussault v. Republic of Arg.*, 616 F. App'x 26 (2d Cir. 2015) (internal quotation marks and citations omitted). "[S]uperior rights in property have been assessed by the New York courts based on legal interests in the property, as for example where the fraudulent conveyance provisions of the New York Debtor and Creditor Law apply." *Dussault*, 616 F. App'x at 28 (internal quotation marks omitted) (quoting *Gelbard v. Esses*, 465 N.Y.S.2d 264, 268 (N.Y. App. Div. 1983)); *see also Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 82 (2d Cir. 2017) (collecting cases that describe Section 5225 turnover proceedings as mechanisms for voiding fraudulent transfers). "Only after both steps of the analysis are demonstrated," may the court enter a Turnover Order. *Beauvais,* 942 F.2d at 840-41 (citation omitted).

In a turnover proceeding under Section 5225, "a court is authorized to make a summary determination upon the pleadings, papers and admissions to the extent that no triable issues of fact

8

are raised." *Centerpointe Corp. Park P'ship 350 v. MONY*, 946 N.Y.S.2d 354, 355 (N.Y. App. Div. 2012) (internal quotation marks and citations omitted).  The court applies summary judgment analysis in such a proceeding.  *Id.* (internal quotation marks and citation committed); *see also Dorchester Fin. Sec. v. Banco BRJ, S.A.,* No. 02-CV-7504 (KMW) (KNF), 2009 WL 5033954, at *3 (S.D.N.Y. Dec. 23, 2009).  "[A] party cannot create a triable issue of fact . . . by renouncing deposition testimony to the effect that he could not remember a particular fact which he now purports to remember," or by "submitting an affidavit contradicting his own prior testimony." *Tube City IMS, LLC v. Anza Capital Partners*, No. 14-CV-1783 (PAE), 2016 WL 5864887, at *3 (S.D.N.Y. Oct. 6, 2016) (internal quotation marks and citations omitted).

**B.  Turnover of Property as Fraudulent Conveyance**

Plaintiffs seek a Turnover Order to set aside and subject to execution fraudulent conveyances made with actual intent to defraud under D.C.L. § 276 or, alternatively, made with fraudulent intent implied by law under D.C.L. § 273-a.

**1.  *Conveyance made with Actual Intent to Defraud***

Section 276 of the D.C.L. provides that:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

N.Y. Debt. & Cred. Law § 276.  A debtor's "actual intent," under Section 276 is "rarely susceptible to direct proof." *Salomon v. Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) (internal citation omitted).  Instead, a plaintiff may "rely on 'badges of fraud' to establish an inference of fraudulent intent." *Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, No. 04-CV-4971 (NG) (MDG), 2013 WL 417352, at *11 (E.D.N.Y. Jan. 29, 2013) (internal quotation marks and citation omitted).   These "badges of fraud" include:

> (1) a close relationship between the parties to the transaction, (2) a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the

> creditor's claim and his or her inability to pay it, (5) the use of
> dummies or fictitious parties, and (6) retention of control of the
> property by the transferor after the conveyance.

*Id.* (internal citations omitted). "[T]he financial condition of the party . . . both before and after the

transaction in question," "the existence or cumulative effect of a pattern or series of transaction or

course of conduct after the incurring of debt," or "the general chronology of the events and

transactions under inquiry" may also be an indicator of fraud. *Salomon,* 722 F.2d at 1583; *see also*

*Ostashko v. Ostashko*, No. 00-CV-7162 (ARR), 2002 WL 32068357, at *18 (E.D.N.Y. Dec. 12,

2002), *aff'd sub nom. Ostashko v. Zuritta-Teks, Ltd.*, 79 F. App'x 492 (2d Cir. 2003). While the presence

or absence of any particular badges of fraud is not determinative in finding fraudulent intent, "the

presence of multiple indicia will increase the strength of the inference," *MFS/Sun Life Tr.-High Yield*

*Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995). "[T]ransfers among

family members raise special concerns, and receive different scrutiny." *Perrone v. Amato*, No. 09-CV-

316 (AKT), 2017 WL 2881136, at *28 (E.D.N.Y. July 5, 2017).

　　　If actual intent is proven, the court may set aside conveyance "regardless of the adequacy of

consideration given." *In re Sharp Int'l Corp.,* 403 F.3d 43, 56 (2d Cir. 2005) (internal quotation marks

and citation omitted). The burden of proving "actual intent" on the part of the transferor by clear

and convincing evidence is on the party seeking to set aside the conveyance. *See id.* (internal citation

omitted).

### 2.   *Fraudulent Intent Implied by Law*

　　　Section 273-a provides:

> Every conveyance made without fair consideration when the person
> making it is a defendant in an action for money damages or a
> judgment in such an action has been docketed against him, is
> fraudulent as to the plaintiff in that action without regard to the actual
> intent of the defendant if, after final judgment for the plaintiff, the
> defendant fails to satisfy the judgment.

N.Y. Debt. & Cred. Law § 273-a. Thus, to prevail on a claim under Section 273-a, "a plaintiff must

10

establish (1) that the conveyance was made without fair consideration; (2) that the conveyor is a defendant in an action for money damages or that a judgment in such action has been docketed against him; and (3) that the defendant has failed to satisfy the judgment." *Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d 636, 641 (2d Cir. 2016) (citation omitted). Proving the conveyor's intent is not a necessary element. *See Ostashko*, 2002 WL 32068357, at *21 ("None of [the NYDCL sections regarding constructive fraud] requires the plaintiff to show that the defendant acted with actual intent."); *United States v. Alfano*, 34 F. Supp. 2d 827, 844 (E.D.N.Y. 1999).

Whether there was fair consideration for a conveyance is a fact-specific inquiry. *In re Palermo*, No. 08-CV-7421 (RPP), 2011 WL 3874866, at *4 (S.D.N.Y. Sept. 2, 2011). Generally, "the burden of proving the lack of fair consideration [is] upon the party challenging the conveyance," *United States v. McCombs*, 30 F.3d 310, 324 (2d Cir. 1994) (citation omitted), but certain factors may shift this burden. For example, "[w]here the transaction involves family members . . . and the transaction was made *without any* tangible consideration, 'a heavier burden is placed upon the grantee to demonstrate fair consideration for the transfer.'" *Id.* (emphasis in original) (internal citations omitted).

Fair consideration is comprised of "two elements—good faith and the payment of a fair equivalent value for the property interest conveyed." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 447 (S.D.N.Y. 2014); *see also* N.Y. Debt. & Cred. Law § 272; *In re Sharp Int'l Corp.*, 403 F.3d 43, 53-54 (2d Cir. 2005). Section 272(b) defines fair value as the "amount not disproportionately small as compared with the value of the property, or obligation obtained." N.Y. Debt. & Cred. Law § 272(b). Assessing fair equivalent value requires "neither mathematical precision nor a penny-for-penny exchange. . . ." *Chen*, 8 F. Supp. 3d at 448 (citation omitted).

"Even where there is a fair exchange of value. . . , the conveyance may be set aside if good faith is lacking." *Palermo*, 2011 WL 3874866, at *4; *see also In re Sharp Int'l Corp.*, 403 F.3d at 54. Because "good faith is a somewhat elusive concept when dealing with claims of constructive fraud,"

11

*Chen*, 8 F. Supp. 3d at 448, it is more usefully defined in the negative. It "may be deemed lacking if there is no honest belief in the propriety of the activities in question, or if there is knowledge of the fact that the activities in question will hinder, delay, or defraud others." *Id.* (citation omitted); *see also Integrity Elecs.*, 2016 WL 3637004, at *8. "In short, the lack of good faith imports a failure to deal honestly, fairly and openly." *Ostashko*, 2002 WL 32068357, at *23 (citation omitted).

Some courts in the Second Circuit have required a demonstration of only the good faith of the transferee. *See, e.g., Integrity Elecs.*, 2016 WL 3637004, at *8; *Analogic Corp. v. Manuelian*, No. 12-CV-1428 (SLT) (VVP), 2014 WL 1330774, at *3 n.1. Those courts have held that "good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer." *Ostashko*, 2002 WL 32068357, at *23 (citation omitted). Others have considered the good faith of both the transferor and the transferee. *See Tube City IMS, LLC*, 2016 WL 5864887, at *4 ("The requirement of good faith is imposed on both the transferor and the transferee."); *Priestley*, 18 F. Supp. 3d at 498; *Chen*, 8 F. Supp. 3d at 447; *see also Integrity Elecs.*, 2016 WL 3637004, at *8 ("courts have considered that of both the transferor and the transferee"). At least one New York state court has concluded that the proper interpretation of New York state law is to consider both. *See Chen*, 8 F. Supp. 3d at 447 n.15.

### 3.  *Fraudulent Conveyance Analysis of Subject Transfers*

#### a.  100 Oceana Transfer

At least four badges of fraud lead to an inference of fraudulent intent in Mirvis and Lyubov's transfer of the proceeds from the sale of 100 Oceana to Tatyana: (1) it was an intrafamily transfer, which was made (2) with no consideration, and (3) with the transferor's apparent knowledge of the creditors' claims, and (4) the transferor retained control of three accounts that were opened with the proceeds from the sale of 100 Oceana.

Mirvis and the Non-Parties do not dispute that this transfer occurred between the parents

12

and daughter without any consideration.  They also do not challenge that Mirvis was properly served with the Complaint and Plaintiffs' request for an entry of default against him, or that he retained control over the funds after the conveyance.  Tatyana concedes that she deposited the checks at her parents' direction, and "[t]hese deposits were held by [her] nominally, as [they] understood that these funds were [her] parents['], to be used at their joint discretion for whatever they pleased."  (Tatyana Mirvis Aff. ¶¶ 20, 22; *see also* Tr. at 50:23-51:12, 52:22-53:24 (counsel conceding that the funds involved in the 100 Oceana Transfer were Mirvis's and used for his benefit).)

Mirvis explains that he asked Tatyana to deposit the checks because he "had eight properties in Florida that were then in foreclosure and those banks had issued subpoenas to [his] banks in New York."  (Mirvis Aff. ¶ 8, Dkt. 542-16.)  In directing Tatyana to deposit the proceeds from the 100 Oceana sale, Mirvis claims that he was trying to avoid the banks that issued subpoenas concerning his properties in Florida but "had no judgment to hide from."  (*Id.*)  However, earlier in the affidavit, Mirvis states that he was well aware of the lawsuit, but that he "ignore[d] it" and did not "take it seriously."  (Mirvis Aff. ¶ 2.)  Tatyana also affirms Mirvis's knowledge of the lawsuit by stating that her father, Mirvis, "told [her] about a judgment that had been filed against him," although she did not know specifically about Plaintiffs' claims against him.  (Tatyana Mirvis Aff. ¶ 25.)  Tatyana claims that she "was unaware of the specifics of Allstate's lawsuit and related action," but her state of mind is irrelevant in finding Mirvis's actual intent to defraud.  (*Id.* ¶ 21.)  What is pertinent is that Mirvis, despite his apparent knowledge of the Judgement against him, transferred a large sum of money to his daughter without any tangible consideration.

Mirvis argues that "had [he] deposited the Oceana Condominium transaction proceeds into a joint account with [his] wife, all of the transaction proceeds would have been expended well before the judgment was obtained and Allstate would have had no claim. . . ."  (Mirvis Aff. ¶ 4.)  However, he did <u>not</u> deposit the proceeds from the 100 Oceana sale into one of his accounts that were still

open and under his name.  (*See id.* ¶ 8 ("I did not close any account or hide any funds therein"); *see also* Tatyana Mirvis Aff. ¶ 30 (As of 2012, "my parents continued to also use their other accounts.").) Instead, he instructed his daughter to open three new accounts and deposit the proceeds there, even though he knew that Plaintiffs had filed claims against him, totaling $45,657,401.01, and sought an entry of default by that time.  Had Mirvis not transferred the funds to his daughter and kept the money in his account as he says he could have, Plaintiffs would be able to seek these funds to satisfy the judgment directly without having to ask the Court to set aside this transfer.

The undersigned finds that the conveyance was made with fraudulent intent based on the existence of several badges of fraud.  The Non-Parties argue that the funds deposited into Tatyana's accounts were "supported by adequate consideration as [Mirvis] used those proceeds to pay his expenses and those of his family."  (Non-Parties' Mem. at 13-14, Dkt. 542-21.)  However, the undersigned finds this argument disingenuous, because both Mirvis and Tatyana admitted that the money transferred to Tatyana was actually Mirvis and Lyubov's to use at all times.  Moreover, once actual intent is found, the adequacy of consideration does not prevent the court from setting aside conveyance. *See In re Sharp Int'l Corp.,* 403 F.3d at 56 (internal quotation marks and citation omitted).

Accordingly, the undersigned finds that Plaintiffs have shown by clear and convincing evidence that the 100 Oceana Transfer was made with actual intent to fraud, and recommends that half of the 100 Oceana Transfer, reflecting Mirvis's interest in the total proceeds, be set aside under Section 276.  Alternatively, because there was no consideration, the undersigned recommends that half of the 100 Oceana Transfer be set aside as fraudulent under Section 273-a.

### b.  Lupolover Transfer

Plaintiffs argue that the $39,000 transfer from Michael Lupolover to Tatyana is a fraudulent conveyance of the proceeds from the November 3, 2010 sale of Unit 2307.  (*See* Pls.' Mem. at 8.) The general chronology of the events as well as the existence of multiple badges of fraud support

Plaintiffs' position.

On November 12, 2010, the proceeds from Mirvis and Lupolover's sale of Unit 2307, totaling $71,613.71, were deposited into Lupolover's account. (Tatyana Mirvis Aff. Ex. E, Dkt. 542-6.) Exactly two weeks later, on November 26, 2010, Lupolover transferred to his son, Michael Lupolover, $39,000, which is about 54.5% of the total proceeds from the sale. (*See* Tatyana Mirvis Aff. Ex. F, Dkt. 542-7.) Five days later, on December 1, 2010, Michael Lupolover transferred $39,000 to Tatyana, which was deposited into one of the Subject Accounts. (*Id.*) While acknowledging the sale of Unit 2307 and the general sequence of events, Mirvis and the Non-Parties argue that this $39,000 was not from the Unit 2307 sale. They do not, however, explain why Mirvis never received his share of the proceeds. The transferring of funds between the Judgment Debtors in such a sequence makes the conveyances highly suspicious.

An inference of fraudulent intent is bolstered by the presence of at least three badges of fraud. The parties to the transactions were the Judgment Debtors, although the funds were channeled through their children. By the time of the transfers, Lupolover had been served with Plaintiffs' claims against both him and Mirvis and the request for certificates of default. (Dkts. 48, 58.) Additionally, as discussed below, Mirvis retained full control of the HSBC Account ending in -3710, where the funds were deposited.

Tatyana and Mirvis explain that the $39,000 from Michael Lupolover is actually a repayment of a loan from the earlier transaction related to the sale of Unit 2307. (*See* Tatyana Mirvis Aff. ¶¶ 41-47; Tatyana Mirvis Aff. Exs. E-F.) Tatyana submits as exhibits a settlement letter indicating the settlement amount of $32,000 to be paid to Solace Financial, LLC ("Solace Financial"); Lupolover's email to Mirvis regarding the payment of $32,000 to Solace Financial as well as a payment of $10,000 to Jaime Mulvihill; and a statement of the HSBC Account ending in -3710 showing transfers of $32,000 to Solace Financial and $10,000 to Jaime Mulvihill. (*See* Tatyana Mirvis Aff. Exs. B-D, Dkts.

15

542-3, 542-4, 542-5.)  Tatyana argues that she made a payment of $42,000 on behalf of both Mirvis and Lupolover, and Lupolover was merely paying her back his share of the payment through his son.  (*See* Tatyana Mirvis Aff. ¶ 43.)

However, the two transactions totaling $42,000 occurred on February 25, 2010, almost nine months prior to the sale of Unit 2307.  Tatyana does not provide documents that would connect these transactions to the sale of Unit 2307.  In fact, at her deposition, she did not even remember that these transactions occurred, stating that she made a personal loan of around $39,000 to Lupolover because Mirvis "asked [her] to."  (Tatyana Mirvis Dep. at 340:14, Dkt. 430-3; *see also* Pls.' Mem. at 8.)  This discrepancy suggests Tatyana's lack of knowledge as to any connection between Michael Lupolover's transfer of $39,000 and two payments of $32,000 and $10,000 made to third parties nine months earlier.  Tatyana "cannot create a triable issue of fact" by "submitting an affidavit contradicting [her] own prior testimony."  *Tube City IMS*, 2016 WL 5864887, at *3 (internal quotation marks and citations omitted).  Moreover, all of these transactions involved the HSBC Account ending in -3710 and occurred within one year of opening that account, which was opened at Mirvis's direction with the proceeds from the 100 Oceana sale.  Therefore, the undersigned does not find the explanation offered by Tatyana credible.  The record is abundantly clear that the real parties to the transactions were the Judgment Debtors.  Suspicious transfers of funds between the Judgment Debtors, who were well aware of claims against them, do not become legitimate by using their children as conduits.

Accordingly, the undersigned finds that Plaintiffs have shown by clear and convincing evidence that the transfer of $39,000 was made with actual intent to defraud, and recommends that the transfer be set aside under Section 276.  Alternatively, because there was no consideration, the undersigned recommends the transfer of $39,000 be set aside as fraudulent under Section 273-a.

c.  Cash Transfers

Much like the 100 Oceana Transfer, the two instances of cash transfers from Mirvis to Tatyana, totaling $37,000, display at least four badges of fraud:  (1) it was an intrafamily transfer, which was made (2) with no consideration, and (3) with the transferor's apparent knowledge of the creditors' claims, and (4) the transferor retained control of the HSBC Accounts, where these funds were deposited.

The father and daughter appear only to argue that there was fair consideration.  They explain that these transactions between them could not have been fraudulent, because Mirvis "felt badly and humiliated that his daughter was paying his way," and transferred part of his pension at Metlife to Tatyana "to help pay the family's expenses."  (Tatyana Mirvis Aff. ¶ 36, n. 4; Mirvis Aff. ¶ 10.)

A finding of fair consideration requires both a fair exchange of value and good faith. *Palermo*, 2011 WL 3874866, at *4; *see also In re Sharp Int'l Corp.*, 403 F.3d at 54.  Moreover, because the transactions involved family members and were "made *without any* tangible consideration," the Non-Parties bear "a heavier burden" of demonstrating fair consideration for the transfer.  *United States v. McCombs*, 30 F.3d 310, 324 (2d Cir. 1994) (emphasis in original) (internal citations omitted).

Here, the Non-Parties have failed to carry that burden, because they cannot establish good faith on the part of either the transferor or transferee.  Around the time of the transfers, Tatyana knew of Mirvis's financial troubles as she, instead of her parents, started to "cover[ ] the overwhelming majority of [their] joint expenses after 2013."  (Tatyana Mirvis Aff. ¶ 9.)  She also knew about the Judgment against Mirvis, even though she did not know about the specifics of the lawsuit.  (*See id.* ¶ 25.)  Her knowledge of Mirvis's financial condition and the Judgment against him at the time of the transfers establishes lack of good faith.  *Ostashko*, 2002 WL 32068357, at *23 (citation omitted).  Moreover, good faith is lacking on the part of Mirvis, because he knew about the pending claims against him and, thus, knew that his transfer of money to Tatyana would "hinder,

17

delay, or defraud" his creditors. *Chen*, 8 F. Supp. 3d at 448.

Even if the Non-Parties can establish that there was adequate consideration, it is not a decisive factor in finding fraudulent intent. *See In re Sharp Int'l Corp.,* 403 F.3d 43, 56. Moreover, additional considerations such as the cumulative effect of Mirvis's pattern of transferring his funds to his daughter and retaining control over the accounts into which these funds are being transferred further supports an inference of fraudulent intent. Thus, the undersigned finds that Plaintiffs have shown by clear and convincing evidence that the two cash transfers from Mirvis to Tatyana were made with actual intent to defraud.

Alternatively, because fair consideration is lacking and Mirvis is a judgment debtor who has failed to satisfy the judgment, the undersigned finds that the cash transfers are fraudulent under Section 273-a.

Accordingly, the undersigned recommends that the two cash transfers totaling $37,000 from Mirvis to Tatyana be set aside as fraudulent.

### 4. *Turnover Order under Fraudulent Conveyance Analysis*

Based on the findings that all three Subject Transfers are fraudulent and there is no genuine issue as to material facts, Plaintiffs have demonstrated that Mirvis "has an interest" in the funds Plaintiffs seek to reach as judgment creditors, and Plaintiffs' rights to the funds are "superior to those of the party in whose possession it is." *See* N.Y. C.P.L.R. § 5225(b); *Beauvais*, 942 F.2d at 840; *see also Ladjevardian v. The Republic of Arg.*, No. 04-CV-2710 (TPG), 2016 WL 3039189, at *4 (S.D.N.Y. May 26, 2016) (citing *Dussault,* 616 F. App'x at 28*), aff'd sub nom. Mohammad Ladjevardian, Laina Corp. v. Republic of Arg.*, 663 F. App'x 77 (2d Cir. 2016).

Plaintiffs request a Turnover Order against HSBC, TD, and Capital One, directing them to release the restrained funds to Plaintiffs. However, the Court lacks such authority because none of these banks have been properly served with process. *See Saregama India, Ltd. V. Mosley*, 12-MC-45

(LAK), 2012 WL 955520, at *2 (S.D.N.Y. Mar. 20, 2012).  "Even though Rule 69 allows turnover orders to be entered on motions," any such motions against a transferee or garnishee must be served "in the same manner as a summons in an action." *Id.* (denying the motions for turnover orders for lack of personal jurisdiction due to inadequate service of process on non-party garnishees); *LaBarbera v. Audax Const. Corp.,* 971 F. Supp. 2d 273, 282 (E.D.N.Y. 2013).  In providing notice to the garnishee banks, a plaintiff may not rely on the less stringent notice requirement "set forth for the judgment debtor, a party who is not a respondent in a turnover proceeding and over whom, unlike respondents in such actions, the court 'does not need to have personal jurisdiction.'"  N.Y. C.P.L.R. § 5225(b); *LaBarbera,* 971 F. Supp. 2d at 282 (citation omitted).  The fact that the garnishee banks were previously ordered by this Court to restrain the funds held in the Non-Parties' names does not automatically establish the Court's jurisdiction over them on this Motion.  *See Gucci Am., Inc. v. Weixing Li,* 768 F.3d 122, 129 (2d Cir. 2014) ("[P]ersonal jurisdiction over the *defendants*, not the Bank, is all that was needed for the district court to restrain the defendants' assets . . .").  "To decide otherwise would allow Plaintiffs to circumvent personal jurisdiction and service requirements solely because they opted to seek enforcement of the . . . Judgment via a motion in federal court instead of via a special proceeding in New York state court or a separate proceeding in federal court, an outcome seemingly at odds with federal and state service requirements as well as notions of fundamental fairness." *LaBarbera,* 971 F. Supp. 2d at 282.

Plaintiffs have likewise failed to submit proof of service on the Non-Parties, but the Non-Parties have appeared in these proceedings through counsel.  Therefore, any challenge to improper service is deemed waived.  *See Cadles of Grassy Meadow II, LLC v. O'Connor*, 330 F. App'x 293, 294 (2d Cir. 2009); *Love v. Riverhead Cent. Sch. Dist.*, 823 F. Supp. 2d 193, 197 (E.D.N.Y. 2011).

Accordingly, the undersigned recommends that the Court enter a Turnover Order against Tatyana for $228,402.88, consisting of:  (1) a half of the 100 Oceana Transfer, which amounts to

$152,402.88; (2) the Lupolover Transfer of $39,000; and (3) Cash Transfers of $37,000.

### C. Turnover of Property Actually Controlled by Mirvis

As an alternative to the argument that the Subject Transfers were fraudulent conveyances into accounts held by the Non-Parties, Plaintiffs argue that the Subject Accounts are actually Mirvis's property, only held nominally by the Non-Parties, and the Restrained Funds must be turned over on that basis. (Pls.' Mem. at 31.) Although Plaintiffs present this theory as an alternative to the fraudulent conveyance theory, Plaintiffs indicated their preference for a Turnover Order based on fraudulent conveyance because they would only be entitled to attorneys' fees if the Court finds actual intent to defraud. (*See* Tr. at 96:25-97:15.)

Under New York law, "[w]hen a party holds funds in a bank account, possession is established, and the presumption of ownership follows." *Karaha Bodas Co., v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"),* 313 F.3d 70, 86 (2d Cir. 2002) (citing *Kolodziejczyk v. Wing,* 689 N.Y.S.2d 825, 825 (N.Y. App. Div. 1999)). However, "this presumption may be rebutted by evidence that [Mirvis] actually controlled the disputed funds, or that [Non-Parties] merely held the funds for [Mirvis], in the manner of a trustee." *Id.*; *see also City of N.Y. v. Venkataram*, No. 06-CV-6578 (NRB), 2011 WL 2899092, at *5 n. 6 (S.D.N.Y. July 13, 2011). Thus, if the Court finds that Mirvis had actual control over the Subject Accounts, the Court may compel the nominal account holders who are "in possession or custody of money" to turnover Judgement Debtor's property. N.Y. C.P.L.R. § 5225(b).

1. **TD Accounts[2]**

Plaintiffs present two sets of evidence to argue that the TD Accounts are controlled by Mirvis for his benefit.  First, Plaintiffs submits an affidavit of Peter Smerick, a handwriting expert, who affirms:  it is "HIGHLY PROBABLE" that Mirvis prepared "at least 42 of the 56 checks from the TD -0319 Account" (75%); it is "PROBABLE" that he prepared another 4 checks from the same account (82%); and it is "PROBABLE" that he prepared "at least 36 out of 46 deposit slips" from the same account (78%).  (Pls.' Mem. at 16; *see also* Nov. 15, 2017 Smerick Aff. ¶¶ 3(a)(i), 3(v), 19(a)(i)-(ii), 19(vi), Dkt. 534.)  Smerick also affirms that it is "HIGHLY PROBABLE" that Mirvis prepared "at least 18 of the 33 checks" (55%) and "at least 34 of the 54 deposit slips" (63%) from the TD -8848 Account.  (Pls.' Mem. at 17; *see also* Nov. 15, 2017 Smerick Aff. ¶¶ 2-3, 19.)

Second, Plaintiffs point to several suspicious transactions involving both TD Accounts. Between August 29, 2013 and November 1, 2014, three checks totaling $5,980 were issued from the TD -0319 Account:  (1) a $5,000 check, dated April 11, 2014, was made payable to Mirvis; (2) a $180 check, dated August 29, 2013, was made payable to "FREE" with "Donation" in the memo line; (3) a $800 check, dated November 1, 2014, was made payable to "Cash."  (Pls.' Mem. at 16; Nov. 15, 2017 Smerick Aff. Ex. B at 5, 14, 20, Dkt. 534-2.)  Smerick affirms that it is "HIGHLY PROBABLE" that Mirvis prepared these checks.  (Nov. 15, 2017 Smerick Aff. ¶¶ 3(a)(i), 19(a)(i).) Plaintiffs also argue that several transfers from the TD -0319 Account to "7E14" between September 29, 2013 and February 11, 2015, totaling $33,200, support the conclusion that this account was actually controlled by Mirvis.  (*See* Pls.' Mem. at 16.)  Plaintiffs' argument is mostly based on the fact that Chase reported Mirvis's employer as "7 East 14 Street Inc." and Smerick's

---

[2] The undersigned notes that the TD Accounts are not involved in the three Subject Transfers discussed above.  Thus, even if Plaintiffs had properly served this Motion on the garnishee banks and this Court's exercise of personal jurisdiction over TD was appropriate, the Court could not enter a Turnover Order against TD as Plaintiffs request.  (*See* Dkt. 566.)

conclusion that it is "HIGHLY PROBABLE" that six of the seven checks made out to "7E14," totaling $32,000 were written by Mirvis.  (*See id.*; Dkt. 386-15 at 3; Nov. 15, 2017 Smerick Aff. ¶¶ 3(a)(i), 19(a)(i).)

Tatyana does not dispute that these checks were prepared by Mirvis.  (Tatyana Mirvis Aff. ¶¶ 58-59.)  She explains that Mirvis wrote checks for "7E14," a creperie business she opened with others, because he "was a man with time and volunteered that time for his daughter's struggling business."  (*Id.* ¶ 58.)  Thus, Mirvis indeed "worked for the creperie . . . but without compensation of any kind."  (*Id.*)  Tatyana also explains that the other checks may have been written by Mirvis to pay the family expenses, but that the funds in these accounts did not originate from Mirvis.  (*Id.* ¶ 59.)  Plaintiffs' submissions suggest that the funds are, indeed, from Lyubov's sale of 2407 SW and A.T. United, which was incorporated only two weeks prior to the opening of the TD Account ending in -8848.  (*See* Marvin Decl. 3 Exs. A, B, K.)

However, the source of funds need not be the judgment debtor himself in order to rebut the presumption of ownership.  The standard requires only that either Mirvis "actually controlled disputed funds," or Tatyana "merely held the funds for [Mirvis], in the manner of a trustee."  *Karaha Bodas Co.,* 313 F.3d at 86.  The source of the funds is not a factor in this analysis.  Even if Mirvis may not have been financially involved in the operation of "7E14," the evidence shows that it is probable that Mirvis wrote 76% of the checks and deposit slips associated with the accounts.  Some of them were ostensibly written for his benefit.

Accordingly, the undersigned finds that the TD Accounts ending in -0319 and -8848 are actually controlled by Mirvis and used for his benefit, and recommends entering a Turnover Order against Lyubov and Tatyana for $2,902.37 restrained in the TD Account ending in -0319, and Tatyana and Boriskin for $28,446.54 restrained in the TD Bank account ending in -8848.

### 2.  *HSBC Accounts*

Plaintiffs submit deposit slips and checks drawn from the HSBC Accounts that were determined by Smerick as having been prepared by Mirvis.  Smerick concluded that it is "probable" that 58 out of 65 checks (89%) of the check were prepared by Mirvis, and there were "very strong indications" that Mirvis prepared 41 out of 69 deposit slips (59%).  (Pls.' Mem. at 12.).

Plaintiffs also point to several transactions purportedly made by or for the benefit of Mirvis. First, on June 23, 2011, a $180 check from the HSBC Account ending in -3710 was issued to "FREE," "for Donation Mark Mirvis." (July 1, 2016 Smerick Aff. at 37, Dkt. 386-38.)  Written beside Tatyana's name in the top left corner of this check is "& Mark," indicating the issuers of the check.  (*Id.*)  Plaintiffs have uncovered at least four other checks made out to "FREE," totaling $1,080.  (*Id.* at 59, 75-76; Marvin Decl. 2 Ex. 23 at 6, Dkt. 386-24)  Smerick concluded that it is "Probable" that Mirvis wrote four out of five checks made payable to "FREE." (July 1, 2016 Smerick Aff. ¶ 21(f).)  Second, on July 7, 2011, $60,151.89 was wired from the HSBC Account ending in -3710 to Salpeter Gitkin, LLP, "OBI:  Mark Mirvis Settlement." (Marvin Decl. 2 Ex. 21 at 34, Dkt. 386-22.)  A $1,500 check was made out to Salpeter Gitkin, LLP from the same account on June 17, 2013.  (Marvin Decl. 2 Ex. 25 at 16, Dkt. 386-24.)  Plaintiffs found that Salpeter Gitkin is a real estate firm that represented Mirvis and other judgment debtors in litigation related to the foreclosure of certain properties in Florida.  (*See* Pls.' Mem. at 14.)  Third, Plaintiffs purport to show that Mirvis used a total of $100,000 from the HSBC Accounts to pay for Tatyana and Boriskin's wedding; and that at least $1,625,948.78, which was transferred into these accounts from the Pharmacies, and approximately $286,429.50, which was transferred to "7E14" from these accounts, were Mirvis's funds.  (Pls.' Mem. at 14-15.)  Lastly, Plaintiffs submit evidence that $20,010 was wired to "Multibank Inc." in Panama from the HSBC Account ending in -9713, without explaining how this transaction is connected to Mirvis.  (*Id.* at 15; Marvin Decl. 2 Ex. 20 at 51, Dkt. 386-21.)

Tatyana does not dispute that Mirvis deposited checks into and issued checks from the HSBC Accounts.  (*See* Tatyana Mirvis Dep. at 122:4-129:19.)  She explains that Mirvis used these accounts to pay for "all of [the family's] combined expenses."  (Tatyana Mirvis Aff. ¶ 29.)  When Mirvis's income "dr[ied] up," and his funds from the 100 Oceana sale were depleted, Tatyana deposited checks from the Pharmacies into the HSBC Accounts.  (*Id.* ¶¶ 30, 33.)  She argues that she continued to use these accounts to pay for the family's expenses.  (*Id.* ¶ 35; *see also id.* ¶¶ 14-15.)

Although Tatyana argues that the sources of these funds are not Mirvis, she does not dispute that Mirvis used and had actual control of these accounts.  Even disregarding the last four transactions pointed out by Plaintiffs concerning Tatyana's wedding, "7E14," the Pharmacies, and "Multibank Inc."—because Plaintiffs have not provided sufficient evidence to connect Mirvis to these transactions—it is clear that Mirvis had control of the HSBC Accounts and used the funds for his benefit.  Some of the funds were used for the family's collective benefit, but some were specifically used for Mirvis's benefit.  Significantly, these accounts were opened at Mirvis's direction for him to use in his own discretion.  (*See id.* ¶¶ 20, 22; *see also* Mirvis Aff. ¶ 8.)

Accordingly, considering the circumstances of the opening of the accounts and other evidence submitted by Plaintiffs, the undersigned finds that the HSBC Accounts ending in -3710 and -9713 are actually controlled by Mirvis and used for his benefit, and recommends entering a Turnover Order against Tatyana for $143,106.74 restrained in the HSBC Accounts.

### 3.  *Capital One Accounts*

The Capital One Account ending in -9992 is designated "TTF Mark Mirvis," and was initially funded with a portion of the proceeds from the sale of 100 Oceana.  (Marvin Decl. 1 Ex. H; Pls.' Mem. at 69.)  This account was later funded by a portion of the proceeds from the sale of Unit 2407 (Marvin Decl. 1 Ex. G at 2, 7), and Tatyana's checks from the Pharmacies (Marvin Decl. 1 ¶ 32, Dkt. 481-2; Marvin Decl. 1 Ex. G at 4-6, 8-9, 12-13, 18, 20-23, 25.)  Approximately $24,560 was

24

transferred from this account to "7E14" and $18,565.61 was used to pay the property taxes for 289 Bayberry.  (*See* Pls.' Mem. at 18; Marvin Decl. 1 Ex. M, Dkt. 481-15.)  However, there is no evidence that Mirvis prepared any checks relevant to these payments or that he carried out the act of transferring the funds.  The Capital One Account ending in -5283 has been exclusively funded by transfers from the account ending in -9992.  (Marvin Decl. 1 Ex. I.)

Plaintiffs seem to suggest that, because Tatyana did not remember at her deposition the specifics of the opening or the use of the Capital One Accounts and whether she had ever deposited funds from the Pharmacies into them, these accounts must belong to Mirvis.  (*See* Pls.' Mem. at 18.)  Although Mirvis is designated as a beneficiary of the Capital One -9992 Account, and the account was initially funded with proceeds from the sale of 100 Oceana (which was jointly owned by Mirvis and Lyubov), Plaintiffs fail to show that the funds in the Capital One Accounts are "actually controlled" by Mirvis.  Unlike the TD Accounts or HSBC Accounts, there is no evidence that Mirvis deposited into or issued checks from either Capital One Account.  Plaintiffs' evidence does not show that Mirvis wrote checks payable to "7E14" or deposited checks from the Pharmacies into these accounts.  Plaintiffs also do not argue that Mirvis made the payment to satisfy the 289 Bayberry property taxes.

Tatyana argues that Plaintiffs have not shown that her interest in "7E14" or the Pharmacies are actually Mirvis's.  (Tatyana Mirvis Aff. ¶¶ 70-104.)  She explains that Mirvis's involvement in the creperie was limited to being a bookkeeper and he had no involvement in the Pharmacies.  (*Id.* ¶¶ 58, 70, 105.)  Plaintiffs have not shown evidence to rebut the affidavits of Tatayana and Bespalko.[3]

---

[3] Plaintiffs attempt to discredit Tatyana's affidavit by noting the alleged discrepancies between the facts affirmed in Tatyana's affidavit and those stated during her deposition. (Pls.' Reply Mem. 19-20.)  However, even assuming these discrepancies are true, they do not necessarily connect Mirvis to the Pharmacies. Plaintiffs also suggest that the Non-Parties' omission of the facts concerning Seta Group, Ltd. ("Seta Group"), which is solely owned by Tatyana and registered at 289 Bayberry, is significant.  (*Id.* at 21-22.) However, Plaintiffs fail to show how Seta Group is connected to Mirvis, other than it is registered at his home address where Tatyana also resides.  Plaintiffs also do not show or argue that any funds transferred to

(*See id.* ¶¶ 70-104; Bespalko Aff., Dkt. 542-20.)  However, even if Plaintiffs had shown that Mirvis had an interest in "7E14" or the Pharmacies, that fact alone does not establish that Mirvis "actually controlled" the funds in the Capital One Accounts.  The accounts are in Tatyana's name and Plaintiffs have not shown that Mirvis exercised control over these accounts or was involved in transactions of any funds in or out of these accounts.

Accordingly, the undersigned finds that Plaintiffs have failed to rebut the presumption of ownership, and recommends that Plaintiffs' request for a Turnover Order as to the funds restrained in the Capital One Account be denied.

### 4.  *Turnover Order under Actual Control Analysis*

If the Court decides not to enter a Turnover Order on the basis of fraudulent conveyance, the undersigned recommends that the Court enter a Turnover Order on the basis that the funds in the TD and HSBC Accounts totaling $174,455.65 are actually controlled by Mirvis.  Specifically, the undersigned recommends entering a Turnover Order against Lyubov and Tatyana for $2,902.37 in the TD Account ending in -0319; Tatyana and Boriskin for $28,446.54 in the TD Bank account ending in -8848; and Tatyana for $143,106.74 in the HSBC Accounts.

The Court should deny Plaintiffs' request for a Turnover Order against the garnishee banks because, as explained above, they have not been properly served with process.

### D.  Attorneys' Fees & Prejudgment Interest

Section 5225 of the C.P.L.R. typically does not provide for an award of attorneys' fees. However, if "the plaintiff established an actual intent to defraud, it is . . . entitled to recover a reasonable attorney[s'] fees," as if it had brought an action under D.C.L. § 276 to set aside for fraudulent conveyance.  *Doubet, LLC v. Trustees of Columbia Univ. in City of N.Y.*, 934 N.Y.S.2d 33 (N.Y. Sup. Ct.), *adhered to on reargument,* 941 N.Y.S.2d 537 (N.Y. Sup. Ct. 2011), and *aff'd,* 952

---

Seta Group from the Pharmacies were deposited into or transferred to any of the Subject Accounts.

N.Y.S.2d 16 (N.Y. App. Div. 2012).  By contrast, attorneys' fees are not recoverable under D.C.L. §

273 for constructive fraud, and an action under C.P.L.R. § 5225 in which constructive, not actual

fraud, is found does not entitle a plaintiff to attorneys' fees.  *See Deflora Lake Dev. Assocs., Inc. v. Hyde

Park*, No. 13-CV-4811, 2016 WL 7839191, at *6 (S.D.N.Y. June 9, 2016), *aff'd*, 689 F. App'x 93 (2d

Cir. 2017).  The Court may also award Plaintiffs prejudgment interest on an award for fraudulent

conveyance under D.C.L. § 276.  *See Howland v. Resteiner*, No. 07-CV-2332 (ILG) (SMG), 2008 WL

1740531, at *6 (E.D.N.Y. Apr. 10, 2008).

Accordingly, the undersigned recommends that Plaintiffs be awarded attorneys' fees and

prejudgment interest, if the Court issues a Turnover Order on the basis that Mirvis made fraudulent

conveyances with actual intent to defraud.  Plaintiffs should then be afforded the opportunity to

submit relevant support for these fees and interest.

**CONCLUSION**

Based on the foregoing, the undersigned respectfully recommends that the Motion be granted, the Subject Transfers be set aside as fraudulent under D.C.L. § 276, and the Court enter a Turnover Order against Tatyana Mirvis for a total of $228,402.88.  Alternatively, the undersigned recommends entering a Turnover Order of $174,455.65 on the basis that Mirvis had actual control of the TD and HSBC Accounts.  Specifically, the undersigned recommends a turnover of $2,902.37 in the TD Account ending in -0319, $28,446.54 in the TD Bank account ending in -8848, and $143,106.74 in the HSBC Accounts.  The undersigned recommends an award of attorneys' fees and prejudgment interest if the Court issues a Turnover Order on the basis of fraudulent conveyances under D.C.L. § 276.

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

**SO ORDERED:**

*Peggy Kuo*
PEGGY KUO
United States Magistrate Judge

Dated:   Brooklyn, New York
           September 4, 2016