UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE CO., et al.,

                       Plaintiffs,

  -against-

MARK MIRVIS, et al.

                       Defendants.

Civ. Action No. 08-CV-4405(SLT)(PK)

ORAL ARGUMENT REQUESTED

OBJECTIONS OF NON-PARTIES LYUBOV MIRVIS, TATYANA MIRVIS,
AND ALEXANDER BORISKIN TO THE MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION

THE SILBER LAW FIRM, LLC
*Attorneys for Non-Parties
Lyubov Mirvis, Tatyana Mirvis,
and Alexander Boriskin*
11 Broadway, Suite 715
New York, New York 10004
Tel.: (212) 765-4567
msilber@silberlawny.com

**TABLE OF CONTENTS**

Table of Authorities .................................................................................................ii

Preliminary Statement ............................................................................................. 1

Background ............................................................................................................. 2

ARGUMENT ........................................................................................................... 3

    I. STANDARD OF REVIEW .......................................................................... 3

    II. THE FINDINGS OF THE R&R ARE WITHOUT SUFFICIENT BASIS ..................... 3

        A.   The Oceana Transfer ........................................................................ 4

            1.   There was no actionable conveyance to bring the transactions under the purview of the DCL................................ 4

            2.   A finding of actual fraud in this transaction is misplaced .......... 5

        B.   Transfers with Michael Lupolover.................................................... 8

        C.   Mark's Cash Transfers to Tatyana Were Innocent ......................... 10

        D.   The Payments of Expenses Post-Oceana Were Controlled by Tatyana Mirvis................................................................................ 12

        E.   An Award of Interest or Attorneys' Fees Is Not Supported........... 13

Conclusion ............................................................................................................ 14

## **TABLE OF AUTHORITIES**

**Cases**

*Brown Publ'g Co. Liquidating Trust v. AXA Equitable Life Ins. Co.*, 519
  B.R. 13, 25 (E.D.N.Y. 2014) .................................................................................. 5

*Citicorp Trust Bank, FSB v. Makkas*, 127 A.D.3d 907, 908 (2d Dept. 2015) ................... 5

*Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978) ......................................................... 7

*Fed. Deposit Ins. Corp. v. Porco*, 75 N.Y.2d 840, 841-42 (1990) .................................... 5

*Field Home-Holy Comforter v. Warns*, No. 12-cv-9285, 2014 U.S. Dist.
  LEXIS 179285, at *12 (S.D.N.Y. 2014) ................................................................ 8

*Grafton v. Assistant Deputy Undersheriff Hesse*, No. 15-cv-4790, 2017 WL
  4286266, at *1 (E.D.N.Y. Sept. 27, 2017) ............................................................. 3

*In Re Crystal Brands Sec. Lit.*, 862 F. Supp. 745, 749 (D. Conn. 1994) .......................... 7

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
  Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) ....................................... 12

*Lopez v. Mohammed*, No. 14-cv-4443, 2017 WL 4277154, at *2 (E.D.N.Y.
  Sept. 26, 2017) ....................................................................................................... 3

*Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 131 (2d Dept. 1986) ..................... 11

*Serova v. Teplen*, No. 05-cv-6748, 2006 U.S. Dist. LEXIS, at *26
  (S.D.N.Y. Feb. 16, 2006) ....................................................................................... 7

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403
  F.3d 43, 56 (2d Cir, 2005) ..................................................................................... 8

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ............................ 7

**Statutes**

28 U.S.C. § 636(b)(1) ................................................................................................. 1, 3

DCL § 270 ......................................................................................................................... 5

DCL § 273 ............................................................................................................... 1

DCL § 273-a ........................................................................................................... 5

DCL § 276 .................................................................................................... 1, 5, 11

DCL § 276-a .................................................................................................. 1, 13

**Rules**

Fed. R. Civ. P. 72(b)(2) ......................................................................................... 1, 3

Fed. R. Civ. P. 72(b)(3) ............................................................................................ 3

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2), non-party Tatyana Mirvis[1] respectfully submits the following objections to Magistrate Judge Kuo's Report and Recommendation, dated September 4, 2018, recommending that the Court grant the turnover motion of plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Deerbrook Insurance Company, Allstate New Jersey Insurance Company, and Allstate Property & Casualty Insurance Company (the "R&R") (Dkt. 577). For all of the reasons and arguments below, the R&R should be rejected in all respects.

## Preliminary Statement

The R&R recommends that this Court grant plaintiffs' turnover motion (Dkt. 533)[2] in full, specifically recommending the turnover of a number of bank accounts that Tatyana Mirvis held individually or jointly with her husband Alexander Boriskin or her mother Lyubov Mirvis, both non-parties, under New York's Debtor Creditor Laws ("DCL") § 273 and DCL § 276. Magistrate Kuo found further that each of the four transactions by Mark Mirvis were done with actual intent to defraud, entitling plaintiffs to interest and attorneys' fees under, DCL §276-a.

Aside from an insufficient basis to find that all of the transfers were improper or otherwise in violation of the DCL, Magistrate Kuo's determination that they were made with actual fraud under DCL § 276, is not supported by the facts when each transfer is

---

[1] While plaintiffs' turnover motion named only Tatyana Mirvis, some of those accounts are held jointly with her mother and husband, non-parties Lyubov Mirvis and Alexander Boriskin, respectively, all of whom were brought into this action by plaintiffs' turnover motions. These individuals are referenced to here and in the underlying motion papers as the "Non-Parties" or the "Mirvis Non-Parties."

[2] The funds in these accounts were initially restrained by Magistrate Kuo pending this turnover motion (Dkt. 386) in one of a number of *ex-parte* restraints issued against the funds or income of the Mirvis Non-Parties. Currently, *all* of Tatyana's income has been restrained, again *ex-parte* (Dkt. 516).

viewed in their totality. When doing so, the transfers by Mark are seen as undertaken in good faith and with either some consideration or as part of a *bona fide* transaction or, if taken concerning an existing debt, not taken in connection with or to avoid plaintiffs or their claims.

At least two of the four subject transfers (the two Metlife transfers are treated as one in the R&R) were legitimately and reasonably explained by Mark Mirvis and the Mirvis Non-Parties in the underlying motion papers. To find them to have been fraudulent conveyances in violation of the DCL (to say nothing of the finding that they were made with actual fraudulent intent) requires the Court to disregard the Mirvis Non-Parties' objective evidence and supported and detailed facts, and to give plaintiffs the benefit of every doubt.

## Background

The comprehensive procedural background underlying this case as it concerns plaintiffs' turnover motion against the Mirvis Non-Parties is set forth in the R&R at pp. 1-4 and not again detailed here. The facts addressed by Magistrate Kuo in reaching her determination are discussed below in the body of this Objection and extensively in the Affidavits of the Non-Parties, especially the Affidavit of Tatyana Mirvis in Opposition to Plaintiffs' Motion to Turn over Property of Judgment Debtors, sworn to January 9, 2018 (Dkt. 542-1) ("Tatyana's Affidavit").

**ARGUMENT**

**I. STANDARD OF REVIEW**

"Any party may serve and file written objections to a report and recommendation of a magistrate judge on a dispositive matter within fourteen (14) days after being served with a copy thereof." *Grafton v. Assistant Deputy Undersheriff Hesse*, No. 15-cv-4790, 2017 U.S. Dist. LEXIS 158869, at *1 (E.D.N.Y. Sept. 27, 2017). *See also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). The district court will then make a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Lopez v. Mohammed*, No. 14-cv-4443, 2017 U.S. Dist. LEXIS 157819, at *2 (E.D.N.Y. Sept. 26, 2017) (quoting 28 U.S.C. § 636(b)(1)). See also Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."). In reviewing a report and recommendation, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). *See also* Fed. R. Civ. P. 72(b)(3) (same).

**II. THE FINDINGS OF THE R&R ARE
WITHOUT SUFFICIENT BASIS**

The R&R addresses four transactions which plaintiffs contend to have been made as a means to evade their claims against Mark Mirvis.[3] All of these transfers are seized upon by plaintiffs as not just fraudulent conveyances under the DCL, but as transfers

---

[3] These four transaction are the (i) Oceana sale proceeds, (ii) the Michael Lupolover loan, (iii) a transfer of $30,000 from Mark Mirvis's Metlife pension account, and (iv) a second transfer of $7,000 from Mark Mirvis's Metlife pension account. The two Metlife transfers were treated as one in the underlying motion and in the R&R.

3

made by Mark with the specific intent to defraud plaintiffs and to hinder their ability to enforce their claims against him. While the transfers at issue were made among family members, they have been shown as being (i) entirely innocent or (ii) undertaken for reasons other than due to plaintiffs' claims, and at a time when plaintiffs undertook no effort to obtain a judgment against Mark, and with no indication that plaintiffs' claims had anything to do with what Mark did.

Additionally, the question of whether there even were actionable conveyances from Mark to Tatyana must be addressed. It is submitted that the language employed in the R&R casts considerable doubt that proper conveyances can be found, at least for the Oceana proceeds and the Lupolover loan. Specifically, because the R&R finds that the transactions at issue all involved the funds of only Mark and transfers that he alone directed and from which he alone benefitted, Tatyana cannot be seen as a true transferee and the subject transfers are not true conveyances, as a matter of law.

**A.    The Oceana Transfer**

    **1.    There was no actionable conveyance to bring the transactions under the purview of the DCL**

As outlined in the Tatyana Affidavit, at ¶¶ 20-28, the funds from the sale of Mark and Lyubov Mirvis's Brooklyn condominium generated funds that were deposited into an account maintained by Tatyana. Those funds unequivocally belonged to Mark and Lyubov and were used to pay the living expenses of Mark and his family, as Mark had always done. Accordingly, if these funds belonged to Mark and were used by Mark directly, as alleged by plaintiffs and so determined in the R&R, that must mean that Tatyana was a mere conduit for the expenditure of these funds so that no conveyance took place. *See*

DCL § 270.[4] *See also Brown Publ'g Co. Liquidating Trust v. AXA Equitable Life Ins. Co.*, 519 B.R. 13, 25 (E.D.N.Y. 2014). As such, Tatyana should not be seen as having received anything from Mark, certainly nothing from which she personally benefitted and that no true conveyance was made. *See Citicorp Trust Bank, FSB v. Makkas*, 127 A.D.3d 907, 908 (2d Dept. 2015)(claims under DCL §276 fail against a party that is neither a transferee nor beneficiary of the assets transferred); *Fed. Deposit Ins. Corp. v. Porco*, 75 N.Y.2d 840, 841-42 (1990)(allegations of assisting in transfer insufficient to find liability under the DCL). Without a conveyance this transaction is not subject to New York's debtor-creditor statute.[5]

## 2. A finding of actual fraud in this transaction is misplaced.

Assuming for purposes of this proceeding that a conveyance did take place, it may have technically run afoul of DCL § 273-a. However, Magistrate Kuo's finding that this transfer took place with actual intent is not supported by the record even as explained in the R&R at pp.12-13 thereof. Initially, there is no question that the details of this transaction were undertaken openly and there was nothing secretive about the transaction or deposit as one would expect in a case of fraud. Additionally, and critical to the consideration of *actual* fraud as to Mark's actions in relation to plaintiffs' interests, the deposit of the Oceana proceeds in Tatyana's accounts was not done to frustrate plaintiffs' collection or enforcement. This is so because at the time of the Oceana sale plaintiffs *held*

---

[4] Under the DCL "'Conveyance' includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance."

[5] The same is true for the Lupolover transaction discussed below. At p. 15 of the R&R, Magistrate Kuo noted how the transaction seemed to be between Mark Mirvis and Michael Lupolover, with the funds merely "channeled" through Tatyana.

5

*no judgment* against Mark Mirvis and made no effort to pursue any collection against him. *See* Affidavit of Mark Mirvis in Opposition to Plaintiffs' Motion to Turn over Property of Judgment Debtors, Dkt. 542-16 ("M. Mirvis Affidavit"), ¶¶ 3,6.[6] That Mark had other bank accounts with six-figure balances, of which plaintiffs were aware and which he did not close, further demonstrates that he was not running or hiding from plaintiffs' claims. *See* Dkt. 542-16 ¶¶ 6-8. At a minimum, someone seeking to hide assets from a creditor would close accounts holding significant sums.

There is no allegation anywhere that provides support for a claim that Mark and Lyubov's deposit of the Oceana proceeds into Tatyana's accounts had anything to do with plaintiffs or their claims against Mark; Mark and Lyubov acted solely due to Mark's crisis in Florida. *See id.* at ¶ 8. While what Mark did may have been in bad judgment and in an effort to avoid dealing with his Florida foreclosures (but not judgments), what he did had nothing to do with this case or the claims alleged.[7]

---

[6] Thus, there was a period of more than five years between the sale of the Oceana condominium (January 2010) and plaintiffs' default judgment (May 2015), which was more than five years after plaintiffs obtained a certificate of default.

[7] Magistrate Kuo's description of how Mark Mirvis treated this lawsuit is, respectfully, taken out of context and wrong. At p. 13 of the R&R, Magistrate Kuo wrote "[i]n directing Tatyana to deposit the proceeds from the 100 Oceana sale, [Mark] Mirvis claims that he was trying to avoid the banks that had issued subpoenas concerning his properties in Florida but 'had no judgement to hide from.' However, earlier in the affidavit, [Mark] Mirvis states that he was well aware of the lawsuit, but that he 'ignore[d] it' and did not 'take it seriously'" (internal citations omitted). The first part of Judge Kuo's statement (Mark trying to avoid the difficulties in Florida) is correct. The second part, however, addressed to Mark's attitude in response to this action, is inaccurate. What Mark Mirvis actually wrote in his Affidavit (Dkt. 542-16), at ¶ 2, is "I was given particularly bad advice at the outset of this case, twice, first to ignore it and then to make some attempt to settle, but not to take it seriously." Taken out of context in the R&R, Mark is made to sound as if he maliciously and recklessly thumbed his nose at plaintiffs and this case. But that is not what happened. Instead, Mark spoke to people whom he thought could help and was given bad advice. To couch his decision as done in bad faith as opposed to being ill-informed is not correct and prejudicial to not just Mark, but the Mirvis Non-Parties.

But more, while depositing the Oceana funds in Tatyana's name may have been the wrong thing to do generally, because Mark's actions had nothing to do with plaintiffs' claims or this case, a finding of actual fraud is "fraud by hindsight" which lacks sufficient fraudulent intent and is not actionable fraud.[8] To find that this conveyance was fraudulent *as directed to plaintiffs,* the parties that allege the injury and fraud, should require a finding that Mark's conduct was undertaken and intended to frustrate *plaintiffs'* collection efforts—of which there were *none* at the time that Mark directed the Oceana proceeds into Tatyana's accounts—not the efforts of unknown third-parties. Unless plaintiffs can allege that the challenged conveyance was executed to frustrate *its* efforts no fraud in that transfer should be found.

By all accounts, what Mark did in connection with the Oceana proceeds had nothing to do with plaintiffs. As such, even if some of the badges of fraud were technically found for this transaction they should not stand as a conclusive finding of fraud where the actual facts upon which those badges are based dictate, not just militate, otherwise. A contrary outcome is simply fraud determined by viewing facts in hindsight.

Plaintiffs' cannot demonstrate by clear and convincing evidence Mark and Tatyana's actual intent to hinder, delay, or defraud plaintiffs, even as they are family members, and the objection to a finding of actual fraud should be sustained. *See Field*

---

[8] *See, generally, Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (in securities-fraud action general factual misstatements found insufficient to indicate "conscious fraudulent behavior or recklessness" of the defendant "reject[ing] the legitimacy of 'alleging fraud by hindsight.' *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978)"). Fraud found with the benefit of "hindsight" is not actionable fraud. *See In Re Crystal Brands Sec. Lit.*, 862 F. Supp. 745, 749 (D. Conn. 1994). While these cases address securities law claims the elements and standards for pleading common-law fraud are the same as those in a setting of securities fraud. *See Serova v. Teplen*, No. 05-cv-6748, 2006 U.S. Dist. LEXIS, at *26 (S.D.N.Y. Feb. 16, 2006).

*Home-Holy Comforter v. Warns*, No. 12-cv-9285, 2014 U.S. Dist. LEXIS 179285, at *12 (S.D.N.Y. 2014)(plausible explanation for challenged conduct can demonstrate innocent intent). Without showing intent to defraud by the transferor no actual fraud will be found. *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir, 2005).

Additionally, even the possibility that Mark paid his own bills with these funds, and received the benefit of these funds, should militate against a finding of actual fraud. *See Midlantic Bank, N.A v. Strong*, No. 94-cv-4901, 1996 U.S. Dist. LEXIS 22384, at * 24 (E.D.N.Y. 1996)(consideration defeats finding of fraudulent conveyance; question of fact as to consideration exchanged defeated motion). Plaintiffs would have had no claim to these funds had Mark kept them in his account and expended them on his living expenses. That he deposited them into Tatyana's account and used them for the same purpose should not support a fraud finding.

**B.     Transfers with Michael Lupolover**

A critical point upon which Magistrate Kuo based her decision that this transfer was a sham and undertaken with the intent to defraud was the timing of the exchange of funds with Mark Lupolover. The basic facts here bear repeating. Mark Mirvis and Mark Lupolover owned a Florida condominium which was in foreclosure. *See, generally,* M. Mirvis Affidavit ¶ 9; Tatyana Affidavit ¶¶ 41-47. Lupolover's son, Michael Lupolover, was able to work out a settlement with the second lender of their condominium. *See id.* at ¶ 42. Under that settlement, the lender of the second loan agreed to accept a buyout settlement of $32,000, with another $10,000 paid to the loss mitigation company that arranged the settlement. *See id.* Mark asked Tatyana to provide $42,000 from the HSBC

8

funds which held the proceeds of the Oceana sale to be sent to Florida, with $39,000 as a loan to Lupolover for his share of the settlement payment. *See id.* at ¶ 43. The documents annexed to the Tatyana Affidavit (Exs. 3-7) provide the documents that establish this exchange. After the second loan had been resolved, that Florida Condominium was sold, the first loan repaid, and the balance split between Mark and Lupolover. *See id.* at ¶¶ 45-47. Mark has stated that he also received a portion of the proceeds of that sale but cannot locate the supporting documents. *See* M. Mirvis Affidavit ¶ 9. Just Exhibit F of the Tatyana Affidavit (Dkt. 542-7), which collects the (i) check from Mark Lupolover to his son Michael Lupolover for $39,000, (ii) days later a $39,000 check from Michael Lupolover to Tatyana and endorsed by her, which notes "Loan Return" and the (iii) November 17-December 16, 2010, HSBC statement showing the $39,000 deposit, made days later, should be sufficient to establish this exchange. Exhibit D demonstrates the money sent to Florida, months earlier.

At p. 16 of the R&R, Judge Kuo finds incredible Mark's explanation that these funds were loaned to Lupolover and went to pay off a second loan on the Florida property because the loan to Lupolover took place some nine months before the sale of that property and repayment of the loan. But that timeline is absolutely credible and plainly intuitive. The buyout of the second loan (in February 2010) would have to have taken place before that property could be sold, the proceeds divided, and the loan repaid (in November 2010). Only after the second loan had been settled could the sale and repayment have been possible. Thus, the sequence follows: Mark loaned Lupolover his portion of the funds necessary to pay off a bank and those funds were repaid to him with the subsequent sale of that property. That Tatyana did not remember or know the details

9

of why the funds were sent to Florida, but could recall that the funds had been sent as a loan, undermines none of this.

Based on these facts, the documents evidence a *bona fide* transaction where both good faith and consideration is found. Thus, not only was this transaction not undertaken with the intent to defraud, it was not a fraudulent conveyance under the DCL.[9]

## C. Mark's Cash Transfers to Tatyana Were Innocent

There is no dispute that the source of the aggregate $37,000 transferred by Mark to Tatyana came from his Metlife pension account, a source that was immune from collection. There has also been no allegation to refute the fact that Mark withdrew those funds to help pay his own living expenses, then being paid almost entirely by Tatyana. Had Mark been able to write a check directly from his Metlife pension account to, for example, the mortgagee of his house, there would be no objection. That payment would have been made in consideration of a legitimate debt.

Nonetheless, Judge Kuo found that these two transfers did not just lack tangible consideration but also were made in bad faith because Mark and Tatyana knew of plaintiffs' claims against Mark. This bad faith finding seems to be Magistrate Kuo's primary basis for finding actual fraud in connection with these two transfers. *See* R&R pp. 17-18. However, Magistrate Kuo does not explain why this knowledge automatically renders these payments to Tatyana as lacking in good faith or actually fraudulent. That Mark may have had control over the account into which the $37,000 was deposited is not alone an indication of fraud—had Mark wanted to provide these funds to Tatyana as a means to

---

[9] This transaction also took place well before plaintiffs obtained their judgment so that Mark had no "need" to make this transfer as a means of hiding his assets or to avoid plaintiffs.

10

hide them from plaintiffs, Mark could have left them in his protected Metlife account or simply paid the expenses directly. More, given that the Metlife account was not accessible to plaintiffs, Mark had no reason to "hide" that money from plaintiffs. If he was trying to keep plaintiffs away from those funds he would have left them in his pension account. That he withdrew the $37,000, therefore, cannot possibly support any fraudulent intent but supports that sufficient consideration was exchanged.

Finding actual intent in connection with these two transactions based on bad faith is to punish Tatyana for Mark's unpaid judgment in light of his pension account. That is not a proper result. *See Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 131 (2d Dept. 1986)(even with a finding of actual fraud, and in a setting of seeking to recover more than what was in the possession of the transferee, "[p]unishment is not a proper basis for granting relief in a fraudulent conveyance action ... [n]o matter how 'scandalous' the conduct ..."). That these funds were never in plaintiffs' reach or subject to their collection, yet found to have been transferred in bad faith only once removed from their protective status, makes this finding of fraud "plainly punitive." *See id.*

If Mark had made any effort to shield these funds from plaintiffs he would have done nothing and left them in his Metlife account. He had absolutely nothing to gain in relation to plaintiffs' claims by withdrawing them and giving them to Tatyana, and his doing so certainly does not manifest bad faith or actual fraud under DCL § 276.[10] Instead, what Mark did and how he did it supports exactly what the Mirvis Non-Parties allege to have taken place—Mark's effort to repay his daughter for the living expenses she had paid.

---

[10] Even more, those $37,000 were paid to Tatyana because Mark was humiliated that his daughter was paying his way. Tatyana did not ask for those funds and given her income at the time, did not need those funds. *See* Tatyana Affidavit ¶¶ 33, 36.

11

**D. The Payments of Expenses Post-Oceana Were Controlled by Tatyana Mirvis**

It is conceded that Mark controlled the Oceana proceeds. However, once those proceeds were exhausted, in 2013, the funds in all of the HSBC and TD accounts were Tatyana's.[11] *See* Tatyana Affidavit ¶¶ 32-35, 37. The R&R, at pp. 21-23, finds that Mark Mirvis controlled a number of TD and HSBC bank accounts based on handwriting analysis of the checks showing that he wrote out the checks—but not their signatures—and deposit slips, and some ten checks (including two in connection with the Florida foreclosure settlement), out of hundreds, that may have been written for Mark's benefit. The Non-Parties have never disputed that Mark wrote these checks for Tatyana's signature in connection with Tatyana paying assorted bills.[12] *See id.* at ¶¶ 59-60. That Tatyana wrote a few checks for Mark's benefit is also conceded. *See id.* at ¶ 37. These are the facts that were found to be the conclusive support that Mark Mirvis controlled these accounts and used them for his benefit, to the exclusion of Tatyana, and should be turned over to plaintiffs. Respectfully, these meager facts cannot establish control sufficient to order the turnover of these funds (*see* R&R pp. 22, 24).[13]

---

[11] TD account ending 0319 included Lyubov Mirvis's money as well. *See* Tatyana Affidavit ¶ 119.

[12] The R&R does not address the signatures of these checks, only the checks themselves and deposit slips. Tatyana had always maintained that she alone signed the checks for her accounts. Neither plaintiffs nor their expert have made a meaningful showing of that not to be true.

[13] The R&R, at p. 22, cites to *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) to support the turnover. Aside from describing the rebuttable presumption that the account holder owns the account and the funds, counsel does not see how this case supports the turnover of these accounts.

**E.      An Award of Interest or Attorneys' Fees Is Not Supported**

Attorneys' Fees may be awarded under DCL § 276-a where both the transferor and transferee acted with intent to defraud. *See* DCL § 276-a. As discussed above, however, none of the transactions satisfy this standard. The Oceana transaction was made without any nefarious intent by anyone as Mark Mirvis could not have been hiding or avoiding plaintiffs' non-collection efforts. The Lupolover and Metlife withdrawal transactions were *bona fide* transfers, with sufficient consideration, both intuitive and logical, obviating any finding of actual fraud. Additionally, the Oceana and Lupolover transactions were made before plaintiffs had a judgment and at a time that Mark had no reason, and did not, hide the details of his conduct or a single asset or bank account. If he were engaged in these transfers maliciously and with intent to defraud, as found in the R&R, he would have made some legitimate efforts to cover his tracks and hide his assets. As to the Metlife transfers, it simply makes no sense for Mark, in purportedly acting to hide his assets and defraud plaintiffs, to remove funds from a protected pension account which was not subject to collection to give $37,000 funds to his daughter. Without exception, the facts that present in this case do not lead to a conclusion that any of these transfers were made with fraudulent intent to deceive plaintiffs or to hinder their ability to pursue their judgment. They evidence ordinary transactions that, with the exception of the misguided Oceana deposit, demonstrate nothing more than *bona fide* transfers for ordinary and supportable reasons.

## Conclusion

The facts in this case, seen within the context of this family setting and after understanding their underlying details, underscores the benign nature of what took place and the lack of any nefarious conduct. Even the Oceana transfer, subject to question on its face, was not maliciously motivated.

The facts and record do not support the claims and characterizations that were adopted in the R&R. Accordingly, the R&R should be rejected.

Dated: October 5, 2018

THE SILBER LAW FIRM, LLC

By _____
Meyer Y. Silber (MS 1719)
*Attorneys for Non-Parties*
*Lyubov Mirvis, Tatyana Mirvis*
*and Alexander Boriskin*
11 Broadway, Suite 715
New York, New York 10004
Tel.: (212) 765-4567