```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2

3     ------------------------------------X
      ALLSTATE INSURANCE COMPANY, et al., :
4                                         :   08-CV-04405 (PKC)
                            Plaintiffs,   :
5                                         :
                   v.                     :   225 Cadman Plaza East
6                                         :   Brooklyn, New York
      MARK MIRVIS, et al.,                :
7                                         :   February 10, 2020
                            Defendants.   :
8     ------------------------------------X

9
                TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
10                  BEFORE THE HONORABLE PEGGY KUO
                    UNITED STATES MAGISTRATE JUDGE
11
      APPEARANCES:
12
      For Plaintiffs:           WILLIAM J. NATBONY, ESQ.
13                              Cadwalader, Wickersham & Taft, LLP
                                1 World Financial Center
14                              New York, New York 10281

15                              DANIEL SCOTT MARVIN, ESQ.
                                ROBERT A. STERN, ESQ.
16                              Morrison Mahoney, LLP
                                120 Broadway, Suite 1010
17                              New York, New York 102710

18    For Movants Lyubov Mirvis GARY TSIRELMAN, ESQ.
      and Tatyana Mirvis:       NICHOLAS PAUL BOWERS, ESQ.
19                              Gary Tsirelman, PC
                                129 Livingston Street
20                              Brooklyn, New York 11201

21    For Defendant Mark        MARK MIRVIS, Pro Se
      Mirvis:                   289 Bayberry Drive
22                              Hewlett, New York 11557

23    Court Transcriber:        RUTH ANN HAGER, C.E.T.**D-641
                                Typewrite Word Processing Service
24                              211 N Milton Road
                                Saratoga Springs, New York  12866
25


      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
```

2

1   (Proceedings began 11:33 a.m.)

2          THE CLERK:  The Honorable Magistrate Judge Peggy Kuo

3   presiding.  Civil cause for motion hearing, docket number 08-

4   CV-04405, Allstate Insurance Company, et al. v. Mirvis, et al.

5          Counsel, please state your name for the record,

6   starting with the plaintiffs.

7          MR. NATBONY:  William Natbony from Cadwalader,

8   Wickersham & Taft, on behalf of plaintiffs.  Good morning,

9   Your Honor.

10          MR. MARVIN:  Daniel Marvin, Morrison Mahoney, also

11   for plaintiffs.  Good morning.

12          MR. STERN:  Rob Stern from Morrison Mahoney on

13   behalf of plaintiffs.  Good morning, Your Honor.

14          MR. TSIRELMAN:  Gary Tsirelman on behalf of Tatyana

15   Mirvis and Lyubov Mirvis.  Good morning, Your Honor.

16          MR. BOWERS:  Nicholas Bowers on behalf of Lyubov

17   Mirvis and Tatyana Mirvis.

18          THE COURT:  Good morning, everyone.  Sorry.  My mic

19   wasn't on.

20          MR. NATBONY:  Good morning, Your Honor.

21          MR. BOWERS:  Good morning, Your Honor.

22          THE COURT:  Okay.  I was saying "good morning" to

23   everyone.  So we're here on a hearing to consider the motion

24   that's been made by plaintiffs with regard to 289 Bayberry

25   Drive.  My -- I guess, let me just start by asking, what is

3

1    the status of the home at the moment?  Who -- who's living

2    there?  What's -- there's a lien on it.  Right.  Like what is

3    happening?

4              MR. NATBONY:  Sure.  First of all, Your Honor, I did

5    have a conversation with Mr. Tsirelman before we began today

6    and my understanding is there is no -- there is going to be no

7    further submission of evidence before you today.  So the

8    record is I know that Mr. Tsirelman and Mr. Bowers sent some

9    additional documents to the Court recently, which we looked at

10   and we'll be happy to address at the time that we present

11   argument to Your Honor.

12             But to answer your question directly, my

13   understanding is that Mark Mirvis, his wife, his daughter,

14   Tatyana, Tatyana's husband and a young child whose name I

15   won't put into the record for the moment, all live in the

16   house at the moment.

17             My understanding is that there are -- there is a

18   mortgage and a line of credit out on the property.  The most

19   recent valuation on the property dated January 2, 2020 that

20   we've pulled off the Nassau County Department of Assessment

21   assesses the market value at over 1.4 million dollars.  My

22   understanding is that the total outstanding based on the

23   mortga -- on the outstanding line of credit and looks to me to

24   be around --

25             What is it?

4

1        MR. TSIRELMAN:  The mortgage -- Your Honor, in their

2   papers the mortgage amounts to approximately $785,000.

3        MR. NATBONY:  Right.

4        MR. TSIRELMAN:  And the homestead exemption they

5   admit to be about $170,000.

6        MR. NATBONY:  Right.  So the mor -- as I had read it

7   in docs 632, the mortgage and LCC balances are somewhere

8   between 750 and 800,000.  We agree on that.  And then the

9   exemption I believe, Your Honor, under the law is $170,825.

10  So, you know, just so that we know this is not an exercise in

11  futility there is, in fact, equity in the property.

12       THE COURT:  Okay.  So can you explain -- I mean, I

13  don't think I understand how the homestead extension --

14  exemption works.  What would that mean?  That --

15       MR. NATBONY:  I --

16       THE COURT:  That's the amount of money that --

17       MR. TSIRELMAN:  That's the amount of money that

18  cannot be garnished by a creditor.

19       THE COURT:  Got it.  That's what I thought it was.

20       MR. NATBONY:  That -- that's my understanding and

21  that's provided for in the CPLR, Your Honor,

22       THE COURT:  Right.  Okay.

23       MR. NATBONY:  Shall I --

24       THE COURT:  So whatever the house is sold for, the

25  Mirvises would get that amount.  All right.

1          MR. NATBONY:  That's correct, Your Honor.

2          THE COURT:  So let me ask another question before

3    you start, Mr. Natbony.  Are you seeking to have the entire

4    house -- I mean, you can't sell half a house I guess.  Maybe

5    you can, so that's what we should find out.  But are you

6    seeking to have the whole house sold and to seize half of it

7    be -- as part of Mr. Mirvis's judgment?

8          MR. NATBONY:  Happy to address that, Your Honor.

9          THE COURT:  Okay.

10          MR. NATBONY:  So I think there's no dispute that the

11   law allows us to execute on whatever that means on Mr. Mirvis'

12   interest in the property.

13          I guess the question is about the second half of the

14   property that Your Honor -- so our position is that under two,

15   in fact, cases now, that is the one in the Eastern District

16   and one in the Southern District, that is under the Clarkson

17   decision, 533 F. Supp. 905 and under the Hallmark Electronics

18   Corporation case out of the Eastern District.  And that was

19   Judge Nickerson that, in fact, once the fraudulent conveyance

20   of the property was made and that Mrs. Mirvis participated in

21   that fraudulent conveyance, the tendency by the entirety is

22   dis -- is extinguished and, in fact, the law provides that we

23   would have the ability to execute on the entire of the house.

24          So that is our position.  That is undisputed as a

25   matter of law that we have at least entitlement to the --

6

1   Mr. Mirvis's interest and under prevailing case law because of

2   Mrs. Mirvis's participation in the fraudulent conveyance it is

3   no longer a tendency by the entirety.  It's now a tendency in

4   common and, in fact, we can execute on the entire -- and in

5   fact, you know, if you think about it, Your Honor, and the way

6   the courts have said the rationale for this, you know, there's

7   a good reason for that rule.  And the rule is that when you

8   are looking at the wife's participation in the fraudulent

9   conveyance, and I think as Judge Nickerson said, if you don't

10  do what is set forth in the two cases that I've said,

11  essentially you are -- the Court is enabling these individuals

12  to accomplish precisely what they wanted to do, you know, in a

13  fraudulent conveyance.

14          So what they couldn't do by fraud you're now able to

15  accomplish by -- if the husband outlived the wife you'd be

16  essentially shielding half the property, you know, from

17  execution.  And Judge Dickerson found -- Judge Owen found in

18  Clarkson that that result, which is allowing the ultimate-only

19  execution on half of the property after the wife has

20  participated, would offend justice.  And that's our position

21  on that.

22          THE COURT:  Right.  And what is the fraudulent

23  conveyance here that Mrs. Mirvis participated in?

24          MR. NATBONY:  If you recall, Your Honor, and Your

25  Honor issued the decision on this again.  It's really

7

1  undisputed that Mr. Mirvis -- Mark Mirvis -- and his wife
2  transferred their interests to their daughter for $10 in
3  consideration.
4          THE COURT:  Right.
5          MR. NATBONY:  And Your Honor will recall that Your
6  Honor found that to be a fraudulent conveyance and
7  essentially --
8          THE COURT:  Reversed it.
9          MR. NATBONY:  -- reversed it.
10         THE COURT:  Right.
11         MR. NATBONY:  And, you know, put it back.  So that
12  is --
13         THE COURT:  So even though that was unsuccessful
14  conveyance, the fact that they tried to do that is enough to
15  extinguish her portion of the house?
16         THE COURT:  Yes, Your Honor.  And, in fact, in both
17  cases that I mentioned they were reversed.  So this wasn't a
18  situation where the conveyances stood or upheld.  Conveyances
19  were reversed.  One argument was made, oh, it goes back to the
20  original tendency and the entirety and the courts rejected
21  that argument in both of those cases.
22         THE COURT:  But -- so I recall -- I don't remember
23  if those were exactly those cases, but in at least some of the
24  cases that I've seen they were a second home and not the
25  primary home.

8

1          MR. TSIRELMAN:  Correct, Your Honor.

2          THE COURT:  A vacation house and a pied-a-terre.

3          MR. NATBONY:  But I don't --

4          THE COURT:  So does that matter?

5          MR. NATBONY:  I don't -- well, I think it doesn't

6    matter for that legal issue.

7          THE COURT:  Right.

8          MR. NATBONY:  I think.  And I believe that at least

9    one of the cases, the <u>Hallmark</u>, was a primary home.  But I

10   think it could be relevant to Your Honor's determination on

11   whether to under the CPLR deal with the hardship issue which

12   I'm happy to address.  You know, I think -- you know, Your

13   Honor is intimately familiar with the family and the

14   fraudulent issues that have surrounded this family.

15          Mark Mirvis was found to be an active member of a

16   fraudulent insurance scheme involving sham companies with a

17   judgment of 45 million dollars.  And the Court has been aware

18   of past instances where Mirvis has involved his family

19   members, you know, in assisting in this scheme.  You will

20   recall not only Mrs. Mirvis and her daughter's participation

21   in this fraudulent conveyance, but there have been others

22   before Your Honor with respect to bank accounts of Mrs.

23   Mirvis -- I'm sorry, of Tatyana Mirvis that the debtor had

24   control over.

25          So, you know, I have -- I've said before that this

9

1   is kind of a, you know, all-in-the-family type of situation

2   but obviously, Your Honor, this is no laughing matter.  It's

3   not a TV show.  It's real life and we think there will have to

4   be consequences to this action -- these actions.

5          I think -- this Court already concluded that the

6   transfer that you talked about was a fraudulent conveyance and

7   recommended cancellation of the discha -- and discharge of the

8   deed and that Mirvis's interest in the property be subject to

9   levy and the property should be levied upon by the U.S.

10  Marshal.  That's already been decided.  And Judge Townes

11  adopted your report and recommendation.  So as far as whether

12  something should be levied on that's already been decided by

13  you and Judge Townes.

14         THE COURT:  The question is when?

15         MR. NATBONY:  The question is when and the question

16  I think also goes to the issue of the hardship, which I'd like

17  to get to.

18         MR. TSIRELMAN:  Your Hon --

19         MR. NATBONY:  So --

20         MR. TSIRELMAN:  Your Honor, may I briefly address

21  before we get to the hardship because hardship is really a

22  small part of our position?

23         THE COURT:  Okay.  So why don't -- fine.  We'll hold

24  that and I'll come back to you, Mr. Natbony.

25         MR. NATBONY:  All right.  I did --

1          THE COURT:  Okay.

2          MR. TSIRELMAN:  Thank you, Your Honor.  Your Honor,

3   we --

4          THE COURT:  Well, hold -- hold on a second.

5          MR. TSIRELMAN:  Oh, there's more?

6          THE COURT:  So before you go to hardship was there

7   anything else you wanted to say on the legal issue?

8          MR. NATBONY:  Oh, yeah.  I mean, I think that --

9   there are a couple of things I think that just remain

10  undisputed that I think the Court should just keep abreast of.

11  Property does have value.  I think we've gone through that.

12  Clearly, Mirvis has an interest in the property.  You've got

13  the prior order and judgment out there already.  And I think

14  the other thing I'll leave for hardship and if Mr. Tsirelman

15  wants to speak I'll get to hardship.  Is there anything else

16  that I had?  Nope.  That's it.

17         THE COURT:  Okay.  Great.

18         So, Mr. Tsirelman, what did you want to say?

19         MR. TSIRELMAN:  Thank you, Your Honor.  Excuse me.

20  Your Honor, we strongly disagree with Allstate's position on

21  the law.  Specifically -- and this is a case -- before I get

22  to the case but in sum and substance, Your Honor, Allstate is

23  really arguing that they should be a creditor with greater

24  rights after the fraudulent conveyance than they have as the

25  creditor before the fraudulent conveyance.  That position,

1   Your Honor, the Appellate Division has already addressed.

2   It's not a case that's cited in any of our papers but I found

3   it last night as I was preparing for this case and I will give

4   you a cite.  It's <u>MAR Midland Bank v. Murkoff</u>, 120 A.D.2d App.

5   Div. (1986).  And that Court has held and I quote that:

6          "Defrauded creditor is not entitled to an

7          enhancement of position beyond what it was before the

8          fraud."

9          It went on to say:

10         "The punishment is not a proper basis for granting

11         relief in the fraudulent conveyance action no matter how

12         scandalous the conduct."

13         Now, the cases that Allstate is relying on, you're

14   right, Your Honor, they're different on the facts.  For one,

15   this was -- in the federal cases this was not a homestead

16   property; number two, the wife in those cases was involved in

17   the fraud itself; and number three, the property unlike this

18   case was transferred to a wife herself and here was

19   transferred to the daughter.

20         Moreover, at least one, if not both cases -- I think

21   one case was before the 1986 and the other case didn't cite to

22   this <u>Midland Bank v. Murkoff</u>.  As far as I remember it did

23   not.

24         And the difference, Your Honor, and I want to point

25   this out -- this is very important -- that the Court has found

1   that Mark Mirvis' interest in the property be subject to the

2   levy.  It never found that Lyubov Mirvis's interest should be

3   subject to the levy.  And, in fact, Your Honor, I would submit

4   to you that the judgment debtor's wife cannot be and could not

5   have been deemed to have fraudulently conveyed her interest in

6   the property to her daughter.  And why not?  Well, simply

7   because the fraudulent intent that attaches to the judgment

8   debtor when he transfers the property to anyone could not have

9   been attached to his wife.  His wife was not a defendant.  His

10  wife did not have a judgment against her.  Her right in the

11  property was unencumbered by any creditor, so her conveyance

12  could not have been deemed fraudulent.

13          Now, I was not an attorney in this case before and

14  the conveyance was -- in fact, was the entire conveyance was

15  deemed fraudulent and was reversed.  And so Allstate, maybe

16  because they read our opposition or some other reason,

17  probably realized that they cannot succeed unless they somehow

18  implicate the debtor's wife in this transaction.

19          So in the reply -- now this is on page 13 -- it kind

20  of summarizes this entire thing.  And this is what they say,

21  quote, "Plaintiffs submit that any tendency by the entirety

22  interest or right of survivorship of L. Mirvis" -- which is

23  debtor's wife -- "has or should be deemed to have

24  terminated" -- which is their argument -- "and based on her

25  participation in fraudulent transactions."

13

1    So they need her participation in fraudulent

2  transaction but, Your Honor, nowhere in the motion or the

3  reply they tell us what is that fraudulent participation.

4  It's not here.  The Court did not make a finding as far as I

5  know that the wife had participated in the fraud.  As argued

6  before she couldn't have.

7    And these cases are very different and the facts of

8  this, as I said before, is very different than the cases they

9  cited where the wife actually testified in open court and the

10  judge deemed her testimony incredible.  In this case Miss --

11  the wife Mirvis did not testify.  She did not submit to any

12  deposition.  There's nothing here that the wife did and, as I

13  said before, her transaction was, I believe, fully legal.  And

14  with that in mind, Your Honor, we believe that this motion

15  should be denied.

16    I want to also address very briefly before we get to

17  the hardship exactly what is this house worth and what can

18  they get out of this house.  So even if we assume that this

19  house is worth 1.4 million dollars, this house is going to be

20  sold at an auction.  And we all know that people buying houses

21  at an auction buy them at 10 to 20 percent below market value

22  price because if the situation was reversed, if people were

23  buying it at an auction above the market value price then,

24  Your Honor, I'd submit to you that every house would have been

25  sold in an auction.  That's just not the case.  People buy at

14

1   an auction and for a good reason.  They can't get into the

2   house.  They can't send an inspector into the house.  They

3   don't know what's broken or what's fixed.  So the houses

4   probably would sell ten, 20 percent below the market value.

5   And 20 percent of 1.4 is $280,000.  And if you subtract from

6   1.4 just this 20 percent and then you subtract the tax that

7   the buyer would have to pay the county, the transfer tax, and

8   the tax they would have to pay to the state.  And the fees

9   that they would have to pay the sheriff or the Marshal for the

10  auction and other costs and add into that the $785,000

11  mortgage and $170,000 exemption, you have to ask yourself why

12  would Allstate knowing all this still file this motion?

13          And the answer, Your Honor, I submit to you is the

14  same reason why Allstate had issued subpoenas for Tatyana

15  Mirvis which they recently withdrew I understand, the same

16  reason they issued subpoenas to her husband, the same issue --

17  the same reason they issued subpoenas to this firm.  The only

18  reason, Your Honor, is exactly what CPLR 5240 is designed and

19  grants the Court broad discretionary powers to control and

20  regulate the enforcement of money judgments to prevent

21  unreasonable annoyance, expense, embarrassment and

22  disadvantage.

23          Your Honor, for all those reasons, and I leave the

24  hardship for later, we ask the Court either to deny the motion

25  or as the courts have held give and allow the creditor

1    legitimate security interest which is protected by a lien and

2    the right of survivorship.  If the wife prede -- predeceases

3    the judgment debtor, Allstate gets the house.

4            THE COURT:  And if not?

5            MR. TSIRELMAN:  And if not, they don't.

6            THE COURT:  Okay.  So how does the judgment get

7    paid?

8            MR. TSIRELMAN:  It cannot get paid through selling

9    of the house and fee simple.  There's simply -- in the State

10   of New York it's simply not an option.  And under the facts of

11   this case it should not be granted.

12           THE COURT:  Okay.  So I was curious about your

13   statement that without Mrs. Mirvis's testimony that the Court

14   then finds incredible, she can't be found to have con --

15   participated in fraud.

16           MR. TSIRELMAN:  Not --

17           THE COURT:  I found that to be a somewhat curious --

18           MR. TSIRELMAN:  Not -- Your Honor --

19           THE COURT:  -- characterization.

20           MR. TSIRELMAN:  That's --

21           THE COURT:  No?

22           MR. TSIRELMAN:  I apologize.

23           THE COURT:  Then I was mistaken.

24           MR. TSIRELMAN:  Yes.  I apologize.  I'll make it a

25   little more clear.  What I meant to say is to distinguish the

16

1  facts of this case with the facts of the case they cited.  I

2  believe the Clarkson case where the wife did testify and the

3  Court found that, just to make the distinction.

4       THE COURT:  Okay.  And so are you saying that -- I

5  guess I'm just trying to extrapolate to this case to see what

6  the circumstances might be where there -- a Court could find

7  fraud.  Would you agree that the Court could -- theoretically

8  maybe not on the facts of the case but that the Court could

9  infer fraud without testimony?

10      MR. TSIRELMAN:  Your Honor, certainly the Court can

11  infer fraud without testimony but as -- I mean, that would be

12  a very interesting inference and depending on the facts of the

13  case.  But as the Appellate Division had said and the case I

14  quoted, they still would not -- the creditor would still not

15  give greater rights they had before the conveyance than they

16  do have now.

17      THE COURT:  All right.  So the fact that Mrs. Mirvis

18  and Mr. Mirvis made the decision together, right -- because

19  I'm just trying to figure out since we don't have testimony

20  what the facts are in this case, they make a decision together

21  to convey this house to their daughter for $10.  So that isn't

22  something that the Court could infer was fraudulent --

23      MR. TSIRELMAN:  Correct.

24      THE COURT:  -- by Mrs. Mirvis?

25      MR. TSIRELMAN:  Correct, Your Honor.  And let me

17

1  explain to you why.  So we would be speculating if we would

2  assume that each one decided to gift each other's half to the

3  daughter.  So what could have happened is Ms. Mirvis could

4  have gran -- or gifted only her half to the daughter.  That

5  would not be fraudulent.  And Mr. Mirvis decided to grant his

6  half to the daughter.  That would be a fraudulent conveyance.

7  But because Ms. Mirvis was not under any judgment and she was

8  not a defendant, she had every right to gift her half to her

9  daughter, and that's the distinction I'm trying to make.

10          THE COURT:  Right.  I understand that.  But in real

11  life when people make those decisions they're only going to do

12  that with knowledge that they're doing something that's not

13  normal for a purpose, right?  I mean, it wasn't a birthday

14  present.  There's no testimony that it was.

15          MR. TSIRELMAN:  Well, could -- there's no testimony

16  that -- of any sort.

17          THE COURT:  Right.

18          MR. TSIRELMAN:  There's no testimony that it wasn't.

19          THE COURT:  But that's what I mean.  That's what I'm

20  saying about --

21          MR. TSIRELMAN:  Correct.

22          THE COURT:  -- in real life the Court can't be blind

23  to what normally happens and what doesn't happen and if

24  there's a good explanation for it, sure.  But when there's no

25  good explanation for something that looks strange and unusual

18

1    the Court could infer certain things from it.  And in your

2    scenario it's not likely that a husband with a multi-million

3    judgment against him doesn't sit down with his wife or -- and

4    have a conversation about what they're doing about their

5    house.  Likewise, there's no information that the wife has no

6    idea what is going on and innocently tried to gift this house

7    as a birthday present to their daughter, right, with this kind

8    of strange $10 thing because it wasn't really even a gift.

9            So I'm just saying that the circumstances are just

10   highly suspicious and in the absence of information that puts

11   a factfinder's mind to rest to say, "Ah, okay.  I see.  That

12   explains everything."  In the absence of that I think it seems

13   fair for the fact finder to say, "You know what, the only

14   explanation I can come up with is that they're trying to --

15   they're up to no good," right?  "They're trying to hide money.

16   They're trying to do something that's technically okay in the

17   scenario that you posited it, that she's gifting her half and

18   then he's doing something else."  It may be technically okay

19   but it in the context is not okay.

20           So that's the gray area that I think you're trying

21   to lead me through and I just have a lot of questions about

22   that.

23           MR. TSIRELMAN:  Yes, Your Honor.  And what I think

24   to make my point clearer is this.  When the judgment transfers

25   something like that, the law imposes on that transfer a

19

1   fraudulent intent.  What I'm saying is that when the wife

2   transferred it, the law cannot impose of that a fraudulent

3   intent.  She could have if she wanted to.  Whether there was a

4   judgment against her husband or what -- no judgment against

5   her husband, whether she wanted to do it to protect her

6   part -- her half of the house, she could have well have done

7   that and that would not have been considered a fraudulent

8   intent.

9          So I will take your scenario and I'll run with it.

10  Suppose, as in this case, the judgment that is half is subject

11  to the creditors and her half is not and she could have -- and

12  I believe there was some testify that they went to an attorney

13  who suggested something and the attorney could have said, you

14  know what, at least your half you can protect.  You can

15  transfer to your daughter.

16          THE COURT:  "You" meaning --

17          MR. TSIRELMAN:  The wife.

18          THE COURT:  Well, why does she have to protect it at

19  that point?  Under your scenario it's already protected.

20          MR. NATBONY:  Right.

21          MR. TSIRELMAN:  She doesn't have to, but if she

22  wanted to give it to her for -- to the daughter for other

23  purposes, she could have.  That's all I'm saying.

24          THE COURT:  Right.  Yeah.  But then it -- but the

25  other purposes hasn't been explained to me.

1          MR. NATBONY:  There was an explanation in the record

2   but not by her.

3          THE COURT:  Okay.  So there's no --

4          MR. TSIRELMAN:  Not by her.

5          THE COURT:  From my perspective there's no

6   explana --

7          MR. NATBONY:  No.  There isn't.

8          THE COURT:  Hold -- hold on.

9          MR. NATBONY:  I'm sorry.

10          THE COURT:  There's no explanation for it.

11          MR. TSIRELMAN:  Not by her.  Correct, Your Honor.

12          THE COURT:  And she would have been protected had

13   she done nothing because the house is half hers.  But instead,

14   she did something that looks like she's trying to hide it.

15   And so once you do that it -- with her husband because it

16   wasn't just her half being transferred; it was his half as

17   well.

18          MR. TSIRELMAN:  Correct.

19          THE COURT:  The whole house is being transferred.

20          MR. TSIRELMAN:  Correct.

21          THE COURT:  So in that scenario it starts to look

22   like they're hiding the money.  So that's the problem, right?

23   If they're just -- if people are just --

24          MR. TSIRELMAN:  Correct.

25          THE COURT:  -- walking out of the bank carrying

21

1   their pocketbook and wallet that looks fine.  But if they're

2   starting to throw money in the gutter, you know, then it looks

3   like they stole it.

4           MR. TSIRELMAN:  Correct.

5           THE COURT:  And unless there's a good explanation

6   for it then that's still what it looks like.  So that's

7   what --

8           There -- there's a gentleman in the courtroom.  Does

9   anybody recognize him?

10          MR. TSIRELMAN:  Yeah.  That's the judgment debtor,

11  Your Honor.

12          THE COURT:  Is it --

13          MR. MIRVIS:  Can I come to --

14          THE COURT:  -- Mark Mirvis?

15          MR. MIRVIS:  For a second?  I'm sorry.

16          MR. TSIRELMAN:  Yeah.  That's Mark Mirvis, Your

17  Honor.

18          THE COURT:  Do you want to talk to your client -- to

19  your lawyer?

20          I think he wants to talk to you.

21          MR. TSIRELMAN:  May I, Your Honor?

22          THE COURT:  Yeah.  Take a break.  Go talk to him.

23          UNIDENTIFIED VOICE:  He's *pro se*.

24          MR. NATBONY:  Wait, who is it?

25          UNIDENTIFIED VOICE:  It's Mark Mirvis.  He's *pro se*.

22

1    He's not his lawyer.

2              MR. NATBONY:  But that's not his lawyer, Your Honor.

3    He's --

4              THE COURT:  No?

5              MR. NATBONY:  -- appearing here *pro se*.

6              THE COURT:  Oh, wait.  Hold on.

7              MR. MIRVIS:  My lawyer, Your Honor.  I had this

8    lawyer.

9              MR. NATBONY:  Not here.  Not in this case, Your

10   Honor.

11             THE COURT:  All right.  Hold on.  So --

12             UNIDENTIFIED VOICE:  What --

13             THE COURT:  Hold.  Wait.  Hold.

14             MR. NATBONY:  He's not representing Mr. Mirvis in

15   this case.

16             MR. TSIRELMAN:  I represent his wife and the

17   daughter now.

18             THE COURT:  Okay.  So I will give you a few moments

19   to talk.  Please come back.

20             MR. TSIRELMAN:  Okay.

21             THE COURT:  This is the first time I've seen

22   Mr. Mirvis I think.

23                      [Pause in the proceedings.]

24             MR. TSIRELMAN:  Thank you.

25             THE COURT:  All right.  So, Mr. Tsirelman, is there

23

1  anything else you want to say at this point?

2          MR. TSIRELMAN:  Your Honor, the -- Mr. Mirvis has

3  informed me that this would -- there was an explanation.  It's

4  in the record.  I'm not going to go through it, but it had

5  something to do with the daughter paying all the mortgage at

6  the time --

7          THE COURT:  Yeah.  I remember that.

8          MR. TSIRELMAN:  -- and everything.  And so --

9          THE COURT:  Yeah.  I remember that.

10          MR. TSIRELMAN:  Right.  So I'm not going to go

11  through them.

12          THE COURT:  Yeah.  I remember that being given and I

13  remember rejecting that.

14          MR. TSIRELMAN:  Right.  Right.

15          THE COURT:  Yes.  Okay.  So that -- that's it?

16          MR. TSIRELMAN:  Yes.

17          THE COURT:  Okay.

18          MR. NATBONY:  May I respond?

19          THE COURT:  Go ahead, Mr. Natbony.

20          MR. NATBONY:  Thank you, Your Honor.  So just a

21  few -- just a few points in particular in response and then

22  I'll touch on hardship, if I may.  So there actually is some

23  evidence in the record that I just want to point to Your Honor

24  to.  And that's in document 459-1 at paragraph 11.  You know,

25  we refer to the fact that Tatyana Mirvis has said that both of

24

1    her parents, that means Mark and Lyubov, convinced her to deal

2    with this fraudulent conveyance and accept the conveyance.  So

3    both not only talked to Tatyana about this and convinced her

4    to participate, but Your Honor has already found that the

5    fraudulent conveyance in which Mr. Mirvis' wife did

6    participate was a fraudulent conveyance.  And I don't know of

7    any other explanations, you know, in the record.

8           THE COURT:  So, I'm sorry.  You -- the -- you said

9    it was document 459-1?

10          MR. NATBONY:  Dash 1 --

11          THE COURT:  Paragraph 11.  And that --

12          MR. NATBONY:  Paragraph 11, I believe.

13          THE COURT:  And that is the daughter's affidavit?

14          MR. NATBONY:  I believe that's correct, Your Honor.

15          THE COURT:  Okay.  All right.  I'll double-check it.

16   If I'm not right I'll -- but that's -- that is that testimony.

17          THE COURT:  Okay.

18          MR. NATBONY:  I -- you know, as far as this other

19   case that, you know, Mr. Tsirelman says, "I have not seen that

20   case."  I know that it predates at least the second case that

21   I've mentioned to you, Your Honor, which is the <u>Hallmark</u> case.

22   I am happy to address it after the argument if you want, but

23   the bottom line is it -- you know, I -- we believe that it's

24   on all fours.

25          So there was a pattern here.  The other thing to

25

1   point out to Your Honor is the timing of these conveyances

2   which, you know, should not be left aside.  I mean, if there

3   was some reason to determine [ph.], why was it done within

4   days of -- you know, of certain key dates relating to the

5   default judgment here?  And by the way, Your Honor, the 459-1

6   was Tatyana Mirvis's affidavit.

7           THE COURT:  Okay.

8           MR. NATBONY:  Okay.  And it's paragraph 11.  She

9   says, "My parents told me it was the proper way to proceed."

10  So "my parents" in plural.

11          As far as the auction price argument that

12  Mr. Tsirelman made, I mean, it's just entirely speculative.  I

13  don't know what the house will go for.  We know what the value

14  is.  Even if you take Mr. Tsirelman's numbers at face value

15  there's still going to be hundreds of thousands of dollars,

16  you know, that can be exercised for a 45-million-dollar

17  judgment.  You know, and I sit here and I listen to, you know,

18  Mr. Tsirelman talk about, you know, bother and expense and

19  unreasonable conduct.

20          You know, in all fairness, Your Honor, if there's

21  been any unreasonable conduct here, you know, it's been by

22  Mr. Mirvis and his family.  Allstate has a 45 million-dollar

23  judgment.  It's seen pittance on that judgment and he just

24  continues and continues to try and evade paying any portion of

25  this judgment.

26

1          THE COURT:  He's been held in contempt.

2          MR. NATBONY:  Yes, Your Honor, he has.  You know,

3    and -- you know, and let's -- so I think -- I'd like to turn

4    to hardship now unless, you know, Your Honor has further

5    questions and I think first let's -- I guess I'd like to deal

6    with the child first, if I may.

7          So there is a past history here of involving family

8    members in evasion schemes and I think now we've gotten to a

9    new low.  And, you know, now they're using their grandson as a

10   pawn to assert hardship.  And essentially what they're asking

11   the Court to do is exercise its discretion under 5240 and help

12   them continue to evade the consequences of their action.  The

13   Court -- a Court should reject that effort.

14         So let's look at what they argue.  Well, first I

15   think it's important to know that the sale of the home does

16   not necessarily mean that the child or the family has to move

17   or that the child has to change schools.  It's the sale of a

18   house.  If you talk about that house, a sale could lead to

19   several options.  The family could rent it from new owners.

20   They could cohabitate.  They could purchase it from the new

21   owner or they could move to another home that is in the same

22   area where the same school could be located or another house

23   in the area.

24         And even if they do move there's no proof that

25   alternate housing or schooling is not available to rent or buy

27

1  near -- rent or buy nearby or other schooling.  Yeah, I

2  appreciate the tendency to put in words to catch people's

3  attention.  This family is not going to be on the street and

4  the child is not going to be on the street.

5          You know, the -- I will say that in some pleadings

6  the -- that Mirvis's wife put into the court she said, "Look,

7  if need be I'm going to provide the Court with a detailed

8  affidavit from a healthcare professional that shows the

9  special needs of this child and why the move would have a

10  substantial impact."  Well, where is that, Your Honor?

11          THE COURT:  Well, there was something filed, not

12  just the --

13          MR. NATBONY:  Well, I'm going to address that right

14  now.

15          THE COURT:  Yeah.  Okay.

16          MR. NATBONY:  There's --

17          THE COURT:  But did you see that or that's under --

18          MR. NATBONY:  I did, yes.

19          THE COURT:  Oh, okay.

20          MR. NATBONY:  We did see it.  It was provided to us

21  I think late Friday.

22          THE COURT:  Okay.

23          MR. NATBONY:  So they put in a letter from

24  Dr. Blinderman and I will tell you, Your Honor, that that

25  letter is totally worthless and here's why.  First of all,

28

1   there's no list of qualifications of this doctor, no

2   background, no CV, no indication of any expertise whatsoever

3   in child development.  In fact, I went on and I did a web

4   search for him.  He's a general pediatrician.  That's what he

5   is.  There's no indication of any psychological developmental

6   disability background.  It's a one-paragraph letter oddly

7   formatted, unsworn, not notarized, not under oath.  Doctor is

8   not here today.  It's not authenticated in any way.  Frankly,

9   it should be ignored.

10          But even if Your Honor chose to look at it there is

11  no identification anywhere in that one-paragraph letter of

12  what these special needs and disabilities are.  It just says

13  there are certain unidentified needs and he needs care not

14  found in every school.  He doesn't say that the care is not

15  available elsewhere.  He doesn't say that the care isn't even

16  available through the Hewlett School District which, by the

17  way, you know, looking online has a very significant special

18  education program for speech therapy, occupational therapy and

19  physical therapy.  You know, the affidavit of -- not in the

20  affidavit -- it's the one-paragraph, non-sworn statement --

21  also assumes a move from the neighborhood, which is not a

22  given.  It baldly says, "Taking the child out of current home

23  will negatively affect his progress and development."  How?

24  What's the basis for this statement?  There is nothing in this

25  one-page letter.  Frankly, Your Honor, if this was an expert

29

1  report it would be the classic case for application of

2  <u>Daubert</u>.

3         Then they also submitted to us on Friday a bunch of

4  school reports.  And again, we believe that these are equally

5  not providing a basis for application of this hardship.  No

6  one is disputing here, Your Honor, that this child has some

7  special needs but the question is, how is execution on the

8  house going to truly impact the needs and development of this

9  child?  And these school reports say nothing about that.

10  Again, they are unauthenticated.  They are pure hearsay.  They

11  should not be admitted.  But again, even if Your Honor wants

12  to look at them there's no mention in any one of those reports

13  about the importance of any peer relationship at that school,

14  of friends or teachers.  There is no mention in any of those

15  reports of the impact or any impact of a change environment or

16  a change of school or a change in residence, just not there at

17  all.  All these reports do show is that the child is getting

18  physical therapy, occupational therapy and speech therapy.

19  And frankly, those services are provided by the Hewlett School

20  District.  They have a special education plan in place that

21  offers those services.

22         So with respect to this hardship or this alleged

23  hardship, we understand this is a difficult situation but it's

24  not one where they have the burden of coming to Your Honor and

25  demonstrating and proving why Your Honor should exercise what

30

1   is a discretionary issue for Your Honor to basically take away

2   Allstate's right to execute on property when they just haven't

3   proved the impact that none of the submissions that they made

4   talk about it with any specificity.  You know, and to the

5   extent that they relied all on hardship for the family I'll

6   remind Your Honor that the family is currently paying mortgage

7   payments in excess of $4200 a month.  That doesn't include

8   property taxes.  When you put it all together they're

9   currently paying $7,000 proc -- over $7,000 a month.

10  Mr. Mirvis has admitted to an additional income of $2,000 a

11  month.  His son-in-law who lives there as we put into evidence

12  is a high-end real estate broker with over 500 million dollars

13  of sales in the last few years.  And according to the website

14  that we put in to Your Honor he is top-producing.  The family

15  takes vacations and the Court has already denied an

16  application by Mr. Mirvis for imporporous [ph.] relief in an

17  application based on a lot of this evidence.

18          You know, in all sincerity, Your Honor, the level of

19  arguments that come from the Mirvis family, you know, are

20  generally unsupported.  They like to throw things -- many

21  things out there in the hopes that something will stick and I

22  think Your Honor has seen many of these arguments, you know,

23  for what they are worth.

24          But to the extent that the Mirvis family is

25  concerned about the child, might I suggest that Mr. Mirvis

31

1   instead of opposing this application somehow maybe you should

2   pay the $10,000 in attorney's fees that Your Honor ordered and

3   avoid the possibility of incarceration and being away from

4   this grandson.

5           THE COURT:  So what information do you have about

6   Mr. Mirvis's ability to live if this house were taken from

7   him?

8           MR. NATBONY:  Well, again, I'm looking at the family

9   as a whole because the family is living there as a group, you

10  know.  And as I --

11          THE COURT:  But I'm try -- I'm asking you what

12  insight you have into his financial situation.

13          MR. NATBONY:  Right.  So I think what I've said is

14  he -- we know that he has at least income of $2,000 a month.

15  His wife has a full-time job.

16          THE COURT:  Has he answered your request for

17  information about his financial status?

18          MR. NATBONY:  Yes.

19          THE COURT:  Yes.

20          MR. NATBONY:  He did.

21          THE COURT:  Okay.

22          MR. NATBONY:  So his wife has a full-time job.  He

23  has a -- has some income for month.  But again, on this house,

24  you know, he's managing to pay over $8,000 a month, you know,

25  when -- over $7,000 a month when you combine the mortgage and

32

1   the property taxes.  So, you know, how is he going to live?

2   Well, if he's managing to do that and pay $7,000 a month, you

3   know, I think he can find another place to live.  And frankly,

4   if the desire is for the son and the daughter-in-law and the

5   child to be with them, there's nothing stopping them from

6   being able to do this.  And, you know, Mr. Tsirelman says,

7   "Oh, there are cases out there and exercising of discretion."

8   Yeah, but if you look at those cases, Your Honor, you know,

9   they're either cases where real hardship has been proven --

10  okay, that's their burden.

11       Okay.  They brought in not a single witness today.

12  You know, they could have brought the doctor.  They could have

13  brought other witnesses.  They chose not to.  The record is

14  the record and that's their burden on hardship.  And -- you

15  know, and in that case I think the answer is they haven't met

16  their burden.  There's enough in this record to show that they

17  can live and they can live just fine.

18       Anything else?

19       THE COURT:  And under the homestead exemption they'd

20  get $170,000 from the sale, is that right?

21       THE COURT:  That's correct, Your Honor.  I -- we're

22  not disputing that.  I mean, this is -- you know, we're not

23  looking for more than we're entitled to under the law.  But

24  the bottom line is when you have a wife that has, as this

25  Court has found, participated in a fraudulent conveyance, and

33

1 those are the words that the Court used in the Hallmark case,

2 participated in a fraudulent conveyance.  And when you've got

3 a pattern, you've got the timing, you've got all of these,

4 they have not come forth to dispute any of this.

5          In the cases where there has been discretion awarded

6 there's either been an absolute finding of severe hardship

7 which they have not done or there have been other instances.

8 For instance, in one case that they cite the Court exercised

9 its discretion not to ex -- execute on the home when they made

10 a commitment to pay thousands of dollars a month to the

11 judgment.  That hasn't happened here.  So, you know, there are

12 no other factors that would tend to allow this Court to

13 exercise its discretion.  What the Court should do is hold

14 this family, hold Mr. Mirvis to the consequences of their

15 actions.

16          THE COURT:  Let me just stop you there for a moment

17 and a procedural question.

18          MR. NATBONY:  Yes, Your Honor.

19          THE COURT:  Is Mr. Mirvis a party to this motion

20 such that he should be permitted to participate *pro se*?

21          MR. NATBONY:  Yes.

22          THE COURT:  Okay.  So should -- since he's here

23 perhaps I should invite him to say what he wants to say,

24 right?  Since he's *pro se* and you don't represent him and

25 Mr. Mirvis is here, I don't want him to be excluded because

34

1  this --

2         MR. MIRVIS:  [Indiscernible]

3         THE COURT:  Yeah.  Why don't you come up?

4         MR. TSIRELMAN:  Your Honor, and may I just address

5  some of the things he said before Mr. Mirvis --

6         THE COURT:  Yeah.  Go ahead.

7         MR. TSIRELMAN:  Thank you, Your Honor.  I'm going to

8  start from --

9         MR. NATBONY:  Ah --

10        THE COURT:  Yes.

11        MR. NATBONY:  Just before we go on, Your Honor --

12        THE COURT:  What?

13        MR. NATBONY:  I -- I have no problem with Mr. Mirvis

14 participating.

15        THE COURT:  Yes.

16        MR. NATBONY:  But I presume I'll have a right to

17 cross-examine if I want to?

18        THE COURT:  Well, if he hasn't testified he

19 hasn't --

20        MR. NATBONY:  Well, if he -- if he's coming on to

21 the record --

22        THE COURT:  Well, if he hasn't -- I -- he will

23 participate as --

24        MR. NATBONY:  As a *pro se* lawyer?

25        THE COURT:  As a *pro se* litigant.

1        MR. NATBONY:  Let -- let's --

2        THE COURT:  If he's not testifying under oath --

3        MR. NATBONY:  Okay.  I'll --

4        THE COURT:  -- he is not subject to --

5        MR. NATBONY:  I'll address that if it need be later.

6        THE COURT:  -- cross-examination.

7        MR. NATBONY:  Okay.

8        THE COURT:  If you want to call him as a witness

9  he's here.

10        MR. NATBONY:  Okay.

11        THE COURT:  So -- but I don't think just because --

12        MR. NATBONY:  I'll address this later if I need to.

13        THE COURT:  Right.  I think that the fact that a

14  person is in court doesn't mean he's testifying.

15        MR. NATBONY:  I agree, Your Honor.

16        THE COURT:  Okay.  So he can participate I think --

17  I didn't expect him to be here, but he's here and so I feel a

18  little bit strange not allowing him to participate if he wants

19  to.

20        MR. NATBONY:  No objection, Your Honor.

21        THE COURT:  Right.  And so that's why I've --

22        MR. NATBONY:  No objection.

23        THE COURT:  -- invited him to be here.  If he wants

24  to testify it needs to be under oath and then he would be

25  subject to cross-examination.  If he doesn't testify and it's

36

1   therefore not under oath the Court will take that as whatever

2   it is.

3           MR. NATBONY:  Thank you.

4           THE COURT:  It's not testimony.  Right.  Okay.

5           So, Mr. Tsirelman, go ahead.

6           MR. TSIRELMAN:  Thank you, Your Honor.  Just start

7   from the -- from the end that opposing counsel has spoken

8   about the case where they've agreed to base some of the

9   judgment -- the distinguishing factor in that case was that

10  the judgment debtor did not live in the house.  The judgment

11  debtor was renting that house out so they were making an

12  income of -- on that house and so the Court said that if you

13  continue to pay --

14          THE COURT:  That's the Clarkson case?

15          MR. TSIRELMAN:  I think so.

16          THE COURT:  Yeah.  Okay.  But --

17          MR. TSIRELMAN:  So that's the distinguishing factor

18  as far as --

19          THE COURT:  But Mr. Natbony pointed out that the

20  Hallmark Electronics case was the primary residence.

21          MR. TSIRELMAN:  I believe so, yes.

22          THE COURT:  Yeah.  Okay.

23          MR. TSIRELMAN:  But -- right.  But where -- in a

24  case where they asked him to pay they didn't live there

25  themselves.  There were tenants there and that's why --

37

1        THE COURT:  Yes.

2        MR. TSIRELMAN:  -- the Court -- so that's the

3  distinction.

4        THE COURT:  I understand that goes to hardship.

5        MR. TSIRELMAN:  Right.

6        THE COURT:  That it's different when it's an

7  investment property.

8        MR. TSIRELMAN:  Right.  As far as he made a lot of

9  comments about the doctor not signing this and not notarizing

10  this.  Pursuant to CPLR, at least a doctor's statement does

11  not have to be notarized.  It's enough to be affirmed and --

12        THE COURT:  Can you hold on a second?  Sorry.

13             [Pause in the proceedings.]

14        Sorry.  Go ahead.

15        MR. TSIRELMAN:  Yes.  Thank you, Your Honor.  And

16  there's a lot of speculation about the son-in-law selling,

17  I've heard for the first time, half a billion dollars right

18  now.  There's -- you know, in all the times that they've

19  complained about us not meeting our burden and showing the

20  proof they've just been making speculation after speculation,

21  statement after statement and there's no proof whatsoever

22  that --

23        THE COURT:  I think there was something submitted in

24  the record.

25        MR. NATBONY:  It was, Your Honor.

38

1          THE COURT:  Yeah.  I see that here.

2          MR. TSIRELMAN:  Right.  But, no --

3          THE COURT:  It's document 650-4?

4          MR. TSIRELMAN:  Yes.

5          THE COURT:  Okay.

6          MR. TSIRELMAN:  I saw the document but there's no

7   in -- that document doesn't show what his portion of all these

8   sales is.

9          THE COURT:  But it --

10          MR. TSIRELMAN:  He didn't --

11          THE COURT:  It's not an exact number but it's

12   listing very high end --

13          MR. TSIRELMAN:  That's the sales.

14          THE COURT:  -- properties.

15          MR. TSIRELMAN:  Right.  Yeah, but those are the

16   sales, but what is his portion from these entire sales?

17          THE COURT:  Well, I --

18          MR. TSIRELMAN:  Did he make a dollar or did he make

19   a million or ten billion?

20          THE COURT:  Do you think he made a dollar?

21          MR. TSIRELMAN:  No.  We just -- no, he made more

22   than a dollar.

23          THE COURT:  Okay.  So --

24          MR. TSIRELMAN:  But there's no -- what I'm saying is

25   there's nothing in the record to suggest how much did he

1    actually make from all these sales.

2              THE COURT:  Well, usually Realtors get six percent.

3              MR. TSIRELMAN:  Usually they do unless there's a co-

4    Realtor on --

5              THE COURT:  Then they get three percent.

6              MR. TSIRELMAN:  Correct.  Unless they are a small

7    person down the totem pole who makes -- who's an assistant.

8              THE COURT:  One -- well, he's not listed as an

9    assistant.

10             MR. TSIRELMAN:  He may not be listed as an

11   assistant.

12             THE COURT:  He's a co-founder and partner and it

13   says one of his top pro -- one of the -- on of New York City's

14   top-producing Realtors.

15             MR. TSIRELMAN:  He just started to be a partner like

16   maybe more than a year ago.

17             THE COURT:  Oh, well --

18             MR. TSIRELMAN:  He used to be -- he used to be

19   [indiscernible] worker.

20             THE COURT:  Okay.  So, Mr. Mirvis, if you want to --

21             MR. TSIRELMAN:  I'm sorry.

22             THE COURT:  -- put facts on the record you need

23   to --

24             MR. TSIRELMAN:  One sec.

25             THE COURT:  -- be under oath.

40

1          MR. TSIRELMAN:  Ah.

2          THE COURT:  Okay.  So I'm looking at what's in the

3   record and this is from the --

4          MR. TSIRELMAN:  Okay.

5          THE COURT:  -- Douglas Elliman site.  I don't know

6   if it's true or not, but it is an official site.

7          MR. TSIRELMAN:  Okay.  I'm sorry.

8          THE COURT:  And it says that he is one of New York

9   City's top-producing Realtors after spending over half a

10  decade with them.  It doesn't say when he became a partner but

11  at the moment when this was printed, which was August of 2019,

12  it says he was co-founder -- team co-founder and partner.  And

13  so I wouldn't think he's an assistant.  He may not make a full

14  six percent, but certainly one percent of 45 million dollars,

15  you know, is quite high.

16         MR. TSIRELMAN:  I agree.

17         THE COURT:  And then there's a whole list of

18  properties.  So I'm -- you're right.  We cannot say with

19  certainty what the exact dollar amount is, but I would think

20  that it's likely to get him into the top one percent possibly.

21         MR. TSIRELMAN:  I'm not sure.

22         THE COURT:  It's just an inference.  Again, in the

23  absence of actual numbers.

24         MR. TSIRELMAN:  Correct.

25         THE COURT:  The Court is allowed to make inferences.

41

1          MR. TSIRELMAN:  Correct.  And that's -- my point is

2     that they didn't bring any numbers in.

3          THE COURT:  Yeah.  Okay.

4          MR. TSIRELMAN:  As far as living and paying for the

5     house, my understanding is that the wife had a pension plan

6     and she is cashing in that pension plan in order to pay some

7     of the expenses.  And my other understanding is --

8          THE COURT:  Is that in the record?

9          MR. NATBONY:  No, Your Honor.

10          MR. TSIRELMAN:  I'm not sure because I was not the

11     attorney before.

12          THE COURT:  Okay.  But once you became the

13     attorney --

14          MR. TSIRELMAN:  I don't know if it's in the record,

15     Your Honor.

16          THE COURT:  It's not?

17          MR. NATBONY:  It's not in the record.

18          MR. TSIRELMAN:  No.

19          THE COURT:  Okay.

20          MR. TSIRELMAN:  And I don't know if this is in the

21     record or not, but my understanding is they already defaulted

22     on one of the mortgages.  Is that in the record?

23          MR. NATBONY:  No.

24          MR. TSIRELMAN:  Okay.

25          THE COURT:  I have not seen that either.

1          MR. TSIRELMAN:  Okay.  Nothing else, Your Honor.

2          THE COURT:  Okay.  All right.

3          MR. NATBONY:  The only response I would have,

4  Your -- Your Honor covered the son-in-law's issue but the

5  doctor's statement that he submitted was also not affirmed.

6  So it's not even affirmed.

7          THE COURT:  Right.  Okay.  So -- and I note that the

8  child was born after the judgment was entered.  So it's not --

9  I mean, the time that people have been living in this house

10 is -- it's a few years but it's not a long time.

11         Can you -- I don't know if this is in the record so

12 I'll just ask.  How long did Mr. and Mrs. Mirvis live in the

13 house?

14         MR. TSIRELMAN:  Since 1999, I believe.  '99 or '98.

15         THE COURT:  Okay.

16         MR. NATBONY:  I think that's right, Your Honor.

17         THE COURT:  Okay.

18         All right.  Mr. Mirvis, I've -- since you're here

19 I've invited you to sit at counsel table because you are a

20 party in this case.  You are not represented by counsel and so

21 I'll let you say what you want to say but if you're adding

22 facts that are not in the record they will not be considered

23 part of the record unless you testify to them under oath.  If

24 you do testify under oath you will also be subject to cross-

25 examination.  But if you want to say anything in terms of the

1  legal issues or anything else I'll --

2          MR. MIRVIS:  I don't want to testify on the record

3  but I can say couple things to say about my grandson.  I don't

4  know if it's -- if not --

5          THE COURT:  Yeah.  Well, I mean, at the moment we --

6  I have what has been submitted.  We've been careful to protect

7  your grandson's privacy by not using names and things like

8  that.

9          MR. MIRVIS:  Okay.

10         THE COURT:  If you want to say something about him

11  I'll give you space to say it.  We've been given a piece of

12  paper and I don't know since that's not your --

13         MR. MIRVIS:  This is the doctor -- so this is the

14  doctor for --

15         UNIDENTIFIED VOICE:  Your Honor, this was admitted

16  Friday under seal.  It is just so that he can see --

17         THE COURT:  What was submitted.

18         UNIDENTIFIED VOICE:  -- what was submitted.

19         THE COURT:  Okay.

20         MR. MIRVIS:  Yeah.  I just want to say -- I want to

21  say about my grandson.  I mean, he's four years -- yesterday

22  he got four years and eight months.  He didn't say a word.

23  He, if you called -- his name is S.  If you called his name,

24  let's say his parents call him S. he make no reaction.  Or to

25  think he's norm -- this is normal.  I mean, 100 percent it's

44

1  not normal.  He's -- at night he's not sleep -- I mean, he's a

2  sick kid and why doctor not testify by law -- I mean, legally,

3  I mean, they're not notarized because he said, "I not notarize

4  any papers.  I'm busy."  He got very busy practice.  This is

5  the doctor who from day one he's doctor for S.  And this is a

6  ba -- our -- I mean, for me main thing can -- in this li -- in

7  this life right now this is the -- this baby.  Nobody else.

8          And same thing for all our members of our family.

9  And this is what has [indiscernible] us a lot and this is --

10  my daughter got only one baby so far and she's 35 years old.

11  And, I mean, she's very depressed and they are -- I'm sure you

12  can understand that.  And this is what I want to say.

13          THE COURT:  Okay.  Thank you.  And certainly I

14  appreciate that that is dis -- distressing for a family.  The

15  issue is what happens when the house is sold and --

16          MR. MIRVIS:  This is probably because the household

17  because he's always in the house.  I mean, only he going to

18  the special school five days a week, Monday through Friday,

19  until 2 o'clock; 2:20 it's finished his school day.  And only

20  lately, last couple month, he was going a little bit more

21  happy because he was crying all the time.  I mean, it's a real

22  part of our life.  I mean, it's -- this is what we deal right

23  now.  And the rest of the things for us it's important, of

24  course, but this is most important to us in our life.

25          THE COURT:  Okay.  Thank you.  Anything else?

45

1          MR. MIRVIS:  No.

2          THE COURT:  Okay.

3          MR. NATBONY:  Nothing else, Your Honor.

4          THE COURT:  Anything from either of the parties?

5          MR. TSIRELMAN:  No, Your Honor.  Thank you.

6          MR. NATBONY:  No, Your Honor.

7          THE COURT:  All right.  So I take it that the

8   request is kind of an all or nothing.  It's the sale of the

9   whole house.  You're not asking for half the house to be sold.

10  I don't know if -- I don't know how that would be practicable

11  so I'm just asking the question in case you have a thought.

12          MR. NATBONY:  Well, I -- I think that's right, Your

13  Honor.  I think -- the only question that I think

14  Mr. Tsirelman really is -- exists is who ends up getting part

15  of the proceeds, right?  I mean, you know, I -- I mean, our

16  position is we're entitled to all of the proceeds except for

17  the homestead exemption, you know, of the 175.  But I -- I'm

18  not sure how you can sell half a house.  I agree with you.

19          THE COURT:  Yeah.  That's why I was wondering.  So

20  if the Court agrees with you and says Mrs. Mirvis forfeits her

21  half of the house because she engaged in a fraudulent

22  conveyance then the house gets -- the whole house gets sold.

23  The family may or may not get evicted depending on the new

24  owner and you get the proceeds after a subtraction of all of

25  those other things, the mortgage and the homestead exemption.

1           MR. NATBONY:  Yes, Your Honor.

2           THE COURT:  And if the Court rules the other way and

3    says Mrs. Mirvis didn't do anything wrong, she gets to keep

4    her portion of it.  Then the house can't get sold because you

5    can't sell half a house.

6           MR. NATBONY:  Well, I --

7           THE COURT:  And so you'd have to wait for the levy

8    and the lien --

9           MR. NATBONY:  No.  I would --

10          THE COURT:  No?

11          MR. NATBONY:  I would suggest, Your Honor, that the

12   house can get sold.

13          THE COURT:  Okay.

14          MR. NATBONY:  And if there is -- I mean, again we

15   would not agree that that result should occur.

16          THE COURT:  I agree.

17          MR. NATBONY:  But if that's -- if Your Honor --

18          THE COURT:  I'm just trying to think through --

19          MR. NATBONY:  -- goes that way --

20          THE COURT:  Yeah.

21          MR. NATBONY:  -- practically, I would think that the

22   whole house could still be sold.  Allstate would get whatever

23   share it's get -- it gets and Mrs. Mirvis would get her share

24   of the proceeds.

25          THE COURT:  How would that work?  Well, I'm just --

47

1   the practicality of it has my head spinning.  That's why I

2   was -- I -- you know, when I originally read the papers that's

3   what I thought you were asking for.  Then I stopped in my

4   tracks --

5         MR. NATBONY:  Yeah.

6         THE COURT:  -- and I thought, wait, hold on.  How

7   does that work?  And then I --

8         MR. NATBONY:  Well, see, I think -- I think this is

9   the whole point of why Clarkson and Hallmark say that, you

10  know, this is why you have to terminate the tenancy by the

11  entirety because otherwise, I mean, I guess if Your Honor goes

12  that route and doesn't terminate it and, you know, Mr. Mirvis,

13  not wishing that on anyone, but if Mirvis were to pass before

14  his wife then essentially Allstate is out of luck and the

15  fraudulent scheme that was attempted to be put into place

16  essentially succeeds, you know, through other means.  So --

17        THE COURT:  Well, it's not through other means.

18  What happens then is it is as if --

19        MR. NATBONY:  Right.  But it's --

20        THE COURT:  -- they never tried the fraudulent

21  conveyance.

22        MR. NATBONY:  That's right.  That's right.  But, I

23  mean, the --

24        THE COURT:  Right.  So they are not really better

25  off for having tried it.  Do you see what I'm saying?

48

```
 1            MR. NATBONY:  I --
 2            THE COURT:  If they had -- because if they hadn't
 3    tried to convey this to their daughter in the first instance
 4    we wouldn't be having this discussion today because the law
 5    would say that Mrs. Mirvis gets to keep her half of the house.
 6    Full stop.  All right.  I mean, maybe we would be having the
 7    conversation but just on how do you sell half a house?  And
 8    so --
 9            MR. NATBONY:  That's what I said.
10            THE COURT:  Yeah.  So I'm just --
11            MR. NATBONY:  Yeah.  I mean, I still --
12            THE COURT:  Yeah.
13            MR. NATBONY:  I'm sorry, Your Honor.  I did not mean
14    to --
15            THE COURT:  I was just trying through the practical
16    parts.  I thought maybe I was missing something.
17            MR. NATBONY:  No.  But I --
18            THE COURT:  And so it has to be an all or nothing.
19            MR. NATBONY:  No.  I mean, I still think there is --
20    I mean, I'm not sure what is the stop to selling the entire
21    house and giving to Mrs. Mirvis the portion that is her
22    interest.  I mean, otherwise --
23            THE COURT:  Well, but you couldn't do -- could you
24    do that if -- let's rewind the clock and do a --
25            MR. NATBONY:  I would suggest --
```

49

1          THE COURT:  -- account of factual history.  Right.
2   So let's --

3          MR. NATBONY:  Okay.

4          THE COURT:  -- do account of factual exercise.
5   Suppose -- the record is undisputed that Mr. and Mrs. Mirvis
6   have lived in this house since 1999 and they are co-owners of
7   the house, right?  And so let's assume -- and let's assume
8   that they just kept doing that.  All right.  And let's assume
9   they didn't try to do any of this funny business with the
10  daughter and so giving her the house for $10.  And so let's
11  assume they're just living there peacefully and you've got
12  your judgment and you want to collect on your judgment and
13  you -- you're having trouble finding bank accounts and other
14  things.  Okay.  So could you then come to the Court and ask
15  the Court to sell the entire house even though Mrs. Mirvis has
16  the -- her interest?

17         MR. NATBONY:  Okay.  Two points on that.  First of
18  all, I would think that the CPLR -- I think it's 5240 or just
19  off the top of my head -- just as it gives discretion that
20  Mr. Tsirelman has suggested you exercise, would give you
21  discretion to faction a remedy but would allow that.

22         Secondly, if what Your Honor is suggesting would be
23  true then in essence fraudsters can insulate, you know, the
24  ability to execute on property merely by entering into
25  tenancies by the entirety.  And I --

50

1      THE COURT:  Only if they had extreme foresight and

2  did something 20 years ago.

3      MR. NATBONY:  Well, but the point --

4      THE COURT:  Right?

5      MR. NATBONY:  But the point is that that would

6  essentially say the tendency by the entireties, you know, as a

7  *per se* rule, you know, are off base.

8      THE COURT:  But that --

9      MR. NATBONY:  But I don't think that's --

10     THE COURT:  That may be in certain circumstances,

11 which is the point of tendencies in the entirety, right?

12     MR. NATBONY:  Right.  But I --

13     THE COURT:  For marital homes.  I'm just thinking

14 out loud.

15     MR. NATBONY:  No, no, no.  I hear you.

16     THE COURT:  Because of -- just trying to figure out

17 where the fault lines are here, right?  So if they hadn't

18 engaged in the fraudulent conveyance/attempt they may well be

19 protected or not because the only reason -- the only way we

20 get Mrs. Mirvis's share is because you said she engaged in the

21 fraud -- in the fraudulent conveyance.

22     MR. NATBONY:  That's correct.

23     THE COURT:  Right.  So if she hadn't, the reverse

24 may well be true or not.  If she hadn't, then life would go on

25 for them.

51

1          MR. NATBONY:  The only point I would reiterate again

2   is I still think that the CPLR provision --

3          THE COURT:  Right.

4          MR. NATBONY:  -- would give Your Honor discretion to

5   find a remedy --

6          THE COURT:  To fi -- to -- okay.

7          MR. NATBONY:  -- to protect the judgment creditor as

8   well.

9          THE COURT:  Right.  And that's what I'm asking for

10  some help in because I don't --

11         MR. NATBONY:  Okay.

12         THE COURT:  I don't know what that remedy would look

13  like and that's why I -- I've got this binary --

14         MR. NATBONY:  Yeah.  No, I hear you.

15         THE COURT:  -- choice in my head, which is that it's

16  an all or nothing.  If there's a different way I'd like to

17  hear it.  I'm not saying that's how I'm going to rule.  I just

18  want to make sure I'm thinking through all the options because

19  all or nothing --

20         MR. NATBONY:  May I have a moment?

21         THE COURT:  Sure.

22                [Pause in the proceedings.]

23         MR. NATBONY:  So I appreciate Your Honor's

24  [indiscernible] and I'm not sure that I have an immediate

25  solution.

52

1          THE COURT:  Okay.

2          MR. NATBONY:  I can try to be creative and submit

3    something to Your Honor if you wanted in a couple of days.

4          THE COURT:  Yeah.  I -- yeah, you don't need to be

5    creative.  I'm just --

6          MR. NATBONY:  I mean, I'm just --

7          THE COURT:  -- wondering if I'm missing something.

8          MR. NATBONY:  Right.  I mean, I -- so that -- that I

9    think is where I am.  I'm not sure I have something off the

10   top of my head that would help you in that regard.

11         THE COURT:  Okay.  All right.  Thank you.

12         So likewise, Mr. Tsirelman, if -- do you think it's

13   an all-or-nothing proposition or do you think there's

14   something that can be done halfway because your -- your

15   clients may have an argument that they're not the judgment

16   debtors but Mr. Mirvis certainly is, you know.  His --

17         MR. TSIRELMAN:  Correct, Your Honor.

18         THE COURT:  His assets are subject to collection and

19   so I wonder if you think -- if you can think of a way that

20   enables the judgment creditors to get what the Court -- what

21   the law says they're entitled to and protect your clients

22   nevertheless.

23         MR. TSIRELMAN:  Your Honor, the law in New York

24   is -- there is a possibility and I've mentioned that before in

25   my opening arguments.  But to be frank, what the law allows

1   the creditor is really not worth a lot so they can -- there is

2   an option.  They can sell his present posse -- it's called

3   present possessory interest and right to survivorship.  And

4   the new purchaser would become a tenant in common.  So the

5   tenant -- the tenancy by the entirety would be extinguished

6   and the purchaser would become a tenant in common with the

7   wife.  They'd both be tenants in common.  But because that

8   interest itself really doesn't have a lot of value, to be

9   frank, so --

10              THE COURT:  Who would want to have that?

11              MR. TSIRELMAN:  Right.

12              THE COURT:  Right.

13              MR. TSIRELMAN:  Right.  So -- and this is why the

14   courts have fashioned the remedies pursuant to CPLR 5240 and

15   said you already have -- the law protects you in a lien on the

16   judgment on the house and should the wife predecease the

17   husband you can have the whole thing.

18              THE COURT:  Okay.

19              MR. NATBONY:  We were thinking, Your Honor,

20   somewhere along the same line as Mister --

21              MR. TSIRELMAN:  Right.

22              MR. NATBONY:  -- Tsirelman was.  If there is always

23   the possibility of actually selling the half interest.

24              THE COURT:  Well, what -- what's the market for

25   that?

54

1          MR. NATBONY:  I -- I'm not -- I mean, I -- you know,

2    I -- you know, I mean, I suppose if -- you know, if the desire

3    here is to keep the family intact, then I guess there are some

4    family members that may want to purchase that half.  I mean,

5    you've got the high-end real estate --

6          THE COURT:  Well, so let's play this out.

7          MR. NATBONY:  Okay.  But I'm just --

8          THE COURT:  Okay.  So -- and so --

9          MR. NATBONY:  I'm trying to be creative here --

10         THE COURT:  Yeah.  So if --

11         MR. NATBONY:  -- as Your Honor has suggested.

12         THE COURT:  If that were to happen --

13         MR. NATBONY:  Yeah.

14         THE COURT:  -- and a family member came forward,

15   it's an auction so highest bidder wins, right?  So let's

16   assume there are no other bidders.  So it's a family member

17   that buys.  Let's assume that the value is super low then what

18   do you get?

19         MR. NATBONY:  Yeah.  I -- no, I hear you, Your

20   Honor, which is again why I think that given the history here

21   and given continued efforts to evade payment of this judgment

22   that it should be an all as opposed to a nothing decision.

23   And if you go back and look again at some of the 5240 cases

24   that Mr. Tsirelman relies on, you know, I spoke about some of

25   them being in -- included in agreement to pay, you know, going

1  forward, others that showed real hardship, which has not been

2  shown here.  Another group of cases that were out there were

3  when the creditor had not in the past taken actions to enforce

4  against the judgment so that it was a huge surprise, right, to

5  the potential debtor, you know, and a situation they could not

6  have anticipated.

7          This is a situation that they certainly should have

8  anticipated and for -- and Allstate certainly has not been in

9  the position where it has lacked enforcement activity.  It has

10 done everything it humanly can, or corporate entities that

11 can, to move this thing forward.

12         THE COURT:  Is there anything on the record as to

13 when Tatyana and her family moved into the house?

14         MR. NATBONY:  One second.

15                 [Pause in the proceedings.]

16         I'm looking, Your Honor.  I don't see a specific

17 date.  Yeah.  And by the way, just so that Your Honor knows,

18 in this document 459-1 that I referred --

19         THE COURT:  Yes.

20         MR. NATBONY:  -- Tatyana also testified that their

21 family income -- and admittedly it goes back a few years --

22 was well into the high six figures.

23         THE COURT:  Okay.

24         MR. NATBONY:  You know, in 2014, 2015.  So they

25 clearly were making more than a dollar.

56

1          THE COURT:  Okay.

2          MR. TSIRELMAN:  Your Honor --

3          THE COURT:  Yes.

4          MR. TSIRELMAN:  That's hearsay evidence but

5   Mr. Mirvis said that -- that Tatyana moved in in 1999 with

6   them when they bought the house.

7          THE COURT:  But there's no evidence of that?

8          MR. TSIRELMAN:  Correct.  That's fine.  I --

9          THE COURT:  Yes.

10          MR. TSIRELMAN:  I prefaced that with a hearsay

11  exception.

12          THE COURT:  To be given whatever weight by the

13  Court, if any?

14          MR. TSIRELMAN:  Correct.

15          THE COURT:  Okay.  All right.  Is there anything

16  else anybody wants to add?

17          MR. NATBONY:  No, Your Honor.

18          MR. TSIRELMAN:  No, Your Honor.  Thank you.

19          THE COURT:  Mr. Mirvis, anything from you?

20          MR. MIRVIS:  No, Your Honor.

21          THE COURT:  Okay.  Hold on a second, so I didn't

22  miss anything.

23                    [Pause in the proceedings.]

24          All right.  Great.  So I will take this under

25  advisement and issue a written decision.

57

1          MR. NATBONY:  Thank you, Your Honor.

2          THE COURT:  All right.  Thank you very much.

3          MR. TSIRELMAN:  Thank you, Your Honor.

4             (Proceedings concluded at 12:45 p.m.)

5                       *  *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

1          I certify that the foregoing is a court transcript

2 from an electronic sound recording of the proceedings in the

3 above-entitled matter.

4

5

6 _____

7          Ruth Ann Hager, C.E.T.**D-641

8 Dated:   February 18, 2020

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25